UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA


UNITED STATES OF AMERICA,          )   07-CR-00550-RBS-3
                                   )
                                   )
     vs.                           )
                                   )
KABONI SAVAGE,                     )
                                   )   Philadelphia, PA
          Defendant.               )   October 22, 2010
                                   )   10:23 a.m.

                 TRANSCRIPT OF MOTION HEARING
          BEFORE THE HONORABLE R. BARCLAY SURRICK
                UNITED STATES DISTRICT JUDGE


APPEARANCES:


For the Government:        DAVID E. TROYER, ESQUIRE
                           CHRISTINE SYKES, ESQUIRE
                           JOHN GALLAGHER, ESQUIRE
                           U.S. ATTORNEY'S OFFICE
                           615 Chestnut Street - Suite 1250
                           Philadelphia, PA   19106


For the Defendant:         TIMOTHY J. SULLIVAN, ESQUIRE
                           BRENNAN, SULLIVAN, McKENNA, LLP
                           6305 Ivy Lane - Suite 700
                           Greenbelt, MD   20770

                           CHRISTIAN J. HOEY, ESQUIRE
                           RUBINO & HOEY, LLC
                           50 Darby Road
                           Paoli, PA   19301


Audio Operator:            MICHAEL FINNEY


Transcribed by:            DIANA DOMAN TRANSCRIBING
                           P.O. Box 129
                           Gibbsboro, New Jersey  08026-0129
                           Office:   (856) 435-7172
                           Fax:      (856) 435-7124
                           E-mail:   dianadoman@comcast.net


Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

1                         I N D E X

2

3    WITNESSES:              DIRECT   CROSS   REDIRECT   RECROSS

4    FOR THE DEFENDANT:

5      KABONI SAVAGE            8(hoe)  53(tro)

6    FOR THE GOVERNMENT:

7      KEVIN LEWIS            82(tro)

8

9    EXHIBITS:                                      ID.   EV.

10   FOR THE DEFENDANT:

11   D-1  10/8/10 Letter from Warren                40    ---

12   D-2  10/1/10 Letter from Hoey's Office         40    ---

13   D-3  9/3/10 Letter from Sullivan's Office      44    ---

14   D-4  Collection of Letters Received by Defendant  44    ---

15

16   CLOSING ARGUMENT:

17        By Mr. Hoey                                      89

18        By Mr. Troyer                                    99

19

20

21

22

23

24

25

26

1          (The following was heard in open court at 10:23:54

2     a.m.)

3          THE COURT:  Okay.  We have the case of United States

4     versus Kaboni Savage.  It's No. 7-550-3.

5          Counsel, please identify yourselves for the record.

6          MR. TROYER:  Good morning, Your Honor.  David

7     Troyer, Assistant U.S. Attorney, for the Government, and I'm

8     accompanied, of course, by Christine Sykes, also an Assistant

9     U.S. Attorney, FBI Special Agent Kevin Lewis.

10          I would also like to introduce the Court to a new

11     member of the trial team, John Gallagher, who's an assistant

12     U.S. Attorney, as well.  He'll be working on the case with us.

13          MR. GALLAGHER:  Good morning, Your Honor.

14          THE COURT:  Good morning.

15          MS. SYKES:  Good morning, Your Honor.

16          MR. HOEY:  Good morning, sir.  Christian Hoey, on

17     behalf of the defendant, Kaboni Savage.

18          MR. SULLIVAN:  Good morning Your Honor.  Tim

19     Sullivan, on behalf of Mr. Savage, who is present.

20          THE COURT:  All right.  Counsel, you received a copy

21     of the memorandum and order that dealt with the issue that was

22     raised at the last hearing.  We're here this morning to deal

23     with those areas that the Court set forth and are appropriate

24     for the Court's consideration.

25          Mr. Hoey, how do you intend to proceed on this

1    matter?

2             MR. HOEY:  We do intend to proceed, Your Honor, by

3    presenting some testimony this morning and oral argument

4    following the receipt of that evidence.

5             THE COURT:  All right.  And what testimony do you

6    intend to present?

7             MR. HOEY:  Your Honor, we intend to call Mr. Savage

8    to the stand to outline certain issues pertinent to the

9    motions that we filed.  We have had an opportunity to discuss

10   that with him at length this morning.  Mr. Sullivan and I met

11   with him and discussed these issues with him.  In lieu of

12   submitting an affidavit he wishes to address the Court

13   directly with these ideas.

14            THE COURT:  Did you discuss with him the fact that

15   if he takes the witness stand and testifies, anything that he

16   says during the course of that testimony can be used at trial

17   in this matter?

18            MR. HOEY:  We did, Your Honor.  We discussed that

19   this is obviously a court of record.  He'll be placed under

20   oath, and those things that he says today will be recorded for

21   permanency's sake and reduced to a transcript perhaps at a

22   later date.  He knows and understands that that is a -- an

23   issue that he faces today, subject to cross-examination, of

24   course, and he wishes to proceed.

25            THE COURT:  It was your advice to -- that he proceed

1    by way of affidavit?

2              MR. HOEY:  By way of background on that issue, Your

3    Honor, Mr. Sullivan and I drafted a lengthy affidavit that

4    contains most of the facts.  It's 23 paragraphs in length,

5    with some modifications that we made downstairs moments ago,

6    that contain really the pertinent facts that we would ask the

7    Court to consider.

8              There are, I guess, portions of this affidavit that

9    Mr. Kabani Savage would like to expand on by way of live

10   testimony.

11             We did propose this as a method and means of

12   presenting the evidence to the Court, upon which it could make

13   its decision without live testimony.  Mr. Savage acknowledges

14   that he has the right to do that.

15             The Government has in fact agreed to accept the

16   affidavit, subject to offering its own evidence, of course,

17   and rebutting anything in it they wish to rebut, and Mr.

18   Savage has chosen not to pursue that route, Your Honor.

19             THE COURT:  All right.  Mr. Savage, you just heard

20   what Mr. Hoey said?

21             THE DEFENDANT:  Yes.

22             THE COURT:  You understand that you do not have to

23   testify in this matter, and that if you choose to testify,

24   anything that you say can be used against you at a later date?

25   You understand that?

Colloquy                                                                    6

1              THE WITNESS:  Yes.

2              THE COURT:  You understand that you will be on the

3    witness stand.  You will be questioned by your attorney, and

4    then the Assistant United States Attorney will have the

5    opportunity to cross examine you.  You understand that.

6              THE DEFENDANT:  Yes.

7              THE COURT:  Your attorneys have indicated that they

8    have prepared an affidavit which would cover the subject

9    matter that we're dealing with here, but that you have chosen

10   not to pursue an affidavit; rather, you'd like to testify

11   yourself, is that correct?

12             THE DEFENDANT:  Yes.

13             THE COURT:  And you do that, knowing that whatever

14   you say during the course of your testimony can be used

15   against you.

16             THE DEFENDANT:  Yes.

17             THE COURT:  Do you have any questions about what

18   you're doing, Mr. Savage?

19             THE DEFENDANT:  No.

20             THE COURT:  All right.  Counsel, we'll hear whatever

21   you want to present.

22             MR. HOEY:  One moment, please, sir.

23             THE COURT:  Yes, indeed.

24             (Pause in proceedings.)

25             MR. SULLIVAN:  Yeah, just one preliminary matter.

1    The marshals have deemed it necessary, I guess, to have Mr.

2    Savage shackled while he's in court.  I don't know the reason

3    why, and if he's going to testify, have to look at documents,

4    I'd object to Mr. Savage being -- unless the Court has

5    information that the defense doesn't have or the Government

6    has, I don't see the necessity that -- even in a non-jury

7    proceeding today that he needs to be shackled while he's in

8    court.  He's in a -- three pieces, shackles on his feet, and

9    his hands are cuffed.

10              THE COURT:  Marshals.

11              U.S. MARSHAL LEWIS:  We can have one, so he can have

12   use of one arm, one hand.

13              THE COURT:  Go ahead.

14              MR. HOEY:  Thank you.

15              U.S. MARSHAL LEWIS:  Bring him to the --

16              MR. SULLIVAN:  Thank you, Your Honor.

17              U.S. MARSHAL LEWIS:  -- witness stand, Your Honor?

18              THE COURT:  Excuse me?

19              U.S. MARSHAL LEWIS:  We going to bring him up to the

20   witness stand?

21              THE COURT:  Certainly.

22              (Pause in proceedings.)

23              COURTROOM DEPUTY:  Mr. Savage, if you can please

24   remain standing and raise your right hand.

25                   KABONI SAVAGE, DEFENDANT, SWORN

1          COURTROOM DEPUTY:  Please be seated.

2          MR. HOEY:  May I inquire, Your Honor?

3          THE COURT:  Yes, indeed.

4                      DIRECT EXAMINATION

5   BY MR. HOEY:

6   Q    Sir, can you state your name for the record and spell

7   your last name, please?

8   A    Kaboni Savage, S-A-V-A-G-E.

9   Q    Okay.  Where are you being housed literally today as --

10  as we speak?

11  A    FDC.

12  Q    Okay.  Can you tell the Court what conditions you're

13  housed in at the FDC?

14       First -- first of all, when did you arrive there, and

15  where did you go, and where did you stay?

16  A    I arrived there approximately 11:00 o'clock yesterday,

17  a.m., and sent straight to a psych cell, suicide cell.

18  Q    Okay.  Is the FDC the Federal Detention Center --

19  A    Yes.

20  Q    -- in Philadelphia?

21  A    Yes.

22  Q    Can you tell the Court whether the cell that you were

23  housed in yesterday has running water or an operative toilet?

24  A    None, neither.

25  Q    Were you housed in that cell throughout the day

1    yesterday, into the evening and through this morning?

2    A     Yes.

3    Q     Is that a cell that you had been in before?

4    A     Since -- they've been putting me in that cell since, I

5    believe, February 18th of this year.  The lights stay on 24

6    hours, two bright lights.

7    Q     You had been back to the FDC from the Metropolitan

8    Correctional Center in New York on occasion in 2010, is that

9    correct?

10   A     Yes.

11   Q     And when you returned to the FDC in Philadelphia, were

12   you housed in the cell that you've jus described?

13   A     Not initially.  I was on the second floor.   The held me

14   in the second floor.  It's playing country music.  I had a

15   situation.  I addressed the Court.

16        They were playing country music necessary for 24 hours.

17   Due to -- I asked the captain to stop playing the music, and

18   he said he couldn't.  So I asked him again to change the

19   station.

20             It's country music.  I don't listen to country

21   music, and he laughed and joked and said, "I forgot niggers

22   can't square dance."  It was a joke to him.  Every since I

23   addressed that in front of the Court, small -- I've never been

24   put back in that cell, coincidentally.

25   Q     Have you otherwise been housed at the FDC in the cell

1    that you've just described?

2    A    Yes, every since that day.  Every time I came back to

3    Court from MCC, since then I've been in this psych cell.

4    Q    You indicated that the light is on in your cell.  Is that

5    light on 24 hours a day?

6    A    Continuously, 24 hours a day.

7    Q    Is it a dim light, a bright light, a moderate light?

8    A    An illuminated light.  It's bright.  I'm sleeping next to

9    the sun.

10   Q    Is it preventing you from sleeping or interacting in a

11   normal manner?

12   A    No question.  How can I sleep when the light stays on

13   like that constantly?

14   Q    I want to talk to you now about your housing arrangements

15   prior to getting here yesterday.

16        For the last year or so have you been housed at the

17   Metropolitan Correctional Center with the MCC in New York?

18   A    For the last approximately 16 months.

19   Q    Are you subject to special administrative measures

20   confining your movement in that facility?

21   A    Yes.

22   Q    And have you been so confined under those measures since

23   your arrival there 16 months ago?

24   A    Yes.

25   Q    Moving backward, if you will, to a procedural history.

1              MR. HOEY:  And if I may be permitted some leeway in

2    cross examining or leading the witness, Your Honor --

3              THE COURT:  Yes, you may.

4              MR. HOEY:  -- through some of the procedural

5    history?

6              THE COURT:  Yes, indeed.

7    BY MR. HOEY:

8    Q    Between April 13 of 2004 and October 1 of 2004 were you

9    sequestered from the general population in the special housing

10   unit here at the FDC?

11   A    Yes.

12   Q    Were you confined to your cell for 23 hours per day in

13   that particular unit during that particular time?

14   A    Give or take, yes.

15   Q    Between -- excuse me.  On February 4 of 2005 were you

16   moved to the housing unit on the second floor of the FDC and

17   confined to your cell 24 hours per day?

18   A    Yes.

19   Q    In December of 2005 were you transported to the United

20   States Penitentiary at Lewisburg, Pennsylvania?

21   A    Yes.

22   Q    Between September 22 of 2005 and April of 2006 were you

23   housed at USP, Lewisburg, and subjected to 23-hour per day

24   confinement in your cell?

25   A    Yes, I was placed in a transient unit.

Savage - Direct (hoe)                                                 12

1    Q      Were you provided any recreational time during that
2    period?
3    A      Sporadically, but general population, shoot, they get
4    preference, the rec, first, then if they have time, the
5    transient unit can go, but we're not allowed to go to the law
6    library, anything, no visits, anything.   I'm on a transient
7    unit so it's different requirements.
8    Q      What is a transient unit?
9    A      A unit that they place you on, allegedly waiting for you
10   to be transferred to another facility.
11   Q      And during the time that you were in that transfer unit
12   between September 22 of '05 and April of '06 were you
13   permitted any social visits?
14   A      None.   Not -- they're not allowed when you're in transit.
15   Q      How many telephone calls or social telephone calls were
16   you provided to your family during that period of time?
17   A      Was there six months, little over six months.   Maybe two.
18   Q      Were you provided any access to the law library during
19   that period of time?
20   A      None.   It's prohibited --
21   Q      Let me ask --
22   A      -- while you're in transit.
23   Q      Let me ask you.   The period of December 22 of '05 to
24   April of 2006, was that a period of time following your
25   conviction here in Federal Court?

1    A    Yes, after conviction.

2    Q    Did you require --

3    A    Three days after the conviction.

4    Q    What would you have used the law library for during that

5    period of time?

6    A    Post-conviction, sentencing, drug amount.  You name it,

7    as far as anything pertaining to my conviction.  Filing post-

8    acquittal motions, drug amount.  Everything that pertains to

9    the process of post-conviction.

10   Q    And --

11   A    Working on my appeal.

12   Q    Had you been sentenced while you were at Lewisburg?

13   A    No.

14   Q    Were you eventually brought back to the FDC on April 21

15   of 2006?

16   A    Yes.

17   Q    Were you returned from Lewisburg and housed in the

18   special housing unit or SHU in the FDC?

19   A    Yeah, I was placed in the SHU for a month till I was

20   designated to Atlanta.

21   Q    Were you subjected to 23 hours of lookdown per day during

22   that period?

23   A    Twenty-four.  They didn't let me out at all during that

24   month.

25   Q    How many -- strike that.

Savage - Direct (hoe)                                    14

1      How long did you remain here when you were brought back

2    on the 21st of April?

3    A    I believe I was here for a month, little over a month.  I

4    went to -- I got to Atlanta, I believe May 25th, so a little

5    over a month.

6    Q    How many social visits did you have during that period of

7    time?

8    A    I was allowed to have, believe one social visit

9    without -- except for my sister.

10   Q    Did you have any telephone use privilege?

11   A    None.

12   Q    After you were sentenced on April 27, were you eventually

13   transferred to USP Atlanta, Georgia?

14   A    Yes.

15   Q    Can you tell the Court where you were housed when you

16   arrived at that facility, please?

17   A    General population.

18   Q    Had you been sentenced?

19   A    Yes, sentenced.

20   Q    Had you been indicted in the new case for which you are

21   about to stand trial?

22   A    No.

23   Q    When you say general population, can you explain to the

24   Court whether or not you had a cell mate?

25   A    Yes, I had a cell mate, access to law library, gym, work,

1    wherever you wanted to work at, facilities, unit call, the

2    kitchen, law library, workout, access to work at commissary,

3    visits during the week or on weekends, goes by a point system.

4    You're allowed to have 25 people on your visiting list, had a

5    few visits during that eight-month time I spent from my

6    family, my sister, that they won't let me speak to now, but my

7    mother, friends.

8         That was in population.  I had access to every --

9    everything everybody else had access to.

10   Q    Can you tell the Court how many write-ups or infractions

11   you were cited for during the period of time that you were in

12   general population at USP Atlanta?

13   A    None.

14   Q    Can you tell the Court what advantages you took of the

15   educational system at USP Atlanta?

16   A    I had the -- the Judge required me in my sentencing to

17   get my GED.  So they automatically put you in the GED program

18   when they see that in your file.

19         So they -- they signed me up, but I took a pre-test

20   and the class was crowded, so they told me -- they basically

21   knew I passed the GED.  I didn't need to stay in the class.

