```
                    UNITED STATES DISTRICT COURT
                 EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA,       )
                                )  Case No. 07-CR-00550-RBS-3
                                )
              vs.               )  Philadelphia, PA
                                )  April 14, 2011
KABONI SAVAGE also known        )  3:56 p.m.
as JOSEPH AMILL, also known     )
as BONNIE, also known as        )
YUSEF BILLA,                    )
                                )
              Defendant.        )
```

                    TRANSCRIPT OF MOTION HEARING
              BEFORE THE HONORABLE R. BARCLAY SURRICK,
                   UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Government:          DAVID E. TROYER, AUSA
                             JOHN M. GALLAGHER, AUSA
                             Office of the U.S. Attorney
                             615 Chestnut Street
                             Suite 1250
                             Philadelphia, Pennsylvania 19106


For the Defendant:           CHRISTIAN J. HOEY, ESQUIRE
                             Rubino & Hoey, LLC
                             50 Darby Road
                             Paoli, Pennsylvania 19301

                             TIMOTHY J. SULLIVAN, ESQUIRE
                             Brennan, Sullivan, McKenna, LLP
                             6305 Ivy Lane
                             Suite 700
                             Greenbelt, Maryland  20770


Audio Operator:              MICHAEL FINNEY

Transcribed by:              DIANA DOMAN TRANSCRIBING
                             P. O. Box 129
                             Gibbsboro, New Jersey  08026
                             Off: (856) 435-7172
                             Fax: (856) 435-7124
                             E-mail: dianadoman@comcast.net


Proceedings recorded by electronic sound recording; transcript
produced by transcription service.

I N D E X

ARGUMENT:

By:  Mr. Hoey                    4, 15, 22

By:  Mr. Sullivan               12

By:  Mr. Troyer                 16


THE COURT:

Ruling on defendant's
   motion to act pro se         16

```
                            Colloquy                        3
```

1        (The following was held in open court at 3:56 p.m.)

2            THE COURT:  All right.  We have the case of United

3    States versus Kaboni Savage, number 7-550.  Counsel, we -- in

4    October -- last October, I filed a memorandum and order dealing

5    with the question of special administrative measures and

6    exhaustion of administrative remedies.

7            We had a hearing then in November with regard to the

8    special administrative measures and the ability of counsel to

9    properly represent their client.  A number of issues were

10   raised at that hearing.  And, at the time of that hearing, Mr.

11   Savage was housed up in New York at the Metropolitan Correction

12   Center.

13           As a result of that hearing and as a result of

14   requests from counsel, we communicated with the Bureau of

15   Prisons about the possibility of Mr. Savage being brought to

16   the FDC in Philadelphia on a permanent basis.  The idea was

17   that, if Mr. Savage was here in Philadelphia, his counsel would

18   have access to him on an almost unlimited basis.

19           Defendant has, in fact, been transferred here within

20   the last month from New York.  And, that transfer was made

21   after the Bureau of Prisons made permanent renovations to areas

22   of the FDC in order to accommodate Mr. Savage.

23           As a result of the transfer, as a result of the

24   accommodation that has been made, I believe that many, if not

25   all, of the complaints that were raised or the issues that were

1    raised at the hearings back in October and November have been

2    resolved.

3            I did receive a letter from you, Mr. Hoey, just a

4    couple of days ago.  And, you raised some issues with regard to

5    your client at the FDC, and you wanted to have those issues

6    addressed here this afternoon.  I will hear whatever you want

7    to say with regard to the situation that you have now and how

8    it's creating --

9            MR. HOEY:  Thank you, Your Honor.

10           THE COURT:  -- creating problems for you and your

11   client.

12           MR. HOEY:  Thank you, sir.  With respect to the April

13   8th letter, Your Honor, we raised within that letter a couple of

14   different ideas with respect to some incidental terms of

15   confinement as well as what we perceive to be some material

16   issues related to Mr. Savage's confinement.

17           The primary list, if you will, Your Honor, I think

18   centers around this concept of Mr. Savage being shackled

19   completely, by hand and by foot.  And, quite frankly, once the

20   hands are shackled, they are shackled again to a waist clip

21   which prevents him really from moving his hands four inches

22   forward, four inches to the side, or really meaningfully in any

23   direction.

