IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| UNITED STATES OF AMERICA | : | |
| --- | --- | --- |
| | : | CRIMINAL ACTION |
| v. | : | |
| | : | NO. 07-550-03 |
| KABONI SAVAGE | : | |

SURRICK, J.                                                                                                                                  FEBRUARY  9 , 2012

**MEMORANDUM**

Presently before the Court is Defendant Kaboni Savage's Motion for Relief from Special Administrative Measures Which Are Interfering With Trial Preparations In This Capital Case (ECF No. 347) and the Government's response thereto (ECF No. 352). For the following reasons, Defendant's Motion will be granted in part and denied in part.

**I.  BACKGROUND**

Defendant Kaboni Savage is currently serving a thirty-year sentence for his convictions in 2005 for the crimes of conspiracy to manufacture and distribute cocaine and crack cocaine, money laundering, and witness tampering. On September 7, 2011, a federal grand jury returned a seventeen-count Third Superseding Indictment in this case charging Defendant with, *inter alia*, conspiracy to participate in the affairs of a racketeering enterprise, witness tampering, witness retaliation, use of fire to commit a felony, and twelve counts of murder in aid of racketeering, all of which are eligible for the death penalty. (Third Superseding Indictment, ECF No. 284.)[1] The

---

[1] Defendant's sister, Kidada Savage, is also named as a defendant in the Indictment, and is charged in six of the murder counts. (*Id.*) Defendant Steven Northington is charged in two of the murder counts and defendant Robert Merritt is charged in six of the murder counts. (*Id.*) All three codefendants are also charged with other crimes named in the Indictment, including the RICO conspiracy count. (*Id.*) Defendant Lamont Lewis was also charged in the Indictment. The charges against Lewis were disposed of by guilty plea on April 21, 2011.

Government contends that Defendant ordered several of the murders charged in the Indictment while incarcerated as a pretrial detainee at the Federal Detention Center in Philadelphia ("FDC"). On March 14, 2011, the Government filed a notice of intent to seek the death penalty against Defendant and two of his codefendants, Robert Merritt and Steven Northington. (ECF Nos. 196, 197, 198.) The Government has been directed to notify the Court and defense counsel of its intention regarding the death penalty as to defendant Kidada Savage by February 17, 2012. (ECF No. 343.) The trial of Defendant and his codefendants is scheduled for September 2012.

Prior to his trial on the 2005 convictions, Defendant was housed at the FDC as a pretrial detainee. (Gov't's Resp. 2, ECF No. 352.) According to the Government, court-authorized recordings intercepted at the FDC reveal that Defendant threatened to kill multiple potential witnesses, their family members, prison employees, and FBI agents. (Third Superseding Indictment 16-32; Gov't's Resp. 2-3.)[2] The Government advises that the court-authorized recordings show that Defendant ordered six of the murders while he was incarcerated at the FDC. (Gov't's Resp. 2.) After Defendant was sentenced for the 2005 convictions, he was incarcerated at various prisons, including the United States Penitentiary in Atlanta, Georgia ("USP Atlanta"); the maximum security unit at the United States Penitentiary in Florence, Colorado ("ADMAX"); the FDC; and the Metropolitan Corrections Center ("MCC") in Manhattan, New York.

Because the Government believed that Defendant posed a threat to others even while incarcerated, in February 2007, the Attorney General authorized the imposition of Special Administrative Measures ("SAMs"). The Attorney General imposed the SAMs in part because

---

[2] These threats were either made directly to other inmates, communicated to other inmates by letter or through the FDC plumbing system, or communicated through family members during telephone calls and visits at the FDC. (Third Superseding Indictment 18-32; Gov't's Resp. 2-3.)

in 2004 Defendant had ordered the firebombing of a Government cooperator's house while Defendant was incarcerated at the FDC. (Gov't's Ltr. 2, Oct. 24, 2001 (on file with Court).) The Attorney General has reauthorized the SAMs annually. (Gov't's Resp. 3.) The memorandum reauthorizing SAMs at the MCC states that "[t]he Bureau of Prisons adopted these special administrative conditions based on information of [Defendant's] proclivity to violence." (SAMs Mem. 1, Feb. 1, 2010 (on file with Court).)[3]

