IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | CRIMINAL ACTION |
| | : | |
| KABONI SAVAGE | : | NO. 07-550-03 |
| ROBERT MERRITT | : | NO. 07-550-04 |
| STEVEN NORTHINGTON | : | NO. 07-550-05 |
| KIDADA SAVAGE | : | NO. 07-550-06 |

SURRICK, J.                                                    DECEMBER  18 , 2012

## MEMORANDUM

Presently before the Court are Defendant Steven Northington's Motion to Sever (ECF

No. 363), Defendant Kaboni Savage's Motion to Sever Counts (ECF No. 383), and Defendant

Kidada Savage's Motion to Sever (ECF No. 433).  For the following reasons, the Motions will be

denied.

## I.    BACKGROUND[1]

On May 9, 2012, a federal grand jury returned a seventeen-count Fourth Superseding

Indictment ("Indictment") charging Defendant Kaboni Savage ("Savage") with conspiracy to

participate in the affairs of a racketeering ("RICO") enterprise, in violation of 18 U.S.C. §

---

[1] The factual background of this case is more fully set forth in our June 1, 2012
Memorandum and Order denying Defendant Kaboni Savage's Motion to Dismiss the Indictment
on Double Jeopardy Grounds and Motion to Dismiss Count Nine of the Third Superseding
Indictment on Double Jeopardy Grounds (ECF Nos. 507, 508), and our June 25, 2012
Memorandum and Order denying Defendant Kaboni Savage's Motion to Transfer Venue Outside
of the Eastern District of Pennsylvania (ECF Nos. 538, 539).  Those documents describe the
charges set forth in the Fourth Superseding Indictment against Defendants Kaboni Savage
(hereinafter "Savage"), Kidada Savage (hereinafter "Kidada"), Robert Merritt (hereinafter
"Merritt"), and Steven Northington (hereinafter "Northington") (collectively, "Defendants"), and
the procedural history of this case.

1962(d) (Count 1), twelve counts of murder in aid of racketeering, in violation of 18 U.S.C. §

1959(a)(1) (Counts 2-7, 10-15), tampering with a witness, in violation of 18 U.S.C. § 1512(a)

(Count 8), conspiracy to commit murder in aid of racketeering, in violation of 18 U.S.C. §

1959(a)(5) (Count 9), retaliating against a witness, in violation of 18 U.S.C. § 1513(a) (Count

16), and using fire to commit a felony, in violation of 18 U.S.C. § 844(h)(1) (Count 17).  (Fourth

Superseding Indictment ("Indictment"), ECF No. 480.)[2]  Savage was charged, along with three

co-Defendants, Steven Northington, Robert Merritt, and Kidada Savage, his sister.[3]  Defendant

Lamont Lewis was also charged in the First Superseding Indictment.  The charges against Lewis

were disposed of by guilty plea.  On March 14, 2011, the Government filed notices of intent to

seek the death penalty against Savage, Merritt and Northington.  (ECF Nos. 196, 197, 198.)  The

Government does not seek the death penalty against Kidada Savage.

The Indictment alleges that Defendants were members of the Kaboni Savage

Organization ("KSO"), an enterprise that operated from late 1997 to April 2010 in this District

and elsewhere.  (Indictment 1-4.)  The KSO packaged, prepared, and distributed controlled

substances throughout the greater Philadelphia area; distributed drugs and collected drug

proceeds in North Philadelphia; and operated multiple drug distribution centers in North

Philadelphia, often referred to as "drug corners."  (*Id.* at 5.)  The KSO engaged in a conspiracy to

"knowingly and unlawfully conduct and participate . . . in the conduct of the affairs of such

---

[2] The First Superseding Indictment was filed on April 8, 2009.  (ECF No. 51.)  The Second Superseding Indictment was filed on June 22, 2011.  (ECF No. 229.)  The Third Superseding Indictment was filed on September 7, 2011.  (ECF No. 284.)

[3] On May 29, 2012, we entered an Order permitting all Defendants to join the pretrial motions of their codefendants to the extent that the Defendants have standing.  (Order, ECF No. 495.)  All Defendants have standing to assert the arguments in the instant Motion.

enterprise through a pattern of racketeering activity." (*Id.* at 2.)  The KSO's activities included, without limitation, acts of murder; dealing and conspiring to distribute and possess with intent to distribute controlled substances; arson; witness tampering; witness retaliation; and money laundering.  (*Id.* at 2-4.)

On February 17, 2012, Northington filed a Motion to Sever Trial.  (Northington Mot., ECF No. 363.)[4]  On February 21, 2012, Savage filed a Motion to Sever Counts.  (Savage Mot., ECF No. 383.)  On March 21, 2012, Kidada filed a Motion to Sever.  (Kidada Mot., ECF No. 433.)  On April 5, 2012, the Government filed an Omnibus Response ("Response") opposing these Motions.  (Gov't Resp., ECF No. 450.)  On June 11 and 12, 2012, we held a hearing on Defendants' pre-trial motions.  Oral argument was heard on Kidada's Motion.

## II.    LEGAL STANDARD

### A.    Rule 8

"Federal Rule of Criminal Procedure 8 governs joinder of offenses and joinder of defendants."  *United States v. Irizarry*, 341 F.3d 273, 287 (3d Cir. 2003).  It states:

> (a) Joinder of Offenses.  The indictment or information may charge a defendant in separate counts with 2 or more offenses if the offenses charged—whether felonies or misdemeanors or both—are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan.
>
> (b) Joinder of Defendants.  The indictment or information may charge 2 or more defendants if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses.  The

---

[4] On February 20, 2012, Merritt filed a motion requesting to join Northington's motion to sever.  (*See* ECF No. 367.)  On March 26, 2012, the Government filed an omnibus response to some of Defendants' pre-trial motions.  (ECF No. 439.)  The Government stated that it does not object to any of the Defendants adopting a co-defendant's motion, provided that the joining defendant has standing.  (*Id.* at 1.)

defendants may be charged in one or more counts together or separately. All defendants need not be charged in each count.

Fed. R. Crim. P. 8.

The Third Circuit has held that Rule 8(a) "'applies only to prosecutions involving a single defendant' and that in a multi-defendant case . . . 'the tests for joinder of counts and defendants is merged in Rule 8(b).'" *Irizarry*, 341 F.3d at 287 (quoting *United States v. Somers*, 496 F.2d 723, 729 n.8 (3d Cir. 1974)).[5] Rule 8(b) is "less permissive" than Rule (8)(a). *Eufrasio*, 935 F.2d at 570; *see also United States v. Jimenez*, 513 F.3d 62, 82 (3d Cir. 2008) (noting that "joinder of defendants under Rule 8(b) is a stricter standard than joinder of counts against a single defendant under Rule 8(a)"). We analyze Defendants' joinder challenges under the less permissive Rule 8(b).[6]

In construing Rule 8(b), the Third Circuit has followed the Supreme Court in recognizing the "fundamental principle that the federal system prefers 'joint trials of defendants who are indicted together [ ]' because joint trials 'promote efficiency and serve the interests of justice by

---

[5] While the Third Circuit has acknowledged that "most courts have held that Rule 8(b) applies exclusively to issues of joinder of multiple defendants and Rule 8(a) applies only in cases of a single defendant charged with multiple offenses," it has suggested that Rule 8(a) may provide the proper standard for joinder of offenses against one defendant, even in cases with multiple defendants. *Irizarry*, 341 F.3d at 287 & n.4 (citing *United States v. Eufrasio*, 935 F.2d 553, 570 n.20 (3d Cir. 1991)); *see also United States v. Heilman*, 377 F. App'x 157, 202 n.34 (3d Cir. 2010) (stating same).

[6] While the standards of Rule 8(a) and Rule 8(b) are similar in that they both require a transactional nexus between offenses or defendants joined, Rule 8(a) is more permissive because it allows joinder when offenses are of the same or similar character, whereas Rule 8(b) does not. *Irizarry*, 341 F.3d at 287 n.4 (citing *Eufrasio*, 935 F.2d at 570 n.20). Accordingly, if joinder satisfies Rule 8(b), it also satisfies Rule 8(a). *Heilman*, 377 F. App'x at 202 n.34; *see also Eufrasio*, 935 F.2d at 570 ("In the interests of justice, we apply the less permissive standard of Rule 8(b) . . . .").

avoiding the scandal and inequity of inconsistent verdicts.'" *United States v. Urban*, 404 F.3d

754, 775 (3d Cir. 2005) (quoting *Zafiro v. United States*, 506 U.S. 534, 537 (1993) (alteration in

original)).  This is particularly true in cases in which defendants have been charged with

engaging in a conspiracy.  *See Eufrasio*, 935 F.2d at 567 ("Rule 8(b) provides substantial leeway

to prosecutors who would join racketeering defendants in a single trial.").  The Third Circuit has

stated that Rule 8(b)

> permits joinder of defendants charged with participating in the same racketeering
> enterprise or conspiracy, even when different defendants are charged with different
> acts, so long as indictments indicate all the acts charged against each joined
> defendant (even separately charged substantive counts) are charged as racketeering
> predicates or as acts undertaken in furtherance of, or in association with, a commonly
> charged RICO enterprise or conspiracy.

*Id.* (citing *United States v. Dickens*, 695 F.2d 765, 778-79 (3d Cir. 1982)).  "[J]oinder . . . of a

conspiracy count and substantive counts arising out of the conspiracy [is permitted], *since the*

*claim of conspiracy provides a common link*, and demonstrates the existence of a common

scheme or plan."  *Id.* (quoting *Somers*, 496 F.2d at 729-30 (internal quotation marks and internal

citation omitted) (original emphasis in *Somers*)).  A RICO conspiracy charge provides that link.

*Id.*

**B.     Rule 14**

Even if joinder is proper under Rule 8(b), a district court may order Rule 14 severance if

the potential prejudice outweighs the expense and time of separate trials that essentially retry the

same issue.  *See Zafiro*, 506 U.S. at 539; *see also United States v. Joshua*, 976 F.2d 844, 847 (3d

Cir. 1992) ("Severance decisions under Rule 14 require the district court to weigh the potential

for prejudice to the defendant from joinder against the conservation of judicial resources that

joinder will occasion.").  Federal Rule of Criminal Procedure 14 states, in relevant part:

> (a) Relief.  If the joinder of offenses or defendants in an indictment, an information, or a consolidation for trial appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires.