22   Other people could utilize it.

23         So they put me in HVAC class, and you had to wait five to

24   six months to get a date to take the GED test 'cause they do

25   it periodically, annually.  I don't -- I don't know how it

1    goes, but my next schedule was six months.  So they put me

2    straight in HVAC class.  I was in HVAC class for the last four

3    months while I was there.

4    Q    Did you -- the HVAC, being the heating, ventilation and

5    air conditioning class?

6    A    Yes.

7    Q    Were you also working in the prison kitchen while housed

8    in general population?

9    A    Yes.

10   Q    If you know, sir, is that a maximum security, medium

11   security or a low security?

12   A    It's a medium security now.  They just still use the old

13   name, penitentiary.

14   Q    On or about February 7, 2007 were you then committed to

15   the terms and conditions of the SAMS or special administrative

16   measures at the prison in Atlanta?

17   A    Yes.

18   Q    Did you have any ability to contest or an opportunity to

19   contest the imposition of those sanctions?

20   A    No, I was took -- took straight to the SHU.

21   Q    Were you afforded a -- a hearing?

22   A    No DHO hearing, none of the above, straight to -- they

23   got a side pocket.  I was sequestered from the regular

24   population in the SHU.

25   Q    Could you tell the Court after February 7, 2007 and

1   between -- between that date and October 28 of 2007 did you

2   remain housed at USP Atlanta?

3   A    Yes, for approximately nine months.

4   Q    Were you subjected to the SAMS confinement restrictions?

5   A    Yes, no visits, same exact thing, no papers.

6   Q    What I'd like you to do is tell the Judge what

7   restrictions you had during that period of time under the

8   SAMS.  How long were you in your cell each day?

9   A    Well, thankfully, Atlanta, the did give me my recreation.

10  I can go to the yard with everybody else, but I had to have a

11  cell alone, been working on the cell alone situation, so I did

12  get to the yard basically every day there, five days a week,

13  but I couldn't get newspapers, and if I did, editorials was

14  took out, the iPads.

15        They had to be two weeks or a month later.  They

16  prohibited me from getting one particular newspaper cause they

17  said it was -- it promoted violence.

18        I wasn't -- wasn't allowed certain books.  My family

19  would send me books.  I would get a rejection notice, no

20  apparent reason.

21        I got a phone call maybe three times under those

22  conditions.  For the first five or six months under those

23  conditions I didn't receive a phone call, if I remember

24  correctly, 'cause they didn't know how to set it up.

25        SAMS was new to them.  They -- they didn't know why I was

Savage - Direct (hoe)                                18

1    under it.  The just told me to file my administrative remedy

2    process, so that's the route I took.

3    Q    When you say telephone calls -- by the way, are they

4    monitored calls?  In other words, is someone listening into

5    your telephone call?

6    A    A few people, absolutely.

7    Q    Okay.  Your -- your social visits that you discussed,

8    literally, from here to the end of this discussion today, are

9    they monitored social visits?

10   A    Yes.

11   Q    What do you mean by "monitored?"

12   A    Agent Lewis or -- forget the other guy's name, they

13   monitor it downstairs in MCC.  The officers upstairs monitor

14   it, and it's a camera in the cell that monitors it that

15   somebody else monitors.

16   Q    So they listen to what you're saying to your social

17   visitors.

18   A    Absolutely.

19   Q    Now, at some point in time you were transferred out of

20   U.S. -- transferred out of USP Atlanta after October 28 of

21   '07, is that right?

22   A    Yes.

23   Q    Where did you go next?

24   A    The ADX.  Well, I went to Oklahoma first in the transit,

25   but I stayed there at night and went straight to Colorado's

Savage - Direct (hoe)                                      19

1    ADX.

2    Q     Did you eventually arrive at the Administrative Maximum

3    Prison at Florence, Colorado, known as ADX Colorado?

4    A     Yes.

5    Q     When did you get there?

6    A     Believe it was October 26th or 7th of that year.

7    Q     2007?

8    A     Yes.

9    Q     Can you tell the Court whether you were subjected to the

10   special administrative measures at that institution?

11   A     Yes, and I was put in a -- a quarantine cell in there.

12   Q     What's a quarantine cell?

13   A     That cell is a -- it's -- it's different from population

14   in ADX.  Those cells have cameras in it.  The light stays on

15   24 hours a day, and I'm not allowed a shower curtain.

16   Q     When you say a light, is that in the cell or the hallway?

17   A     In the cell.

18   Q     I see.  Is there -- was there any type of use of the yard

19   or recreation time at ADX Colorado?

20   A     Not while you're in quarantine.

21   Q     How long were you in that cell?

22   A     Probably a month.

23   Q     Did you have any social visits?

24   A     None.

25   Q     Any telephone calls?

1    A      None.

2    Q      Any receipt of periodicals, newspapers, magazines?

3    A      None.  I wasn't allowed commissary.  I wasn't allowed ear

4    plugs for the TV.  They kept the TV -- no -- I wasn't allowed

5    anything.  I was just in there with a sheet and a blanket.

6    Q      Did you eventually get out of that cell and get placed in

7    a cell at ADX and subjected to SAMS?

8    A      Yes, I was placed on H Unit, and I got access to

9    commissary and recreation every other day.

10   Q      Who were the other inmates, if you know, on the H Unit?

11   A      All terrorists.  Zakawi, Musawi, Ramsey, Yusef, Faris

12   (all phonetic), the guy that tried to blow up the Brooklyn

13   Bridge.

14          Nothing but terrorists, and the two Aryan Brotherhood

15   leaders was on that block, and -- but they were placed on a

16   separate unit with the rest of the Aryan brothers.

17   Q      Did you stay at ADX Colorado, other than coming to the

18   FDC here for short visits for Court-related matters?  Did you

19   stay there until you were transferred to the MCC primarily?

20   A      No.  Yes, I stayed there until I was transferred to the

21   FDC.  Besides the transit I went from the ADX to Seattle for

22   eight -- eight or nine days, then from Seattle, Oklahoma for

23   two or three weeks, then I got here.

24   Q      Okay.  And eventually you end up at the MCC.

25   A      Yes, after I stayed here 12 days --

Savage - Direct (hoe)                                           21

1    Q    Let's talk about --

2    A    -- in the FDC.

3    Q    -- ADX Colorado.  How many hours per day were you

4    confined to yourself during that period of time?

5    A    Twenty-four, because you get rec every other day, but

6    there's so many things that go on during that rec.  Those

7    terrorists are still at war with this country.  They're

8    throwing feces.  They're making bombs.

9         So those guards are constantly strapping up or shielding

10   up, extracting myself, food strikes, whatever, and if that's

11   going on, we don't get recreation.  We don't get showers, no

12   showers in those particular cells.  They take us to showers.

13   So we don't get any of that.

14        We don't get commissary, and this -- it's been going on

15   since I've been there.  They are still at war.  It's still

16   going on.  So anything that affects them, quite naturally,

17   affects me.

18   Q    All right.  With respect to the light, the -- the limited

19   social visits, the -- the literature that was restricted, the

20   23 hours per day lookdown --

21   A    No, no lights in ADX.  You control your own lights.  Can

22   sleep in darkness.  I had access to commissary.

23        They provide you newspapers, so my family didn't have to

24   buy it.  They provide us with USA Today and I believe the

25   Colorado Post, but they would take the editorials out -- out

Savage - Direct (hoe)                                          22

1    that.

2          It's whatever anything they deem could be sent a message.

3    So if the paper was a 30-page paper, we may get four pages of

4    that.

5    Q    Moving forward to May 15 of 2009, did you get eventually

6    get transferred out of ADX Colorado?

7    A    Yes.

8    Q    Where did you go next?

9    A    Went to Seattle transit unit eight or nine days, then I

10   went to Oklahoma for maybe, little over two weeks in transit,

11   then I got to FDC.

12   Q    When you arrived at the FDC between May 15, '09 and June

13   1, '09, why were you housed here?  Why were you coming back to

14   Philadelphia?

15   A    I was re-indicted in --

16   Q    In the -- in the instant matter.

17   A    In the instant matter.

18   Q    Okay.  And did -- where did you stay at the FDC?

19   A    I was placed in the second floor cell that I was placed

20   in during my trial.

21   Q    Okay.

22   A    I stayed there, believe, ten or 11 months during my

23   trial, and I was put right back in that cell.

24   Q    So from May 15 of '09 to June 1 of '09 did you stay on

25   the second floor here at the FDC in Philadelphia?

1   A    No.  I got here -- I left ADX May 15th, but I didn't get

2   here till June 1st, so I stayed in the second floor for 11

3   days.

4   Q    All right.  And eventually you were transferred to MCC

5   New York on the 14th of June, is that right?

6   A    Believe the 12th.

7   Q    Okay.  Talk to the Court now about the conditions of

8   confinement between June 1 of '09 and June 12th of '09 here at

9   the FDC.  How many hours a day were you confined to your cell?

10  A    In FDC?

11  Q    Yes.

12  A    Twenty-four hours.  Well, I did --

13  Q    Was the light --

14  A    They did take me to work, two jobs, I believe.  They

15  would take me to rec when they was doing count for the rest of

16  the population.  So I got to rec maybe two or three times

17  around 4:00 o'clock.

18  Q    Did the light remain on 24 hours a day in that cell?

19  A    In FDC?

20  Q    Yes.

21  A    No.  Well, there is a light.  It's a -- it's a -- it's a

22  split cell.  There's a light in the bathroom, but you can see

23  it, but you do -- you are able to sleep in some relative

24  darkness.

25  Q    Did you have any personal visits during that period of

1    time?

2    A     None.

3    Q     Have any monitored telephone calls during that time?

4    A     No access, commissary, not any.  Well, they did give me

5    commissary, believe two days before I left, and that was a

6    mistake.  They didn't want to give me that.

7    Q     Were you again separated from the general population?

8    A     No -- there's nothing on that second floor but a -- a

9    nurse's station and across from it another -- the suicide

10   cells or dry cell, and I was the only one down there.

11   Q     All right.  On June 14 of '09 you transferred to the

12   Metropolitan Correctional Center in Manhattan, is that

13   correct?

14   A     Yes.

15   Q     Have you primarily resided there as an inmate --

16   A     Yes.

17   Q     -- through today?

18   A     Yes.

19   Q     Can you tell the Court what unit you're housed in at the

20   MCC?

21   A     Ten South.

22   Q     What do you understand Ten South to be at that particular

23   unit?

24   A     What it is, it's a terrorist unit.

25   Q     Who are you housed with on that block?

1    A    Now?   There's so many that's -- had come and gone, but

2    now Faisal Shahzad, Times Square bomber, Ghailani (phonetic),

3    Yemenese bomber, Hashmen (phonetic), New England bomber.

4    Terrorists, all terrorists.

5    Q    Are you in your own cell there?

6    A    Yes.

7    Q    Is there a light on in your cell 24 hours a day?

8    A    Twenty-four hours a day.

9    Q    Have you had yard privileges?

10   A    There's no recreation.   There's no yard.   It's -- their

11   recreation is another cell.

12   Q    Have you ever gone to recreation since you got there in

13   June of 2009?

14   A    Only time I smell fresh air is when I come to court.   I

15   asked the marshal -- the guard to roll the window down.

16   There's -- there's no recreation there, none whatsoever.

17   Q    How many hours a day are you confined to your cell at the

18   MCC?

19   A    Twenty-four hours a day.

20   Q    Do you have social visits?

21   A    When they allow me to.   I'm scheduled to have them every

22   other week, but they're always calling my mother, telling her

23   she can't come for this reason.   The FBI can't make it so she

24   can't come.   They can't monitor it.   There's always a reason

25   or another, but --

1    Q    Well, have there ever been any times where your social

2    visits were cut short or people were asked to leave before the

3    social visit was concluded?

4    A    Yes, and they were late.  My mother would sometimes get

5    there, visit supposed to start 1:00, she might get there at

6    1:30, but she have to leave at scheduled a lot of times, so

7    there's always a problem when mom visits.

8    Q    Now, are they scheduled every month, once a month, twice

9    a month?  Is there a particular schedule that is supposed to

10   be followed regarding social visits?

11   A    From my understanding, they -- my mother contacts them

12   and let her know what day she's coming.

13   Q    Okay.

14   A    Same way with ADX.  She -- she contact them and let

15   her -- tell them she will be out there a certain day.  I

16   believe it was from Monday to Wednesday.  I had a three-day --

17   they could come out there for three days, but the Agent Lewis

18   didn't get there Monday, some apparent reason, so I didn't get

19   to see them till Tuesday and Wednesday.  The same thing goes

20   in MCC.

21   Q    At the MCC do you know if -- if your mother is permitted

22   to see you every week there, or is she restricted to a

23   particular number of visits per month?

24   A    Initially, it was two hours a visit once a week, but for

25   some reason he told me he would give me two hours at one

1    particular visit.

2         I believe it was four hours a month initially I was

3    allowed to see my family, but he said he would break them

4    down, two hours biweekly, so I would get two visits for that

5    month --

6    Q    Who were you --

7    A    -- instead of waiting one month for four-hour visit.

8    Q    Who are you referring to?  Who is he?

9    A    Haas.

10   Q    Mr. Haas?

11   A    Yes.

12   Q    Is he an administrator at the MCC?  Does he work there?

13   A    He's not a counselor.  He's not a -- I don't know what he

14   is.  I just call him a Nazi.  I don't know what he is.

15   Q    All right.  Is he employed by the prison?

16   A    Yes.

17   Q    All right.  And he is somebody that talks to you about

18   your social visits and things of that sort?

19   A    Yes.

20   Q    All right.  So at some point he agreed to split up your

21   four hours to two separate visits of two hours each?

22   A    I don't know what happened.  I don't know if he conducted

23   that with my mother or she worked it out.  I don't know how

24   that happened, but I know eventually that's how my visits were

25   being meted out.

1   Q    So have your visits, social visits, been scheduled, and

2   have you been accommodated by these visits occurring during

3   this period of time, June 14, '09 through today?

4   A    No.  Like I said, there's always a reason.  If Haas is on

5   vacation, I don't get a visit.  The agent doesn't come, I

6   don't get a visit.  There's always a reason that I hear later

7   'cause I rarely get my social calls to find out why my mother

8   didn't come.  They never tell me she's not coming or she

9   couldn't make it.

10       I don't know until she comes to the visit why she didn't

11  come last visit.  So you have to ask her.

12  Q    Do you have any opportunity to use the telephone at the

13  MCC?

14  A    When I'm allowed.

15  Q    All right.  Per month, when are you typically allowed to

16  use the phone?  How many times per month?

17  A    In ADX we had them twice a month, but here it's once a

18  month.  MCC's once a month.

19  Q    And do you always get your once a month telephone call?

20  A    No.  They always late, but I got my June phone call

21  coincidentally two days before I came to court 'cause he heard

22  me complain to my mother that I was going to address it with

23  the Court and with my lawyers, and I got my phone call three

24  hours later.

25  Q    Has there ever been a month that you've been housed at

1    the MCC where you did not have a telephone call to your

2    family?

3    A    A few of them.

4    Q    Okay.  Has there ever been a month where -- when you've

5    been housed at the MCC where your social visit did not occur?

6    A    Few of them.

7    Q    Moving forward to your access to newspapers, periodicals,

8    reading materials and books, do you routinely get updated and

9    current newspapers at the MCC?

10   A    Get them, like I said, maybe two to three weeks,

11   sometimes a month late.

12   Q    Do you -- are you permitted to receive books from your

13   family?

14   A    I was, but now they got some new restriction.  The SAMS

15   says no books pertaining to violence or terrorism.  My family

16   sent me books on psychology and a regular book that's well

17   known throughout the system, *The 48 Laws of Power*.  They

18   denied it, and when I asked the warden and captain why they

19   deny it, said Kevin Lewis, the agent, denied it.  It was out

20   of their hands.

21        They just impose the SAMS.  It's not up to them to

22   deny periodicals, what I can read and not, but they denied a

23   few books.

24        They denied newspapers.  I was getting a paper out of

25   Oakland, the Oakland Bay Review.  They denied that paper, just

1   flat out said I couldn't have it.  No reason, nothing.

2       They denied letters from my attorneys.  They denied

3   letters from my family.  Had nothing to do with anything in my

4   indictment.  I'm not allowed to speak to certain people, my

5   kids' mothers.  It's been four years since I spoken to a few

6   of them.  They won't allow me to speak to them.

7   Q    Okay.  Let's move forward to your access to the law

8   library at the MCC.  Can you tell the Court what books you're

9   able to look at, legal books, periodicals pertaining to law,

10  things of that sort, at the MCC?

11  A    None.  I can't -- they don't give me social books, legal

12  books.  I can't have any books.

13  Q    I want to talk specifically about legal books, law

14  library stuff.