24           As you are well aware, Your Honor, there are

25   thousands and thousands of pieces of paper, document discovery

1      in this case that require a thorough review between counsel and
2      -- and the client.
3              Obviously, this is a case of significant magnitude.
4      This is a case that is going to require an extensive review of
5      documents between attorney and client, which is, quite frankly,
6      impossible and impractical under those conditions.
7              That would be the first issue that I'd like to raise
8      with the Court and, quite frankly, request of the Court an
9      opportunity for, I guess, yourself and the Bureau to review any
10     type of modifications that are available to Mr. Savage and --
11     and counsel.  I would urge the --
12             THE COURT:  Are you suggesting that the fact that his
13     hands are shackled is making it difficult for you to hand him
14     documents and him to hand documents to you and --
15             MR. HOEY:  It -- it is -- difficult, I think, is the
16     -- is an understatement, sir.  I think it's really impossible.
17     The arrangement -- you know, so you understand, -- I think you
18     have seen this area -- is -- you know, the meeting room where
19     the attorneys are and the computer is and where the client is
20     eventually brought, Your Honor, is a -- you know, 12 by 12
21     cell.
22             There is no desk in that cell.  And, again, we have a
23     box, you know, each time we meet, of, you know, this -- this
24     size, two feet by two feet by three feet high filled with
25     paper.

1          So, we're able to review one sheet of paper at a

2     time, where we literally sit on a plastic chair, pull it out of

3     a box, show it to him, put it back in the box, take the next

4     one out and show it to him.

5          There's no desk similar -- obviously we wouldn't want

6     something this big, but something where we can spread out 10 or

7     20 or 30 pieces of paper at the same time, transcripts, search

8     warrants, 302s, photographs of crime scenes, things of that

9     sort, which require kind of full review as opposed to one sheet

10    at a time.

11         The -- the shackling and the lack of a desk or a

12    chair or anything of that sort in that particular room prevents

13    that from occurring really at all.  So, we would ask the Court

14    to, if possible, respectfully explore the possibility of having

15    a table in that room that would allow for that kind of

16    discovery review, along with the shackles being removed from

17    Mr. Savage so he can participate meaningfully in that -- in

18    that manner of discovery review.

19              THE COURT:  All right.

20              MR. HOEY:  That's the first issue, Your Honor.  We do

21    have a list of things.  You were kind enough to allow us to

22    meet with Mr. Savage moments ago just to really hone down the

23    things that he would like to present to the Court.

24         With respect to number three on the letter, Your

25    Honor, the family visitation has not yet been reestablished.

1      He was brought to Philadelphia in March of 2011.  He has yet to

2      have any telephone calls or visits with his family.  I

3      understand there is an issue with VOP involving my client,

4      which has yet to be, I -- I believe, formally investigated and

5      -- and a result or a conclusion issued as to this contraband

6      concern.

7               Nevertheless, I think, until that is resolved, Your

8      Honor, there is no implication that the family members or

9      visits with the family members would in any way prevent that

10     investigation, impair it, or in any way influence it.

11              And, quite frankly, any visitation that he has with

12     his mother in person or by phone really is incidental or really

13     unrelated whatsoever to the concerns that the VOP has raised

14     through Mr. Sadowski.  We understand his concerns.  We

15     certainly understand where they're coming from on that issue.

16     But, I think there's been no formal ruling or investigation.

17              And, I should add, Your Honor, that the issue itself

18     had likely been investigated through the many shakedowns that

19     Mr. Savage was subjected to at the MCC for the year or so that

20     he was an inmate there, prior to his transfer to the FDC where

21     the -- these documents were discovered.

22              In fact, the day he was transferred, all of the

23     personal effects belonging to him were reviewed, scanned,

24     x-rayed, and nothing was discovered.  The area where these

25     documents were discovered, Your Honor, was searched thoroughly

1    prior to his exit from the MCC.  My understanding is personnel

2    from the FDC contacted MCC employees following its discovery

3    and concluded that, in fact, those personal items were searched

4    prior to him leaving the MCC.