Defendant has been complaining about nearly every aspect of the SAMs restrictions since they were imposed in 2007. One complaint has been that, at the MCC, Defendant is not permitted contact visits with his attorneys. (Gov't's Resp. 6.) After Defendant complained about not being permitted contact visits, we arranged in early 2010 for him to be transported to the FDC in Philadelphia once per month to allow him to have contact visits with his attorneys. (Gov't's Resp. 4.) In due course, we modified these arrangements to allow Defendant to travel to the FDC twice per month to allow such visits. (Hr'g Tr. 7, Sept. 30, 2010, ECF No. 159.) Because Defendant was not satisfied with the conditions of the meeting room at the FDC, he often refused to be transported to the FDC to have contact meetings with his attorneys. (Gov't's Resp. 4; Hr'g Tr. 53, Oct. 22, 2010.)[4]

---

[3] The memorandum further states that based on Defendant's previous convictions, the charges currently pending against him, including multiple counts of murder, and "information that the orders to commit the arson and murder of the family members were communicated by [Defendant] while incarcerated, there is a substantial risk that [Defendant's] communications or contacts with persons could result in death or serious bodily injury to persons, or substantial damage to property that would entail the risk of death or serious bodily injury to persons." (SAMs Mem. 1)

[4] During the twelve-month period that Defendant was permitted to have contact visits at the FDC, he traveled to Philadelphia only twice for such visits. (Govt.'s Ltr. 2, Oct. 24, 2011.)

On July 16, 2010, Defendant moved to strike the SAMs in their entirety. (Def.'s SAMs Mot., ECF No. 137.) We held a hearing on September 30, 2010 to address the issue of whether Defendant was barred from seeking relief from the SAMs due to his failure to exhaust administrative remedies as required by the Prison Litigation Reform Act, 42 U.S.C. § 1997e(a). We determined in our Memorandum and Order of October 21, 2010, that Defendant was not required to exhaust his administrative remedies before challenging aspects of the SAMs that directly affected his ability to prepare his defense in this criminal action. *See United States v. Savage*, No. 07-550-03, 2010 WL 4236867, at *7 (E.D. Pa. Oct. 21, 2010). We heard testimony and argument on the constitutionality of the SAMs during an evidentiary hearing held on October 22, 2010. On October 28, 2011, we entered an Order denying Defendant's request to lift and strike all SAMs restrictions. (ECF No. 333 (filed under Seal).)

To address counsel's concerns about better access to their client and the need to properly prepare his defense, Defendant was transferred to the FDC in March 2011. Because the FDC is not a maximum security facility equipped to handle SAMs inmates, the Bureau of Prisons had to construct a "suite" on the second floor of the FDC building to house Defendant. (Gov't's Resp. 4.) The suite consists of the cell where Defendant sleeps, an adjacent bathroom with a shower, and a room located across a small hallway where Defendant can have contact visits with his attorneys and his defense team, and which houses the discovery materials in Defendant's case and a computer for access to discovery materials. Despite these accommodations, Defendant's complaints about the conditions of his confinement persisted at the FDC. Among other things, Defendant took issue with the restriction that he remain shackled during all contact visits with his attorneys and with investigators because it "prevents [Defendant] from effectively reviewing

4

discovery, paperwork, and related materials." (Def.'s Ltr., Apr. 8, 2011 (on file with Court).) Defendant further complained that he was unable to meet with a private investigator without the presence of his attorneys. (*Id.*) At the request of his attorneys, Defendant was permitted to have the leg and waist restraints removed, while wearing only hand restraints during contact visits with his attorneys. (Gov't's Ltr. 3, Oct. 24, 2011.)