Fed. R. Crim. P. 14(a).

Defendants are not entitled to severance merely because they may have a better chance of acquittal in separate trials or because the evidence is different as to each defendant.  "Severance should only be granted 'if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence.'"  *United States v. Riley*, 621 F.3d 312, 335 (3d Cir. 2010) (quoting *Urban*, 404 F.3d at 775 (quoting *Zafiro*, 506 U.S. at 539)).  To prevail on a Rule 14 motion, a defendant has a "heavy burden," *United States v. Quintero*, 38 F.3d 1317, 1343 (3d Cir. 1994), and must "'pinpoint clear and substantial prejudice resulting in an unfair trial,'" *Riley*, 621 F.3d at 335 (quoting *United States v. McGlory*, 968 F.2d 309, 340 (3d Cir. 1992) (internal quotation marks and citation omitted)).

In the context of multiple defendants, the Third Circuit has noted that prejudice sufficient to warrant severance might occur in the following situations:  "(1) a 'complex case' involving 'many defendants' with 'markedly different degrees of culpability,' (2) a case . . . where evidence that is probative of one defendant's guilt is technically admissible only against a co-defendant, and (3) a case where evidence that exculpates one defendant is unavailable in a joint trial."  *United States v. Balter*, 91 F.3d 427, 432-33 (3d Cir. 1996) (citing *Zafiro*, 506 U.S. at 539).  The question of prejudice hinges upon "whether the jury will be able to 'compartmentalize the evidence as it relates to separate defendants in view of its volume and limited admissibility.'"  *United States v. Davis*, 397 F.3d 173, 182 (3d Cir. 2005) (quoting *Somers*, 496 F.2d at 730).

Where additional charges against a single defendant are "relatively straightforward and discrete," we have "not doubt[ed] that the jury reasonably could [be] expected to compartmentalize the evidence . . . ." *United States v. Lore*, 430 F.3d 190, 205 (3d Cir. 2005). By contrast, "[w]hen many defendants are tried together in a complex case and they have markedly different degrees of culpability, the risk of prejudice is heightened." *Zafiro*, 506 U.S. at 539.

"The decision to sever a trial is left to the sound discretion of the District Court." *United States v. Ginyard*, 65 F. App'x 837, 838 (3d Cir. 2003) (citing *Zafiro*, 506 U.S. at 538-39 ("Moreover, Rule 14 does not require severance even if prejudice is shown; rather, it leaves the tailoring of the relief to be granted, if any, to the district court's sound discretion.")); *United States v. Reicherter*, 647 F.2d 397, 400 (3d Cir. 1981) ("Motions for severance rest in the sound discretion of the trial judge, whose determination should not be disturbed in the absence of an abuse of discretion.")); *United States v. Albowitz*, 380 F. Supp. 553, 555 (E.D. Pa. 1974) (stating same).

In death penalty cases, some district courts have held that in the context of severance, "[t]he threshold for determining what constitutes prejudice and when the jury's ability to render a reliable verdict is compromised is necessarily lower than in the ordinary case." *United States v. Green*, 324 F. Supp. 2d 311, 320 (D. Mass. 2004); *see also United States v. Solomon*, No. 05-385, 2007 WL 1228029, at *3 (W.D. Pa. Apr. 25, 2007) (citing same); *United States v. Perez*, 299 F. Supp. 2d 38, 44 (D. Conn. 2004) (noting "heightened need for reliability in a death penalty trial"). Nevertheless, "defendants charged with capital murder under federal statutes have been tried jointly in both the guilt and penalty phases of trial." *United States v. Bernard*, 299 F.3d 467, 475 (5th Cir. 2002) (citing *United States v. Causey*, 185 F.3d 407, 417 (5th Cir.

1999); *United States v. Tipton*, 90 F.3d 861, 892 (4th Cir.1996)).  "There is no per se rule; plainly the degree of antagonism must be such that the jury will inappropriately infer that one or both are guilty."  *Green*, 324 F. Supp. 2d at 324 (citing *United States v. Talavera*, 668 F.2d 625, 630 (1st Cir. 1982)).

## III.  DISCUSSION

We will address each of Defendants' Motions separately.  The facts relevant to each of the instant Motions are set forth in the Indictment.[7]

### A.  Northington's Motion to Sever

#### 1.  Relevant Facts

Northington was a drug distributor, drug corner boss, enforcer and assassin for the KSO. (Indictment 8.)  He participated in murders, the distribution of controlled substances, carrying firearms during violent crimes, witness tampering and witness retaliation.  (*Id.* at 8-9.) Specifically, Northington has been charged with the murder of Tybius Flowers, which occurred on March 1, 2004, at the corner of 8th and Butler Streets, in Philadelphia.  (*Id.* at 18, 34-35.)[8]

---

[7] For purposes of addressing Defendants' pre-trial Motions, we accept as true the factual allegations set forth in the Indictment.  *See United States v. Liss*, 265 F.3d 1220, 1228 (11th Cir. 2001) (noting that "[t]he propriety of joinder 'is to be determined before trial by examining the allegations contained in the indictment'") (citation omitted); *United States v. Harrelson*, 754 F.2d 1153, 1176 (5th Cir. 1985) ("The propriety of joinder under Rule 8 is determined by the initial allegations of the indictment, which are accepted as true absent arguments of prosecutorial misconduct." (citing *Schaffer v. United States*, 362 U.S. 511, 513 (1960))); *see also Heilman*, 377 F. App'x at 202 (noting that inquiry into propriety of joinder of offenses "focuses on the face of the indictment" (citing *Irizarry*, 341 F.3d at 287)).  In addition, we may "look beyond the face of the indictment" to representations made in pre-trial documents where those documents "clarify factual connections between the counts."  *United States v. McGill*, 964 F.2d 222, 242 (3d Cir. 1992).

[8] Flowers was murdered while attempting to purchase a substantial quantity of drugs for re-sale.  (Northington Mem. 1, ECF No. 363.)

Northington also has been charged with the murder of Barry Parker, which occurred on February 26, 2003, in Philadelphia. (*Id.* at 34.)[9] Based upon the notice of intent to seek the death penalty against Northington, the Parker murder is an aggravating circumstance for the murder of Flowers. The Government seeks a capital sentence for the Flowers murder. (ECF No. 198 at 3.)

## 2. *Parties' Contentions*

Northington argues that his trial should be severed from that of his co-defendants. He claims that "[d]uring the twelve year plus operation of the [KSO], [he] played a relatively limited role," as evidenced by his consecutive periods of incarceration. (Northington Mem. 1.)[10] Northington also argues that while he obtained narcotics from Savage, he "was not a decision maker in the overall direction that the [KSO] took nor did he share in any major way in the profits it accrued." (Northington Mem. 2.) In addition, Northington points to the fact that the Indictment describes several murders, including "a particularly heinous mass murder of an adult and four children including an infant," that were committed by members of the KSO but which did not involve Northington. (Northington Mot. ¶ 4; *see also* Northington Mem. 2.)

In support of his argument for a separate penalty hearing, Northington claims that his

---

[9] Northington was found guilty in state court for the murder of Parker. He is serving a life sentence for this crime. Parker had been an active participant in narcotics distribution and allegedly had been attempting to take over the corner over which Northington had control. (Northington Mem. 1; *see also* Indictment 14.)

[10] Northington states that in May 1990, he was arrested for robbery, was subsequently convicted, and then received a sentence of imprisonment in a Pennsylvania state prison. He was released on May 7, 2000. (Northington Mem. 1.) Upon release, he was again incarcerated from September 26, 2000 to November 24, 2000 for what he claims to be a "mistaken" probation violation. (*Id.*) He was subsequently incarcerated from August 22, 2001 to May 2, 2002; from March 3 to March 7, 2003; and from April 9, 2003 to June 3, 2003. (*Id.* at 1-2.) In May 2004, he was arrested for the federal drug conspiracy involving the KSO and has since been incarcerated. (*Id.* at 2.)

rights will be violated, if tried jointly, since: (1) the "acts of the joined co-defendants are so horrific and prejudicial" that Northington will not receive individualized consideration as to whether he should "live or die"; (2) the jury will inevitably be invited to draw comparisons among, and engage in an unconstitutional evaluation of the relative worth of, Defendants, when evaluating mitigating factors and antagonistic defenses; and (3) the constitutional and procedural rights of his co-defendants will deprive Northington of notice of the issues he may confront at a penalty hearing. (Northington Mot. ¶¶ 5-6; *see also* Northington Mem. 3-12.) In addition, Northington claims that holding sequential but separate sentencing hearings for Defendants will not resolve the issue of individualized consideration. He argues for a separate sentencing jury. (Northington Mem. 9.)

The Government responds that Northington's role was hardly limited. (Gov't Resp. 2.) It contends that the fact that each Defendant, including Northington, has been charged with conspiracy in furtherance of a racketeering enterprise, and that the evidence used against each Defendant will be substantially the same — when combined with efficiency considerations — favor a joint trial. (*Id.* at 6-11.) The Government asserts that any prejudice that might result from a joint trial can be cured by a limiting instruction to the jury. (*Id.* at 12-13.) With respect to Northington's argument for a separate sentencing jury, the Government responds that the language of the Federal Death Penalty Act of 1994 ("FDPA"), 18 U.S.C. §§ 3591-3598, does not support this argument. (*Id.* at 14-18.)