15  A    None.

16  Q    Is there a law library?

17  A    Yes, on 9 South, but since I'm on 10 South, terrorists

18  can't go down there, so I'm -- I can't get those books.  I

19  can't have those books.

20  Q    Have you ever seen a law book since you've been housed at

21  the MCC?

22  A    No.

23  Q    Have you ever been given access to a room that has law

24  books at the MCC?

25  A    No.

1    Q    Have -- the library or the room that you go to at the

2    MCC, other than yourself, is there a room with a computer that

3    you have access to?

4    A    Yes.

5    Q    Are there law books in that room?

6    A    No.

7    Q    Is there any law periodical or written word anywhere in

8    that particular cell?

9    A    None.

10   Q    Where is that cell at the MCC?  What floor and what unit?

11   A    It's on 10 South.  It's the first cell you see getting on

12   the block.  It's -- it's a visiting room, but it's also the

13   barber shop.

14        It's also legal visits, for legal visits, social visits.

15   A visit -- those rooms are used for anything.

16        That's why -- the computers, they didn't -- that

17   particular computer didn't get in there till June of this

18   year.

19   Q    Of 2010.

20   A    Yes.

21   Q    So when you went to that room before, 'cause you've been

22   there since May of -- I'm sorry, June of 2009 --

23   A    Yeah.

24   Q    -- when you went to that room before the computer got

25   there for the full year --

Savage - Direct (hoe)                                    32

1    A    Yes.

2    Q    -- what was in there?

3    A    Nothing, just a chair for visits, legal or social.

4    Q    Are you able to conduct any legal research on your own at

5    the MCC?

6    A    Well, now they have the computers, but the computers are

7    in the visiting cells, and those terrorists, they get visits

8    from the counselors.  Ghailani has military attorneys and

9    civilian attorneys.

10        Those guys have attorneys that's constantly up there, and

11   they're stationed in New York.  So they're constantly getting

12   visits, if not in the barber shop, if not a social visit.  So

13   I'm never, never allowed to get in that library.

14        Last time I was they shook my cell down.  I got in there

15   by default.  I says, "Since I'm in here, you might as well let

16   me stay in here."  He let me stay in there for a hour.

17   Q    All right.

18   A    Two hours.

19   Q    When we say the computer, what programs are on -- strike

20   that.

21        Are there legal databases like WestLaw and Nexus on this

22   computer that you're using?

23   A    I believe that particular one is Nexus.

24   Q    So you have that on the computer?

25   A    It's on there.  I don't have it, but it's on there, yes.

Savage - Direct (hoe)                                              33

1    Q     What do you mean, you don't have it?  You -- can you

2    access it?

3    A     Yeah, you got to access your PIN registration number to

4    get to access the law library, 'cause they also -- I guess how

5    they have it set up, they do emails for their regular inmates,

6    they email or whatever, so I push my PIN code in, and it says

7    law library, emails, whatever.  I push law library.  The

8    screen comes up.

9    Q     All right.  And are you allowed to do -- I mean can you

10   at that point do legal research in that Lexus?

11   A     Yes, but I can't get copies of anything.  So anything in

12   there -- if a case law I need, I got to write it down by hand.

13   Q     So it doesn't enable you to print out a case?

14   A     No.

15   Q     All right.

16   A     Not in 10 South.

17   Q     How many times --

18   A     They can't do it.

19   Q     How many times since June of 2010 when that computer got

20   to that room that you described through today, the four months

21   that it's been there, how many times have you been in there

22   using the computer and accessing that law database that you've

23   described?

24   A     Twice.

25   Q     How many times have you been able to print cases from

1    there to take back to your cell?

2    A    None, not at all.

3    Q    Are the two times that you've described for the Court

4    about using a law database the only two times that you've

5    accessed law materials at the MCC since June 14 of 2009?

6    A    Yes.

7    Q    Now, I want to talk to you about your ability at that

8    facility to talk to your attorneys.

9         Now, in short, you and I have been able to meet there, is

10   that fair to say?

11   A    Yes.

12   Q    Mr. Sullivan and his associate, Brett Cooke, have been

13   able to meet with you there?

14   Q    Are we having face-to-face visits at any time?

15   A    No.

16   Q    So there's no contact attorney visits, right?

17   A    None.

18   Q    Correct?

19   A    Yes.

20   Q    All right.  And in terms of being able to communicate

21   with your lawyer, myself, Mr. Sullivan and Mr. Cooke, we speak

22   through a metal mesh window, is that right?

23   A    Yes.

24   Q    And in -- in order for me to hand you a piece of paper,

25   we have to knock on the door, get a guard to receive it, open

1  the door and then transmit or give that to you in your cell.

2  A    Yes.

3  Q    There's no handing paper back and forth.

4  A    None.

5  Q    And by was of background, our office has copied for you

6  the thousands and thousands of pages of discovery and

7  transcripts and sent them to you at the MCC.

8  A    Yes.  I -- I've never seen them, but if I ask for them, I

9  get them.  They keep them in Haas' office.  They stay in his

10  office, and his office is the only office that doesn't have a

11  camera in it, so he keeps them in his office.  I'm only

12  allowed to get them from a lieutenant, and that might take a

13  week or two to get it.

14       So you -- you sent those to me in June.  I may have seen

15  my last box a month ago.

16  Q    All right.  We sent you about 13 separate boxes.

17  A    Yes.

18  Q    About seven months ago.

19  A    Yes.

20  Q    Have you now reviewed all 13 boxes?

21  A    Yes.  Now yes.

22  Q    All right.

23  A    But I'm not allowed --

24  Q    Are they --

25  A    -- to keep them in my cell.  I have to give them back.

1    I'm allowed one -- one box at a time.

2    Q    I see.  Have you ever asked to have all of that paperwork

3    in your cell at one time?

4    A    Certainly.  Once I found out they was in Haas' cell, I

5    asked him, "What -- what does he went with my legal work?"

6         He said I couldn't have it.  He didn't want them in my

7    cell.

8    Q    Have you been given a reason why you can't have all of

9    those boxes in your cell at one time?

10   A    Basically, 'cause he said so.  They didn't want me to

11   have it.  It's mine, but I can't have it.

12   Q    Let's talk about your ability to talk to us.

13        Are you of the mindset that you can freely discuss openly

14   the strategy in your criminal case, the strategy of our

15   defense and -- and the strategy of pursuing mitigation with

16   Mr. Sullivan?

17   A    No, I won't discuss anything 'cause I know they're

18   listening.  I won't discuss anything about anything pertaining

19   to this case, my last case or any other case.

20   Q    Why do you feel that they're listening?  What has given

21   you proof, if any, that they've been listening or reading or

22   looking into what you and I and Mr. Sullivan have been

23   discussing?

24   A    Their history with Lynn Stewart bugging her attorney-

25   client privilege visits, my -- my history with with them, them

Savage - Direct (hoe)                                                    37

1    bugging my cell in my visits, and the cameras in the cell, and

2    it -- the microphone there, and I know they're listening.

3    Q    Now, you indicated the history of your cell being bugged.

4         Are you referring to the interception of your discussions

5    and conversations at the Federal Detention Center pursuant to

6    a Title 3 wiretap?

7    A    Yes.

8    Q    Are you aware of any such interception occurring at the

9    MCC?  I mean do you have a factual basis --

10   A    Yes, Lynn Stewart --

11   Q    -- upon which you can conclude that?

12   A    Lynn Stewart, what I believe the (inaudible), and she was

13   charged with baiting [sic] and abetting terrorists.

14   Q    Do you understand the SAMS restrictions also suggest to

15   you that your conversations are monitored?

16   A    SAMS restrictions don't say anything, but yes.

17   Q    Okay.  So when we meet, you and I and Mr. Sullivan on

18   various occasions, and we've met probably ten times over the

19   last eight months, is it your testimony today, Mr. Savage,

20   that you don't feel confident in your ability to openly

21   discuss the strategy and the nuances of your defense?

22   A    At all, and I refuse to say anything in that cell.

23   Q    Is there a second manner of communication that your

24   attorneys have undertaken with you through the mail?

25   A    Yes.

Savage - Direct (hoe)                                                    38

1    Q    Have you gotten letters from us?

2    A    A few, late, but I -- I get them.

3    Q    Let's first talk about the method by -- let's talk about

4    the method by which you receive mail at the MCC.

5         If I mailed you a letter on September 1st that got to the

6    MCC on September 2nd, when, if at all, do you typically receive

7    that letter that was mailed on the 1st, received by them on the

8    2nd?

9    A    Depends, the 15th or October 1st.  It depends.  At least --

10   at least two to three weeks later.

11   Q    Have you been told why your mail was being held?

12   A    It's the process, 10 South process, I was told.

13   Q    And when you receive letters that are marked, "Special

14   Mail, Open in the Presence of Inmate," from perhaps Mr.

15   Sullivan's office, have you ever received a letter where the

16   envelope was fully sealed and unopened?

17   A    Never.  They're all opened and read.

18   Q    Do you know who's opening your mail?

19   A    No.

20   Q    Have you --

21   A    They all -- when I ask, they always pass the buck.  It's

22   R&D, it's policies.  I've never got a concise answer who

23   opened it, who read it.

24   Q    What is the most recent piece of mail that you've

25   received there from an attorney, other than myself, Mr.

1    Sullivan -- well, strike that.

2        When is the most recent piece of mail that you've

3    received at the MCC from an attorney?

4    A    Believe I got it October 8th.  It was from Christopher

5    Warren about my appeal.

6    Q    All right.  And Christopher Warren, for the record, is

7    the attorney that represented you in the previous matter

8    before Judge McLaughlin.

9    A    And my appellate case.

10   Q    All right.  So he's also handling the -- the appeal of

11   that conviction?

12   A    Yes.

13   Q    Was he communicating with you through the mail?

14   A    I haven't heard from him at all.  When I was on the SAMS

15   in Colorado, they refused to let him write me, and they

16   refused to let me write him, even though he was down as my

17   appellate attorney.  They said he didn't sign up for the SAMS,

18   so I had no contact with Warren till I got back here and got

19   indicted.

20       And since I recuse him off this case to represent me,

21   since I've got him off the case to represent me, Judge

22   appointed me new counsel.  I haven't heard anything from him

23   until he sent me those letters.

24           MR. HOEY:  Your Honor, if I may approach with

25   Defense Exhibits 1 and 2, if I could.

1                    (Pause in proceedings.)

2                    MR. HOEY:  Your Honor, if I may identify for the

3       record, Defense Exhibit 1 is a letter from Christopher Warren,

4       attorney at law, which is marked in the upper left-hand corner

5       with a Philadelphia postal mark of October 8 of 2010.

6            Defense Exhibit 2 is a letter received -- well, the

7       Southeastern Pennsylvania postal mark is October 1 of 2010.

8       It's a letter from our office indicating "Special Mail, Open

9       in the Presence of the Inmate, Authorized by Bureau Policy."

10           May I publish Exhibit 1 and 2 to the witness?

11                   THE COURT:  Yes, indeed.

12      BY MR. HOEY:

13      Q    I'm going to show you what we've just identified on the

14      record as Defense Exhibit 1 and 2, one being the top, two

15      being on the bottom.

16           Tell the Court what number one is, when you received it,

17      and was it opened or closed?

18      A    One is a letter from Christopher Warren dated October 8th,

19      and it was open when I received it.

20      Q    When you say it was open, what -- what do you mean, open?

21      Was the envelope sealed, torn?

22      A    Open.  Exactly how you see it now is how I received it.

23      Q    You're holding up the envelope without the letter in it

24      that --

25      A    Yes.

1   Q      -- appears to have the top of the envelope torn off?

2   A      Yes.  The letter was inside the envelope, but this

3   particular envelope was open as you see it here.

4   Q      So the condition that you have it in today is the

5   condition that you received it from the prison

6   administration --

7   A      Yes.

8   Q      -- is that fair to say?

9   A      Yes.

10  Q      Did they open it in your presence?

11  A      No.

12  Q      Did they tell you why it was open?

13  A      No.

14  Q      Okay.  Exhibit 2 is what?

15  A      This is a letter from -- from you, Christopher Hoey.

16  Q      All right.  And what is the postal mark?  What is the

17  date on the postal mark, October 1?

18  A      October 1, but this particular date -- you dated

19  September 9th.

20  Q      Okay.

21  A      And I didn't get this till the same day I got this

22  October 8th.  So I got this 31 days later.

23  Q      Now, that -- that envelope, was that open or closed when

24  you received the letter?

25  A      Open.  Each and every last one of them were open.

1   Q    Is Exhibit 2 marked on the outside of the envelope,

2   "Inmate Mail, Legal Mail, Open in the Presence of the Inmate?"

3   A    Yes.

4   Q    Was it opened in your presence?

5   A    No.

6   Q    Have those two letters being opened outside of your

7   presence caused you any concern regarding your ability to

8   effectively communicate your defense strategy with your

9   attorneys?

10  A    No question, 'cause I know they're going to keep opening

11  them.

12  Q    Do you feel that they're reading your mail?

13  A    I know they're reading.  It's not that I feel; I know it.

14  Q    Do they read --

15  A    I can't seal any letters leaving my cell.  They got

16  cameras.  They got them on video.  There's nothing -- they got

17  evidence that we can use in our favor.

18       When I send a letter out of that door, stick it in the

19  door for them to pick it up, I'm not allowed to seal it.  So,

20  of course, they read it.  I'm not allowed to -- to the Courts,

21  anywhere.

22  Q    Well, have -- are you sending letters to your lawyers?

23  A    I sent you a few, and I sent the Courts a few.

24  Q    Do you -- do you feel that the letters that you're

25  sending to your lawyers are also being reviewed?

1    A    Absolutely.

2    Q    What evidence do you have to suggest that that is true?

3    A    If I seal a letter to anybody, it won't go out.  So only

4    way I can get it to the mailbox, to the UPS man, the Federal

5    Express man, the postal department, if I send it out similar

6    to this, open, they seal it.

7         So, of course, if it's open, they're going to read it.

8    Q    Do you know why they don't want it sealed?

9    A    Yeah, they want to read my mail.

10   Q    Do you know that the SAMS restrictions permit them to

11   read your mail prior to it leaving the institution?

12   A    The SAMS is vague when it says -- it says -- I can't

13   remember verbatim, but it says they can and it says they

14   can't, but another part of SAMS says you are allowed to

15   contact senators, congress and the courts without

16   interference, but that's a lie, too.

17   Q    Now, the method of unsealing the envelope and presenting

18   it to an administrator in an unsealed fashion, is that the

19   same for your legal mail, meaning when you write me a letter

20   or you write Mr. Sullivan or Mr. Cooke a letter, you have to

21   leave it unsealed?

22   A    I write anybody.  I write the President, the Judge, I

23   have to leave it unsealed.  If I stick it out that door, if

24   it's sealed, they won't take it.  The guards won't take it,

25   but Haas or A.W., they walk past, they'll it, but I know

1    they're going to open it again, anyway.

2         So I don't waste my time -- so the process can be

3    hurried, I don't waste my time sealing any of them.

4              MR. HOEY:  Your Honor, if I could approach the

5    witness with some additional exhibits?

6              THE COURT:  Yes.

7              MR. HOEY:  Your Honor, I have two separate exhibits

8    which I'd ask be marked Defense Exhibits 3 and 4.

9              Defense Exhibit 3, for the record, is a -- an

10   envelope from the Law Offices of Timothy J. Sullivan, which

11   has a postal mark date of September 3 of 2010.

12             It's an envelope and a letter marked "Special Mail,

13   Open in the Presence of Inmate" on the outside of the

14   envelope.

15             I have as Exhibit 4 a three-page stapled collection

16   of letters received by the inmate at the MCC, all from the Law

17   Offices of Timothy Sullivan, all noted to be special mail,

18   open in the presence of the inmate.

19             The dates on those letters, for the record, January

20   5, 2010, January 4, 2010 and July 14 of 2010.  That

21   collectively would be Exhibit 4.  Defense Exhibit 3 would be

22   the single letter.

23             THE COURT:  Right.

24             MR. HOEY:  May I approach?

25             THE COURT:  Yes.

BY MR. HOEY:

Q    Mr. Savage, I'm going to show you Exhibits 3 and 4,
three, being on the top, four being on the bottom.

     Can you tell the Court what Exhibit 3 is, please?

A    Three is a letter from Tim Sullivan dated September 3rd of
this year, 2010.

Q    All right.  That is an envelope that appears to be torn
open, is that correct?

A    Yes.

Q    All right.  Was I present in your unit on 10 South when
you received that mail roughly September 14th --

A    Yes, you were sitting --

Q    -- 2010?

A    You were sitting across from me in that visiting booth.

Q    Was it handed to you during that -- that visit?

A    Yes, in your presence.

Q    Was it opened when it was handed to you during that
visit?