5         So, until there's really a formal conclusion or

6    resolution as to what happened, why he had these things, I

7    don't see why the family visits that -- that are really

8    important based upon his terms of confinement -- once a month a

9    personal visit and once a month a telephone call -- should be

10   restricted at all.  So, we would ask the Court to respectfully

11   consider that as well.

12        THE COURT:  All right.

13        MR. HOEY:  The other issue, Your Honor, concerns the

14   use of a private investigator.  Leonard Ward has been appointed

15   and authorized by the Court to conduct our private

16   investigatory matters.

17        On one particular occasion, he was permitted into the

18   FDC alone.  He has attended a meeting with Mr. Savage, myself,

19   and Mr. Sullivan.  He then came back to the FDC after that

20   meeting and was permitted unfettered access to Mr. Savage.

21        On his third visit to the FDC, which were pretty much

22   in rapid sequence, Mr. Ward was denied an opportunity to see

23   Mr. Savage and was told that he was not going to be allowed to

24   see Mr. Savage without an attorney.

25        That creates a problem, I think, from a financial and

1        a practical perspective.  My schedule or Mr. Sullivan's

2        schedule may not comport with Mr. Ward's schedule.  We are all

3        working on three different potential things at the same time.

4              Mr. Ward may have an agenda that's different than

5        mine or Mr. Sullivan's, and rarely are we really all together

6        on the same page whereby we could all sit down together or I

7        could spend a day with Mr. Savage and Mr. Ward and work on the

8        same things together.

9              In other words, we give assignments to the private

10       investigator.  And, once those assignments are given, we're --

11       we're really on to the next issue ahead of the private

12       investigator.

13             So, for us to -- to kind of sit there with Mr. Ward

14       while he conducts his investigation or meets or interviews my

15       client, I think, is a waste of resources.  Rarely, if at all,

16       would we ever be discussing kind of the same things.

17             THE COURT:  So, you're suggesting that Mr. Ward be

18       permitted non-contact visits with --

19             MR. HOEY:  Certainly.

20             THE COURT:  -- your client?

21             MR. HOEY:  And, that can be accommodated in that

22       room, Your Honor.  There is a non-contact visit available.

23       There is a screened window that would separate both Mr. Ward

24       and Mr. Savage.  And, I think they conduct -- you know, they

25       can speak and conduct interviews and move forward with

1   assignments that way, Your Honor.

2            THE COURT:  All right.

3            MR. HOEY:  I believe -- and, I will submit under

4   cover, Your Honor -- the Mikhel case which, I believe,

5   addresses that same issue.  That's M-I-K-H-A-I-L.

6            THE COURT:  H-E-L.

7            MR. HOEY:  H-E-L.

8            THE COURT:  All right.

9            MR. HOEY:  The next issue concerns access to the

10  paper discovery.  We did -- and, the Court understands we were

11  able to get a computer that is going to be able to activate

12  these discovery disks.  And, Mr. Savage has an opportunity to

13  review those disks.

14            Again, that's really one page at a time.  He does

15  have all of his paper discovery copied.  He would simply like

16  an opportunity to have it all together at one time so he can

17  review it on his own.  So, when we're not there, he'll have all

18  of his paper discovery available to him.

19            THE COURT:  Isn't the meeting room -- the room where

20  counsel meet with Mr. Savage -- isn't there room for the

21  discovery to be in that room?

22            MR. HOEY:  That -- that was my understanding.  But,

23  he has not had access to all of his discovery since he's been

24  here at the FDC.

25            THE COURT:  All right.  We'll look into it.

1          MR. HOEY:  He also has no outside recreation, Your

2     Honor.  We've been advised by the FDC personnel that the second

3     room on the second floor for him is to accommodate his

4     exercise.  Obviously, that's inside.

5          He has no -- really no ability to get outside at all,

6     whether it be once, twice, or three times or more a week.  We

7     would -- we would respectfully request the Court look into that

8     matter as well.