At the request of all Defendants and their counsel, trial of this matter was continued. By Order dated May 13, 2011, trial previously scheduled for September 12, 2011 was rescheduled for September 10, 2012. (Order, ECF No. 227.) In part due to this postponement, and due to the burden on the Bureau of Prisons in maintaining Defendant's specially created, secure housing area at the FDC, the Bureau of Prisons expressed a desire to transfer Defendant to another facility on an interim basis with the intention of returning Defendant to the FDC in sufficient time prior to his September 2012 trial.[5] At about the same time, Defendant requested to be returned to ADMAX in Florence, Colorado. Defendant then retracted this request.[6]

In October 2011, the Bureau of Prisons transferred Defendant to the MCC in New York on an interim basis. (Def.'s Ltr., Oct. 28. 2011, ECF No. 332.) Arrangements were made to transport Defendant from New York to the FDC in Philadelphia each month for contact visits with his defense team. Defendant is to be returned to the FDC at least six months prior to trial. Defense counsel advise that since Defendant's transfer to the MCC in October 2011, Defendant

---

[5] The exact date for Defendant's return to the FDC has not been selected, but his return is expected in late February or early March of 2012.

[6] On October 11, 2011, Defendant filed a Motion to prohibit the Bureau of Prisons from transferring him to another prison. (ECF No. 313.) We denied the Motion on October 28, 2011. (ECF No. 333, filed under seal.)

5

has refused to travel to the FDC for contact visits with his defense team. (Def.'s Mot. 3 n.1, ECF No. 347.)

Defendant filed the instant Motion on December 26, 2011. (Def.'s Mot.) The Motion seeks relief from certain SAMs restrictions that he alleges are interfering with his trial preparations. The Government filed a response to the Motion on January 19, 2012. (Gov't's Resp.)

## II. DISCUSSION

The Motion requests that the Court remove or modify the following three SAMs restrictions imposed on Defendant: (1) that he remain shackled at his wrists during visits with his defense team; (2) that meetings with fact investigators may only occur when his attorneys are present at such meetings; and (3) that his attorneys only, and not his fact investigators, may disseminate the contents of his communications to third parties.[7] The Government opposes any modification to these SAMs restrictions.

Federal regulations provide that the Bureau of Prisons may implement SAMs upon direction of the Attorney General, when "there is a substantial risk that a prisoner's communications or contacts with persons could result in death or serious bodily injury to persons." 28 C.F.R. § 501.3(a). Prisoners may challenge SAMs, as Defendant has done here, on the basis that the SAMs constitute impermissible restrictions of constitutional rights. *See, e.g.*, *United States v. Mikhel*, 552 F.3d 961, 963 (9th Cir. 2009); *United States v. Hashmi*, 621 F. Supp. 2d 76, 78 (S.D.N.Y. 2008). Although "imprisonment does not automatically deprive a

---

[7] Because Defendant's complaints implicate regulations that affect his ability to prepare his defense in this criminal action, he need not have exhausted his administrative remedies prior to raising these concerns to the Court. *See Savage*, 2010 WL 4236967, at *7.

prisoner of certain important constitutional protections," the prison setting allows greater restriction of such rights than in other settings. *Beard v. Banks*, 548 U.S. 521, 528 (2006). In determining whether a restriction is constitutionally permissible, courts "owe substantial deference to the professional judgment of prison officials." *Id.* (quoting *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003); *see also O'Dell v. Netherland*, 112 F.3d 773, 777 (4th Cir. 1997) (recognizing that "it is not for the federal courts to so micromanage the Nation's prisons"). We evaluate Defendant's constitutional challenges to the SAMs restrictions under the "reasonableness" test set out in *Turner v. Safely*, 482 U.S. 78 (1987). In *Turner*, the Supreme Court determined that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Turner*, 482 U.S. at 89.

Under *Turner*, we must first "determine whether there is a valid rational connection between the prison regulation and the legitimate interest put forth to justify it." *Monroe v. Beard*, 536 F.3d 198, 207 (3d Cir. 2008) (internal quotation marks omitted). "'Thus, a regulation cannot be sustained where the logical connection between the regulation and the asserted goal is so remote as to render the policy arbitrary or irrational' or to demonstrate that it 'represents an exaggerated response to [the asserted] objectives.'" *Jones v. Brown*, 461 F.3d 353, 360 (3d Cir. 2006) (*quoting Turner*, 482 U.S. at 89-90, 97-98.). If we find that a rational relationship exists between the SAMs restriction and the governmental interest, we next consider three additional factors set forth in *Turner*. The factors that we must consider are "(1) whether inmates retain alternative means of exercising the circumscribed right, (2) the burden on prison resources that would be imposed by accommodating the right, and (3) whether there are alternatives to the