       3.    *Analysis*

       a)    Northington's Role in the KSO

According to the Indictment, Northington played an integral role in the KSO. He

participated in the racketeering enterprise by murdering individuals, distributing controlled

substances, carrying firearms during violent crimes, and tampering with and retaliating against

witnesses. (Indictment 8.) Specifically, the Indictment charges Northington with the following

overt acts in furtherance of the enterprise:

- On or about January 30, 2003, in Philadelphia, KABONI SAVAGE, STEVEN NORTHINGTON, and others known and unknown to the grand jury, arrived at 3510 North Palmetto Street, to re-compress cocaine. (*Id.* at 14.)
- On or about February 26, 2003, in Philadelphia, STEVEN NORTHINGTON complained to KABONI SAVAGE that Barry Parker was selling drugs on a drug corner controlled by Northington and the KSO. (*Id.* at 14.)
- On or about February 26, 2003, in Philadelphia, KABONI SAVAGE instructed STEVEN NORTHINGTON and Lamont Lewis to kill Barry Parker, in order to eliminate Barry Parker as a competitor on one of the KSO's drug corners. (*Id.*)
- On or about February 26, 2003, in Philadelphia, STEVEN NORTHINGTON provided a handgun to Lamont Lewis, to be used to shoot and kill Barry Parker. (*Id.*)
- On or about February 26, 2003, at or near Franklin & Luzerne Streets, in Philadelphia, KABONI SAVAGE, STEVEN NORTHINGTON, and Lamont Lewis ordered and aided and abetted, the shooting and killing of, and caused the murder of, Barry Parker. (*Id.* at 15.)
- On or about February 27, 2003, at 3908 North Franklin Street, in Philadelphia, STEVEN NORTHINGTON possessed in his apartment approximately 90 packets of cocaine, a scale, razor blades, packaging materials, handcuffs, security badges, ammunition, and firearms, that is, a loaded Intertec 9 mm semi-automatic handgun with an obliterated serial number, and a Davis Industries .380 caliber handgun. (*Id.*)
- On or about February 27, 2003, in Philadelphia, KABONI SAVAGE distributed approximately 126 grams of cocaine to Lamont Lewis, as payment for the murder of Barry Parker, while telling Lamont Lewis that STEVEN NORTHINGTON would provide an additional cash payment for the murder. (*Id.*)
- On or about February 28, 2003, at or near the 3600 block of North Darien Street, in Philadelphia, STEVEN NORTHINGTON possessed approximately $3,078 in U.S. currency that represented the proceeds of drug dealing, in the presence of KABONI SAVAGE. (*Id.*)
- On or about April 7, 2003, at 3643 North Darien Street, in Philadelphia, KABONI SAVAGE and STEVEN NORTHINGTON possessed firearms and a blender containing cocaine residue, used in the processing of cocaine. (*Id.*

at 16.)

- On or about February 24, 2004, in Philadelphia, KABONI SAVAGE ordered STEVEN NORTHINGTON to murder Tybius Flowers, to prevent Tybius Flowers from testifying in Philadelphia Court of Common Pleas, at the trial of <u>Commonwealth of Pennsylvania v. Kaboni Savage</u>, in which KABONI SAVAGE was charged with the murder of Kenneth Lassiter . . . . (*Id.* at 18.)
- On or about February 26, 2004, in Philadelphia, KABONI SAVAGE directed STEVEN NORTHINGTON, a co-conspirator known to the grand jury as D.B., and a co-conspirator known to the grand jury as J.T., a/k/a "Reef," to arrange for the murder of Tybius Flowers." (*Id.*)
- On or about March 1, 2004, in Philadelphia, STEVEN NORTHINGTON and another person unknown to the grand jury, ambushed, shot and killed, and caused the murder of Tybius Flowers, at or near the corner of 8th & Butler Streets. (*Id.*)
- On or about November 28, 2005, in Philadelphia, STEVEN NORTHINGTON threatened witness Robert Wilks, a/k/a "Miami," during the federal trial of KABONI SAVAGE, STEVEN NORTHINGTON, and others, stating, "The same thing that happened to Twin's family is going to happen to your family." (*Id.* at 30.)

These overt acts demonstrate that despite Northington's consecutive periods of incarceration, or the fact that he may not have been the decision maker of the KSO's operations, he played a key role in the enterprise's racketeering activity. *See United States v. Thornton*, 1 F.3d 149, 153 (3d Cir. 1993) (rejecting defendant's assertion that joinder with his co-defendants was improper since he had been incarcerated on an unrelated charge and the government failed to prove his continuing participation in the conspiracy after that date, since the indictment alleged that he participated in the conspiracy through its conclusion and since joinder is not improper merely because a defendant did not participate in every act alleged in furtherance of the overarching conspiracy).

"Ordinarily, defendants jointly indicted should be tried together to conserve judicial resources. The public interest in judicial economy favors joint trials where the same evidence would be presented at separate trials of defendants charged with a single conspiracy." *Eufrasio*,

935 F.2d at 568 (citing *United States v. Sandini*, 888 F.2d 300, 306 (3d Cir. 1989); *United States v. De Peri*, 778 F.2d 963, 984 (3d Cir. 1985)).  The fact that the Indictment describes several murders in which Northington did not participate, including the arson murders, does not constitute "clear and substantial prejudice" that would warrant severance.  *Riley*, 621 F.3d at 335 (internal quotation marks and citation omitted); *see also Thornton*, 1 F.3d at 153 ("In any event, joinder would not be improper merely because a defendant did not participate in every act alleged in furtherance of the overarching conspiracy." (citing *United States v. DeVarona*, 872 F.2d 114, 120 (5th Cir. 1989); *United States v. Nerlinger*, 862 F.2d 967, 973 (2d Cir.1988))); *Eufrasio*, 935 F.2d at 569 ("Indeed, since evidence of the [ ] murder conspiracy could have been admitted as evidence of the underlying RICO enterprise in separate trials, denial of a severance motion which alleged evidence of that crime would cause trial prejudice, cannot be an abuse of discretion.").

In *United States v. Eufrasio*, two co-Defendants, Eufrasio and Iacona, argued that joinder of their trials with that of the third co-defendant, Idone, was reversible error because they were "wholly unconnected with and unaware of the murder conspiracy charged as a racketeering predicate against Idone only."  *Eufrasio*, 935 F.2d at 566.  Eufrasio and Iacona claimed that joinder prejudiced them since "the murder conspiracy alleged against Idone infected the entire trial with evidence of uncharged Mafia crimes and the murder conspiracy itself."  *Id.* at 566. They contended that joinder exposed the jury to evidence of numerous mob murders and attempted murders in which they did not participate.  *Id.* at 567.  Eufrasio and Iacona argued that the district court erred by denying their pre-trial severance motions made pursuant to Rule 14. *Id.* at 567-58.  The Third Circuit held that there was no Rule 8(b) misjoinder since "all the criminal acts charged against each defendant, including the murder conspiracy implicating Idone,

were undertaken in furtherance of a single, commonly charged racketeering enterprise and conspiracy." *Id.* at 567. The Third Circuit also concluded that the district court did not abuse its discretion by denying the Rule 14 severance motions, explaining that:

> Since Eufrasio and Iacona were jointly indicted with Idone, and all appellants were charged with the same conspiracy to participate in the same Scarfo enterprise, the public interest in judicial economy favored joinder. Common evidence of appellants' gambling and extortion activity and loansharking, would have been admissible against each appellant in separate trials, as would evidence of the Auferio murder conspiracy which proves the nature, history and means of the enterprise charged against each appellant. Because there would have been substantial overlap in the evidence presented in separate trials, we cannot say the trial court abused its discretion denying Eufrasio's and Iacona's Rule 14 severance motions. The substantial public interest in the judicial economy of a joint trial outweighs the potential for prejudice to Iacona and Eufrasio associated with evidence of Idone's murder conspiracy. Furthermore, since the Scarfo enterprise was recognized as the underlying criminal enterprise, evidence of other criminal activities engaged in by that organization would have been admitted in separate trials.

*Id.* at 568-69.

The Third Circuit's reasoning in *Eufrasio* applies equally here. In the instant case, all of the Defendants have been charged with the same conspiracy to participate in the KSO racketeering enterprise. "Participants in a single conspiracy should ordinarily be tried together for purposes of judicial efficiency and consistency, even if the evidence against one is more damaging than that against another." *United States v. Ward*, 793 F.2d 551, 556 (3d Cir. 1986); *see also United States v. Voigt*, 89 F.3d 1050, 1094 (3d Cir. 1996) (noting that "joint trials of defendants charged under a single conspiracy aid the finder of fact in determining the 'full extent of the conspiracy,' and prevent 'the tactical disadvantage to the government from disclosure of its case.'" (quoting *United States v. Provenzano*, 688 F.2d 194, 199 (3d Cir. 1982); *United States v. Jackson*, 649 F.2d 967, 973 (3d Cir. 1981))); *Eufrasio*, 935 F.2d at 567 (holding that Rule 8(b) permits joinder of defendants charged with participating in the same racketeering enterprise or

conspiracy, even when different defendants are charged with different acts, "so long as indictment indicates all the acts charged against each joined defendant (even separately charged substantive counts) are charged as racketeering predicates or as acts undertaken in furtherance of, or in association with, a commonly charged RICO enterprise or conspiracy").

Common evidence, such as Defendants' drug distribution activity and their threats, intimidation, violence and murder, would be admissible against each Defendant to prove the existence of the underlying RICO enterprise if Defendants each were to have a separate trial. *See United States v. Hart*, 273 F.3d 363, 370 (3d Cir. 2001) (dismissing defendant's argument for prejudice since "much, if not all, of this [conspiracy] evidence could have been presented against [defendant] had the trials been severed," and since the district court properly instructed the jury to "give separate individual consideration to each charge against each defendant"); *United States v. Console*, 13 F.3d 641, 655 (3d Cir. 1993) ("The public interest in judicial economy favors joint trials where the same evidence would be presented at separate trials of defendants charged with a single conspiracy." (internal quotation marks and citation omitted)). Clearly, judicial economy favors a joint trial in this case.[11]

Furthermore, the jury will be instructed to give separate consideration to each charge against each Defendant. This is not a case in which the jury will be unable to compartmentalize the evidence against each Defendant. While the Indictment describes 140 overt acts, the allegations in the Indictment with respect to each Defendant are clear. The trial will involve four

---

[11] If Northington's trial were to be severed from that of his remaining co-Defendants, we anticipate that a joint trial of the remaining co-Defendants would last several months, excluding the jury selection process. The joint trial of the remaining co-Defendants would involve numerous witnesses. In view of the substantial amount of overlapping evidence in both trials, judicial economy favors joinder of Northington's trial with that of his co-Defendants.

defendants.  The seventeen counts are manageable.  *See United States v. BetonSports PLC*, No. 06-337, 2009 WL 736942, at *3-4 (E.D. Mo. Mar. 15, 2009) (denying defendants' motions for severance in RICO action since none of the defendants made a specific showing that a jury could not be reasonably expected to compartmentalize the evidence, with appropriate instructions, and since "[t]here is not necessarily a correlation between the volume of evidence and inevitable confusion"); *United States v. Urso*, 369 F. Supp. 2d 254, 269-70 (E.D.N.Y. 2005) (holding, in a RICO case concerning an organized crime family, that a joint trial involving six defendants, four murder allegations, and numerous racketeering offenses could be "quite lengthy" but did not amount to the "mega-trials" which the Second Circuit has admonished district courts to avoid where possible); *United States v. Edelin*, 118 F. Supp. 2d 36, 44 (D.D.C. 2000) (finding that case involving capital and non-capital defendants was not so complex that a jury would be unable to compartmentalize the evidence when facing six co-defendants charged with RICO and related crimes).