A    Yes, and this letter was outside the envelope that
particular instance.

Q    Now, that is a letter from Mr. Sullivan to you?

A    Yes.

Q    Now, you were here at the last hearing when the
Government indicated that they had contacted the
administration there and told them to refrain from opening

1    legal mail?  Do you recall that particular discussion?

2    A    There's a few of them.  Happened in February, the Judge

3    said something about it, so --

4    Q    Right.

5    A    -- which particular time?

6    Q    So there's been a couple occasions you've been in this

7    courtroom where the mail issue has been raised.

8    A    Absolutely.

9    Q    Since it was raised the last time on October 4 of 2010

10   here in the courtroom, I believe was the last date, have you

11   subsequently received legal mail from attorneys that was

12   opened outside of your presence and handed to you in an opened

13   state?

14   A    Yes, and from the Courts.  October 8th I received it.  My

15   last court date was what, September 20th?  September 20th, I

16   believe, right?  September 30.  October 8th.  I don't see them

17   up there, but October 8th, this one.  Yeah, October 8th, and

18   this one I got on October 8th, but it's marked October 1st.

19   Q    The collection of three letters that I gave you, January

20   4, January 5 of 2010 and July 14 of 2010 --

21   A    Yes.

22   Q    -- are they all collectively letters from Mr. Sullivan

23   that have been marked "Special Mail, Open in the Presence of

24   Inmate," all three of them?

25   A    Yes, and it says it on here, "Opened as general

1   correspondence which special mail requires.

2   Q    Are those --

3   A    They stamp it telling you they opened.

4   Q    All right.  So there is a stamp on each of those letters.

5   Could you read that into the record, please?

6   A    "Notice, opened as general correspondence for special

7   mail requirements" --

8   Q    Was that stamped on that envelope and the envelope opened

9   when you received the letter from the administration?

10  A    Yes, on each and every last one.

11  Q    Can you also read the end where it says, see 28 CFR?

12  A    Yeah, see 28 CFR 540.19.

13  Q    All right.  Do you know whether or not that particular

14  regulation section corresponds with SAMS restrictions that

15  permit mail to be opened prior to giving it to the inmate?

16  A    If I read it right, it's for social mail, not legal mail.

17  Q    I see.

18           MR. HOEY:  One moment, please, Your Honor?

19           THE COURT:  Yes.

20           (Pause in proceedings.)

21  BY MR. HOEY:

22  Q    Have you asked the administration at the MCC why it is

23  that they're opening your legal mail prior to you receiving it

24  outside of your presence?

25  A    At first it was an ongoing issue, continuously, but I

1    gave up since then 'cause it's going to happen, regardless, so

2    what's the sense of keep complaining if it's going to keep

3    happening?

4    Q    Did you receive any particular verbal response from a

5    member of the staff there regarding this legal mail issue?

6    A    From a few.  I got one from the warden directly, saying

7    anything that comes to 10 South they're going to read.  They

8    don't care about a Judge, anybody.

9         If it comes up there, they read it, and I got one from

10   the counselor, the same lady that handed me the mail in front

11   of you, 'cause after you left, I said, "You know that was my

12   lawyer."  She said, "I don't care.  This is how 10 South

13   mail -- this is how it's conducted."

14   Q    When you have meetings with your attorneys, myself, Mr.

15   Sullivan, how far away are the guards from this door where --

16   where you discuss your case on 10 South?

17   A    Five feet, six feet.

18   Q    Is there a desk in that particular unit where these staff

19   members sit and -- and watch the unit?

20   A    Yeah, they sit and watch the cameras at each cell.

21   Q    All right.  And is that desk just outside the door of

22   that particular room where you meet with your attorneys?

23   A    Right outside.

24   Q    And is there typically a staff member at that desk?

25   A    Two.  Well, they're supposed to do 15-minute rounds,

1    periodically, every 15 minutes.  So one is sitting watching

2    the camera, and one takes his walk.

3    Q    Have you explored with Mr. Sullivan the opportunities to

4    meet with experts and mitigation specialists at the MCC?

5    A    I'm not -- I've refused.  I'm not letting my family get

6    involved in this process for mitigation, for psychological --

7    they're going to mention me, they're going to mention me

8    without my cooperation so they can say I exhausted all my

9    administrative remedies, I had effective since there's

10   counsel.  I'm not taking part in this charade --

11   Q    Well --

12   A    -- so I've refused to discuss it, let my family discuss

13   it.  We're not playing this game.

14   Q    Why are you refusing to meet with these folks at the MCC

15   in New York?

16   A    It's being monitored.  Anything I say, they get first-

17   hand knowledge.  It's like I might as well talk to them, they

18   might as well come up here and talk to me themselves.

19   Q    Have you lost confidence in the ability to communicate

20   with your attorneys through the mail and in person at the MCC?

21   A    Absolutely, years ago.

22   Q    The Court has graciously afforded us an opportunity to

23   meet with you in the Federal Detention Center here in

24   Philadelphia.

25   A    Yes.

Savage - Direct (hoe)                                    50

1    Q    You were brought down on a couple of occasions to meet

2    with your attorneys in an open cell where the windows were

3    open, and we could pass paperwork.

4    A    Once, April -- April 19th to 21st, for two days.

5    Q    Where were you housed when you came down on those

6    particular dates?

7    A    That suicide cell right next to that visiting room.

8    Q    This suicide cell, does it have a toilet and running

9    water?

10   A    No.

11   Q    Does it have a sink?

12   A    No.

13   Q    Is the light on all night?

14   A    Constantly, two bright lights.  If I have to go to --

15   Q    Do you have the ability to rest or get sleep prior to

16   meeting with your lawyers?

17   A    How can you?  I pace all night.  I'm up all night.  If I

18   have to use the bathroom -- if I have to have a bowel

19   movement, they keep me cuffed.  I can't wipe myself if -- they

20   keep me cuffed as I am now if I go to the bathroom, if they

21   take me out.  So going to the bathroom is at -- is not a

22   option --

23   Q    Wait a minute.

24   A    -- but they'll give me urinal to urinate.

25   Q    I'll -- we'll get there in a second.  I want to talk to

1    you about the cell itself, the arrangements.

2         You come down here from the MCC.  Are you able to bring

3    the boxes of discovery that we mailed you?

4    A    One box.  I'm limited to one box.  They said I could

5    bring one box.

6    Q    And are you able to sleep at night and rest and prepare

7    for your meeting with your attorneys?

8    A    No.  How can you sleep with a light on that stays 24

9    hours?  Want one of them to try.

10   Q    Do you have any ability --

11   A    You can't.

12   Q    -- to use -- strike that.

13        You mentioned having to go to the bathroom on that

14   particular block, in that particular cell.

15   A    No, I don't go to bathroom in that block in that cell.

16   They take me to the SHU cells, the regular 8 South -- 8 North

17   cells, to use the bathroom.

18   Q    And is -- is this arrangement in place today?  Meaning

19   you came down yesterday, is this where you've been staying?

20   A    Eleven o'clock yesterday I got here.  They fed me.  Told

21   them I had to go to the bathroom about 4:00 o'clock.  They

22   asked me what -- what I had to do.  I said a bowel movement.

23   They said, "We'll get the lieutenant."  Lieutenant left, never

24   seen another lieutenant.

25        I asked all night.  This morning they finally came to get

1    me, said I to go to the bathroom.  Said, "You know you got --

2    you're staying cuffed."

3          The last lieutenant, I forget his name, he took one cuff

4    off, as I am now, so I could wipe myself.  This guy, Tybo,

5    Tibu (phonetic), whatever his name was, he said I had to stay

6    cuffed, and they had to stand at the door with the door open.

7    How can I go to the bathroom like this?  So I had to wait till

8    I got over here to go to the bathroom, till the marshals took

9    the cuffs off, put me in a cell.

10   Q    But you were not provided an opportunity to -- to use

11   basic hygiene at the FDC.

12   A    No.  Well, I did do that this morning, cuffed.

13   Q    Here.

14   A    No.  At the -- at the FDC.  I refused to have the bowel

15   movement, but I did wash my face and brush my teeth, cuffed up

16   as I am now, with both cuffs on.

17   Q    Are there any other inmates within that psych unit or --

18   or occupying any other cells on that block that you've just

19   described?

20   A    No.  Across from that cell's the lieutenant's office.

21   Maybe 12, 15 feet from there is the officers' station, three

22   of them sitting there all night.

23         They're in there all night loud, playing the radio, so

24   how can I sleep, on top of the lights?  I'm right next to

25   where they stay at.  They have the computer loud or they're

1   playing the radio loud all night long.

2   Q    Are you able to get to the law library when you've been

3   here sporadically at the FDC?

4   A    No.

5   Q    Have you been effectively able to meet with your

6   attorneys here at the FDC?

7        In your -- in your words, we all know that you've refused

8   to come down here to the FDC.  Why are you doing that?

9   A    'Cause of the conditions I'm under.  What's the sense of

10  coming down here?  I can't sleep.  They don't feed me right.

11  Can't go to the bathroom, can't have a bowel movement.  If I

12  get a urinal, I got to use this dirty, filthy urinal.  They

13  don't give me anything to wash my hands with.  I rarely get

14  water, barely get it.

15       What's the sense of coming down to be placed in those

16  inhumane -- I could stay up there.  What's the sense of coming

17  down here?  Then I know they monitor those visits, too.  That

18  same cell, I believe I was bugged on my social visit the last

19  time I went to trial.

20  Q    Do you think you're being recorded at the FDC?

21  A    Absolutely.  Absolutely.

22  Q    In -- in both your cell and in the attorney meeting room?

23  A    Not the -- I wouldn't go as far as the cell, but the

24  attorney visit room, without question.  I was bugged in those

25  booths already.

1          MR. HOEY:  Your Honor, I have no other questions of

2     Mr. Savage at this time.

3          THE COURT:  Mr. Troyer.

4          MR. TROYER:  Thank you, Your Honor.

5                         CROSS-EXAMINATION

6     BY MR. TROYER:

7     Q    Mr. Savage, you're currently designated to ADX in

8     Colorado as part of your -- to -- to do your 30-year sentence,

9     is that right?

10    A    Wasn't designated there.  You placed me there.  I was

11    designated to Atlanta.

12    Q    All right.  But you're currently designated now to ADX,

13    isn't that right?

14    A    I'm in MCC.  I don't know where I'm designated.

15    Q    Okay.  Now, you claim that when you're in MCC, the

16    light's on all night, is that right?

17    A    Yes.

18    Q    Okay.

19    A    Not a claim, it's a fact.

20    Q    All right.  And you have a -- you are afforded sheets,

21    blankets, is that right, to keep yourself warm while you

22    sleep?

23    A    Yes.

24    Q    Okay.  And you can -- you pull the blanket up over your

25    head so you can keep the light out of your eyes, sir?

1    A    No.  It's called carbon dioxide.  I would suffocate.

2    It'd kill you.  You can't do that with a blanket.

3    Q    All right.  So you also were talking earlier about your

4    2005 conviction and about how you weren't able to file any

5    motions or do any legal research for that, right?  That's what

6    you were saying?

7    A    After I was convicted, yes.

8    Q    Right.  Okay.

9    A    And previous, prior to.

10   Q    All right.  But currently that conviction's now been

11   affirmed on appeal, you're aware, right?

12   A    Well, I just found out.

13   Q    All right.  All right.  So you don't have any legal --

14   A    This -- the --

15   Q    -- efforts you have to make at this time on that, do you?

16   A    It just got affirmed a week ago.  He filed it.  I didn't

17   know about him filing it 'cause they've been rejecting my

18   letters from --

19   Q    All right.

20   A    -- from him to me.

21   Q    All right.  Now, after you were indicted in this case,

22   you were -- you were brought initially here to Philadelphia,

23   right, for your initial appearance and arraignment, correct?

24   A    Well, after the travels to -- traversing from Seattle to

25   Oklahoma, yes.

1  Q    Okay.  And then instead of going -- being sent back out

2  to Colorado, you were sent to New York instead, right?

3  A    Yes.

4  Q    Okay.  And you're aware that that was part of -- that the

5  reason for that was part of efforts that were made by your

6  attorney, or your previous attorney, talking to us to keep you

7  closer to Philadelphia so you could visit with your lawyers,

8  right?

9  A    I wasn't aware.  He never told me.  I would have asked to

10  go back to Colorado before I stayed under those conditions.

11  Q    Excuse me.  Say that again.

12  A    I wasn't aware of a deal he made with you or the Courts,

13  whatever.  I would have asked to go back to Colorado before I

14  was placed under those conditions.

15  Q    Well, as you sit here today, is that your preference?

16  Would you rather go back to Colorado?

17  A    Before I sit in MCC?  Well, certainly, and I don't want a

18  attorney.

19       If they send me back to Colorado, I'm going *pro se*

20  because what's the chance of them traversing back and forth

21  across the country to see me and get effective legal

22  assistance?

23  Q    Okay.  Now, the fact is you were -- you are aware,

24  though, that there have been meetings with your lawyers,

25  including -- including Mr. Sullivan, your previous lawyer and

1   us where we worked out something where you would be able to be
2   brought back down to Philadelphia for contact visits, correct?
3   A    Yes.
4   Q    Okay.  Because when you are at MCC in New York, you could
5   have visits with your lawyers, right?
6   A    If that's what you want to call them.
7   Q    All right.  Well, you were able to -- to see your lawyer,
8   correct?
9   A    Visually, yes.
10  Q    You were able to talk to your lawyer, right?
11  A    No.
12  Q    Well, could you hear what your lawyer was saying to you?
13  A    I don't want to hear.  I have nothing to talk to him
14  about as long as I'm under those conditions.
15  Q    That's not my question.  When your attorneys speak, would
16  speak to you in MCC New York --
17  A    We don't speak.
18  Q    -- can you hear him?
19  A    We don't speak.  I can hear him, but we don't speak.
20  Q    All right.  So you're saying that your attorneys show up
21  at MCC New York, sit in a room across from you and say
22  absolutely nothing.
23  A    We talk sports.
24  Q    That's all you talk about.
25  A    How you doing, hello and sports.

1    Q    Okay.  So your testimony is that your attorneys have

2    never tried to talk to you about your case in MCC New York.

3    A    Trust me, they've tried, but to no avail.  I refuse to

4    discuss it.

5    Q    Aha.  So the reason that you don't talk about your case

6    in MCC New York is because you refuse to talk about it with

7    them, right?

8    A    Absolutely.

9    Q    Okay.  And you say that the reason for that is because

10   you think your conversations with your lawyers are being

11   monitored?

12   A    I know they are.

13   Q    All right.  And you say you -- you say you know they are.

14   A    I assume.

15   Q    You're assuming.

16   A    Yeah, I presume.

17   Q    So you really don't know, Mr. Savage?

18   A    Not with absolute certainty.

19   Q    All right.  Now, you're aware, aren't you, Mr. Savage,

20   that in the SAMS order -- you've read the SAMS order, right?

21   A    Which one?  There's five different ones.  They all have

22   different language.

23   Q    Well, let's go with the most recent one, the one that

24   pertains today.  Okay?

25   A    Okay.

1   Q    All right.  So in that SAMS order you're aware that

2   there's no provision in the SAMS order for you to -- for your

3   conversations with your lawyers to be monitored, correct?

4   A    It doesn't say it, but they -- they do it, anyway.  The

5   monitor them, anyway.  It doesn't say it overtly.

6   Q    So -- so the SAMS order does not say that your

7   conversations with your lawyers can be monitored or

8   recorded --

9   A    No.

10  Q    -- does it?

11  A    No.

12  Q    Okay.  But you're assuming that they are, anyhow, right?

13  A    I know they are monitored.  There's a camera in there.

14  They don't turn the camera off.

15  Q    Well, are you worried about somebody seeing you meeting

16  with your lawyers?

17  A    Reading my lips.  They have lip readers.  That's just the

18  Government.

19  Q    Right.

20  A    What don't they have?  They can see a snake in Iraq.

21  Q    But --

22  A    Think they can't -- somebody read my lips, my attorney

23  lips?

24  Q    Are you really worried about people reading your lips?

25  A    No question.  I'm -- I'm scared.  I'm frightened.  I'm

1   schizophrenic.  I don't trust the Government.

2   Q    All right.  Mr. Savage, you are aware, aren't you, that

3   in order for people to listen otherwise to your conversations,

4   especially conversations with your lawyers, there would have

5   to be an order signed by a Judge permitting this under --

6   under Title 3, right?

7   A    They can say anything to get that order.  They're allowed

8   to get that order.  I don't know.  It's -- it's capable of

9   getting a wiretap, anything.

10  Q    All right.  And you're aware that an order's required

11  because in fact you've received such orders in this very case

12  in your discovery, right?

13  A    Yes, with lies.  That's why I know, the caveat, with

14  lies, getting those wiretaps, they'll say anything to a Judge.