9          I think it's only fair and, quite frankly, humane to

10    allow him outside for an hour.  It doesn't have to be every day

11    of the week.  But, if he had some yard privilege at some point

12    during the week, I think it's only a humane request, Your

13    Honor.

14          THE COURT:  All right.  Anything further?

15          MR. HOEY:  Yes, Your Honor.  Again, some incidentals.

16    He was able to have a Walkman radio device at the MCC in New

17    York.  I believe in Florence as well at -- in Colorado.  That

18    device has been confiscated.  In essence, his SAMs restrictions

19    have been expanded to, you know, disqualifying the use of that

20    device at the prison here in Philadelphia.

21          THE COURT:  So, you're saying that he was not

22    restricted in that regard up in New York or in Colorado?

23          MR. HOEY:  Correct.  Each facility allowed him to

24    have the exact same device, which --

25          MR. SAVAGE:  And, a TV.

1        MR. HOEY:  And, a TV as well.  I don't believe there

2    was a TV in New York, but there was a TV in Colorado.

3        THE COURT:  All right.

4        MR. HOEY:  And, with respect to the -- the light

5    situation.  His light goes on a 7 in the morning inside his

6    cell and goes off at 4 p.m., which is fine.  There is a light

7    apparently outside that cell that is very bright and

8    illuminates his cell 24 hours a day.

9        If that could be modified to some extent, we would

10   also ask the Court to review that issue as well.  Again, that's

11   a carry over from the previous hearing that we had where the

12   light was in -- inside of his cell was on 24 hours a day.

13       And, finally, Your Honor, with respect to legal mail,

14   it is my client's ongoing concern that that is being opened

15   outside of his presence.  And, he has had documents received

16   from the Court that were opened outside of his presence at the

17   FDC.

18       THE COURT:  Anything further?

19       MR. HOEY:  Mr. Sullivan is, if the Court permits,

20   going to address the Court regarding some penalty phase

21   concerns.

22       THE COURT:  Go ahead, Mr. Sullivan.

23       MR. SULLIVAN:  Thank you, Your Honor.  Your Honor,

24   good afternoon.  Your Honor, as the Court is aware, on March

25   14th, 2011, the Government filed its notice of intent to seek

1    the death penalty for Mr. Savage if he's convicted of one of

2    eleven authorized by the Attorney General -- counts.

3              I don't think the SAMs, when they were original

4    placed on Mr. Savage, anticipated that he -- that he -- for a

5    death penalty defendant.  The SAM restrictions essentially are

6    designed for committed inmates in the Bureau of Prisons who are

7    basically brought to ADMAX in Florence, warehoused and

8    segregated and isolated from the rest of society essentially to

9    do their term of imprisonment.

10             They're not designed for nor is there anything in the

11   SAM restrictions that were implemented by the Bureau of Prisons

12   and the Department of Justice that address the issues that I

13   face now as capital counsel for Mr. Savage now that this case

14   is an official death penalty prosecution based on the decision

15   by the Attorney General to seek death for Mr. Savage.

16             For example, in order to provide a level of

17   competence for Mr. Savage, obviously the Court is aware that we

18   have to prepare for the penalty phase, which means we have to

19   have Mr. Savage evaluated by mental health experts, there could

20   be neuropsychologists, neuropsychiatrists, confinement experts,

21   physicians, a whole list of experts.

22             These experts -- which are going to cost money to the

23   tax dollars -- are not going to make sense to have Mr. Hoey or

24   I sitting in there while a neuropsychologist is trying to do a

25   battery of tests with Mr. Savage which requires dexterity,

Sullivan - Argument                    14

1    which requires using different parts of the brain to do

2    evaluations.

3            These are not issues yet.  But, I'm just fronting

4    them to the Court that having a non-contact visit with some of

5    these mental health experts just isn't going to work, that

6    these experts are going to require contact visits with Mr.

7    Savage.

8            Having the attorneys there, one, probably is not

9    within the degree of professionalism that these mental health

10   experts are going to expect and may even taint or give rise and

11   perhaps some Government speculation that having me there or Mr.

12   Hoey there has somehow spoiled their examinations.

13           And, the -- the problem with having non-contact, I

14   know, is going to be huge, because this is what I do, and I

15   have been down this road before.  And, I know that, for

16   example, the neuropsychologist that we're getting ready to ask

17   the Court to appoint on our behalf is going to have to sit in a

18   room unfettered by anything in order to have Mr. Savage

19   manipulate things.