7

regulation that fully accommodate[] the prisoners' rights at de minimis cost to valid penological interests." *Jones*, 461 F.3d at 360 (internal quotation marks omitted) (alteration in original). With respect to the third factor, the Government is not required to use the least restrictive means possible to accomplish its goal. *Monroe*, 536 F.3d at 207.

### A. Shackling During Defendant's Meetings with his Defense Team

Defendant argues that the requirement that he remain shackled during visits with his defense team violates his Sixth Amendment right to effective assistance of counsel and his statutory right to access of counsel under 18 U.S.C. § 3005. Defendant contends that shackling prevents him from locating papers from the piles of discovery documents and passing those papers freely with his attorneys. The Government opposes any modification to the shackling requirement, and argues that, in light of Defendant's "extreme conduct," there is a rational connection between this SAMs restriction and the governmental interest of prison security. (Gov't's Resp. 9 ("The impact on the lives of witnesses, other inmates, and corrections officials has been, and would again be, quite severe were the restrictions to be lifted.").) The Government contends that it has evidence showing that Defendant ordered murders of witnesses and their families while he was incarcerated. The Government further contends that despite the intense scrutiny surrounding Defendant's conduct and the SAMs restrictions imposed on him, Defendant nevertheless continues to communicate threats.[8] Not only has Defendant threatened to kill witnesses and their families, he has also vowed to kill corrections officers, FBI agents and

---

[8] The Government states that Defendant communicates threats "utilizing the telephone, written correspondence, personal prison contact, the visiting rooms, messages left in prison books, and even the FDC Plumbing system." (Gov't's Resp. 8.)

8

Bureau of Prison staff, often describing his intentions in vivid detail. (Third Superseding Indictment 24-31.)

Defendant's dissatisfaction with this SAMs restriction implicates his Sixth Amendment rights. Thus, *Turner* applies. *Turner* requires that we first determine whether the governmental objective underlying the SAMs restriction is legitimate, and whether the SAMs restriction is rationally related to that objective. *Turner*, 482 U.S. at 89-90; *Thornburgh v. Abbot*, 490 U.S. 401, 414 (1989); *Monroe*, 536 F.3d at 207.

The Government's objective in requiring Defendant to remain shackled during visits with his defense team is to protect prison staff, other inmates and Defendant's attorneys and investigators. It is well-settled that prison security is a legitimate objective under *Turner*. *See Thornburgh*, 490 U.S. at 415 (determining that it was "beyond question" that prison security was a legitimate governmental interest); *United States v. Felipe*, 148 F.3d 101, 110 (2d Cir. 1998) ("[T]he goal of preventing [the defendant] from ordering the killings and beatings of additional individuals, within the prison system or outside, is unquestionably a legitimate penological interest."); *O'Dell*, 112 F.3d at 776 ("[T]he state's interest in prison security and safety in general is concededly substantial and continuing."); *Casey v. Lewis*, 4 F.3d 1516, 1521 (9th Cir. 1993) ("A prison official's concern for prison security is entitled to significant deference."); *Hashmi*, 621 F. Supp. 2d at 86 (preventing death or serious bodily harm to others held to be a legitimate penological interest). Furthermore, there is a logical connection between the Government's legitimate interest of institutional security and the requirement that Defendant remain shackled during attorney-client visits. The Government explains that, if Defendant were to attack his attorneys, then corrections officers have a duty to offer assistance, and would thus place

themselves at risk. (Gov't's Resp. 10 ("[Defendant] could easily use such a feigned attack on counsel to carry out a serious physical attack on a corrections officer.").) The connection between the SAMs restriction and governmental objective is not "so remote as to render the [SAMs restriction] arbitrary or irrational." *See Casey*, 4 F.3d at 1521 (finding a rational relationship between prison's policy of denying attorney-client contact visitation and penological concern of "protecting inmates, prison staff and the general public from the possibility of assault, hostage-taking and escape"); *Hashmi*, 621 F. Supp. 2d at 86 (holding that SAMs restriction giving the BOP discretion to make attorney visits contact or non-contact was reasonably related to legitimate penological interest of preventing risk of death or serious bodily harm to others).