Northington has offered only conclusory assertions and hypothetical situations in support of his position.  He has failed to demonstrate that a jury will be unable to separate the evidence and apply it only to the specific Defendants against whom it is offered.  We presume that the jury will follow limiting instructions and will be able to compartmentalize the evidence and issues. *See Urban*, 404 F.3d at 776 ("We presume that the jury follows such [limiting] instructions, and regard such instructions as persuasive evidence that refusals to sever did not prejudice the defendant." (internal citations omitted)); *Voigt*, 89 F.3d at 1096 (citing *United States v. Rivera*, 6 F.3d 431, 438 (7th Cir. 1993)); *see also Heilman*, 377 F. App'x at 200-01 (rejecting defendant's argument that the jury would not be able to compartmentalize the evidence, despite the numerous

documents, wiretaps, physical evidence, photographs and witness testimony involved, and the fact that in a twelve-count indictment, defendant was charged in only one count, and of the forty-two overt acts for the charged conspiracy, he was mentioned in only five, since the district court gave proper limiting instructions to ensure the jury would compartmentalize the evidence, which presumably were followed). Here, as in *Eufrasio*, the substantial public interest in the judicial economy of a joint trial outweighs the potential for prejudice to Northington associated with evidence of the murders in which Northington had no involvement. *See Eufrasio*, 935 F.2d at 569.

        b)    Individualized Consideration

Northington contends that a penalty hearing separate from that of his co-Defendants is necessary because the "acts of the joined co-defendants are so horrific and prejudicial" that Northington will not receive individualized consideration as to whether he should "live or die." He claims that he will be "overwhelming[ly] prejudice[d]" from being tried with the perpetrators of the arson murders, in which he had no involvement. He also claims that the photographs, the age of some of the victims, and the description of how the victims died will inevitably inflame the jury, and that the overwhelming evidence against Savage and Merritt will prevent "individualized consideration" of his own case. (Northington Mem. 3-4.) We disagree.

As discussed above, the jury is presumed to be able to compartmentalize the evidence against each of the Defendants. This presumption applies to both the liability and the penalty phase. *See United States v. Tipton*, 90 F.3d 861, 892 (4th Cir. 1996) ("The same considerations of efficiency and fairness to the Government (and possibly the accused as well) that militate in favor of joint trials of jointly-charged defendants in the guilt phase must remain generally in play

at the penalty phase.") (internal citations omitted).

c)    Unconstitutional Comparison of Defendants

Related to his argument on individualized consideration, Northington asserts that the jury will inevitably be invited to draw comparisons among, and engage in an unconstitutional evaluation of the relative worth of, Defendants, when evaluating mitigating factors and antagonistic defenses.  He claims that each Defendant will present mitigating evidence and theories, much of which will be inconsistent with and antagonistic to the evidence and theories presented by the other co-Defendants, and that this will force the jury to draw comparisons among Defendants.  (Northington Mem. 4.)  Northington provides several hypothetical examples in which this situation may occur.  (*See id.* at 5-8.)

We are satisfied that appropriate instructions to the jury will sufficiently address the risk of prejudice that may result from a joint trial.  *See Bernard*, 299 F.3d at 475 (affirming district court's denial of severance at penalty phase of trial since "[a] court's limiting instructions will often cure any prejudice resulting from a joint trial" and "defendants charged with capital murder under federal statutes have been tried jointly in both the guilt and penalty phases of trial").  Northington's references to hypothetical examples cannot support his argument of prejudice.  "Speculation is not a sound basis for severance."  *Solomon*, 2007 WL 1228029, at *7.

Northington cites *United States v. Catalan-Roman*, 376 F. Supp. 2d 96 (D.P.R. 2005), and *United States v. Green*, 324 F. Supp. 2d 311 (D. Mass. 2004), two cases in which the district court granted motions to sever at the penalty phase.  These cases are distinguishable.

In *United States v. Catalan-Roman*, defendants were charged with counts related to conspiracy, carjacking, armed robbery, and murder during the armed robbery.  *Catalan-Roman*,

376 F. Supp. 2d at 98. The court had denied a defendant's pre-trial motion for severance, finding that it could not discern whether blame-shifting or spillover issues would materialize. *Id.* at 104. In the middle of the penalty phase, the defendant renewed a request to sever. *Id*. at 98. He argued for the empaneling of a new jury, or in the alternative, for severance in the form of sequential penalty hearings. *Id.* at 102-04. The court denied the request for a separate jury. *Id.* at 104. However, the court determined that sequential penalty hearings were warranted. *Id.* at 108. The court explained that "[a]t the time of [the moving defendant's] mid-penalty phase request, . . . the Court was in a position to make that determination and decide what if any remedy was appropriate in light of the circumstances of the case." *Id.* at 104. The court explained that at that stage of the trial, the government had switched narratives of how the victim was shot. *Id.* at 105. The court also explained that "[t]he information [the co-defendant] presented in support of his character mitigation was indeed potent" and "[i]f [the moving defendant] lacked pre and post-arrest character and background mitigating information as powerful as [his co-defendant's], he would undoubtedly be at a comparative disadvantage before the jury," particularly since "lack of remorse was an aggravator only as to [the moving defendant], and at trial, the evidence presented showed that while detained . . . he had boasted about his sharpshooting skills and how if he went to trial, he was sure to win." *Id.* at 106-07. These circumstances simply do not exist here. At most, Northington has posed only a series of hypothetical situations that could occur in any trial involving multiple defendants.[12]

---

[12] We note that the court in *Catalan-Roman* observed that "[t]he care with which courts protect a capital defendant's constitutional right to an individualized determination, does not inevitably translate to automatic severance during capital sentencing proceedings." *Catalan-Roman*, 376 F. Supp. 2d at 99-100. The district court also noted that "[f]or a variety of reasons, the current weight of authority remains against severance of multiple defendants even in capital

In *United States v. Green*, a racketeering case, one of the racketeering acts alleged was murder, which carried the potential for the death penalty as to two of the defendants. *Green*, 324 F. Supp. 2d at 314. The court severed the trials of the capital defendants, in both the guilt and penalty phases. *Id.* at 326-28. Two of the four defendants (one capital and one non-capital) would be tried together on one date, and the remaining two defendants (one capital and one non-capital) would be tried together on another later date, although the court indicated it would revisit the issue as to the latter trial. *Id.* at 315-16. The district court in *Green* noted, however, that "[t]he instant case stands in an unusual posture . . . ." *Id.* at 320. "First, another judge of this Court has seen some of the government's evidence — albeit in truncated form" and "has made findings that surely reflect badly on a central pillar of the government's case, that the Esmond Street gang was a gang at all, much less a racketeering enterprise." *Id.* Again, such circumstances do not exist here, and the facts in the Indictment clearly demonstrate that the KSO was a racketeering enterprise.

d)      Deprivation of Notice

Northington claims that the constitutional and procedural rights of his co-Defendants will deprive him of notice of the issues he may confront at a penalty hearing. Specifically, he states that he will be deprived of the opportunity to investigate and rebut the harmful information placed by his co-Defendants before the sentencing jury. (Northington Mem. 8.) Again, however, Northington offers no support other than a hypothetical example. This does not give us reason, at this stage, to sever his trial. *See Solomon*, 2007 WL 1228029, at *6 ("Without knowing what the statements are or without seeing any proposed redaction, the Court finds that any severance

cases." *Id.* at 100.

determination based upon *Bruton* issues would be premature at this time.").

        e)     <u>Separate Jury</u>

The FDPA states, in relevant part:

> (b) Hearing before a court or jury. If the attorney for the government has filed a notice as required under subsection (a) and the defendant is found guilty of or pleads guilty to an offense described in section 3591, the judge who presided at the trial or before whom the guilty plea was entered, or another judge if that judge is unavailable, shall conduct a separate sentencing hearing to determine the punishment to be imposed. The hearing shall be conducted —
>> (1) before the jury that determined the defendants guilt;
>> (2) before a jury impaneled for the purpose of the hearing if —
>>> (A) the defendant was convicted upon a plea of guilty;
>>> (B) the defendant was convicted after a trial before the court sitting without a jury;
>>> (C) the jury that determined the defendant's guilt was discharged for good cause; or
>>> (D) after initial imposition of a sentence under this section, reconsideration of the sentence under this section is necessary; or
>> (3) before the court alone, upon the motion of the defendant and with the approval of the attorney for the government.
>
> A jury impaneled pursuant to paragraph (2) shall consist of 12 members, unless, at any time before the conclusion of the hearing, the parties stipulate, with the approval of the court, that it shall consist of a lesser number.

18 U.S.C. § 3593(b). It is clear that at this stage of the litigation, neither subsection (b)(2) nor subsection (b)(3) applies. Thus, the jury determining Defendants' guilt must also determine their sentences. *See United States v. Green*, 407 F.3d 434, 444 (1st Cir. 2005) ("Section 3593(b)(2) requires that, in a federal capital case, the jury that determines guilt also must determine the penalty unless one of four exceptions pertains.")[13]; *Solomon*, 2007 WL 1228029, at *9 (noting

---

[13] However, the court in *Green* noted that:

> We are not unmindful that the FDPA, as written, may complicate the trial of mixed capital and non-capital charges. But our task is to attempt, as best we can, to follow Congress's prescription, not to endeavor to improve upon it. The Supreme Court has made it pellucid that a death-qualified jury constitutionally may hear and determine

that the language of Section 3593(b) "does not countenance the actual variation on severance that Defendant . . . proposes, which would result in empaneling two juries. In sum, the statute favors a unitary jury and the Court finds that the interests of justice do not warrant empaneling a second jury for the penalty phase.").

Moreover, empaneling separate juries would require the presentation of the same evidence to two different sets of individuals. This not only weighs against the public interest of judicial efficiency, but also heightens the likelihood of inconsistent and unfair decisions. *See Lockhart v. McCree*, 476 U.S. 162, 181 (1986) (noting that in most capital cases, "much of the evidence adduced at the guilt phase of the trial will also have a bearing on the penalty phase," and if two different juries were to be required, the testimony would have to be presented twice, once to each jury, which could lead to inconsistencies). Accordingly, in the event that Northington is found guilty, the sentencing hearing will be conducted before the jury that convicts him.