15  Q    All right.  Now, so basically, based on your assumptions

16  or your beliefs, is it fair to say you have refused to talk

17  about your case in MCC New York with your attorneys?

18  A    My beliefs, absolutely.

19  Q    Okay.  And as part of this -- this deal to have contact

20  visits, your -- you have refused to come down to Philadelphia

21  to have those contact visits with your lawyers, haven't you?

22  A    Once.

23  Q    Okay.  Well, in fact, how many contact visits have you

24  had down in Philadelphia here?

25  A    One.

Savage - Cross (tro)                                         61

1    Q    You've had one.

2    A    One.

3    Q    Okay.  And in fact, the -- the arrangement is -- the

4    arrangement between the attorneys, the Government, Bureau of

5    Prisons and -- and blessed by this Court, if I may say -- use

6    those words --

7    A    Blessed to who?

8    Q    -- that -- that you're supposed to be able to come down

9    here once a month, right?

10   A    Yes.

11   Q    All right.  And in fact you're allowed to come down here

12   once a month, but you've refused to come down on all those

13   other occasions, right?

14   A    There's only one other occasion I refused.  Where do you

15   get -- "all those?"  All those -- you're saying there was many

16   of them, all.  Once.

17   Q    So --

18   A    I refused once.

19   Q    So you've refused to come down here.

20   A    Once, yes, absolutely.

21   Q    And you say the reason you refuse is 'cause you don't

22   like the cell that you're put in in FDC.

23   A    Yeah, I refuse to basically submit to those inhumane

24   slave's conditions.  I'd rather stay at the MCC.  I'd rather

25   not have an attorney if I got to go through that.

1    Q    Okay.  Fact is, Mr. Savage, you -- and you did make a

2    complaint to FDC about those conditions, didn't you?

3    A    No question.

4    Q    Okay.  And your -- and you received back a response from

5    the FDC warden here in Philadelphia, didn't you?

6    A    Well, I received a response from the warden at MCC, but I

7    would assume it was from the warden in FDC.

8    Q    Okay.  And that response explained that the reason -- it

9    gave you a reason for -- for putting you in a cell without a

10   flushing toilet facility, didn't it?

11   A    No.

12   Q    Wasn't it true that the response that you received back

13   was that you were not permitted to have those facilities

14   because you had previously abused those by communicating

15   threats through the toilet system?

16   A    It said -- if I remember correctly, said because I was

17   under SAMS, then at the end of it it said I used the toilet to

18   communicate, which everybody does in that facility.

19   Q    Okay.  In fact --

20   A    It's not exclusive to me.

21   Q    Fact is you're not being denied water.

22   A    Yes, I am.

23   Q    Right?

24   A    Yes, I am.

25   Q    So -- well, if you -- if you didn't have water, you --

1    you'd die, wouldn't you?

2    A    I was on the way to dying.  You see the episode I had

3    last time.

4         I didn't eat, didn't have a bowel movement.  They didn't

5    feed me, didn't give me water, anything.

6    Q    Yeah, let's talk about last time.  Isn't it true you had

7    breakfast that day?

8    A    No, I didn't.

9    Q    All right.  So you deny that.

10   A    Absolutely.  With certainty.

11   Q    All right.  You had breakfast this morning, too, didn't

12   you?

13   A    Yes.  A bagel.

14   Q    A bagel?

15   A    The cereal's still in the cell.  A bagel.

16   Q    A bagel and --

17   A    Half a bagel.

18   Q    Half a bagel and what else?

19   A    And this particular guard this morning gave me water.

20   Q    Okay.  Nothing other than a bagel and water?

21   A    Nothing.

22   Q    You're sure about that.

23   A    I'm positive.

24   Q    Okay.  Now, fact is also when you need to use the

25   restroom, when you need to use the toilet facilities, you've

1   been permitted to do that, right?

2   A    Not in every instance.  I got to wait for the lieutenant

3   to come up.  That takes four or five hours sometimes, as it

4   did today.  I've been asking since last night.

5   Q    All right.  Well, pardon the messiness of this question,

6   but the fact is you -- you've never had any kind of accident

7   as a result of the -- of what you're complaining about, have

8   you?

9   A    Due to my ability to hold my bowels, no.

10  Q    Okay.  All right.  Now, you brought up the issue about

11  the legal mail, as well, at MCC New York, correct?

12  A    No.  You never talked about me being cuffed when I have

13  to use my bowel, when I want to use my bowel.  You keep me

14  cuffed.  How can I wipe myself?

15  Q    Would you like to suggest questions for me?  Is that --

16  A    We --

17           THE COURT:  Counsel --

18           MR. HOEY:  Objection.

19           MR. TROYER:  Okay.  All right.

20           THE COURT:  Counsel --

21           MR. TROYER:  Okay.  All right.

22  BY MR. TROYER:

23  Q    Well, let me -- let me talk about legal mail for a

24  moment, Mr. Savage, if I might.

25  A    Please.

1   Q    Okay.  Yes.  All right.  Now, you've -- you've complained

2   about the legal mail previously being opened, correct?

3   A    Yes.

4   Q    All right.  Now, you were in court here the last time

5   when we discussed that issue, didn't you?

6   A    Yes, a few cases.  It wasn't just last time.  It was

7   prior to -- if I remember correctly, since February 18th of

8   this year.

9   Q    All right.  Let -- my question is about last time.  You

10  recall it being brought up last time, correct?

11  A    Yes.

12  Q    Last -- last month, in fact.

13  A    Yes.

14  Q    Right?  Okay.  And when it was brought up, you heard me,

15  you heard this Assistant U.S. Attorney tell the Court in this

16  very courtroom that that issue had been addressed, and that

17  there had been changes made as a result, correct?

18  A    I heard you say that prior to, but, yes.  Last time, yes.

19  Q    Okay.  And you actually -- do you remember that we

20  actually -- the Government even submitted an exhibit, an

21  email --

22  A    Yes.

23  Q    -- that had been given from Kenneth B. Haas to us --

24  A    What was that date?

25  Q    -- and it's dated September 28, 2010, 5:45 p.m.  Have you

1    reviewed that?

2    A    Yes.  September 28th, yes.

3    Q    Okay.  And in that email it -- it acknowledges some

4    recent problems and issues, right?

5    A    Again.

6    Q    And it says:

7              "Specifically, starting now we will not open any

8         mail that we believe could be legal until the envelope is

9         reviewed by a lawyer in our legal department or, in their

10        absence, me.  It is our hope this extra step will add a

11        higher level of review and prevent any mistakes.  I'm

12        sorry our mistakes have caused problems for you, but rest

13        assured, we take any mistakes seriously and try to place

14        corrective measures in place to prevent future mistakes."

15   Okay.  You've -- you're  familiar with this, correct?

16   A    Yes.

17   Q    Okay.  Now, your testimony here today is that since then,

18   even in this month, October, you've received two items that

19   you previously identified that you say were opened before they

20   came to you.

21   A    Absolutely.

22   Q    All right.

23   A    After that letter, October 8th.

24   Q    But you admit, don't you, sir, that you haven't filed any

25   complaints with regard to that, have you?

1    A     For what?  It's going to happen, anyway.  I've been

2    through that.  I've addressed it with the Court.  If you're

3    going to do irregularity, disrespecting the Court, what chance

4    do I have with the MCC?

5         You don't respect the Judge's orders, so why would I

6    waste my time?

7    Q     So the answer to my question is no.

8    A     No, absolutely not.

9    Q     All right.  And in fact you haven't had this communicated

10   to the Government in any way until this very morning, did you?

11   A     Surprise.  I wanted to bring it in and show the Judge,

12   live and effect -- live and direct your disregard for his

13   orders after that letter.  Your apology again from Haas, it

14   still happened.

15   Q     All right.  And the only thing you have to back that up

16   is your own word, isn't it, Mr. Savage?

17   A     And a camera in the cell, your evidence.  Get the camera.

18   Check it.  I received it at 2:45 on October 8th.  Check the

19   camera.  They can rewind it.

20   Q     Uh-huh.

21   A     If I -- if I did something, they'd rewind it.  Rewind the

22   camera, check how the mail was given to me.  Thank God for

23   that camera sometimes.

24   Q     You haven't -- and you haven't -- so you haven't asked

25   for any administrative remedies as a result.

Savage - Cross (tro)                                            68

1    A    And I will not.

2    Q    All right.  Now, let's talk about your family visits.

3         You mentioned that the -- that your family, of course,

4    that is, your mother and your sister Conchetta are allowed to

5    visit you, aren't they?

6    A    And not Kadada, yes.

7    Q    Yes.  All right.  And --

8    A    Why not Kadada?

9         MR. HOEY:  Your Honor, if I could object at this

10   point and perhaps maybe streamline this issue.

11        I recognize the Court's order of yesterday

12   restraining this particular issue, if you will, to three

13   areas, being the legal mail consideration, the inability to

14   effectively communicate with his attorneys and the inability

15   to access the computer and law library as those things that

16   you would wish to address within this criminal case by way of

17   the -- the motion we filed.

18        We would be willing to concede at this point that

19   the personal visits, telephone calls are things that aren't

20   ripe for today or before this Court today.

21        THE COURT:  Counsel, you asked many, many questions

22   down this line on direct examination, and Mr. Troyer is simply

23   inquiring in that regard.  My memorandum and order was

24   focused --

25        MR. HOEY:  Yes, Your Honor.

1              THE COURT:  -- and your direct went beyond that

2    focus --

3              MR. HOEY:  Yes, sir.

4              THE COURT:  -- and we'll permit him.  Go ahead.

5              MR. TROYER:  All right.

6              THE WITNESS:  And I agree.

7    BY MR. TROYER:

8    Q    Let me just ask a few questions about this.

9         Isn't it true that -- that while your mother and your

10   sister have been allowed to visit you, the fact is that

11   they've just failed to appear at these visits, scheduled

12   visits?  Isn't it true?

13   A    I have visits.  They come.  They've missed a few, yes,

14   but they've come.  I had some.

15   Q    Okay.  And -- and the fact is that none of thee visits

16   were cancelled by the Government or the FBI.

17   A    Yes, they were.  My mother's in this courtroom.  You can

18   put her on.  Yes, they were, and by Haas, his vacation.  He's

19   on vacation.  I can't get a visit.

20   Q    All right.  Isn't it -- isn't it true, and I really -- I

21   won't spend a lot of time on this area, but isn't it true,

22   sir, that in fact Mr. Haas himself had mentioned to you that

23   it would be a nice courtesy that when your family was planning

24   not to show up, that it would be nice for them to call the FBI

25   so that they didn't have to make the trip all the way to New

1   York?

2   A    Oxymoron, us being nice to the FBI?  They're not nice to

3   me.  It's to required in the SAMS to tell them they're not

4   coming.  If I was a regular inmate, do I have to tell the

5   facility my family's not coming?  No, so why -- why go through

6   that?

7   Q    And that basically -- what you just said was basically

8   your response to Mr. Haas, wasn't it?

9   A    Absolutely.

10  Q    Okay.

11  A    That's not required in the SAMS.

12  Q    So the fact is you were aware that, from Mr. Haas, that

13  there was this issue about your family not showing up and the

14  FBI agents having to come up there for nothing, wasn't there?

15  A    This particular incident happened maybe a month ago.

16  Q    All right.

17  A    It wasn't a reoccurring incident.

18  Q    All right.

19  A    This happened a month ago, one time.

20  Q    All right.  Now, you have had -- you say there's only

21  time you're aware of that your family didn't show up?

22  A    On, once when I addressed Mr. Haas, saying why waste the

23  time.  It's not required in the SAMS.

24  Q    Okay.  In fact, you did have a visit, was it last week,

25  from Conchetta, your sister?

1    A    Yes -- last week?  No, the 5th, October 5th.  October 5th.

2    Q    All right.  October 5th, and in that visit you were -- the

3    nature of that visit was you were allowed to talk to

4    Conchetta, is that correct?

5    A    Yes.

6    Q    Okay.  And in that visit, essentially, your sister

7    Conchetta and you were using hand signals to communicate with

8    each other, weren't you?

9    A    Not intentionally.  We -- we're black people.  We speak

10   with our hands.  Get the camera.  We're using hands.  We're

11   not gang members.  We don't -- no gang sign.  So that's what

12   you're inferring.  No.

13   Q    So it's your testimony that no hand signals -- signals

14   were used b your sister at that visit?

15   A    Not intentionally.  See, this is what you think of black

16   people?  That's why you won't let me see our kids.

17        I'm allowed to see her, Your Honor, but not my niece and

18   nephew.

19        This is what you think of 13 or 14-year old black kids?

20   Why do you hate black people, man?  What do those kids have to

21   do with anything?

22        It's a three-year old little boy I can't see, my nephew,

23   because he's not a part of the SAMS.  What can he do?  He

24   throws gang signs, too?  He may talk with his hands.

25   Q    All right.  Now, let's talk about the legal --

Savage - Cross (tro)                                            72

1    A     Racist.

2    Q     -- the law library and access to legal materials.

3          The -- the fact is that you are permitted access, upon

4    request, to a computer terminal that has electronic -- an

5    electronic law library, right?

6    A     No, I'm not.

7    Q     You deny that.

8    A     Absolutely.  With certainty I deny it.

9    Q     Isn't it true that Mr. Haas himself has told you that you

10   have -- that you can request that, and when you need it, it

11   can be provided to you, right?

12   A     Mr. Haas has nothing to do with that.  It's a lieutenant

13   issue and a captain's issue, security concern.  Haas has

14   nothing to do with that, so I'd never address that with Haas.

15   Q     All right.  And isn't it true that essentially this

16   terminal is brought to your very self, and there's a keyboard

17   that is passed through the -- the slot so that you can

18   actually use this -- this material, correct?

19   A     Either he doesn't know the process, Your Honor, or he's a

20   liar.

21         The -- the computer is mounted to the floor in that

22   particular cell.  So how can you take -- extract that in and

23   out of my cell?  My lawyer sees it.  Tim sees it.  They see it

24   on the camera.  When is that keyboard -- get the -- get the

25   cameras, not -- anybody up there that way.  Either you're

1    making things up or you're lying.

2    Q    Isn't it true that you've never requested the computer

3    terminal to be brought to you?

4    A    I request it constantly.  I'd do anything to get out of

5    that cell.

6    Q    All right.

7    A    I will email Nazi propaganda to get out of that cell.

8    They bring me a key- -- they don't bring you a keyboard.  It's

9    mounted and screwed down.

10   Q    All right.  And you -- you complain that you weren't able

11   to print any cases.

12   A    You're not allowed.  The printer's not hooked up to that

13   particular computer, so how can I?

14   Q    All right.  Isn't it true that you can print -- upon

15   request you can print basically whatever you want to from that

16   computer.

17   A    Not on 10 South.

18   Q    Isn't it true that you've never made a request to have

19   anything printed?

20   A    I've made many.

21   Q    Really?

22   A    Really.  Verbally.

23   Q    So you --

24   A    Verbally.  I refuse to waste the time with the paperwork.

25   Q    Oh, so you've made only oral requests.  You've never put

1    that on paper.

2    A    For what?

3    Q    Okay.  So you base -- again, you have nothing to back

4    that up but your own word, right?

5    A    And your camera.  Your camera.

6    Q    Okay.  Now, one point earlier today you said you've

7    never -- you've not seen any discovery papers in this case.

8    A    No, I said I did.

9    Q    Oh, so -- so you have seen --

10   A    Took me quite some time to get them.  I -- I've

11   eventually got to see them, but I can't have them in my cell.

12   Why do you want Haas to hold my paperwork?

13   Q    All right.  Now, you're --

14   A    So he can say anything and say I told him something about

15   my case?

16   Q    You're claiming that the -- the papers are in Mr. Haas'

17   office?

18   A    Each and every last box of my discovery's in Haas'

19   office.

20   Q    Have you seen these papers in Mr. Haas' office?

21   A    I could see it.  I was in five cell for -- we moves every

22   21 days.  I seen him in my legal work, asked him what was he

23   doing in my legal work.  He said it's in his cell, it's his.

24   All of my -- everybody's legal work is in his cell.

25   Q    Mr. Savage, it is true that you're allowed to have up to

1    one full box of legal materials in your cell at any given

2    time, right?

3    A    Yes.  I have 13 of them.  So what'd he do -- held other

4    12 at?

5    Q    All right.  Well --

6    A    There's no other room up there.

7    Q    You --

8    A    Somebody else's cell?

9    Q    So it's true that you can review at least one box at a

10   time in your legal -- in your cell, right?

11   A    Yes, I can.

12   Q    In fact, you've brought -- I don't know, there's maybe

13   eight, ten, 12 inches of -- thick of legal materials --

14   A    That's stuff --

15   Q    -- that you brought here to Court today, right?

16   A    That has nothing to do with the boxes.  That's stuff that

17   I have, that I'm allowed to keep and the box, but you're

18   talking about 13 boxes.  I'm allowed one at a time.  Where do

19   other 12 be kept at?