20           And, there's going to be a huge problem if the Bureau

21   of Prisons is going to say that is not possible, because that

22   directly is going to impair our ability to present, in the

23   capital phase, if we get that far, issues that would affect the

24   jury for the jury to make the determination as to whether Mr.

25   Savage should receive a sentence of life imprisonment or death.

1          And, I just know that these are going to be problems.

2     So, while the Court is exploring with the Bureau of Prisons the

3     issues that Mr. Hoey discussed, I think it would be prudent for

4     the Court to address the issues of the mental health experts

5     having contact visits with -- with Mr. -- with Mr. Savage.

6          And, it's just not the mental health experts.  We

7     have a mitigation specialist, we have Mr. Ward.  All of these

8     people are going to need to have meetings -- and, they can be

9     non-contact, of course -- but with Mr. Savage.  And, it's just

10    not practical or fiscally responsible to require Mr. Hoey or I

11    to be there.

12         Of course, the Court knows I'm from Maryland.  It

13    just -- it just doesn't make sense to make me come up when Mr.

14    Hoey's is out in the counties doing his job -- to sit there

15    while our investigator or our mitigation specialist is talking

16    to Mr. -- to Mr. Savage.  So, these are issues that I'd ask the

17    Court also to consider.

18              THE COURT:  All right.  Anything further?

19              MR. HOEY:   Your Honor, with that, I have spoken with

20    Mr. Savage.  Obviously, before the Court today is this issue

21    regarding his decision to proceed pro se.  He is willing to,

22    without prejudice, withdraw that today with the prospect of

23    having it reheard by the Court in the future following,

24    respectfully, your exploration of the issues that we presented

25    today.

1          THE COURT:  All right.  Mr. Savage, you want to

2     withdraw the pro se application at this juncture without

3     prejudice?

4          MR. SAVAGE:  Yes.  I definitely want to preserve.

5          THE COURT:  Well, we'll permit you to withdraw it

6     without prejudice.  And, if you decide that you want to refile

7     such an application, you certainly have the right to do that.

8          MR. SAVAGE:  Thank you.

9          THE COURT:  All right.  Mr. Troyer, do you have

10    anything you want to add at this juncture?

11          MR. TROYER:   Well, yes, Your Honor, actually I do.

12    There is -- I suppose we're here for two reasons, one because

13    of Mr. Savage's pro se motion and one because Mr. Hoey sent

14    this letter to the Court on April 8th.

15          As -- as for Mr. Savage's letter, I think Mr.

16    Savage's statement just now takes care of that, at least for

17    the time being.  We recognize, of course, that any -- any

18    defendant has the ability to make a request such as the one

19    that he made at any -- at any time.  And, he can certainly do

20    that in the future.

21          As to Mr. Hoey's letter, however, Mr. Hoey's letter

22    re -- addressed certain things, not all of the things that he

23    raised today, of course.  Some things were raised today for the

24    very first time.  And, his letter addresses some things, but

25    was sent to the Court without -- without any consultation with

1     the Assistant U.S. Attorneys.

2              And, while I have the utmost respect for counsel --

3     for defense counsel -- both defense counsel, I think it is, at

4     the very least, discourteous to be bothering the Court with

5     these requests without first addressing those with the

6     Assistant U.S. Attorneys assigned to the case.

7              I -- I appreciate the fact that they may have had

8     some communications with certain people at the Bureau of

9     Prisons.  I would encourage them to have those communications.

10             However, if they -- if they're not receiving sat --

11    what they feel is satisfactory answers from the Bureau of

12    Prisons' personnel, I think they at least owe us a phone call,

13    if nothing else, to -- so that we can address those matters as

14    well.  So, -- or at least be aware of those issues before

15    letters are sent to the Court asking for hearings on these

16    matters.

17             As far as the shackling goes, I think I -- I'll just

18    briefly address these ad seriatim.  As far as the shackling

19    goes, Mr. Savage obviously is a -- is a SAMs inmate.  There are

20    serious security concerns with regard to Mr. Savage, both by

21    the nature of the -- of the crimes with which he is charged and

22    some of the incidents which have occurred since he was indicted

23    in this case.