Having found a rational connection between the SAMs restriction and the legitimate governmental interest, we next address the remaining *Turner* factors. First, Defendant retains alternative means of exercising his Sixth Amendment rights. At the MCC, Defendant is permitted unlimited non-contact attorney-client visits. We ordered that Defendant be allowed to travel to the FDC in Philadelphia for contact visits with his attorneys at least once per month. Although Defendant's hands are shackled during these meetings, nothing prevents Defendant from reviewing and discussing discovery documents with his attorneys and meaningfully preparing for trial. Defendant claims that he is unable to pass papers to his attorneys. One alternative would be for defense counsel to make a copy of those documents they intend to discuss with Defendant at a particular meeting. Defendant and counsel could simultaneously review these documents without the need to pass documents back and forth between them. More significantly, defense counsel advised the Court at the October 14, 2011 hearing that, even though Defendant's inability to move paper was an "inconvenience," it did not affect counsel's

ability to represent him. (Hr'g Tr. 13, Oct. 14, 2011 (filed under seal).)

With respect to the second *Turner* factor, accommodating Defendant's request to have meetings without shackles will impact prison staff and other inmates, and be a burden on prison resources. The Government states that it has evidence that Defendant has made threats to prison staff. The Government is concerned that if Defendant was unshackled, there is a risk that he could attack his counsel. If counsel were attacked, corrections officers would be required to offer assistance, which in turn, places them at risk. We agree with the Government that "[t]here is simply no reason to create such unnecessary risks to the lives of law enforcement officers, simply to accommodate [Defendant's] personal preferences." (Gov't's Resp. 10.)

Finally, there appears to be no alternative to this SAMs restriction that would accommodate Defendant's right at a de minimis cost to the legitimate penological interest.[9] *Turner*, 482 U.S. at 90-21 ("[T]he existence of obvious, easy alternatives may be evidence that the regulation is not reasonable, but is an exaggerated response to prison concerns."). Defense counsel have offered to sign waivers that would absolve the Government of liability in the event that Defendant attacked them. Counsel's suggestion does not alleviate the risk threatened to prison security under these circumstances and thus ignores one of the Government's objectives in requiring that Defendant remain shackled. Moreover, we reject Defendant's argument that because there is no evidence that Defendant poses any risk to the physical security of his attorneys, the shackling requirement is not necessary. Prison regulations that are based on anticipatory concerns of prison security are rational, despite the absence of evidence of prior

---

[9] We have already modified this SAMs restriction to allow Defendant to remove the leg and waist restraints during meetings with his attorneys.

violence or disruptions. *See Fletcher v. Lewis*, 4 F.3d 1516, 1521 (9th Cir. 1993) ("The [Prison's] failure to specify a past event wherein a contact visit resulted in assault, escape, or hostage-taking, does not render irrational the adoption and implementation of a non-contact policy."). Requiring the Government to produce concrete evidence to support a regulation would conflict with *Turner*, which "requires that courts allow prison officials 'to anticipate security problems and to adopt innovative solutions to the intractable problems of prison administration.'" *Friedman v. Arizona*, 912 F.2d 328, 332-33 (9th Cir. 1990), *cert denied*, 498 U.S. 1000 (1991) (quoting *Turner*, 482 U.S. at 89) (emphasis in original).

We also reject defense counsel's suggestion that the shackling of Defendant during their meetings with him frustrates a trustworthy attorney-client relationship, which in turn, undermines Sixth Amendment protections. Effectiveness of counsel is not measured by the strength of the bonds that attorneys have with their clients. *Mann v. Reynolds*, 46 F.3d 1055, 1060 (10th Cir. 1995).

Accordingly, we are satisfied that the Government has demonstrated a "valid, rational connection" between the SAMs restriction and the Government's legitimate penological interest.