For all of the above reasons, Northington's Motion to Sever is denied.[14]

_____

non-capital charges, at least where there are "significant interests" in trying a non-capital defendant jointly with a defendant who is facing a capital charge. At the same time, this language cannot be read to provide the government with an absolute entitlement to joint capital/non-capital trials whenever it pleases.

*Green*, 407 F.3d at 444 (internal citation omitted). As discussed above, the interest in judicial economy outweighs the risk of prejudice to Northington.

[14] For the same reasons that we deny Northington's Motion to Sever, Merritt's Motion to Sever is denied as well.

### B.    Kidada's Motion to Sever

#### 1.    *Facts*

Much of the KSO's distribution of, and collection of proceeds from, drugs took place at the residence of Kaboni and Kidada Savage. (Indictment 5.) The Indictment alleges that Kidada became involved in the KSO's activities, starting in late 2003. (*Id.* at 17.) She was "an enforcer for the KSO. She participated in murders, murder conspiracy, arson, conspiracy to distribute controlled substances, witness tampering, and witness retaliation." (*Id.* at 9.)

#### 2.    *Parties' Contentions*

Kidada requests that this Court sever her trial from that of her co-defendants because of: (1) the fact that Kidada is the only defendant in this case not facing the death penalty, and prejudice will result from jury selection from a death-qualified jury pool; (2) prejudicial spillover and the likelihood that the jury will be confused by the evidence presented, due to the complexity of the case; (3) Defendants' antagonistic defenses and the violation of Kidada's Sixth Amendment confrontation rights, arising from the introduction of evidence by her co-Defendants and from her co-Defendants' statements; and (4) the inability of jury instructions to cure the prejudice that will result from joinder in this case. (Kidada Mot. 2.)

Responding to these four points, the Government states that: (1) courts have stated that a defendant has no constitutional entitlement to a non-death-qualified jury (Gov't Resp. 29-30); (2) there is no prejudicial spillover, and this case is not so complicated or overwhelming that the jury will encounter difficulty separating the evidence and applying it to the relevant Defendants (*id.* at 30-36); (3) Kidada's arguments concerning the violation of her Sixth Amendment rights are general and unsupported (*id.* at 38-43); and (4) jury instructions will provide "ample

protection" against prejudice (*id.* at 44-45).

3.      *Analysis*

a)      <u>Kidada As the Sole Defendant Not Facing the Death Penalty</u>

Kidada contends that severance should be granted since she is the sole non-capital defendant and prejudice will result from selecting a jury from a death-qualified jury pool. (Kidada Mot. 3, 12.)  Kidada concedes that death-qualification of a jury alone does not require severance.  (*See id.* at 12.)  However, she claims that in this case, she will be prejudiced by the jury selection process since she will take a *voir dire* approach that is different from that of the capital Defendants.  Moreover, Kidada claims that giving her a separate trial will not be time-consuming or "bear any additional expense than that of any other single trial in this court," since a separate trial for her would entail "a very limited number of criminal acts . . . as compared to the RICO Conspiracy alleged . . . ."  (*Id.* at 5.)

A death-qualified jury is one from which prospective jurors have been excluded for cause based on their inability to set aside their views about the death penalty that would prevent or substantially impair the performance of their duties in accordance with their instructions and oath.  *Buchanan v. Kentucky*, 483 U.S. 402, 407 n.6 (1987) (citation omitted).  As acknowledged by Kidada, the Supreme Court has expressly held that death qualification does not violate either a capital defendant's or a jointly tried non-capital defendant's rights under the Sixth and Fourteenth Amendments to an impartial jury selected from a representative cross-section of the community.  *See id.* at 414-15; (*see also* Kidada Mem. 12).[15]  A number of district courts,

---

[15] Indeed, the Supreme Court also noted in *Buchanan* that "[i]n joint trials, the jury obtains a more complete view of all the acts underlying the charges than would be possible in separate trials.  From such a perspective, it may be able to arrive more reliably at its conclusions

following *Buchanan*, have concluded that a death-qualified jury alone is not a sufficient reason to justify severance. *See, e.g.*, *United States v. Cuong Gia Le*, 316 F. Supp. 2d 330, 339 (E.D. Va. 2004) (rejecting argument that death qualification requires severance); *United States v. Bin Laden*, 109 F. Supp. 2d 211, 221-22 (S.D.N.Y. 2000) (denying severance because death-qualified jury does not lack impartiality); *United States v. Aiken*, 76 F. Supp. 2d 1346, 1357 (S.D. Fla. 1999) (same). However, other district courts, while acknowledging that a death-qualified jury may not in itself be a sufficient reason to justify severance, have viewed the potential prejudice from death qualification as further support for severance. *See, e.g.*, *United States v. Basciano*, No. 05-060, 2007 WL 3124622, at *7-8 (E.D.N.Y. Oct. 23, 2007) (citing cases); *United States v. Rollack*, 64 F. Supp. 2d 255, 257 (S.D.N.Y. 1999) (holding that although death-qualified jury may not be sufficient in itself to justify severance, it provided additional support for severance in light of other spillover prejudice in that particular case).

Kidada has failed to articulate any specific prejudice that will result from selecting a jury from a death-qualified jury pool. *See infra*. Courts have refused to adopt a *per se* rule that every trial involving both capital and non-capital defendants is so inherently prejudicial as to warrant severance, even absent a showing of any specific prejudice. *See United States v. Brown*, Nos. 99-4062, 99-4063, 99-4254, 2000 WL 930786, at *6 n.10 (4th Cir. July 10, 2000) (citing *Tipton*, 90 F.3d at 868 n.1 (noting that non-capital co-defendant was tried together with capital defendants)); *United States v. Reavis*, 48 F.3d 763, 766-68 (4th Cir. 1995) (affirming district

---

regarding the guilt or innocence of a particular defendant and to assign fairly the respective responsibilities of each defendant in the sentencing." *Buchanan*, 483 U.S. at 418. "This jury perspective is particularly significant where, as here, all the crimes charged against the joined defendants arise out of one chain of events, where there is a single victim, and where, in fact, the defendants are indicted on several of the same counts." *Id.*

court's refusal to sever trial of Sandra Reavis from that of co-defendants Tipton, Johnson, and Roane on the basis that Roane would have offered favorable testimony at a separate trial because Reavis failed to make an "affirmative demonstration that she was deprived of a fair trial by the denial of her severance motion")). At most, Kidada makes the general argument that she may have a different trial strategy than that of her co-Defendants.[16] This does not constitute grounds for us to sever her trial from that of her co-Defendants. *See Brown*, 2000 WL 930786, at *6 n.10 (rejecting argument that non-capital defendant was prejudiced by having to stand trial with co-defendant, a capital murder defendant, against whom evidence of brutal murders was offered, since he failed to articulate actual prejudice and "relie[d], instead upon broad arguments

---

[16] In support of this argument, Kidada cites *Basciano*. There, the court noted that "[m]y recent experience in trying a death penalty case . . . has convinced me that the different trial strategies employed by counsel in approaching jury selection in a death penalty trial may in fact be sufficient on their own to justify severance where one defendant faces the death penalty and the others do not." 2007 WL 3124622, at *8. However, this statement was dicta. *See id.* ("It is not necessary to reach that issue here, however, because when these concerns combine with a high likelihood of spillover prejudice, as in this case, they provide 'further support' for severance.").

Kidada also cites *United States v. Ayala Lopez*, 319 F. Supp. 2d 236 (D.P.R. 2004). There, the court cited data in support of its observation that "in the majority of federal death penalty cases some type of severance has been granted." *Id.* at 240. However, the court there subsequently stated, "[w]e clarify that we are not establishing a steadfast rule of general applicability, but that confronted with this particular case as presented, we find that it is in the best interest of justice that severance be granted." *Id.* In that particular case, the court found that "[a]fter reading the submitted briefs on the issue of conflicting defenses, inclusively that of the capital Defendant, we are of the impression that the Defendants, both the capital Defendant as well as the non-capital Defendants, face an unacceptable risk of prejudice if tried together." *Id.* at 239. For the reasons stated in this Memorandum, we do not find an "unacceptable risk of prejudice" here. We also note that the court in *Ayala Lopez* noted that it was "more skeptical, however, of the argument raised with regards to a death-certified jury" and noted that the argument had been foreclosed by the Supreme Court in *Buchanan*. *Id.*

Moreover, the law is clear that each case must be decided on its unique facts and circumstances. The Supreme Court has not adopted a bright-line test requiring severance each time a capital and non-capital defendant or defendants are indicted together.

concerning the generally prejudicial nature of a capital trial"); *Causey*, 185 F.3d at 416-17 (rejecting defendant's argument that "the non-capital character of his prosecution set him apart from the other defendants" since defendant "had not demonstrated that any compelling prejudice would result as a consequence of the non-capital character of his prosecution").

Moreover, should a penalty phase of the trial be required, the Court will instruct the jury at the beginning of the penalty phase that it must keep in mind that each Defendant must be given separate consideration. A capital jury is presumed, at both the liability phase and at the penalty phase, to understand and follow its guiding instructions. *Richardson*, 481 U.S. at 206; *Solomon*, 2007 WL 1228029, at *8. In light of Supreme Court precedent holding that a death-qualified jury by itself poses no constitutional problem with respect to non-capital defendants in a joint trial, and the Government's significant interests in having a joint trial, we reject Kidada's argument for severance on this basis.

   b) <u>Prejudicial Spillover and Likely Confusion of Evidence</u>

Kidada argues that "[t]he magnitude of evidence in this case will be staggering, and most of it will involve events in which [she] was not involved." (Kidada Mot. 6.) She claims that the evidence of violent acts and murders alleged over the course of several years will spill over and unfairly prejudice the jury's determinations of her criminal conduct. (*Id.*) Kidada claims that "before a jury hears any evidence relating to [her], they will have heard of seven murders she had no involvement in." (*Id.* at 8.) Kidada argues that she will be prejudiced by the fact that, prior to 2004, when these seven murders were committed, she was a teenager. (*Id.*) She also argues that she will be prejudiced by evidence that she was raised in the same household as, and was largely raised by, her brother. She claims that acts attributed to her brother will likely be attributed to

her.  (*Id.* at 8-9; *see also* June 12, 2012 Hr'g Tr. 7 (on file with Court.)