20        There's no other closet up there, Your Honor, but five

21   other cells and Mr. Haas' office, no other where in this

22   particular place in 10 South to put my legal mail but Haas'

23   office.  There's no closets.

24        This was a cell they made -- put together.  They're metal

25   walls.  They're not sheetrock, they're not cement.  It's

Savage - Cross (tro)                                    76

1  metal.  They got welders to put these cells together.  There's
2  no other place there they could put my legal mail but Haas'
3  office.
4  Q    Okay.  Mr. Savage, the essence of this complaint is
5  you -- you would like to have these SAMS restrictions lifted,
6  correct?
7  A    Absolutely.
8  Q    Okay.  And the essence of your complaint, essentially,
9  one of the problems is you're not allowed to have any
10 communications with other inmates, are you?
11 A    Not by who?  By you.
12 Q    By the SAMS restrictions, right.
13 A    Yeah, that you imposed, so it's you.  It's not that the
14 BOP denied.  The BOP says they're following your orders.  The
15 BOP says, "Upon the U.S. Attorney's request we will impose,
16 but we can't rescind the SAMS."  So it's you.  It's not the
17 BOP.
18     It's nothing I did in the BOP for you to say that SAMS
19 imposes -- like you're accusing me of something I did.
20 Q    All right.  Well, regardless of who's responsible for the
21 restrictions, you're at least aware of them, are you not?
22 A    Yes.
23 Q    Okay.  But despite that fact and despite the fact that
24 you're asking -- asking for these restrictions, at least in
25 some regards, to be -- to be lifted, the fact is that you've

Savage - Cross (tro)                                        77

1    attempted to circumvent these restrictions by having

2    conversations with other inmates, haven't you?

3    A     How?  When?  Not in 10 South.  You get wrote up for it.

4    Q     All right.  Isn't it --

5    A     They take my commissary.

6    Q     Isn't it true that on April 21, 2010, on or about that

7    date, you had written -- or leading up to that date, at least,

8    you had written on a mattress up at MCC in New York the

9    following"

10        "A rat is an animal, police's pet, that will chew off his

11   own mother-fucking tail to get out of a trap.  I wish I had a

12   bullet for every rat's head."

13        Isn't it true that you wrote that on a mattress --

14   A     Allow me to address this, Your Honor.

15   Q     -- in MCC New York?

16   A     This --

17             THE COURT:  Just answer the question.

18             THE WITNESS:  No, I didn't write --

19             THE COURT:  Did you -- did you write it?

20             MR. TROYER:  Okay.

21             THE WITNESS:  And -- can I finish, Your Honor?

22   Please?

23             THE COURT:  Did you write it?

24             THE WITNESS:  No, no, I didn't write it.

25             THE COURT:  All right.

1            THE WITNESS:  But it wasn't -- the mattress wasn't

2      found in my cell.

3            THE COURT:  All right.

4            THE WITNESS:  The mattress found in six cell.  I was

5      in two cell at the time.  You never said it was in my cell.

6      Check the motion.

7            THE COURT:  All right.

8      BY MR. TROYER:

9      Q    Now, isn't it true that on April 21, 2010 you had been

10     brought down to FDC New York for your attorney contact visit,

11     right?

12     A    Wrong.  I was brought down on the 19th.

13     Q    Okay.  But you were here then on -- on April 21, 2010,

14     right?

15     A    Depends -- I went back on the 21st.  Depends what time

16     you're talking about.  I went back 5:00 o'clock that morning,

17     6:00 o'clock that morning on the 21st, that Friday.

18     Q    Okay.  And when you're taking both to here and from here,

19     you go through these transit areas, as you refer to them,

20     right?

21     A    Where at?  Where you --

22     Q    At FDC, at FDC Philadelphia.

23     A    Yes, I come down from up there on the elevator and

24     straight down to R&D.

25     Q    Okay.  And isn't it true that on April 21, 2010, while in

 1   one of these transit areas, you spoke to another inmate whom

 2   you learned had had contact and was housed with Dawud Bey, and

 3   that you told that inmate that, as to Dawud Bey, "He's

 4   working," and then you told that same inmate, "You know what,

 5   you can tell Dawud Bey?  He can run, but he can't hide.  A

 6   smoky sad night will solve all of that."

 7        Isn't it true that you said those words?

 8   A    Let me address this.  I'm on a three-man hold.  Anywhere

 9   I go a lieutenant and two officers with me.  When I go in a

10   cell, they cuff me up.  I leave out, they shackle me.

11        None of them heard -- and I'm ready to call the

12   lieutenant and those two guards for witnesses, and they

13   would -- I never said that.  I didn't see any other inmates.

14   Don't have time to say that much to anybody.

15        They restrict all movement where I move, wherever I go,

16   Oklahoma, Seattle, on the loudspeaker says, "Restrict all

17   movement."  So who did I see?  That's -- it takes a lot of

18   time to say it.  I didn't just blurt that out.  None of them

19   heard me, and I'm ready to call that lieutenant.  I seen it.

20   She's willing to testify under oath that I didn't say a word

21   to anybody on that particular day.

22   Q    Is your conversation that none of the prison people heard

23   it, or is your --

24   A    They -- right there, none of them --

25   Q    Or is your testimony that you didn't say it?

Savage - Cross (tro)                                          80

1    A    Both.  I didn't say it, nor did they hear it, and they

2    were right next to me.  So -- and this particular place,

3    anywhere I go I have to holler through a cell.  So they had to

4    hear me if I had to holler it.

5         I don't know -- ESP, we don't have telepathic abilities.

6    So that's a bold-faced lie.

7              MR. TROYER:  Just a moment, Your Honor?

8              THE WITNESS:  And you can go to the camera, Your

9    Honor.  It's a camera, this particular cell.

10             THE COURT:  I understand.

11             THE WITNESS:  I -- I got to address these lies, Your

12   Honor.  They got a history here --

13             THE COURT:  Well, you -- you --

14             THE WITNESS:  -- just saying anything.

15             THE COURT:  You have addressed it.

16             THE WITNESS:  Thank you.

17             MR. TROYER:  Your Honor, I believe I don't have

18   anything else at this time.

19             THE COURT:  All right.

20             THE WITNESS:  I bet you don't.

21             THE COURT:  Counsel, can I --

22             MR. HOEY:  We have no redirect, sir.

23             THE COURT:  Okay.  You may step down.

24             THE WITNESS:  Thank you.

25             THE COURT:  Counsel, can I see you at sidebar.

1          (Sidebar discussion held, 11:50:06 a.m. to 11:50:45

2     a.m.)

3          THE COURT:  Counsel, I don't know what -- where you

4     intend to go from here.  I have a memorial service to go to,

5     and actually if I don't leave now, I'm not going to get there.

6          MR. TROYER:  Okay.

7          THE COURT:  What -- what do you intend to present in

8     addition to this, Mr. Hoey?

9          MR. HOEY:  This would, I think, wrap up with brief

10    oral argument, Your Honor.

11         THE COURT:  Okay.  And how about you -- Mr.

12    Sullivan, you -- do you -- what do you intend to present?

13         MR. SULLIVAN:  We were just going to briefly present

14    to rebut a few minor matters -- or not minor matters, but

15    Mister -- Special Agent Haas, and that was it.

16         THE COURT:  Okay.  Well, we're going to recess till

17    2:00 o'clock.  We'll be back at 2:00.  We'll hear the rest of

18    this, and then we'll go from there.

19         MR. SULLIVAN:  Thank you, Your Honor.

20         THE COURT:  Thank you.

21         MR. HOEY:  Thank you.

22         (Sidebar concluded at 11:50:45.

23         THE COURT:  Recess.

24         (Luncheon recess, 11:51 a.m.)

25                         AFTERNOON SESSION

1                          (2:30 p.m.)

2                THE COURT:  Mr. Hoey, any additional evidence or

3    testimony?

4                MR. HOEY:  No, Your Honor.  The defendant rests on

5    this particular issue.

6                THE COURT:  All right.  Mr. Troyer.

7                MR. TROYER:  Thank you, Your Honor.  The Government

8    would call Special Agent Kevin Lewis.

9              KEVIN LEWIS, GOVERNMENT'S WITNESS, SWORN

10               COURTROOM DEPUTY:  State and spell your name for the

11   record, please.

12               THE WITNESS:  Special Agent Kevin Lewis, L-E-W-I-S.

13                         DIRECT EXAMINATION

14   BY MR. TROYER:

15   Q    Okay.  And, Special Agent Lewis, you're the case agent in

16   this matter?

17   A    Yes.

18   Q    And for how long have you bee a special agent with the

19   FBI?

20   A    About 13 years.

21   Q    Now, Special Agent Lewis, have you, or to your knowledge,

22   any other law enforcement officers or agents in this case,

23   ever listened to any conversations between the defendant and

24   his attorneys?

25   A    No.

1    Q    Since his arrest.

2    A    No.

3    Q    Okay.  The -- and in this matter, also, have -- have you

4    ever read any of Kaboni Savage's legal mail?

5    A    No.

6    Q    Are you aware of anybody -- any other law enforcement

7    officers or -- or agents in this matter reading Mr. Savage's

8    legal mail?

9    A    No.  In fact, on one occasion Mr. Savage included letters

10   from his former attorney, Christopher Warren, in his personal

11   mail back to his -- to, I believe, it's to his mother and his

12   sister, and we actually -- I -- when I realized that was what

13   it was, I pulled it out and gave it to another agent who

14   wasn't involved in the investigation to make sure that there

15   were no threats or anything like that communicated in there,

16   and then that was sealed with -- with our CDC.

17   Q    Okay.  So -- so neither you nor anyone else on the -- on

18   the prosecution or investigative team has read any of Mr.

19   Savage's mail, is that right?

20   A    That's correct.

21   Q    All right.  And has -- have the contents of any of Mr.

22   Savage's mail ever been conveyed to you by anyone?

23   A    No.

24   Q    All right.  Now, with regard to visits, are you familiar

25   with the -- the general procedure at MCC New York for the

1    social visits that Mr. Savage has?

2    A    Yes.

3    Q    And could you just briefly summarize what those are?

4    A    He has a two-hour visit scheduled from 1:00 p.m. to 3:00

5    p.m. every other Tuesday, and I want to -- I forget when the

6    next one is, but the -- the visit starts at one -- 1:00 p.m.,

7    but the -- the individuals showing up, they have to process

8    through the security of the -- the MCC to get brought up to

9    the -- the tenth floor for their visit.

10   Q    Okay.  So as a result if somebody is arriving for a one

11   to -- 1:00 p.m. to 3:00 p.m. visit, is it wise to arrive a

12   little early to account for that processing?

13   A    Yes.

14   Q    Okay.  Now, is -- as part of the SAMS procedure in this

15   case that's been implemented is -- is it permitted and

16   expected that a member of the FBI or some other agent involved

17   in this case will be present for social visits?

18   A    Yes.

19   Q    And are those social visits, as part of the SAMS

20   procedure, monitored?

21   A    Yes, they are.

22   Q    Okay.  Now, have -- have you or -- has the FBI or a

23   representative from the FBI attended each one of those visits

24   that is scheduled?

25   A    Yes, we have.

1    Q    Okay.  Have you ever missed a visit?

2    A    No.

3    Q    Now, those visits in Mr. Savage's case are with whom?

4    A    Normally, his -- normally his mother comes.  Sometimes

5    his sister comes, sometimes his fiancé, Crystal Copeland,

6    comes, and his minor children have also come on occasion.

7    Q    All right.

8    A    Let me -- let me just clarify.  When he was pre-

9    indictment, when he was at ADMAX in Florence, there was -- he

10   had a visit scheduled in which I was struck -- stuck on the

11   tarmac in Philadelphia and was -- arrived -- actually, I

12   missed my connecting flight to Colorado in Chicago.

13        So he missed the first day of a three-day visit out

14   there, pre-indictment because I was not -- I could not make it

15   out there 'cause I was stranded in Chicago overnight.

16   Q    Okay.  But since Mr. Savage has been in MCC New York,

17   has -- have there any -- been any such incidents?

18   A    We have not -- we have not been the result of that, no.

19   Q    Okay.  Have there been times when -- when those people

20   who are scheduled to visit Mr. Savage have missed those

21   visits, in other words, have not -- have not shown up?

22   A    They -- he normally -- works out to be about an average

23   of one -- every three visits that he has, somebody shows up on

24   one out of every three -- every three visits.  So there are

25   usually two visits, you know, in any three-week period that

1   he's missing.

2              Now, sometimes he has two or three in a row where

3   they'll make it, but then they'll go two or three where they

4   miss it, also.  So it's not in every -- there's nobody

5   available there.  We -- we're up there in New York waiting for

6   somebody to show up, and on five or six occasions nobody has

7   shown up.

8   Q    Okay.  And the -- has there been -- what has the practice

9   been in terms of those people who are supposed -- the visitors

10  showing up, whether they call ahead of time to -- to announce

11  that they're not coming or will be late?

12  A    For -- for the first nine months or so they would call

13  and advise Mr. Haas at MCC New York that they were going to be

14  at the visit or they were not going to be at the visit, and if

15  they were not going to be there, we didn't travel to New York.

16             For the last nine months or so they no longer call, so we

17  go up there.  We wait there.  They don't show up, and we end

18  up driving back later on that night.

19  Q    Okay.  So to summarize, approximately how many times have

20  either you or your partner gone from Philadelphia up to New

21  Your and only -- only to have nobody show up?

22  A    About four or five, four or five occasions.

23  Q    All right.  Have there been occasions when the family

24  members have arrived -- have arrived late?

25  A    It actually happened frequently, yes.

1   Q    Okay.  And on those occasions what -- what has been the

2   result in terms of the length of the visit?

3   A    The -- the visit -- the MCC New York extended the visits

4   on several of the occasions where it was supposed to end at

5   3:00, they extended it to -- towards 4:00 o'clock.

6        There was a count, I think it's at 4:00 o'clock, so they

7   have to be out of the institution.  Might even be 4:30.  They

8   have to be out of the institution.

9        So they've extended a couple times beyond the 3:00

10  o'clock if it was the MCC's fault because in processing, and

11  sometimes getting people upstairs they have to have manpower

12  to get the visitors upstairs.  They have extended visits.

13       There have also been visits where the people visiting

14  showed up late, and the visit was cut off at 3:00 o'clock, as

15  it was prescribed by the -- by the -- the MCC New York.

16  Q    Okay.  And is there any requirement under either the SAMS

17  or MCC New York procedures to -- to extend those visits, or is

18  that simply a courtesy that they extend?

19  A    It's just MCC New York's courtesy.

20  Q    All right.  Now, let me ask about telephone calls.

21       Are you familiar with the telephone calls that he -- he

22  can have with, again, social calls to the family members?

23  A    Yes.

24  Q    And those are also monitored?

25  A    Yes, they are.

                          Lewis - Direct (tro)                    88

1    Q    Okay.  And they're monitored real time, as opposed to

2    simply recorded, as are most prison calls with most prisoners.

3    A    Yes, they're monitored real time.

4    Q    Okay.  And since -- since Mr. Savage has been at MCC New

5    York, approximately how many times has -- has the Bureau of

6    Prisons missed a call, or rather, failed to do a scheduled

7    call?

8    A    I believe there was one time where we -- we were

9    unavailable for the call, and I think that call was later made

10   up, and there was another time where the prison was

11   unavailable to do a call in a given month, and they made that

12   call up in a following month.  So he had two calls in a -- in

13   a subsequent month.

14   Q    Okay.  All right.  Now, earlier today you may have heard

15   some testimony about -- about books.

16        Have -- have you had any input or attempted to have any

17   input into the books that Mr. Savage can receive or not

18   receive?

19   A    The MCC New York sends us the books that he does receive

20   at the institution for us to review, but we haven't rejected

21   any books.

22        MCC -- I am aware that MCC New York did -- did reject, I

23   think it was two books, for whatever purposes -- for their own

24   purposes, not for any at our direction.

25   Q    Okay.

1           MR. TROYER:  Your Honor, I have no further questions

2   at this time.

3           THE COURT:  All right.  Mr. Hoey.

4           MR. HOEY:  One moment, please, sir.

5           (Pause in proceedings.)

6           MR. HOEY:  Your Honor, we have no questions of the

7   agent.

8           THE COURT:  All right.  You may step down.

9           Mr. Troyer, anything further?

10          MR. TROYER:  No.  Thank you, Your Honor.  We -- we

11  do not.  Thank you.

12          THE COURT:  All right.  Mr. Hoey, I'll hear whatever

13  you have to say.