24             And, I know the Bureau of Prisons, having spoken to

25    one of the attorneys in the regional office since the filing of

1    this letter, -- the Bureau of Prisons concerns go beyond simply

2    the concerns for the safety of defense counsel.  There are

3    concerns about safety of defense counsel, but there are also

4    concerns about the safety of corrections officers in this case.

5              It's all well and good if defense counsel say they're

6    happy to waive any -- any issues as to their own safety.  But,

7    that hardly covers -- covers all of the matters.  In fact,

8    corrections officers, you know, would have to intervene and --

9    and address those matters, and there could be severe harm to

10   corrections officers.

11             I'll remind the Court that one of the allegations in

12   this case involving -- which is contained in this indictment --

13   the fact that Mr. Savage, while -- among all the very many

14   people that he threatened, also threatened a person at FDC, one

15   of the captains, in his previous case.

16             And, in fact, one of the -- one of the allegations or

17   claims that he had made during that time was that he wanted to

18   -- to handcuff the man to a chair and set him on fire.  These

19   are the kind of things which obviously causes concern among the

20   Bureau of Prisons, and I think it's reasonable that he be

21   shackled.

22             Secondly, I really -- I do take issue factually with

23   -- with this -- this representation being made that there's any

24   kind of impingement on Sixth Amendment rights.  Mr. Savage has

25   -- has two viable avenues of meeting with defense counsel.

1          One is to meet with him through a screen, in which

2     case he does not have to be shackled, and one is meeting with

3     him in person in a contact visit, -- both are in person -- but

4     in the contact visit scenario in which he is shackled.

5          That shackling is really no different than how people

6     are shackled when they are brought over for witness proffers or

7     -- or defendant proffers over in the -- in the Green Building.

8     And, that is that they -- they have -- their legs are shackled

9     and they -- and their hands are shackled, but they have

10    movement.

11         And, he certainly has sufficient movement to be able

12    to review documents, pass documents back and forth.  It may not

13    be as much movement as he wants, but it's sufficient movement

14    to satisfy Sixth Amendment concerns.

15         As far as family visitation, again counsel alluded to

16    recent problems.  And, again, among -- there was a recent

17    problem where apparently contraband was discovered in Mr.

18    Savage's cell.  And, that contraband took the form of internal

19    Bureau of Prisons documents that reflected the separations and

20    locations of Government witnesses.

21         This is a huge problem.  We can't have that.  The

22    Bureau of Prisons is dealing with that.  They're investigating

23    that.  I have not seen the documents.  I'm not part of that

24    investigation.

25         However, I think, in the meantime, it certainly --

1   Mr. Savage can expect that there might be some curtailment of

2   his family visitation if he were to have such documents -- such

3   contraband in his cell.

4           As far as the private investigator is concerned, I

5   understand, as Government counsel, that -- that private

6   investigators may need to meet with Mr. Savage.  I think as

7   long as the SAMs requirements are met, that is the -- there are

8   SAMs affirmations made by the various people who have to meet

9   with Mr. Savage, I really don't have a problem with the -- with

10  investigators meeting with him.

11          I'll -- I will, of course, consult with BOP counsel

12  further to -- to see how that can be done and see who -- if

13  somebody else needs to be present.  I'll -- I'll make those

14  consultations.  But, -- but, again, this could have been

15  brought to our attention.  We could have dealt with this

16  informally without having to bother the Court with this issue,

17  I believe.

18          The remaining issues, of course, were not raised in

19  Mr. Hoey's letter at all, but were raised today for the first

20  time.  Access to paper discovery.  I believe Mr. -- Mr. Savage

21  has access to all of his discovery.  I'm quite confident in

22  that.

23          He may not get all of the boxes of his discovery in

24  one place at one time.  He may have -- he may be limited, as I

25  remember he was in MCC New York as to the number of boxes of

1    discovery he could have at any given time.  Again, that hardly

2    affects his ability to prepare for trial in this case.

3              As far as outside recreation, again, I think that has

4    to be left to the -- to the conscience and concerns of the

5    professionals involved in this and the Bureau of Prisons as to

6    whether he gets outside recreation.  Given the current

7    investigation considering -- that I just mentioned a little

8    while ago, it might be understandable as to why Mr. Savage

9    might not receive that.