In addition to his constitutional claim, Defendant argues that the shackling requirement violates his statutory right to have "free access" to counsel. (Def.'s Mot. 6.) Defendant refers to 18 U.S.C. § 3005, which provides that capital defendants are entitled to two attorneys "who shall have free access to the accused at all reasonable hours." We are not aware of any cases that have looked specifically at the phrase "free access" for purposes of compliance with 18 U.S.C. § 3005. Nor has Defendant cited to any cases. We need not decide what kind of access the statute requires. We are satisfied that "free access" does not require that a capital Defendant, who the

12

Attorney General has determined to be a severe security risk, be permitted to meet with his defense team without wearing hand restraints.

If Defendant was truly concerned about being a "productive member to his defense," as his counsel suggest, then he would have taken advantage of the opportunity to travel to the FDC for contact visits with his attorneys. It seems apparent that the only impediment to Defendant "actively engag[ing] in his defense" is Defendant himself. Contrary to his contentions, Defendant's constitutional rights have been and will be scrupulously honored and protected.

**B.     Meetings with Investigators and Dissemination of Information**

Defendant also requests that the Court strike two SAMs provisions related to the use of investigative services. The first SAMs states that "[a]n investigator may not meet alone with" Defendant. (Def.'s Mot. 6 (quoting SAMs Memorandum ¶ 2.d) & Ex. A.) Under this provision, pre-cleared paralegals are permitted to meet with Defendant and an investigator. (*Id.* at 10.) The second SAMs provides that "only [Defendant's] attorney may disseminate the contents of [Defendant's] communication to third parties," and for limited purposes. (*Id.* at 6-7 (quoting SAMs Memorandum ¶ 2.c).) Defendant argues that these SAMs are an "'exaggerated response to prison concerns' and place an unacceptable burden on [Defendant's] due process and Sixth Amendment rights." (*Id.* at 7 (quoting *Turner*, 482 U.S. at 89-80).)

*1.     Presence of Defendant's Counsel During Meetings with Fact Investigators*

Defendant claims that it is necessary that he meet routinely with investigators in order to prepare for trial and to develop a mitigation strategy. Defendant further argues that requiring counsel to attend each meeting with an investigator will necessarily cause those meetings to occur less frequently. The Government opposes any modification to this SAMs restriction. The

Government's concerns derive largely from a lack of trust towards fact investigators and their ability to limit the scope of Defendant's communications to topics that are "legal and necessary to accomplish [the] goals of preparing for trial." (Gov't's Resp. 11.) Based on Defendant's history of allegedly orchestrating murders and intimidating witnesses while detained by communicating orders to others, the Government believes that Defendant's attorneys are better equipped to restrict the scope and nature of Defendant's communications. (*Id.* (noting that the Government "has considerably less confidence in the legal acumen, discretion, and common sense of private investigators who are not trained in the law, and whose backgrounds, experience, and motivations are largely unknown to the government").)

Defendant relies on the case *United States v. Mikhel*, 552 F.3d 961 (9th Cir. 2009), in support of its request to strike this SAMs restriction. *Mikhel* is instructive. In *Mikhel*, the Ninth Circuit struck down an identical SAMs provision, stating that it was an "arbitrary requirement" that an attorney or paralegal accompany any fact investigator to meetings with the defendant. *Id.* at 964. The Court also stated that, in light of the substantial distance between the prison and counsel's office, the SAMs restriction "imposes a significant burden on defendant with respect to the availability of necessary investigative services." *Id.* In reaching its conclusion, the Court first determined that "'an indigent defendant has a constitutional right to investigative services . . . . when some need is demonstrated,' which is invariably the case in complex capital cases." *Id.* (quoting *Williams v. Stewart*, 441 F.3d 1030, 1053 (9th Cir. 2006)). Next, the Court applied the analysis in *Turner* and found that the Government failed to provide a valid justification for the restriction. *Id.* In particular, the Court took issue with the absence of any justification for distinguishing between paralegals and investigators. *Id.* Finally, the Court found that modifying

the SAMs to permit fact investigators that meet the government's pre-clearance requirements will not burden the Government or otherwise impact guards, other inmates, or the allocation of prison resources. *Id.*