Kidada's argument that her role in the KSO is relatively minimal, in comparison with the respective roles of her co-Defendants, is unpersuasive.  She "was an enforcer for the KSO" and "participated in murders, murder conspiracy, arson, conspiracy to distribute controlled substances, witness tampering and witness retaliation.  (Indictment at 9.)  The Indictment reflects that she committed various over acts in furtherance of the KSO's objectives, including, *inter alia*:

- Sometime in late 2003, KIDADA SAVAGE sent a letter to Eugene Coleman in the FDC - Philadelphia, in which letter she stated that they were "all in this thing together," that she knew that the FBI "be talking shit to you . . . you know never to tell them shit, fuck them, feed them niggas dog shit," and warned Coleman not to "say shit to them pussies.  They're going to try to divide and conquer, don't let them divide us."  KIDADA SAVAGE concluded the letter with:  "If U said something let us know, if U didn't, let us know, we have to know what's going on.  Don't say shit to nobody."  The letter also contained a line that was half handwritten and half typed, which said, "Death before dishonor (to your family)."  The letter was signed "Love yah Nigga Always, Your Little Sis." (*Id.* at 17.)
- On or about April 23, 2004, in Philadelphia, KIDADA SAVAGE and co-conspirators known to the grand jury as B.S. and C.C., confronted a person known to the grand jury as V.C., telling V.C. that KABONI SAVAGE was in possession of statements made by V.C.'s brother, witness Eugene Coleman, a/k/a/ "Twin," and discussed their abilities to convince other co-conspirators to leave V.C. alone.  (*Id.* at 18.)
- In or about May 2004, in Philadelphia, KABONI SAVAGE threatened to harm the sister of witness Craig Oliver, explaining to inmate A.W. that when KIDADA SAVAGE came to visit him at the FDC-Philadelphia, KIDADA SAVAGE had told KABONI SAVAGE That she had found out where Craig Oliver's sister had moved, by following her home from a store.  (*Id.* at 19.)
- In or about May 2004, in Philadelphia, KABONI SAVAGE told KIDADA SAVAGE that witnesses known to the grand jury as "J.N.," a/k/a "Yusef," and Stanley Smith were cooperating with the government.  (*Id.* at 19.)
- In or about May 2004, in Philadelphia, KABONI SAVAGE told KIDADA SAVAGE that he would let her know what had to be done with the family members of witnesses.  (*Id.*)
- On or about May 27, 2004, KIDADA SAVAGE obtained a license to carry a firearm in the Commonwealth of Pennsylvania.  (*Id.*)
- In or about late Spring 2004, in Philadelphia, KABONI SAVAGE provided an inmate known to the grand jury as "H.N." with the home address and

telephone number of KIDADA SAVAGE, explaining that KIDADA SAVAGE handles communications for KABONI SAVAGE outside of prison, pays money to people, and takes care of his "boys" for KABONI SAVAGE. (*Id.* at 19-20.)

- In or about late Spring and early Summer 2004, KABONI SAVAGE provided an inmate known to the grand jury as "T.R." with the home address and telephone number of KIDADA SAVAGE, with instructions for T.R. to provide KIDADA SAVAGE with any information on the family of witness Juan Rosado. (*Id.* at 20.)

- On or about July 1, 2004, in Philadelphia, KIDADA SAVAGE purchased a Rossi .38 caliber handgun. (*Id.*)

- On or about October 8, 2004, in Philadelphia, KABONI SAVAGE placed a telephone call from the FDC-Philadelphia to his family's home, and spoke to KIDADA SAVAGE and Lamont Lewis, ordering Lamont Lewis to do what KIDADA SAVAGE would instruct him to do. (*Id.* at 21-22.)

- On or about October 8, 2004, in Philadelphia, KABONI SAVAGE and KIDADA SAVAGE solicited and ordered Lamont Lewis to set fire to the home of witness Eugene Coleman's family, and to kill the family of Eugene Colement. (*Id.* at 22.)

- On or about October 8, 2004, KIDADA SAVAGE promised to pay Lamont Lewis approximately $5,000, to burn down the home of witness Eugene Coleman's family, and to kill members of the Coleman family. (*Id.*)

- On or about October 8, 2004, in Philadelphia, KIDADA SAVAGE instructed Lamont Lewis to notify her of the successful completion of the arson murders upon the Coleman family, by calling her home telephone number and allowing the call to go to voice-mail without leaving a message. (*Id.*)

- On or about October 8, 2004, in Philadelphia, KIDADA SAVAGE directed Lamont Lewis to the home of Eugene Coleman's family, and pointed out the home, for the purpose of showing Lamont Lewis which home KIDADA SAVAGE and KABONI SAVAGE wanted Lamont Lewis to set on fire. (*Id.*)

- [After Merritt and Lewis set fire to the home of the Coleman family] [o]n or about October 9, 2004, in the early morning hours, in Philadelphia, Lamont Lewis placed a telephone call to KIDADA SAVAGE, confirming that he had set the Coleman house on fire. (*Id.* at 23.)

- On or about October 9, 2004, in Philadelphia, a telephone call was placed from a telephone used by ROBERT MERRITT to a telephone used by KIDADA SAVAGE. (*Id.*)

- On or about October 9, 2004, in Philadelphia, KIDADA SAVAGE paid Lamont Lewis $2,000 for the arson murders, and told Lewis that a person known to the grand jury as R.W., a/k/a "Manny," would pay him an additional $3,000. (*Id.*)

- On or about October 28, 2004, in Philadelphia, KABONI SAVAGE directed KIDADA SAVAGE to tell a person known to the grand jury as "F.T.," a/k/a "Nitti," that a person known to the grand jury as "M.M.," a/k/a "Shark,"

owed KABONI SAVAGE $35,000. KABONI SAVAGE told KIDADA SAVAGE to tell F.T., a/k/a "Nitti," to "get that money" and to "get on that." (*Id.*)

- On or about October 28, 2004, in Philadelphia, KABONI SAVAGE told KIDADA SAVAGE to tell R.W., a/k/a "Manny," to "go get" a person known as "C.S.," and to tell "Poppy" (Lamont Lewis) that C.S. "[c]ame down (there) and said something" and to make sure that C.S. does not "come to court." (*Id.* at 23-24.)

- On or about November 5, 2004, in Philadelphia, KABONI SAVAGE asked KIDADA SAVAGE if she told a person known to the grand jury as F.T., a/k/a "Nitti," about M.M., which KIDADA SAVAGE confirmed that she had. (*Id.* at 24.)

- On or about January 15, 2005, in Philadelphia, KIDADA SAVAGE, using the nickname "Diz Matic" and a contact e-mail of "dizmatic20@yahoo.com," posted "Informant Profiles" for witnesses Eugene Coleman, Myron Wilson and Craig Oliver on the internet website, "whosarat.com." (*Id.* at 28-29.)

- On or about February 14, 2005, in Philadelphia, KIDADA SAVAGE wrote a letter to KABONI SAVAGE, which letter, referring to witnesses and law enforcement officers, stated, "I hope all them cock suckers die, I hope they die, they're [sic] mom's [sic], wive's [sic], children, there [sic] whole family." (*Id.* at 29.)

- On or about February 20, 2005, in Philadelphia, KIDADA SAVAGE threatened U.S. Bureau of Prisons employees at the FDC-Philadelphia, stating that she "should have brought (her) motherfucking gun," while making a shooting gesture. (*Id.*)

- On or about February 23, 2005, in Philadelphia, KABONI SAVAGE asked T.R. to contact KIDADA SAVAGE if T.R. were to find an address for witness Juan Rosado's girlfriend. KABONI SAVAGE wrote a telephone number and "Lil Sis" on one of T.R.'s legal documents." (*Id.*)

- On or about April 19 and 20, 2005, in Philadelphia, T.R. spoke by telephone with KIDADA SAVAGE, introduced himself as KABONI SAVAGE's cellmate at FDC-Philadelphia, and told KIDADA SAVAGE that KABONI SAVAGE wanted T.R. to contact her with some information. (*Id.*)

- On or about Mary 23, 2005, in Philadelphia, KIDADA SAVAGE asked KABONI SAVAGE about T.R., to which KABONI SAVAGE responded that T.R. was on their "side." (*Id.* at 29.)

- On or about May 28, 2005, in Philadelphia, T.R. met with KIDADA SAVAGE at a store, and provided her with fictitious information concerning witness Juan Rosado's family members, and a "tribute" payment for KABONI SAVAGE. (*Id.* at 30.)

- On or about June 3, 2005, in Philadelphia, KIDADA SAVAGE told KABONI SAVAGE that she met with T.R. KABONI SAVAGE asked KIDADA SAVAGE if T.R. had told her anything. KIDADA SAVAGE told

KABONI SAVAGE that T.R. had, to which KABONI SAVAGE responded, "You have to fight fire with fire with these motherfuckers." KABONI SAVAGE told KIDADA SAVAGE that he had "a few other people," too, and that he was on "their (witnesses') ass so bad." (*Id.*)

- On or about June 17, 2005, in Philadelphia, KABONI SAVAGE asked KIDADA SAVAGE about people known to the grand jury as "K.O.," "Harp," and "Ozzie." KABONI SAVAGE told KIDADA SAVAGE that they are "counting [him] out." KABONI SAVAGE told KIDADA SAVAGE to tell them KABONI "needs" them, and to make sure she does not "pull . . . punches." KABONI SAVAGE told KIDADA SAVAGE to tell them that he is "mad," because "it's gonna strike fear in them niggas." (*Id.*)

- On or about April 24, 2007, in Philadelphia and elsewhere, KIDADA SAVAGE maintained a "Myspace" web page on the internet, containing her photograph, the nickname "D A," Myspace URL "http://www.myspace.com/dizmatic215," and the wall quote, "C wut I discovered is yall some snitch lovers, I might speak, but I don't fuck wit nobody!" (*Id.* at 31.)