14          MR. HOEY:  Thank you, Your Honor.

15          Your Honor, first order of business is to thank the

16  Court for taking on the issues that we've raised today.  They

17  are clearly serious, as they pertain to our ability to

18  represent Mr. Savage.

19          Mr. Sullivan and I certainly wish to thank the Court

20  for listening to these concerns.

21          I think the first order of business is to discuss

22  those areas which the Court has outlined in its recent

23  memorandum as being ripe for today's consideration that

24  consider the legal mail issues, the inability to effectively

25  communicate with counsel, as well as the inability to access a

1    computer and a law library.

2            Collectively, I would think and conclude all pertain

3    to Mr. Sullivan, Mr. Cooke and I's ability to represent Mr.

4    Savage effectively.

5            As the Court is aware and as the Court has cited

6    within its memorandum, a defendant in Mr. Savage's capacity,

7    one being certified perhaps for the death penalty, enjoys a

8    broader range of constitutional privileges, if you will.

9        That concept that a capital defendant detainee enjoys

10   greater protections is well-founded, not only within the

11   statute, but within the case law that we've cited within our

12   own brief.

13           The simple reason and the common sense reason for

14   that is that because the stakes are so high in such a case and

15   because the requirements placed upon counsel in such a case

16   are significant.

17           Mr. Sullivan, as the Court is well aware, is a

18   second attorney appointed to the case.  Under statute it's

19   required that Mr. Sullivan have unfettered access to his

20   client in the capital case.

21       It's clearly required under the law that Mr. Sullivan be

22   permitted unfettered access to his client and really

23   unfettered ability to prepare a mitigation defense.  Clearly,

24   with the penalty phase attorney that's -- that's fairly clear.

25           As it pertains to my representation, Your Honor, in

1    the guilt phase I think the same standard would apply.  This

2    is a very serious matter involving very serious consequences,

3    and when we analyze the restrictions that have been placed on

4    Mr. Savage and his constitutional protections, the case law

5    also is very clear.

6            The case law requires the Government to demonstrate

7    that there's a rational means or a rationale between the

8    restrictions and the penalogical interests at heart, and when

9    we analyze the restrictions under *Turner v. Saffley* and the

10   test set forth in that matter which we've cited, it, again,

11   requires that the -- the burdens that a constitutional right

12   might have must be reasonably related to legitimate objectives

13   of the prison.

14           And in this particular case I would argue

15   strenuously, Your Honor, that the SAMS restrictions, most

16   specifically, those three that you've identified, are clearly

17   impairing our ability to fairly and effectively represent our

18   client.

19           I would ask the Court from the evidence that was

20   taken today to determine whether or not leaving somebody's

21   light on in a jail cell 24 hours a day is reasonably related

22   to anything that the -- the prison or the Bureau may seek to

23   impede.  Why is keeping somebody awake with a light on 24

24   hours a day -- we're not talking about a month now, talking

25   about over 18 months at the MCC -- while it was not the

1   condition at ADX, it certainly has been the condition for 18

2   months, and I think the response or the questioning of Mr.

3   Savage today with respect to his ability to somehow remediate

4   that condition by pulling a blanket over his head is absurd.

5          I think what -- what happens when someone's

6   subjected to that particular condition for that period of time

7   goes without saying.

8          To bring him down here for 48 hours to the FDC and put

9   him in a dry cell with no toilet, no sink, no ability to -- to

10  void, to leave the light on in his cell for 24 hours a day and

11  then to say, "You know what, I can't believe he's not ready to

12  meet his lawyers, I can't believe he's -- he's not -- not --

13  not prepared to have a very cogent discussion with his

14  attorneys about his defense" -- the guy's been up all night.

15         He can't go to the bathroom without knocking on the

16  door and asking the guard to open the door up and let him out

17  in the middle of the night to go to the bathroom 'cause he has

18  no toilet in his cell.  He's got no sink.  He has no

19  facilities or use of any facility that would be reasonable

20  under the circumstances.

21         And then he's asked, "Well, why -- why wouldn't you

22  want to come back to Philadelphia?"  Why would he?  How are

23  those conditions reasonably related to any penalogical

24  interest in the case?  What can the Bureau of Prisons or the

25  Government say in this case is why they're doing that.  Why

Hoey - Closing                                        93

1    are they doing that?  How does that effectively impede Mr.

2    Savage from doing anything untoward?

3            Quite frankly, it sounds like it's punitive in

4    nature and certainly goes beyond any reasonable bounds of

5    managing an inmate.

6            The next issue concerns the access to a legal

7    library.  This is a capital defendant.  In the Metropolitan

8    Correctional Center, which is a facility that houses America's

9    worst criminals in 10 South the -- Mr. Ghailani on trial in

10   New York now is accused of blowing up a -- an embassy in

11   Africa, which, of course, preceded the 9/11 attacks.  He's one

12   of the most serious offenders in the United States.

13           In that institution on his block that gentleman, as

14   well as Mr. Savage, have no law library.  He's been afforded

15   two separate one-hour occasions to be behind a computer on the

16   block that allows him access to a -- a computerized legal

17   database, Lexus, from which he can't print off a case, from

18   which he can only look at case law and write down on his

19   notepad what the case may say.  He has no ability to prepare

20   his own defense.

21           The discovery that we carefully copied at great

22   expense to the Government was provided to him in paper form

23   because he didn't have access to a computer, and we weren't

24   going to mail him disks that would sit in his jail cell unused

25   'cause he can't get to his computer.

Hoey - Closing                                    94

1        We mailed him the boxes of discovery.  They're

2   sitting in the warden's office, or the assistant warden's

3   office.  Nevertheless, he gets one box at a time that may be

4   one box completely out of order chronologically from all the

5   other discovery he may have looked at.

6        I can only imagine how difficult it is to request

7   another box and get one that is somewhat chronologically

8   consistent.

9        THE COURT:  Mr. Hoey, the things that are in the

10  boxes, are they on disk?

11       MR. HOEY:  They are.

12       THE COURT:  Everything?

13       MR. HOEY:  They are.

14       THE COURT:  All right.

15       MR. HOEY:  And we'd be happy to provide him those

16  disks, but when we asked our client what is the best way to

17  look at it, he said he has no access to the computer, and

18  there's no way for him to look at it in that manner.

19       THE COURT:  If he had access to a computer and he

20  had the disks, there would be no problem.

21       MR. HOEY:  Correct.

22       THE COURT:  All right.

23       MR. HOEY:  So the -- the other argument with respect

24  to the -- the legal library access, Your Honor, is very

25  simple.  What rational basis exists to subject him to -- to no

1    right to the library?  What penalogical interest is advanced

2    by doing that?  He can't communicate over that internet.  He

3    can't copy any cases.  He can only look at the cases?  There's

4    no rational basis between restricting his access to the law

5    library and any penalogical interest that may exist.

6                THE COURT:  All right.

7                MR. HOEY:  The other issue concerns the legal mail,

8    Your Honor.  Mr. Savage testified clearly on direct and was

9    challenged heavily on cross about, you know, his confidence in

10   communicating with his attorneys.

11               Well, who could blame a guy who's been kept in ADMAX

12   in Colorado, 24 hours a day in his cell at the MCC and having

13   very remote supervised human contact once a month, who could

14   blame him for being concerned about his ability to effectively

15   communicate privately with his lawyers, both in person and

16   through the mail when there have been at least two orders from

17   this Court directing the Bureau not to open his mail, and it

18   continues unmitigated, and then he's cross examined today,

19   "Well, you know, you can talk to your lawyers through the

20   mesh.  You can talk to them, right?"

21               Well, yeah, he can, but what kind of confidence do

22   you think he has when every piece of mail that he's getting

23   from his lawyers is opened?  There's two ways for a -- the

24   lawyer to communicate with his client.  Clearly, one is in

25   person, and the other is through the mail.  We know how

Hoey - Closing                                         96

1    expensive it is to send a lawyer up on the train to see his

2    client in Manhattan.  It's expensive.

3           One equally effective way to communicate way to

4    communicate with Mr. Savage is for me to mail letters

5    outlining strategy, suggesting ways we can cross examine

6    witnesses, go through all sorts of defense tactics through the

7    mail and discuss these things, when we now know it's being

8    opened and, presumably, read.

9           And to suggest that he should somehow be emboldened

10   to have some kind of confidence in the system, quite frankly,

11   I think is outrageous.

12          Now, the attorney meetings occur in a metal cell

13   with a mesh wall between my client and myself with the

14   administrator sitting right outside the jail cell at the desk.

15          THE COURT:  Mr. Hoey, we made arrangements for you

16   to meet with your client, have contact visits, you and Mr.

17   Sullivan --

18          MR. HOEY:  Certainly, Your Honor.

19          THE COURT:  -- here at the FDC.  Why is that not

20   adequate?

21          MR. HOEY:  I think it's inadequate constructively

22   and actually, Your Honor, for -- for several reasons.

23   Constructively -- well, actually, what's occurring is when

24   he's brought down here, he's subjected to conditions that are

25   pretty -- downright deplorable.  He's discussed his inability

1    to have shackles removed when he has a bowel movement in the

2    prison, which is not only unsanitary, but completely

3    impossible to believe.

4              He sits in a cell that's a dry cell, a suicide watch

5    cell with a light on 24 hours a day.  This is very technical

6    stuff that we're reviewing in terms of discovery.  He's only

7    allowed to bring one box of that down at a time.  When he

8    meets with us -- when he met with us at the prison, he's

9    effectively awake for 48 hours.  It's a completely disruptive

10   process.

11             Clearly, Your Honor, I think the easy resolution is

12   to -- to have him housed at the FDC in Philadelphia.  This is

13   a trial that's beginning in September 2011, less than a year

14   away.  We're going to need him here, anyway, eventually, and

15   he's going to be a permanent resident at that facility from

16   jury selection, pretrial motion arguments, which are going to

17   go on for days, the substance of the trial, the penalty phase.

18   He's going to live there, and the question is, is he going to

19   live in that dry cell with a light on and be asked to come to

20   Court the next day fresh and ready to participate in his

21   defense.

22             I think it's a tortuous element of his confinement

23   to have a light on 24 hours a day.  There's been no evidence

24   from the Government today to suggest why that's necessary.

25             But to answer the question about why he's not coming

1  to Philadelphia, I think actually those things are

2  impediments, and I think constructively, even if he were to be

3  able to withstand that and come into a room and meet with us,

4  he's not of the mindset to deal with preparing for a capital

5  offense.  I think the easy resolution is to move him -- move

6  him down here permanently.

7          And I don't know that there's been -- there's been

8  no evidence put on the record today as to why that can't

9  happen.  There's no -- there's no record to suggest that that

10  less invasive measure is inappropriate, and isn't that the

11  Government's burden to demonstrate under *Wolfish* and the other

12  cases that we've cited.

13          Finally, Your Honor, getting back to the legal mail,

14  I think Mr. Savage aside, I think the attorneys in the case

15  have concluded that there is a lack of confidence in the

16  ability to communicate through the mail, and I think that

17  that's a serious problem, and -- and I understand Mr. Troyer's

18  taken steps, and we're very grateful for that, and I know Ms.

19  Sykes has been part of it, and we're grateful for it, but --

20  but on the 21st of September those steps were recited to the

21  Court, and when Mr. Savage goes back to his cell, the mail's

22  re-opened and stamped as having been re-opened.

23          So I mean this is really, you know, a pretty bad

24  history on the legal mail, and I think it's undermined his

25  confidence and undermined our confidence that the mail is an

1    appropriate manner of communicating with our client.  I think

2    the sum total of all of this restriction is that it is

3    practically, actually and constructively interfering with our

4    right to effectively represent Mr. Savage.

5           Your Honor, I see no other way around it, and I

6    think the practical resolution, which has not yet been

7    rebutted with any credible evidence, is housing him at the

8    FDC, subject to restrictions that may prevent what -- what

9    they think needs to be prevented can be imposed.

10          THE COURT:  All right.

11          MR. HOEY:  Thank you, Your Honor.

12          THE COURT:  Thank you.

13          Mr. Troyer.

14          MR. TROYER:  Thank you, Your Honor.

15          Your Honor, we do -- we do begin with the Supreme

16   Court's determination that a prison regulation that burdens a

17   constitutional right is constitutional, provided that it's

18   reasonably related to legitimate penalogical objectives,

19   and -- and we do go then to the *Turner* factors.

20          And in this case I mean what we're really getting

21   down to, it's somewhat unbelievable that we're spending time

22   talking about, you know, the -- the type of cell and whether

23   there's a light on and how often he can get to his -- his

24   toilet facilities.  Those are really not the kind of things

25   that the Courts should or should have to -- to get involved

1    with.

2              These are -- these are situations in this case, and

3    we look at the factors, and, you know, the factors, of course,

4    are, one, whether there's a valid rational connection between

5    the prison regulation and the legitimate Government interest

6    put forward to justify it.

7              You know, in a situation where Mr. Savage is brought

8    to Philadelphia, yes, he's put in a -- in a cell that -- that

9    doesn't have flushing toilet facilities, and the reason for

10   that, of course, as was clearly described to him, and they're

11   in the papers that are part of the addendum to the motion

12   itself, is the reason for that, as was described by the warden

13   of FDC, is that Mr. Savage had previously been in FDC and he

14   had been in the SHU, which is about, other than where he is

15   right now, is at the highest security one can have in the

16   special housing unit, and even while in the SHU he was not

17   only communicating threats and conspiring with witnesses who

18   were on the other side of -- in the next cell, but he was --

19   he and the other person were using the toilet facilities to --

20   to also communicate threats and conspire to hurt witnesses and

21   their families.

22             And so, obviously, this is a valid rational

23   connection.  Normally, it's true.  The prison system wouldn't

24   put that kind of a restriction on somebody, but in this case,

25   unfortunately, it -- it's quite necessary.

1           And, again, when we get down to the nitty-gritty of

2    the testimony, you know, there's never been any occasion where

3    Mr. Savage hasn't been able to -- to use toilet facilities

4    when he's needed, and I know there's some testimony about how

5    he was handcuffed or shackled.  I don't know that that's the

6    case or not, but it's -- in any event, it certainly hasn't

7    hindered -- it doesn't rise to a constitutional level in this

8    case.

9           Are there alternative means of exercising your

10   right?  Mr. Hoey can come up here and say, well, you know, he

11   should be sent to FDC Philadelphia, and, gee, that would make

12   everything easier, but easier for whom?  It's -- you know, the

13   Bureau of Prisons has to -- has to house Mr. Savage, and they

14   have to make sure that Mr. Savage is safe and that others are

15   safe.

16          The reason that we have these restrictions, and,

17   yes, it's a capital case, but the reason we're here and the

18   reason it is a capital case and the reason there are SAMS

19   restrictions is because Mr. Savage, you know, has committed

20   some very serious crimes, and, unfortunately, many of the

21   crimes that he's committed, that he's been indicted by a grand

22   jury for having committed, are crimes he's committed while

23   he's been in correctional facilities.

24          In fact, six of the 11 murders that he's charged

25   with were committed when he was at the FDC Philadelphia right

1    across the street in -- in a rather secure setting.

2                  It's -- so it's not an easy situation, and, of

3    course, the other murder was when he was at one of the local

4    facilities, CFCF.  So it's not as if there are easy

5    alternative means of exercising the right.

6                  The impact accommodation of the asserted

7    constitutional right, you know, when we look at those factors

8    and the absence of ready alternatives -- but the fact is Mr.

9    Savage is a pretrial detainee, but he's also a sentenced

10   prisoner.  He's designated to ADMAX.  He was in ADMAX before

11   he was indicted and before he was brought closer to the

12   Eastern District of Pennsylvania for -- for trial.

13                  It was -- he could have easily -- the Bureau of

14   Prisons and the marshals could have said, "You know what, send

15   him back to ADMAX.  Counsel can go out, and they can -- they

16   can visit him out there," but we -- we knew that that would --

17   that could create some difficulties.

18                  We knew that because of the nature of the case and

19   because it is a big case, that we would have to take some

20   extra steps.

21                  The Bureau of Prisons, to their -- to their great

22   credit, I think, took those steps and with the consent and

23   agreement of defense counsel at that time he was sent to MCC

24   New York, a place that is much more convenient for an attorney

25   in the Philadelphia area and for an attorney from Maryland, as

1    is Mr. Sullivan, and it's not that far.  It's not that hard to

2    get to, and -- and then, of course, the next thing we heard

3    is, "Well, we need contact visits, and MCC New York won't give

4    them."