10             The lighting of the cell -- this has already been

11   addressed.  This became a -- this became perhaps the premier

12   issue the last time we had a -- a hearing in this matter.  They

13   actually have retrofitted or -- or revamped this entire cell

14   creating a -- essentially a suite for Mr. Savage.

15             The fact that there may be a -- a light outside of

16   Mr. Savage's cell that is on is consistent again with security

17   at the Bureau of Prisons.  I mean, he doesn't get to choose how

18   much light is on or what lights are on.  If there are lights

19   outside the cell, then I'm afraid he, like every other inmate,

20   is probably going to have to -- to deal with that.

21             And, then in terms of legal mail, I don't even think

22   that's necessarily worth commenting on.  We've addressed that

23   before.  Mr. Savage raised those issues.

24             We have -- the Government has shown that Mr. Savage's

25   previous complaints with regard to that were, in fact, entirely

1     bogus.  And, -- and, I don't have any reason to believe that

2     his legal mail is being curtailed at this time.

3          I'm sure -- as for the death penalty concerns that

4     Mr. Sullivan has raised, I submit that they -- at this point,

5     those are speculative.  I know Mr. Sullivan is perhaps trying

6     to get ahead of the game somewhat, and I -- I applaud that

7     effort.

8          I will certainly be happy to work with Mr. Sullivan

9     to see that his experts have access to Mr. Savage and try to

10    work out those issues with the Bureau of Prisons.  But,

11    frankly, there's really nothing before the Court at this time

12    on that.  All of that is quite speculative at this time.

13         I understand that they have experts who may need to

14    meet with the defendant.  I certainly don't -- the Government

15    certainly is not going to do anything to impede those -- impede

16    those efforts.  I think that's really all I have to say at this

17    time.

18         THE COURT:  All right.

19         MR. HOEY:  Judge, I -- you know, I hate to beat the

20    drum with the legal mail, I do.  And, I don't want to turn this

21    into a circus.  It's not fair obviously.

22         The legal mail issue is still relevant because we

23    have a letter that's dated March 17th with a March 21st post

24    stamp.  It was returned to the prison for an insufficient

25    address.

1          In this envelope was Mr. Savage's petition to go pro

2    se, which apparently was recorded in the press and The Daily

3    News as having been, you know, presented.  Well, it couldn't

4    have been presented because it was returned back to him at the

5    prison.

6          So, how somebody got a hold of it and got it to The

7    Daily News so they could print it and talk about it in the

8    newspaper is almost impossible if this letter hasn't been

9    opened and its contents communicated to somebody else in the

10   press.  We'll leave that probably for another day.  But, we

11   don't want to keep batting that ball over the net.

12          I -- I think, you know, really, Judge, with the

13   shackles, I think it's tantamount to asking, you know, really

14   somebody to prepare for a trial of this level without a desk,

15   without some -- someplace to lay out their work and look at it

16   by themselves -- when he's there in the prison by himself, and

17   we're not there to meet with him, he has full access to that

18   room thankfully.

19          But, that room -- it has no desk.  And, when we're

20   there to review things, we can look at a page at a time.  I

21   mean, I -- I can't imagine that the Government would want to

22   prepare for trial handcuffing themselves and looking at one

23   document at a time.  If it's not fair to them, how could it

24   possibly be fair to him?  They're going to put him to death.

25          THE COURT:  All right.  Counsel, we'll take a look at

Colloquy                              24

1    these concerns.  We will deal with them and resolve them to the

2    extent that it's appropriate to resolve them.  And, counsel

3    will be kept advised, all right?

4              MR. HOEY:  Thank you, Your Honor.

5              THE COURT:  Anything further?  Recess.

6                   (Proceedings concluded at 4:27 p.m.)

7

8                             * * * * *

9

10                   C E R T I F I C A T I O N

11

12        I, Frances L. Maristch, court approved transcriber,

13   certify that the foregoing is a correct transcript from the

14   official electronic sound recording of the proceedings in the

15   above-entitled matter.

16

17   ___April 22, 2011_____        _____

18   DATE                          FRANCES L. MARISTCH

19

20

21

22

23

24

25