We are satisfied that the Government has not shown a rational relationship between this SAMs restriction and its legitimate penological concern. We do not discredit the Government's valid interest in restricting the scope and nature of Defendant's communications, particularly in light of its concerns that Defendant may use opportunities to communicate to commit crimes or threaten potential witnesses. Rather, we find a lack of logical connection between this SAMs restriction and the Government's interest in restricting Defendant's ability to communicate. We agree with the Ninth Circuit in recognizing the lack of a rational justification for distinguishing between paralegals and fact investigators. *Id.* Both a paralegal and an investigator would first have to undergo the Government's pre-clearance requirements before meeting with Defendant. Furthermore, we fail to see how an investigator is any more likely than a paralegal, or an attorney for that matter, to be duped by Defendant and sent on a "mission" where they "unwittingly communicate[] information that could cause criminals to harm witnesses." (Gov't's Resp. 12.)

Accordingly, we will modify the SAMs restriction to allow court-appointed fact investigators to meet with Defendant without the presence of legal counsel or paralegals, so long as the investigator first signs an affirmation agreeing to abide by the SAMs provisions and receives pre-clearance from the Government.[10] We are satisfied that this modification will not

---

[10] One SAMs provision requires that Defendant's attorneys "sign an affirmation acknowledging receipt of the SAM restrictions document." (SAMs Mem. 1, Feb. 1, 2010 (on file with Court).) The SAMs provision further states that "[b]y signing the provision, your attorney acknowledges his/her awareness and understanding of the SAM provisions and his/her agreement to abide by these provisions, particularly those that relate to contact between you and your

15

impact prison guards or other inmates, nor create an additional burden on prison resources.

### 2. Fact Investigators' Dissemination of Defendant's Communications to Third Parties

Defendant requests that this SAMs restriction be modified to allow "a Court-appointed expert and/or investigator or any member of the defense team [to] pass on communications to and/or from [Defendant] for the purpose of preparing the defense and/or penalty phase cases to counsel and other members of [Defendant's] defense team." (Gov't's Resp. Ex. A.) The Government opposes the modification, arguing that it poses a serious danger in that it increases Defendant's ability to threaten witnesses and order murders.[11]

Again, the Government's interest is legitimate. However, it fails to show a logical connection between the SAMs restriction and the valid interest justifying it. Defense counsel's suggestion to permit the free transfer of the contents of Defendant's communications among only members of the defense team strikes the appropriate balance between the Government's concern in restricting Defendant's ability to "effectuate murder and witness intimidation while incarcerated" and Defendant's interest in effectively preparing for trial and sentencing. Accordingly, the SAMs provision will be modified to allow pre-cleared fact investigators to

---

attorney and your attorney's staff . . . in signing the affirmation, your attorney and pre-cleared staff, acknowledge the restriction that they will not forward third-party messages to or from you." (*Id.*) Defense counsel suggest, and we agree, that any fact investigators meeting with Defendant also sign an affirmation prior to meeting with Defendant. (*See* Def.'s Mot. Ex. A at 2 ("All such [fact investigators] will sign affirmations and be pre-cleared by the government prior to any scheduled meetings with [Defendant].").)

[11] The defendant in *Mikhel* took issue with this same SAMs restriction. However, the Government did not oppose modifying the SAMs restriction to allow two fact investigators to disseminate the contents of the defendant's communications to third parties, so long as it was only for the purpose of preparing for post-sentencing proceedings. *Mikhel*, 552 F.3d at 964.

disseminate the content of Defendant's communications to other members of Defendant's defense team; however, any dissemination must be for the sole purpose of preparing for trial and sentencing.

## III. CONCLUSION

For the foregoing reasons, Defendant Kaboni Savage's Motion for Relief from Special Administrative Measures Which are Interfering with Trial Preparations in this Capital Case is granted in part, and denied in part.

An appropriate Order will follow.

**BY THE COURT:**

_____
**R. BARCLAY SURRICK, J.**