Kidada was an active member of the KSO. She played a key role in the arson murders, which also were committed in furtherance of the KSO's objectives.[17]

Nevertheless, Kidada asserts that "[t]he evidence of so much violence and other crimes alleged against the co-defendants will spill over into and unduly prejudice the jury's determinations as to Ms. Savage'[s] conduct." (Kidada Mem. 6.) That evidence includes "at least thirteen murders" and threats in which Kidada had no involvement. (*Id.* at 8.) She claims

---

[17] Even if Kidada's role was comparatively more minor than that of her co-Defendants, this would not necessarily warrant severance. The Third Circuit has made clear that "[a] defendant is not entitled to a severance merely because the evidence against a co-defendant is more damaging than the evidence against him." *United States v. De Larosa*, 450 F.2d 1057, 1065 (3d Cir. 1971). "While such a disparity in the proofs is sufficient in certain cases, the primary consideration is whether the jury can reasonably be expected to compartmentalize the evidence as it relates to separate defendants in view of its volume and limited admissibility." *Id.*; *see also Eufrasio*, 935 F.2d at 568 ("Prejudice should not be found in a joint trial just because all evidence adduced is not germane to all counts against each defendant." (citing *Sandini*, 888 F.2d at 307); *Id.* ("Neither a disparity in evidence, nor introducing evidence more damaging to one defendant than others entitles seemingly less culpable defendants to severance." (citing *United States v. Sebetich*, 776 F.2d 412, 427 (3d Cir. 1985))).

that the jury will be unable to compartmentalize the evidence against Savage from the evidence against her. (*Id.*)

Spillover prejudice may occur where "evidence of a codefendant's wrongdoing . . . erroneously could lead a jury to conclude that a defendant was guilty." *Zafiro*, 506 U.S. at 539. However, "[t]he mere circumstance that some evidence is admissible against one defendant but not others in a joint trial does not usually constitute prejudice warranting severance." *United States v. Murgas*, 967 F. Supp. 695, 711 (N.D.N.Y. 1997). As discussed above, the allegations in the Indictment with respect to each Defendant are clear. The jury will be able to compartmentalize the evidence against the various Defendants, particularly when provided with instructions by the Court. *See Causey*, 185 F.3d at 416 (rejecting defendant's spillover evidence argument since the district court gave cautionary instructions requiring the jury to consider the evidence against each defendant individually); *Solomon*, 2007 WL 1228029, at *7 ("Multi-defendant trials are quite common in the federal system, and many involve evidence that is admissible against one defendant, but not against another. Federal courts, quite routinely, have found juries able to follow and abide by appropriate cautionary instructions." (citing *Richardson v. Marsh*, 481 U.S. 200, 209-10 (1987)).[18]

---

[18] With respect to Kidada's argument that "a jury will be more inclined to believe that [she] committed the crimes alleged simply because they believe her brother committed some or all of the acts alleged" (Kidada Mem. 9), several courts have held that family relationships are not sufficient grounds for severing the trials of co-defendants. *See, e.g.*, *United States v. Spagnola*, 632 F.3d 981, 988 (7th Cir. 2011) (rejecting defendant's argument that the district court should have severed the trial based on statements about other robberies and their family's drug dealing); *United States v. Saunders*, 553 F.3d 81, 85 (1st Cir. 2009) (affirming district court's refusal to sever trials of mother and son in conspiracy case); *United States v. Reyeros*, 537 F.3d 270, 287 (3d Cir. 2008) (in conspiracy case, rejecting argument that defendant suffered "any prejudice, let alone clear and substantial prejudice, by being tried with his brother").

Antagonistic Defenses and Violation of Kidada's Sixth
              Amendment Confrontation Rights

Kidada contends that she may present a defense of duress — that she was intimidated by, or under the authority of, her brother, Kaboni.  She also claims that she and her co-Defendants will have mutually antagonistic defenses.  (*See* Kidada Mem. 10 ("All evidence having the effect of exonerating one defendant implicitly indicts the other.").)

"Mutually antagonistic defenses are not prejudicial *per se*," *Zafiro*, 506 U.S. at 538, but "antagonistic defenses may conflict to such a degree that codefendants are denied a fair trial," *United States v. Cardascia*, 951 F.2d 474, 484 (2d Cir. 1991).  The "defenses must conflict to the point of being so irreconcilable as to be mutually exclusive before we will find such prejudice as denies defendants a fair trial." *Cardascia*, 951 F.2d at 484.  "Defenses are mutually exclusive or irreconcilable if, in order to accept the defense of one defendant, the jury must of necessity convict a second defendant." *Id.*  The Third Circuit has observed that "courts have consistently held that finger-pointing and blame-shifting among coconspirators do not support a finding of mutually antagonistic defenses." *Voigt*, 89 F.3d at 1095 (citing string of cases in which the court held that blaming one co-conspirator, or claiming ignorance, was not grounds for granting a motion to sever).  Furthermore, the Third Circuit has stated that "[e]ven where a defendant establishes that his defense and those of his codefendants are mutually antagonistic . . . severance is not mandatory." *Id.* at 1094 (citing *Zafiro*, 506 U.S. at 539).[19]

---

[19] We also note that "[w]hile mutually antagonistic defenses have been much discussed in theory, only rarely have courts found that they exist in practice." *Voigt*, 89 F.3d at 1094.  Courts have often concluded that the asserted defenses, while in conflict with one another, are not so irreconcilable that "[t]he jury could not have been able to assess the guilt or innocence of the defendants on an individual and independent basis." *United States v. Tootick*, 952 F.2d 1078, 1083 (9th Cir. 1991); *see, e.g.*, *United States v. Flanagan*, 34 F.3d 949, 952 (10th Cir. 1994)

Here, Kidada has failed to show that any anticipated mutually antagonistic defenses will impair any specific trial right or prevent the jury from making a reliable determination of guilt or innocence. At this juncture, we can only speculate as to the nature of Defendants' defenses. It is not apparent that there will be irreconcilable conflicts, or that with proper instructions and evidentiary rulings, prejudice cannot be avoided. To the extent that Kidada claims that antagonistic defenses will be based upon the testimony of witnesses, she will have the opportunity for cross-examination and rebuttal. We see no reliable evidence of mutually antagonistic defenses that cannot be cured with instructions to justify severance. *See Solomon*, 2007 WL 1228029, at *5.

In addition, Kidada claims that much of the evidence against her will be in the form of co-conspirator statements by her co-Defendant brother. She claims that she will be unable to cross-examine Savage at trial, and thus, a joint trial violates her Sixth Amendment confrontation rights. (Kidada Mem. 10-11.) However, "[b]are assertions that co-defendants will testify" do not, in itself, warrant severance. *United States v. Boscia*, 573 F.2d 827, 832 (3d Cir. 1978). Rather, "[i]n determining the necessity of severance under these circumstances, courts have placed emphasis on the following four factors: (1) the likelihood of co-defendant's testifying; (2) the degree to which such testimony would be exculpatory; (3) the degree to which the testifying co-defendants could be impeached; [and] (4) judicial economy." *Id.* Kidada has presented no

---

(affirming denial of motion to sever because a jury "could logically" accept one defendant's defense without concluding that the codefendant was guilty, and vice versa); *United States v. Harris*, 9 F.3d 493, 501 (6th Cir. 1993) (affirming denial of motion to sever trials of coconspirators, one of whom claimed innocence and the other of whom claimed entrapment, on the ground that these defenses were not inconsistent because the jury could logically have accepted both).

evidence that her brother will testify or shown how any such testimony would be exculpatory.

*See Solomon*, 2007 WL 1228029, at *6 ("Without knowing what the statements are or without seeing any proposed redaction, the Court finds that any severance determination based upon *Bruton* issues would be premature at this time."). Moreover, the admission of statements of co-conspirators made in furtherance of a conspiracy does not violate the Confrontation Clause.

*Giles v. California*, 554 U.S. 353, 374 n.6 (2008) (noting that admission of evidence did not violate the Confrontation Clause because the evidence "was not (as an incriminating statement in furtherance of the conspiracy would probably never be) testimonial"); *see also Crawford v. Washington*, 541 U.S. 36, 56 (2004) ("Most of the hearsay exceptions covered statements that by their nature were not testimonial-for example, business records or statements in furtherance of a conspiracy."). Nor does *Bruton v. United States*, 391 U.S. 123 (1968), apply to these statements. In *Bruton*, the Supreme Court held that a defendant's Sixth Amendment confrontation right is violated where a hearsay confession by his co-defendant inculpating the defendant is admitted into evidence and the co-defendant does not testify. *Id.* at 126. The Court held that in these sorts of situations, limiting instructions by the trial court are not an adequate remedy and if the statement is to be admitted without being appropriately redacted, severance is required. *Id.* at 137; *see also Sandini*, 888 F.2d at 310 (interpreting *Bruton*). However, the Third Circuit has rejected the argument that *Bruton* requires a holding that the co-conspirator's hearsay exception violates the Confrontation Clause. *United States v. Ward*, 793 F.2d 551, 556 (3d Cir. 1986) (rejecting argument that an accomplice's hearsay confession incriminating the defendant is presumptively inadmissible if the defendant has no opportunity to cross-examine the declarant since the Supreme Court has explained that a statement that falls within a hearsay exception —

here, testimony that was admissible as a co-conspirator's statement under Federal Rule of

Evidence 801(d)(2)(E) — is treated differently for constitutional purposes); *see also United*

*States v. Addonizio*, 451 F.2d 49, 71 (3d Cir. 1971) (citing *United States v. Am. Radiator &*

*Standard Sanitary Corp.*, 433 F.2d 174 (3d Cir. 1970); *Parness v. United States*, 415 F.2d 346

(3d Cir. 1969)).[20]

---

[20] The cases cited by Kidada are distinguishable. In *United States v. Breinig*, 70 F.3d 850, 853 (6th Cir. 1995), the Sixth Circuit found that defendant had carried the heavy burden of showing "compelling and unfair" prejudice, justifying severance. *Breinig* involved former-husband-and-wife defendants in a tax-evasion case. *Id*. The wife claimed that she lacked the capacity to form the requisite *mens rea* to have evaded taxes wilfully since she was being dominated and controlled by the husband. *Id*. This defense was premised on the testimony of a psychiatrist and psychologist who had treated her. *Id*. at 852. The husband claimed that since his former wife kept all of the books and an accounting firm prepared their taxes, he had no knowledge of the underreporting. *Id*. The court held that the husband was prejudiced not as a result of mutually antagonistic defenses, but rather from highly inflammatory evidence of the husband's bad character. *Id*. at 853. "The jury was told, by well-credentialed experts, that Breinig was an adulterous, mentally abusive, and manipulating spouse. Such testimony, of course, would have been inadmissible against him under any theory of the Federal Rules of Evidence on a trial for tax evasion." *Id*. Those circumstances are not present here.