5              Again, the Bureau of Prisons and the Government has

6    bent over backwards to -- to accommodate Mr. Savage, and

7    despite the fact that the case law is fairly clear that

8    there's not a constitutional requirement of having contact

9    visits, we all recognize, I know the Court recognizes, and the

10   Government as well recognizes that there -- there -- that

11   contact visits are -- are something that are valued and -- and

12   valuable to defense counsel and -- and their clients

13             And so, again, we made these accommodations.  We

14   made these accommodations to bring him down here to

15   Philadelphia, and he was going to be brought down here once a

16   month and then later on, twice a month as we got closer to

17   trial, and what happens, Mr. Savage, you know, as if he's

18   staying at the Holiday Inn and he's -- and he doesn't like his

19   room, he says, "Well, you know, I don't like the room I'm

20   staying in.  It's -- it's dirty, and I don't like the

21   facilities."

22             Well, that -- you know, that's just simply not an

23   answer.  I mean, you know, the Bureau of Prisons is not a

24   travel agency.  You know, he's brought down here.  He's in --

25   in this type of room for a reason, and there's nothing about

1    being in a room like that that would stop him from having a

2    contact visit and a valuable legal visit with his legal team.

3    It's just not --

4            THE COURT:  Mr. Troyer, let's back up a minute.

5            MR. TROYER:  Yes, sir.

6            THE COURT:  Tell me what -- what the penalogical

7    interest is in having a light on in your cell for 24 hours a

8    day.

9            MR. TROYER:  Well, the one that occurs to me

10   immediately is, although I don't -- I know that wasn't exactly

11   the focus of their motion, at least until today, but is a

12   security issue.  Now, I --

13           THE COURT:  They do that to everybody in the SHU

14   over in the FDC?

15           MR. TROYER:  They -- they -- to my knowledge, they

16   do not.  I'm not 100 percent sure, but I don't believe that --

17           THE COURT:  Well, if they don't do it for everybody

18   that's in the SHU, why are they doing it for Mr. Savage?

19           MR. TROYER:  From my understanding, from having

20   talked -- talked to other -- a couple of the people from FDC

21   today, my understanding is that the particular cell that he's

22   in, because it is a strip cell or suicide cell, that -- that

23   they do not have the ability -- what I heard earlier this

24   morning was they do not have the ability to turn that light on

25   and off.  It's a light that stays on all the time.  It's --

1    it's -- I think it would be an easy fix if -- if there were

2    simply a light switch and they could do that, but that's --

3    that's what I heard earlier today, so --

4              THE COURT:  With regard to the mail, Mr. Troyer --

5              MR. TROYER:  Yes, Your Honor.

6              THE COURT:  -- is there any -- what is the solution

7    to that problem?

8              MR. TROYER:  The solution to that problem was --

9    was -- I believe was articulated was -- was found last month

10   and was articulated to this Court last month and was -- and

11   was documented by the email that I gave.

12             And -- and that -- we addressed that rather

13   completely.  We recognized that there had been some errors

14   made, and -- and I'll repeat that some of those errors were

15   made by counsel, and they weren't made on purpose, but there

16   were a couple of -- of the envelops that were sent, I know

17   from Mr. Hoey's office, was probably just done by a clerical

18   staff person without Mr. Hoey looking at it, simply had, you

19   know, 50 Darby Road, Paoli, PA.  There were others, though,

20   where there were mistakes, and it clearly appeared to be legal

21   mail.

22             THE COURT:  Well, the indication is from the

23   defendant that even after the hearing that we had to address

24   that problem it happened again.

25             MR. TROYER:  I submit that that's false, and I -- I

1    submit that Mr. Savage is not -- that is a claim that was not

2    made.  It was not brought to the Government's attention until

3    this morning.  It was -- Mr. Savage has filed -- has filed

4    nothing with the Bureau of Prisons making that allegation.  He

5    basically came into Court today and said, "Look, here's an

6    envelope.  It's been opened."

7            Well, of course, it's been opened.  That could have

8    been opened by him.  It could have been opened in his

9    presence.  It was not -- there's nothing but Mr. Savage's own

10   word as to these two envelopes.

11           One thing I will do, Your Honor, and I would -- I

12   would encourage -- not having seen these two envelopes until

13   today, I noticed one thing very, very important about them.

14           Do we have them?

15           (Pause in proceedings.)

16           MR. TROYER:  You know, the previous envelopes have

17   been attached as exhibits that had been -- that had been

18   opened.  The ones -- and the ones that MCC New York

19   acknowledged had been opened, and the one thing that was

20   interesting about those was that MCC New York, when -- when it

21   came in, they stamped it, erroneously and mistakenly.  They

22   stamped that as general correspondence to be opened, and there

23   was a stamp put on it.  So there was -- it was clear that it

24   had been opened.

25           By contrast, none of these, given the fact that that

1    is the practice up there, none of these bear that stamp.

2    There's nothing on these envelopes to show that that was --

3    that that was the case here.  There's nothing on these

4    envelopes to show that they were opened either on purpose or

5    by mistake.  Again, all we have is Mr. Savage's word that,

6    "Oh, yeah, I got these, and they were already open."

7           Nothing -- there's nothing on here at all to show

8    that, not on the front of the envelope, not on the back of the

9    envelope, nowhere, and -- and we know from the other

10   envelopes, again, just to be perfectly clear, it says,

11   "Notice, opened as general correspondence.  For special mail

12   requirements, see 28 CFR 540.19."

13          And so -- so it's Mr. Savage and Mr. Savage alone

14   who's making this claim that, "Oh, I got these, and they were

15   opened.  They shouldn't have been opened."

16          Now, again, is it possible that a mistake could have

17   been made?  I suppose it's possible, but I -- I submit that

18   the evidence is really to the contrary on this.

19          THE COURT:  Mr. Troyer, couldn't the problem be

20   solved by a -- the -- the security cameras not -- giving him

21   the mail right in front of the security cameras and showing

22   him the mail, the legal mail we're talking about now, so that

23   there's a record, essentially of the fact that it has not been

24   opened before it's been given to him?

25          MR. TROYER:  Candidly, I -- I can't answer that

1    question because I don't know how the cameras -- specifically

2    how the cameras are positioned and whether that would show it

3    or not.

4              THE COURT:  I don't know either, but I think it

5    needs to be looked into.

6              MR. TROYER:  Well, one thing I will say is that,

7    despite what Mr. Hoey said about the Government's burden, this

8    is the defendant's motion and this is the defendant's

9    burden --

10             THE COURT:  I understand.

11             MR. TROYER:  -- and the defense could certainly

12   have --  they could certainly have subpoenaed those -- those

13   tapes, if there are tapes from it, and I don't know if there

14   are.  They certainly could have made efforts to do that and

15   present that evidence, if there was such evidence, and they've

16   made no such attempt to do so.

17             THE COURT:  Well, I would suggest that perhaps you

18   ought to communicate with the -- the New York people and find

19   out just exactly ow that could be resolved.

20             MR. TROYER:  Yes, and I -- and I have, of course, in

21   the past, and -- and, again, I know that, at least until this

22   morning, there was no further controversy about that matter,

23   and I know that -- again, from the email that I had submitted

24   as an exhibit for Mr. Haas, that all of matters were to go

25   through, you know, one central authority so that there would

1    be no mistakes and no problems with that -- with that mail.

2              But, of course, you know, more importantly, and I

3    recognize that, you know, what Mr. Savage is saying, although,

4    again, I mean I think it's certainly somewhat biased, but I

5    don't think -- I don't think there's any rational reason to

6    believe that anyone is reading Mr. Savage's mail.

7              We know that there -- you know, when mail comes in

8    and when any parcel or item comes in, certainly things have to

9    be opened to make sure that there's not some sort of

10   contraband, and we're not suggesting, of course, that

11   contraband in the form of drugs are going to be sent in mail

12   or some weapon, but -- but there are, however, certain things

13   that come in that are not -- sometimes unwittingly are sent,

14   sometimes there are staples, there are paperclips or other

15   things that could be fashioned into weapons, and I know

16   that -- that obviously federal correctional institutions are

17   very concerned and careful about that.  But nobody's

18   reading -- nobody is reading Mr. Savage's mail.

19             And if I just can -- can sum up this whole thing, I

20   think there's one person, there's one person and one person

21   only, who's restricting this defendant's constitutional

22   rights, and that's Mr. Savage himself.  He's -- he's the one

23   who is -- despite his attorneys' best efforts, despite the

24   Government's best efforts and even this Court's best efforts,

25   that he's the one who's impeding his ability to talk to his

1    lawyers and is impeding his lawyers' ability to talk to him.

2    He's the one who's saying -- who's making up this -- this

3    crazy stuff about, "Oh, well, you have lip readers so I can't

4    talk to -- can't talk to my attorneys in MCC."  It just is not

5    credible information.

6          Mr. Savage has the ability, he has the opportunity

7    to have full and fair preparation of his defense and full and

8    fair access to his attorneys, and he is declining those

9    opportunities, just as he's declining his opportunities to use

10   the electronic law library, just as he's declining his

11   opportunities to -- well, or family's declining opportunities

12   to have visits.  That's not on Mr. Savage, but he's -- he's

13   the one who's turning down these opportunities.

14         And he's the one who's causing his own problems, as

15   well, because he's had -- you know, with all the restrictions

16   he's had, he's had further discipline problems in here, as we

17   put -- set forth in our -- in our response.

18         You know, Mr. Savage, unfortunately, you know,

19   hasn't -- certainly hasn't seen the error of his ways, and

20   he's certainly continued.  Even with the -- the few and

21   fleeting opportunities that he's had, he's continued to try to

22   take advantage of those opportunities to -- to either convey

23   threats or otherwise cause problems.

24         So, again, the only person who's standing in the way

25   of Mr. Savage -- Mr. Savage preparing his defense is Mr.

1    Savage, and he shouldn't be rewarded for that. Mr. Savage

2    does he some strict restrictions on him, but those

3    restrictions are there for a reason.

4          He's been indicted for 11 murders. He's been

5    indicted for murdering, you know, family members of a witness.

6    He's been indicted for murdering a witness in yet another

7    murder case. Mr. Savage is the veritable poster child for the

8    SAMS restrictions.

9          He can complain about being put in there with

10   terrorists. If I were one of the terrorists, I'd be worried

11   about being in there with Mr. Savage. That's how dangerous he

12   is.

13         So I think that's -- I think under the -- under the

14   circumstances, these restrictions are rational, and they're

15   certainly related to -- to the BOP's functions, and I think

16   they should be left intact.

17         Mr. Savage practically invited the Court or the

18   Government to send him back to ADMAX, and that is certainly

19   a -- a possibility if Mr. Savage just doesn't want to comply

20   and doesn't want to cooperate with all the opportunities that

21   have been given him, but I submit that the best thing would be

22   for Mr. Savage to take advantage of those opportunities that

23   the Court and the Government and his own lawyers have

24   attempted to fashion for him here.

25         THE COURT: All right.

1          MR. TROYER:  Thank you.

2          THE COURT:  All right, counsel.  We'll take a look

3    at the situation, and we'll make a determination as to what

4    needs to be done, if anything, to resolve the problem.  All

5    right.

6          MR. HOEY:  Thank you, Your Honor.

7          THE COURT:  Okay.  Before we leave, Counsel, can I

8    see you at sidebar.

9          (Sidebar discussion, 3:09 p.m. to 3:15 p.m.)

10         THE COURT:  Okay.  Mr. Troyer, let me break this

11   down.  I'm going to request that you communicate with the

12   people at New York with regard to my inquiry about giving him

13   the mail under conditions where it will be absolutely clear

14   that it hasn't been tampered with.

15         I'm going to also -- I want you to talk to them

16   about this computer situation and the fact that the disks are

17   available for his use.  Seems to me --

18         MR. HOEY:  They are --

19         THE COURT:  -- that that would resolve a huge

20   problem, and I want to know whether -- where is the computer

21   that he's supposed to use, are there problems --

22         MR. TROYER:  The computer could actually be brought

23   to his cell, and he can actually -- right there he can -- he

24   can use it.  He can access it.  He can put the disk in.

25   That's been offered to him.  He's -- he's the one who's chosen

Sidebar                                                              113

1    to -- to get things in paper.

2           THE COURT:  I want to -- that has -- Mr. Hoey, is

3    that consistent with your understanding?

4           MR. HOEY:  When I go up there, Judge, there's a, you

5    know, the resident cells and then there's visiting cells, a

6    very small block.

7           From what I recall, there was a -- just a keyboard,

8    if you will, kind of like a phone keyboard in that room where

9    I met with him.  I don't think I saw a computer.

10          THE COURT:  Well, let's -- let's find out, and let's

11   get to the bottom of it and find out exactly how the situation

12   can be resolved.

13          With regard to the situation over at the FDC, I want

14   you to communicate with the FDC and report back why it's

15   necessary to keep him in -- in a situation here he can't sleep

16   at night.  All right.

17          MR. TROYER:  All right.

18          THE COURT:  And, finally, with regard to the -- the

19   contact visits, it seems -- when he' down here, you have the

20   ability to communicate with him --

21          MR. HOEY:  Uh-huh.

22          THE COURT:  -- and you have contact visits.

23          MR. HOEY:  Yes.

24          THE COURT:  Do you need more of them?

25          MR. HOEY:  Well, you know, it's been kind of

1     suspended during the course of this proceeding simply because

2     he's, I think, refused to come back down and sit in that dry

3     cell.

4                    THE COURT:  If he -- if he continues to refuse,

5     that's his problem, but if you need additional visits as this

6     thing goes forward, I want you to --

7                    MR. HOEY:  Certainly, Your Honor.

8                    THE COURT:  -- communicate that, and we will make

9     arrangements for it.  Okay.

10                   MR. HOEY:  Yes.

11                   THE COURT:  All right.

12                   MR. TROYER:  Sorry to ruin your schedule today, and,

13    you know, I didn't expect this would take as much time as it

14    did.

15                   THE COURT:  Sure enough.

16                   MR. SULLIVAN:  We're under a year until trial, so

17    inevitably we're going to be having this discussion about

18    housing -- where we're going to house Mr. Savage during the

19    trial in this case, and it just seems prudent to me to kind of

20    be in front of the problem as --

21                   THE COURT:  I intend to talk to the Bureau of

22    Prisons about that situation, because, certainly, if there

23    were some way that he could be down here, it would be -- it

24    would solve the problems.

25                   I understand that they're not anxious to accommodate

1    that, but we'll check and find out.

2              MR. HOEY:  It sounds like the toilet is the only

3    issue.

4              THE COURT:  Well --

5              MR. HOEY:  Other than the --

6              THE COURT:  There is -- there is --

7              MR. HOEY:  For many reasons.

8              THE COURT:  There is a valid reason why he doesn't

9    have a toilet in his cell, and he confirmed it today with his

10   testimony.  They do communicate.  So --.

11             Finally, we're going to run into a problem with

12   mitigation experts wanting to -- mitigation exerts, a

13   psychologist wanting to communicate with him --

14             MR. TROYER:  Well, that won't be a problem.  We will

15   certainly have -- they'll all be -- they'll all be admitted

16   through the SAMS process.  We've had -- we've had other co-

17   defendants in this case who have had the same kind of request

18   with --

19             THE COURT:  Will they have the ability to have

20   contact visits as -- if counsel --

21             MR. TROYER:  If they need them, we could -- we can

22   provide them, certainly.

23             MR. SULLIVAN:  Are the co-defendants under SAMS?

24             MR. TROYER:  No.

25             THE COURT:  Hmm?

1          MR. SULLIVAN:  The co-defendants aren't under SAMS,

2    though.

3          MR. TROYER:  No, but --

4          MR. SULLIVAN:  So it's a -- it's a totally different

5    analysis, and I can tell you now, Savage is not going to be

6    evaluated by any mental health people up at MCC New York.

7    It's going to have to happen down here.

8          THE COURT:  Okay.

9          MR. TROYER:  Well, then we can bring him --

10         MR. SULLIVAN:  And that's more than --

11         MR. TROYER:  -- down here and have him evaluated by

12   somebody.

13         MR. HOEY:  Is there no other cell in that prison

14   that he can be in with the -- you can turn a light of and -- I

15   mean to be, just to be practical.  I mean this guy comes down

16   here.  They bring him at 4:00 o'clock in the morning.  He gets

17   down in the cell.  The light's on all day.  I mean its -- it's

18   not conducive to --

19         THE COURT:  Mr. Hoey, I will communicate with the

20   people at the FDC and find out what can and cannot be done in

21   that regard.  Okay.

22         MR. HOEY:  Okay.

23         MR. TROYER:  Thank you.

24         THE COURT:  All right.

25         MS. SYKES:  Thank you.

1          (Sidebar ends, 3:15 p.m.)

2          (Proceedings concluded, 3:15 p.m.)

3                    * * * * *

4

5

6              **C E R T I F I C A T I O N**

7

8          I, Tara Martin, court-approved transcriber, certify

9     that the foregoing is a correct transcript from the official

10    electronic sound recording of the proceedings in the above-

11    entitled matter.

12

13

14

15    _____          15 November 2010

16    TARA MARTIN

17    DIANA DOMAN TRANSCRIBING

18

19

20

21