In *United States v. Tootick*, 952 F.2d 1078, 1081 (9th Cir. 1991), each defendant claimed that the other alone committed the assaults. One defendant claimed that he watched the other stab the victim repeatedly and then lick the victim's blood of the weapon. *Id*. The other defendant claimed that he was highly intoxicated and passed out or asleep during the attack. *Id*. The court held that since only these two defendants were present when the victim was attacked, and since there was no suggestion that the victim injured himself, the jury could not acquit one defendant without disbelieving the other. *Id*. Each defense theory contradicted the other such that the acquittal of one defendant necessitated the conviction of the other. *Id*. This situation is not present here.

In *United States v. Odom*, 888 F.2d 1014, 1018 (4th Cir. 1989), the judge denied severance at first, but as the trial unfolded, "it became obvious . . . that throughout the trial [the judge] was going to be faced with a choice of either curtailing [defendant's] defense, which could prejudice [defendant], or allowing [defendant's] attorney to continue his inflammatory attacks on [the other defendant], which would be prejudicial to [the other defendant]." Kidada has only presented hypothetical situations at this stage, and we do not find that she will be unfairly prejudiced such that severance is necessary at this stage.

d)      <u>Jury Instructions</u>

Kidada contends that a jury will be unable to compartmentalize the evidence against each

of the Defendants "in this highly complicated RICO case[] involving multiple defendants,

numerous murders and threats to murder, and a multi-year large scale drug trafficking

conspiracy." (Kidada Mot. 13.) She claims that her right to an individualized determination of

her guilt or innocence will be compromised through the jury's confusion and exhaustion. (*Id.*)

She further contends that jury instructions will not be able to cure any prejudice. (*Id.* at 14.)

However, as discussed above, the Indictment is clear as to which allegations and acts pertain to

each Defendant. We presume that the jury will follow the instructions that we provide.[21]

For the foregoing reasons, we will deny Kidada's Motion to Sever.

**C.      Savage's Motion to Sever Counts**

*1.      Facts*

The Indictment alleges that Kaboni Savage was the leader of, and exercised direct

authority over, the members of the KSO. (Indictment 8.) "He participated in murders, murder

conspiracy, arson, money laundering, beatings, conspiracy to distribute controlled substances,

carrying firearms during violent crimes, witness tampering, and witness retaliation." (*Id.*) He

also "ordered murders of rival drug dealers, people he deemed to be disloyal to the KSO,

witnesses, potential witnesses, and family members of witnesses." (*Id.*) The Indictment alleges

that he was involved in the vast majority of the overt acts committed in furtherance of the KSO's

---

[21] Kidada cites *United States v. Baker*, 10 F.3d 1374 (9th Cir. 1993) for the proposition that "mega-trials" may create substantial risks of prejudice in light of human limitations and the risks of spillover prejudice. *Id.* at 1391. However, in *Baker*, the Ninth Circuit concluded that "the district court did not abuse its broad discretion in denying Appellants' motions for severance." *Id.* at 1389.

objectives and goals.  (*See id.* at 9-32.)

### 2.    *Parties' Contentions*

Savage seeks to sever the Counts charged against him into three groups:  (1) Count 2, which concerns the murder of Kenneth Lassiter "for the purpose of maintaining and increasing position in an enterprise engaged in racketeering activity"; (2) Counts 1, 3, and 4 through 8, which charge Savage and three co-Defendants with conspiring to participate in a RICO enterprise (Count 1), with five murders committed in aid of racketeering (Counts 3 through 7), and with witness tampering (Count 8); and (3) Counts 9 through 17, which concern the arson murders. (Savage Mot. 1-3.)  Savage claims that he will suffer "severe and unwarranted prejudice — including a sentence of death" if all of the counts he has been charged with are tried together. (*Id.* at 3.)  Specifically, he contends that trying the counts in the first two groups alongside the arson murder counts will be "unduly prejudicial."  (*Id.* at 4.)  He claims that the groups of counts are unrelated, and that the evidence related to each group of counts is unrelated to the evidence concerning the other groups of counts.  He argues, "a joint trial would result in trivial savings in judicial efficiency."  (*Id.* at 3-4.)

The Government responds that the murders that Savage has been charged with are "linked" in that they were committed to further the purposes of the KSO.  (Gov't's Resp. 20-22.) Moreover, the Government contends, the arson murder counts require proving the conspiracy to participate in a racketeering enterprise, as charged in Count 1.  (*Id.* at 23.)  The Government argues that any unfair prejudice that may be associated with trying all of these counts together is outweighed by the probative value of the evidence.  (*Id.* at 24-26.)

3.    *Analysis*

The Indictment alleges that "[i]t was a further purpose of the [KSO] that its members and associates would maintain, preserve, protect and attempt to expand the power, territory and profits of the enterprise through the use of threats, intimidation, violence, and murder." (Indictment 6.)  Savage committed various overt acts in furtherance of the KSO conspiracy and its objectives.  In furtherance of the conspiracy, Savage "shot and killed, and caused the murder of, Kenneth Lassiter . . . ."  (*Id*. at 9; *see also id.* at 38-39 (Count 2, charging Savage with murder of Lassiter).)  Also in furtherance of the KSO's objectives, he "knowingly and intentionally murdered, knowingly aided and abetted, and willfully caused the murder of, Mansur Abdullah" and Carlton Brown.  (*See id*. at 40-41 (outlining murder in aid of racketeering charges for the respective victims in Counts 3 and 4); *see also id.* at 11 (charging murder of Abdullah in furtherance of conspiracy, and alleging that Savage directed Lamont Lewis to kill Carlton Brown in retaliation for murder by Brown and in furtherance of conspiracy).)  Savage was also responsible for the murders of Barry Parker and others (*see id.* at 42 (Count 5, murder in aid of racketeering of Parker), 43 (Count 6, murder in aid of racketeering of Tyrone Toliver), 44 (Count 7, murder in aid of racketeering of Flowers), 45 (Count 8, witness tampering murder of Flowers)) — all of whom were killed in furtherance of the KSO conspiracy (*see id.* at 14-15 (murder of Parker in furtherance of conspiracy), 15-16 (murder of Toliver in furtherance of conspiracy), 17-18 (murder of Flowers to prevent him from testifying).)  Savage also conspired to commit the firebombing murders.  (*Id*. at 21-24 (describing October 9, 2004 arson-murder), 46-54 (Counts 9 through 17, which encompass the arson murders).)

Clearly, the counts that Savage seeks to sever all concern murders that were committed in

furtherance of the KSO's goals. "Where charges leveled against only a single defendant 'arose directly' from his participation in a common illicit enterprise which led to charges against that defendant and co-defendants," the Third Circuit has held that "all of the charges may be considered part of the same series of acts, rendering joinder proper under Rule 8(b)." *United States v. Walker*, 657 F.3d 160, 169 (3d Cir. 2011); *see also Riley*, 621 F.3d at 334 ("In this case, it was [defendant's] failure to report income earned from the land fraud scheme that led to her Tax Fraud Counts. Because the tax evasion arose directly from the land fraud proceeds, it was in the interest of judicial efficiency to join these claims.").

Moreover, the Government will offer common evidence to prove each of these counts. The evidence that will be used to prove that each of the murders was committed in furtherance of the KSO's objectives will also be used for the other counts. Accordingly, these counts are properly joined. *See Aiken*, 76 F. Supp. 2d at 1351 (holding that joinder of counts was proper since the indictment charged all defendants with criminal enterprise and racketeering conspiracy, the "common thread" linking the defendants was the racketeering conspiracy, and "[s]ince the acts alleged in the various counts are connected together, if not inextricably linked, in terms of common objective, mode of operation, and participants"); *Rollack*, 64 F. Supp. 2d at 258 (noting that evidence of racketeering enterprise of which defendant is alleged to have been the leader would be offered and admissible at a trial of the non-capital as well as the capital crimes charged against him); *see also United States v. Friedman*, 854 F.2d 535, 561 (2d Cir. 1988) ("The presence of a substantive RICO count under 18 U.S.C. § 1962(c), and of a RICO conspiracy count under 18 U.S.C. § 1962(d), further broadens the government's power to charge multiple defendants together. A RICO charge under § 1962(c) necessarily incorporates allegations that

40

each of the defendants named was associated with or employed by the same enterprise, and participated in the enterprise by engaging in at least two acts of racketeering related to the enterprise.").

With respect to the argument that severance is required to avoid unfair prejudice, Savage has failed to demonstrate that any unfair prejudice he may face as a result of the counts being tried together weighs heavily against the probative value of the evidence. At most, he argues that the arson murders were so horrendous that, when those counts are tried with the other counts involving murder, Savage will inevitably be prejudiced. This, however, is insufficient to warrant separate trials where the counts have been properly joined. *See Eufrasio*, 935 F.2d at 570-71 (holding that there was no misjoinder of RICO and non-RICO counts against one co-defendant since "the gambling and extortion along with the . . . murder conspiracy and loansharking charged against [him], were all allegedly undertaken by him in furtherance of and in association with the same racketeering enterprise and conspiracy" and "[a]ll the conduct charged against [him] constituted a single series of related acts furthering the . . . enterprise conspiracy and its purposes"); *Aiken*, 76 F. Supp. 2d at 1355 ("[T]he Constitution does not guarantee a trial free from the prejudice that inevitably accompanies any charge of heinous group crime; it demands only that the potential for transference of guilt be minimized to the extent possible under the circumstances . . . .") (quoting *United States v. Elliott*, 571 F.2d 880, 905 (5th Cir. 1978)) (internal quotation marks omitted). Savage has not demonstrated that appropriate limiting instructions would fail to cure any potential prejudice. *Aiken*, 76 F. Supp. 2d at 1355. Indeed, in *Buchanan*, the Supreme Court held that the jury, in considering the evidence of RICO criminal enterprise and conspiracy as to all defendants in a joint trial, may be able to obtain a more

complete view of all the acts underlying the charges and may be able to arrive more reliably at its conclusions regarding the guilt or innocence of a particular defendant and to assign fairly the respective responsibilities of each defendant in the sentencing.

**IV.     CONCLUSION**

For the foregoing reasons, Defendants' Motions are denied.

An appropriate Order follows.

**BY THE COURT:**

*/s/R. Barclay Surrick*
**U.S. District Judge**