IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | CRIMINAL ACTION |
| v. | : | |
| | : | NO. 07-550 |
| KABONI SAVAGE | : | |
| ROBERT MERRITT | : | |
| STEVEN NORTHINGTON | : | |
| KIDADA SAVAGE | : | |

**SURRICK, J.**                                                        **JANUARY 23, 2013**

## MEMORANDUM

Presently before the Court is Defendant Kaboni Savage's Motion to Suppress Physical

Evidence Seized From 3510 Palmetto Street and Request for a *Franks* Hearing.  (ECF Nos. 398,

400, 415.)[1]  For the following reasons, the Motion is denied.

## I.        BACKGROUND[2]

### A.        Procedural History

On May 9, 2012, a federal grand jury returned a seventeen-count Fourth Superseding

Indictment charging moving Defendant Kaboni Savage with conspiracy to participate in the

affairs of a racketeering ("RICO") enterprise, in violation of 18 U.S.C. § 1962(d) (Count 1),

twelve counts of murder in aid of racketeering, in violation of 18 U.S.C. § 1959(a)(1) (Counts 2-

7, 10-15), conspiracy to commit murder in aid of racketeering, in violation of 18 U.S.C. §

---

[1] We refer to the supplemental version of this Motion (ECF No. 415) throughout this
Memorandum.

[2] The factual background of this case is more fully set forth in our June 1, 2012
Memorandum and Order denying Defendant Kaboni Savage's Motion to Dismiss the Indictment
on Double Jeopardy Grounds (ECF No. 374) and Motion to Dismiss Count Nine of the Third
Superseding Indictment on Double Jeopardy Grounds.  (*See* ECF Nos. 507, 508.)

1959(a)(5) (Count 9), retaliating against a witness, in violation of 18 U.S.C. § 1513(a) (Count 16), and using fire to commit a felony, in violation of 18 U.S.C. § 844(h)(1) (Count 17). (Fourth Superseding Indictment, ECF No. 480.)[3] Defendant was charged along with three co-defendants, Steven Northington, Robert Merritt, and his sister, Kidada Savage. Lamont Lewis was also charged in the First Superseding Indictment. The charges against Lewis were disposed of by guilty plea on April 21, 2011. On March 14, 2011, the Government filed a notice of intent to seek the death penalty against Defendant, Merritt, and Northington. (ECF Nos. 196, 197, 198.) The Government does not seek the death penalty against Kidada Savage.

On February 21, 2012, Defendant filed the instant Motion. (ECF No. 398.) Defendant refiled this Motion, accompanied by a Memorandum of Law, on February 22, 2012. (Def.'s Mot., ECF No. 415; Def.'s Mem., ECF No. 415.) The Government has submitted an Omnibus Response, which addresses Defendant's Motion together with other suppression motions. (Gov't's Resp., ECF No. 466.) Defendant filed a Reply to the Government's Response. (Def.'s Reply, ECF No. 502.)

A suppression hearing was held on June 11 and June 12, 2012. (Min. Entries, ECF No. 516, 519.) At the hearing, the Government presented testimony from Kevin Lewis, a Special Agent with the Federal Bureau of Investigation ("FBI"). (June 11, 2012 Hr'g Tr. 10 (on file with Court).) Special Agent Lewis has been the case agent for the FBI investigation into the Kaboni Savage Organization ("KSO") for the past thirteen years. (*Id.* at 11.) Special Agent Lewis has been heavily involved in wiretap applications and field work related to the KSO investigation.

---

[3] Count 8 of the Fourth Superseding Indictment was dismissed by agreement of the parties. (ECF No. 855.)

(*Id.* at 11, 36, 231-48.)

**B.      Factual Background**

On April 7, 2003, agents with the FBI and officers of the Philadelphia Police Department ("PPD") searched a building located at 3510 Palmetto Street, Philadelphia, Pennsylvania ("3510 Palmetto").  The search was conducted pursuant to a warrant issued by United States Magistrate Judge Thomas J. Rueter on April 4, 2003.  (Warrant, Gov't's Resp. Ex. A.)

3510 Palmetto "is a two story building with a garage on the first floor."  (Warrant Attach. A.)  The garage features a roll-up metal door, which is approximately fifteen feet tall.  The building is "the only two story structure" on its block.  (*Id.*)  Although other garages adjoin the building, the Warrant does not include those garages.  (*Id.*)  3510 Palmetto was not owned or leased by any of the Defendants in this action.  (Gov't's Resp. 11; June 11 Hr'g Tr. 165-66.)

The Warrant was issued based on Special Agent Lewis's Affidavit ("Affidavit"). (Affidavit, Gov't's Resp. Ex. A.)  The Affidavit contains, *inter alia*, the following information obtained from confidential informants ("CIs"), named individuals cooperating with the FBI, intercepted wire and oral communications, and video surveillance of 3510 Palmetto.  The Affidavit begins with an extensive history of Defendant's involvement in illegal drug trafficking in Philadelphia and evidence linking Defendant and the KSO with illegal activity.  Special Agent Lewis stated that he believed that 3510 Palmetto was used by the KSO as "a 'stash house' to store, process and distribute cocaine."  (Affidavit ¶ 4.)

3510 Palmetto first came to the FBI's attention in late 2002.  Kareem Bluntly, an associate of Defendant's who was working with the FBI, had mentioned a garage where Defendant and associates were "recompressing kilograms of cocaine."  (*Id.* at ¶ 83.)  Bluntly did

not identify the exact address, but his description of the garage's location and characteristics allowed Special Agent Lewis to determine that the garage was, in fact, 3510 Palmetto. (*Id*.)

In February 2003, Special Agent Lewis learned from confidential informant "CI-3" that Defendant, Bluntly, and KSO associate Eugene Coleman frequently visited 3510 Palmetto. (*Id*. at ¶ 87.) CI-3 informed PPD Detective Thomas R. Zielinski that a blue car, with Pennsylvania Registration Number ENZ-9190, had visited 3510 Palmetto on the evenings of February 4 and February 6. (*Id*. at ¶¶ 88-89.) The car was registered to "Yusef Billa" (*id*. at ¶ 88), which is a known alias of Defendant's (*id*. at ¶ 73).

Special Agent Lewis's Affidavit refers repeatedly to physical surveillance conducted outside 3510 Palmetto during the early months of 2003. This surveillance revealed that, on multiple occasions, individuals connected to the KSO visited the address. For example, on the afternoon of January 30, 2003, Special Agent Lewis and other law enforcement officers observed several vehicles driving between 3643 North Darien Street ("Darien"), Defendant's residence, and 3510 Palmetto, carrying Defendant, co-Defendant Steven Northington, and other unidentified males. (*Id*. at ¶ 95.) Vehicles registered to "Yusuf Billa" were also observed entering and exiting the 3510 Palmetto premises on February 4, 2003 (*id*. at ¶ 97) and February 28, 2003 (*id*. at ¶ 98).

The FBI also conducted extensive video surveillance of the street and sidewalk around 3510 Palmetto. (*Id*. at ¶ 102 & n.14.) This surveillance revealed that Coleman was "staying at [3510 Palmetto] on almost a nightly basis," and "frequently returns to the location two or three times during the course of a day." (*Id*. at ¶ 102(a).) Coleman exchanged and accepted packages, removed the trash, and greeted visitors to 3510 Palmetto. (*Id*. at ¶ 102(b)-(f).) Special Agent

Lewis believed, based upon all of the facts and circumstances, that many of these packages to contain drugs or money.  (*Id*. at ¶ 102(f).)  The video surveillance also captured images of Defendant standing outside 3510 Palmetto.  (*Id*. at ¶ 103.)

The FBI's video surveillance also recorded events which suggested that a KSO associate, Tyrone Toliver, was murdered at 3510 Palmetto in mid-March 2003.  (*See generally id*. at ¶¶ 104-113.)  A cooperating witness, "CW-2," stated that Toliver was a customer of Defendant's, and an associate of Coleman's.  (*Id*. at ¶ 104.)  Toliver had been arrested by the PPD in February of 2003 (*id*. at ¶ 106), and the KSO may have feared that Toliver would cooperate with law enforcement (*id*. at ¶ 104).  Toliver's body was found on March 31, 2003 in a Mercury Grand Marquis, which Toliver had borrowed from an individual named Debbie Woods.  (*Id*. at ¶¶ 107-08.)  Toliver disappeared on March 14, 2003.  (*Id*. at ¶¶ 108-09.)  According to the 3510 Palmetto video, Coleman and an unidentified black male—believed to be Toliver—exited a Mercury Grand Marquis and entered 3510 Palmetto.  Over the course of March 14 and 15, several individuals—including Coleman, Bluntly, and a second unidentified male—entered and exited 3510 Palmetto.  (*Id*. at ¶¶ 110-111.)  At one point on March 15, the Grand Marquis pulled into a garage adjacent to 3510 Palmetto, remained for several hours, and then pulled out of the garage.  (*Id*. at ¶ 111.)  Based on these observations, Special Agent Lewis concluded that Toliver was probably murdered at 3510 Palmetto between March 14 and 15, 2003.  (*Id*. at ¶ 113.)

Special Agent Lewis's personal observations, intercepted wire and oral communications, video surveillance, and statements from cooperating witnesses and confidential informants formed the basis for the Affidavit.  The Warrant specifically delineated eighteen categories of evidence which could be seized.  (Warrant Attach. B.)

## II.  LEGAL STANDARD

The Fourth Amendment guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV. It further provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized."  *Id.*; *see also United States v. Christine*, 687 F.2d 749, 756 (3d Cir. 1982).  Evidence obtained in violation of the Fourth Amendment is generally not admissible at trial.  *See, e.g.*, *Herring v. United States*, 555 U.S. 135, 139-40 (2009) (explaining history of exclusionary rule). "The proponent of a motion to suppress has the burden of establishing that his own Fourth Amendment rights were violated by the challenged search or seizure."  *Rakas v. Illinois*, 439 U.S. 128, 130 n.1 (1978).

## III.  DISCUSSION

### A.  Defendant's Capacity to Challenge Search

The Government argues that Defendant lacks "standing" to raise a Fourth Amendment claim in regard to the search of 3510 Palmetto Street.  (Gov't Resp. 11.)  Defendant claims that "it has been alleged that Defendant rented and visited the Palmetto Street property," and "therefore has standing to raise a Fourth Amendment challenge."  (Def.'s Mem. 15.)

At oral argument, Defendant's counsel analogized 3510 Palmetto to a workplace, saying that although this was admittedly "not [Defendant's] house, they work out of the office."  (June 11 Hr'g Tr. 165.)  Consequently, Defendant argues, he has a reasonable expectation of privacy in 3510 Palmetto.  (*Id.*)  Defendant offers three arguments in support of this contention.

First, Defendant argues that 3510 Palmetto has "always [been] identified as a storage house related to" him, and notes that Detective Zielinski observed him "entering and exiting [3510 Palmetto] on many occasions in February 2003." (*Id*.) Defendant points to the fact that although Coleman occupied 3510 Palmetto, Defendant "controlled" it and "visited on many occasions." (*Id*.) Second, Defendant argues that the presence of his personal possessions at 3510 Palmetto—Defendant cites "presses, firearms [and] other personal effects"—indicate "that he controlled that building, that he used it as a storage house for his operations, that it was always his place basically." (*Id*.) Defendant argues that he "ran his business" from 3510 Palmetto. (*Id*.) Third, Defendant argues that the rental status of the property is unclear. Defendant did not own or rent the property. (*Id*. at 165-66.) Defendant notes, however, that there were no "formal leases or checks" for 3510 Palmetto; instead, Defendant argues, it was leased pursuant to a "handshake agreement." (*Id*. at 166.) Defendant claims that the Government asserts that 3510 Palmetto "was rented to [the KSO]." (*Id*.)

The Government argues that "[s]imply being a co-conspirator or having somebody in the organization renting that property" are insufficient to confer standing upon Defendant. (*Id*. at 167.) The Government notes that Oscar Francis, a co-conspirator, was the listed lessee of the property. (*Id*.) The Government reiterates that Defendant never lived at 3510 Palmetto, and merely used it to conduct illegal activities for which he had no reasonable expectation of privacy. (*Id*.)

To claim the protection of the Fourth Amendment, "a defendant must demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable." *Minnesota v. Carter*, 525 U.S. 83, 88 (1998). A defendant can show the

reasonableness of such expectation by referring to "'concepts of real or personal property law or to understandings that are recognized and permitted by society.'" *Id*. (quoting *Rakas*, 439 U.S. at 143, n.12). A defendant need not show that he had a possessory interest in the property in order to establish standing.

The plain text of the Fourth Amendment indicates that an individual has the capacity to challenge a search conducted in his own home. U.S. Const. amend. IV; *see also Payton v. New York*, 445 U.S. 573, 589 (1980) ("In none is the zone of privacy more clearly defined than when bounded by the unambiguous physical dimensions of an individual's home."). The Supreme Court has recognized that "in some circumstances a person may have a legitimate expectation of privacy in the house of someone else." *Carter*, 525 U.S. at 89. An overnight guest in another's home, for example, is considered to have a reasonable expectation of privacy which permits him to challenge a search. *Minnesota v. Olson*, 495 U.S. 91, 98-99 (1990).

Similarly, "[i]t has long been settled that one has standing to object to a search of his office." *Mancusi v. DeForte*, 392 U.S. 364, 369 (1968). This is true even if the office is shared with other individuals. *Id*. at 368-70. "An expectation of privacy in commercial premises, however, is different from, and indeed less than, a similar expectation in an individual's home." *New York v. Burger*, 482 U.S. 691, 700 (1987). Furthermore, "[g]iven the great variety of work environments . . . the question whether an employee has a reasonable expectation of privacy [in his work area] must be addressed on a case-by-case basis." *O'Connor v. Ortega*, 480 U.S. 709, 718 (1987).

3510 Palmetto is presented as a property designated for several uses: a stash house; a drug processing center; and a residence, among others. While the Government claims that the

property's uses were limited, we note that the Government suggests that a number of criminal activities occurred within the walls of 3510 Palmetto. It may have been "used for cutting and packaging and storing drugs," (June 11 Hr'g Tr. 167), as the Government alleges, and as an occasional residence, but it may also have been used to conduct the manifold commercial transactions of a drug trafficking organization. The Government strongly suggests that a murder and coverup occurred at 3510 Palmetto. Presumably, 3510 Palmetto was the site for conversations between high-level members of the KSO. That Defendant, the KSO's alleged leader, visited the address with frequency indicates that it was not merely a low-level industrial warehouse but a commercial premises at the heart of the organization's structure.

Although Defendant neither owned nor rented the property, this alone does not preclude a claim of standing. *See, e.g.*, *Rakas*, 439 U.S. at 142 (an individual may also have a "sufficient interest in a place other than his own home so that the Fourth Amendment protects him"); *United States v. Baron-Mantilla*, 743 F.2d 868, 870 (11th Cir. 1984) (despite Government's proof that defendant did not own or rent commercial premises, he could theoretically establish a legitimate expectation of privacy); *see also United States v. Johns*, 851 F.2d 1131, 1135-36 (9th Cir. 1988) (co-owner of a storage unit whose name did not appear on rental agreement nevertheless had legitimate expectation of privacy). Both sides agree that the KSO rented 3510 Palmetto, and that the KSO used it for its own business purposes.

Defendant relies on the Government's own averments as to his frequent visits to 3510 Palmetto to establish his legitimate expectation of privacy. Although "[o]ccasional presence . . . is not enough" to confer standing, Defendant's presence seems to have been anything but rare. *United States v. Torch*, 609 F.2d 1088, 1091 (4th Cir. 1979). The Affidavit cites confidential

informants who stated that Defendant frequently visited 3510 Palmetto, and noted that vehicles registered to Defendant or known aliases were often seen outside the premises. Defendant's continuous contact with 3510 Palmetto supports his claim to standing. *See, e.g.*, *United States v. Fields*, 113 F.3d 313, 320-21 (2d Cir. 1997) (defendant had standing when he had a key to the apartment and came and went as he pleased).

Defendant's classification of 3510 Palmetto as his "office" also bolsters his claim to standing. *See, e.g.*, *United States v. Chaves*, 169 F.3d 687, 690-91 (11th Cir. 1999) (defendant had legitimate expectation of privacy in warehouse despite lack of formal ownership and maintenance of a different "principal place of business," because he conducted business and kept personal possessions there). The fact that Defendant was employed in the business of narcotics distribution does not negate the legitimate expectation of privacy in a place of business under his control.

The Government contends that management of a criminal enterprise dedicated to narcotics distribution is not a privacy interest that society is prepared to recognize as legitimate. It is true that an "interest in possessing contraband cannot be deemed 'legitimate.'" *Illinois v. Caballes*, 543 U.S. 405, 408 (2005). At stake for Defendant here was not merely an interest in possessing contraband that could justify, as in *Caballes*, a cursory dog sniff of a vehicle. Much of Defendant's business operations were conducted from the 3510 Palmetto warehouse.

We will assume that Defendant has standing to challenge this search, even as we have reservations about 3510 Palmetto's status as an "office." Accordingly, we will proceed to Defendant's substantive Fourth Amendment claims.[4]

### B. Defendant's Substantive Fourth Amendment Claims

#### 1. Staleness

Defendant argues that "the affidavit of probable cause provides information which occurred over two years prior to the issuance of the warrant." (Def.'s Mem. 16.) Defendant specifically points to the use of intercepted wire and oral communications from September 2000 through January 2001 and information provided by confidential informants. Defendant argues that this information "must be considered stale and does not demonstrate probable cause for a search of the property." (*Id.*; *see also* June 11 Hr'g Tr. 171.)

If information supporting a warrant application is too old, the information is stale and cannot establish probable cause. *United States v. Harvey*, 2 F.3d 1318, 1322 (3d Cir. 1993). However, age alone does not determine whether information is stale. *United States v. Vosburgh*, 602 F.3d 512, 529 (3d Cir. 2010). The reviewing court must assess: (1) the nature of the crime; and (2) the type of evidence sought by the warrant. *Harvey*, 2 F.3d at 1322. In addition, "where the facts adduced to support probable cause describe a course or pattern of ongoing and continuous criminality, the passage of time between the occurrence of the facts set forth in the

---

[4] Defendant's co-Defendants have joined this Motion to the extent that they have standing. (*See* ECF No. 495 (granting motions to join all co-Defendants' motions).) We conclude that none of these Defendants has standing. There is no mention of Kidada Savage or Merritt ever visiting 3510 Palmetto. As discussed above, Northington is mentioned once as having driven between Darien and 3510 Palmetto, but there is no indication that he entered 3510 Palmetto. None of these Defendants has submitted any additional information which suggests that they should have the capacity to challenge this search.

affidavit and the submission of the affidavit itself loses significance." *United States v. Urban*, 404 F.3d 754, 774 (3d Cir. 2005).

Although Special Agent Lewis's Affidavit refers to events which occurred as early as 1999, the primary purpose of such background information was to establish the criminal character of the KSO. The mere mention of background information does not render that information stale. Furthermore, even if we were to disregard this information, it would not undermine the existence of the probable cause for the issuance of the warrant by Magistrate Judge Rueter. Special Agent Lewis presented concrete examples of suspicious activity and the presence of known KSO associates at 3510 Palmetto in February and March of 2003. Special Agent Lewis further offered considerable evidence that a murder had occurred at 3510 Palmetto mere weeks prior to the issuance of warrant. Given the serious nature of the alleged criminal activity, and the evidence linking 3510 Palmetto to illegal activity in the weeks and months immediately preceding the issuance of the warrant, this information was material and recent. As discussed hereinafter, there clearly existed probable cause for the issuance of a warrant.

### 2. *Probable Cause*

Defendant claims that there was insufficient probable cause to justify issuance of a warrant. Alternatively, he claims that the basis for the Affidavit's probable cause determination was tainted because it relied on evidence seized during two 1999 searches of Defendant's apartment and vehicle, which Defendant claims were illegal. (Def.'s Mem. 16-17.)

"Probable cause to search exists where information suggests that the items sought will be in the location searched." *United States v. Marranca*, 98 F. App'x 179, 181 (3d Cir. 2004). When considering whether to issue a search warrant, a magistrate must consider that "[t]he

likelihood the evidence sought is still in place depends on a number of variables, such as the nature of the crime, of the criminal, of the thing to be seized, and of the place to be searched." *United States v. Greene*, No. 07-120, 2008 WL 2246923, at *3 (E.D. Pa. June 2, 2008) (citing *United States v. Harris*, 482 F.2d 1115, 1119 (3d Cir. 1973)). While "direct evidence linking the place to be searched to the crime is not required for the issuance of a search warrant," *United States v. Conley*, 4 F.3d 1200, 1207 (3d Cir. 1993), probable cause creating a nexus between the suspected criminal activity and the place to be searched may be inferred. *United States v. Hodge*, 246 F.3d 301, 305 (3d Cir. 2001) (citing *United States v. Jones*, 994 F.2d 1051 (3d Cir. 1993)).

Defendant's argument as to the sufficiency of probable cause lacks merit. Special Agent Lewis's Affidavit, which was more than fifty pages long, describes in exhaustive detail, the history of the KSO and the identities of its key players. Special Agent Lewis's extensive introduction leaves no doubt that the KSO was an organization engaged in illegal activities, chiefly drug dealing. The Affidavit establishes concrete links between known KSO associates and 3510 Palmetto, based on a number of sources, including confidential informants and cooperating witnesses as well as physical and video surveillance. KSO associates were frequently seen coming and going at 3510 Palmetto, often carrying packages that were believed to be drug-related. This confirmed statements from confidential informants, and cooperating witnesses such as Kareem Bluntly, that 3510 Palmetto was used as a processing site for cocaine and other drugs. (Affidavit ¶ 83.)

A clear indicator of probable cause, however, comes from the disappearance and murder of Tyrone Toliver. Toliver was last seen alive on March 14, 2003, entering 3510 Palmetto. His body was found several weeks later, in a missing car that was last seen leaving the 3510 Palmetto

garage.  Known KSO associates, including Eugene Coleman and Kareem Bluntly, were seen in the vicinity of 3510 Palmetto during the period that Toliver is believed to have been murdered. Substantial evidence existed, at the time the warrant was issued, that Toliver was murdered on 3510 Palmetto's premises by individuals affiliated with the KSO.

Given the evidence that Palmetto was used as a "stash house" and processing site by the KSO, and the evidence pointing to a recent murder on the premises, there was clearly more than sufficient probable cause for the issuance of a search warrant.  Defendant's argument is meritless.

Defendant's "taint" argument is similarly meritless.  Defendant alleges that Special Agent Lewis's mention of a September 1999 search, conducted pursuant to a warrant, of his apartment in Maple Shade, New Jersey, taints the probable cause in the warrant.  (Def.'s Mem. 17.) Defendant also points to a search conducted, pursuant to a warrant, of Defendant's 1999 Plymouth Villager minivan.  (*Id*.)  Defendant has filed a motion to suppress evidence seized in those searches.  (*See* ECF No. 418.)  Defendant contends that evidence seized during the 3510 Palmetto search constitutes the "fruit of the poisonous tree," *see Wong Sun v. United States*, 371 U.S. 471, 488 (1963), and should be excluded because of the 3510 Palmetto Affidavit's citation to those searches.

We have determined that the searches of Defendant's apartment in Maple Shade and his 1999 Plymouth Villager were proper under the Fourth Amendment.  Accordingly, the doctrine of the "fruit of the poisonous tree" cannot apply.  Defendant's argument that the Affidavit should be stricken because of the taint of illegally obtained evidence is thus meritless.

C.     *Franks* **Hearing**

Finally, Defendant requests that we conduct a hearing, pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978), "to determine the validity of the search warrant affidavit." (Def.'s Mem. 21.) Defendant lists several "intentional and reckless misrepresentations," which he alleges "amount[] to a material misrepresentation within the affidavit," and "likely had a profound effect" on Magistrate Judge Rueter's probable cause determination. (*Id.*) The Government contends that the "information in the affidavit contained no material misrepresentations nor omissions." (Gov't's Resp. 14.)

The Supreme Court in *Franks* stated:

> [W]here the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request.

*Franks*, 438 U.S. at 155-56. If a defendant can make a "substantial preliminary showing" to overcome the affidavit's presumption of validity, the defendant must ultimately prove, by a preponderance of the evidence, that the affiant's statements were material to a finding of probable cause and were made knowingly and intentionally, or with reckless disregard for the truth. *Sherwood v. Mulvihill*, 113 F.3d 396, 399 (3d Cir. 1997) (citing *Franks*, 438 U.S. at 171-72). If the defendant meets this burden, "the Fourth Amendment requires that . . . the fruits of the search [must be] excluded to the same extent as if probable case was lacking on the face of the affidavit." *United States v. Frost*, 999 F.2d 737, 743 (3d Cir. 1993) (quoting *Franks*, 438 U.S. at 156).

To make a substantial preliminary showing, a defendant must raise "allegations of deliberate falsehood or of reckless disregard for the truth . . . accompanied by an offer of proof."

*Franks*, 438 U.S. at 171. The Third Circuit has articulated a standard "to identify what constitutes 'reckless disregard for the truth' regarding both misstatements and omissions." *United States v. Yusuf*, 461 F.3d 374, 383 (3d Cir. 2006).

> In evaluating a claim that an officer both asserted and omitted facts with reckless disregard for the truth, we hold that: (1) omissions are made with reckless disregard for the truth when an officer recklessly omits facts that any reasonable person would know that a judge would want to know; and (2) assertions are made with reckless disregard for the truth when an officer has obvious reasons to doubt the truth of what he or she is asserting.

*Wilson v. Russo*, 212 F.3d 781, 783 (3d Cir. 2000) (citations omitted).

Defendant cites several classes of omissions and misrepresentations. First, Defendant claims that information which undermines the credibility of CI-1's assertions was omitted from the Affidavit. (Def.'s Mem. 19-20.) Defendant states that "CI-1 provided false and misleading information in a previous Title III affidavit filed with the court in 2000 and 2001." (*Id*. at 20.) In that Affidavit, CI-1 had stated that Defendant and Tybius Flowers had been business partners. According to Defendant, since Flowers was a cooperating witness in the prosecution of Defendant for the 1998 murder of Kenneth Lassiter, CI-1 must have been less than truthful, since "the Commonwealth and the federal authorities would not permit Mr. Flowers to operate as a cocaine salesman and cooperating witness simultaneously." (*Id*.)

Defendant's attempt to claim that CI-1's credibility is in doubt lacks basis. The sole evidence that Defendant proffers is an alleged statement by Special Agent Lewis that Defendant has a "bad relationship with Mr. Flowers," and that Flowers was a better boxer. (June 11 Hr'g Tr. 57.) This does not affect any assessment of CI-1's credibility as to a potential business relationship between Defendant and Tybius Flowers. In addition, it is not unusual for

Government cooperators to be involved in illegal activities while under the aegis of Government supervision. *See, e.g.*, *United States v. Twigg*, 588 F.2d 373, 377-78 (3d Cir. 1978) (discussing government informers and cooperators involved in drug trafficking); *United States v. Pitt*, 193 F.3d 751, 754 (3d Cir. 1999) (same). Flowers's cooperation while trafficking cocaine is not precluded by logic or law, as Defendant suggests in his Memorandum.

Furthermore, even if the Savage-Flowers relationship had deteriorated to the point that CI-1's depiction of it was inaccurate, this would not have been a material omission as it pertains to the 2003 Affidavit. This Affidavit included dozens of bases for probable cause. Most had no connection to CI-1. Indeed, even if CI-1's credibility had been completely impeached, it would not affect any reasonable jurist's finding of probable cause.

Defendant states that the Affidavit's declaration that Defendant was the leader of a violent drug trafficking organization that had been active in Greater Philadelphia since 1999 (Affidavit 4) is incomplete. (Def.'s Mem. 20.) According to the Defendant, "nowhere in the affidavit does the affiant note that Defendant was incarcerated" for over two years from 1999 to 2003. (*Id*.) Defendant states that "[i]t is impossible that Defendant was a high level cocaine distributor" while incarcerated, and that Special Agent Lewis deliberately minimized and omitted the fact of Defendant's incarceration. (*Id*.)

There are several problems with Defendant's argument. As Special Agent Lewis noted while testifying, "we referenced [Defendant's incarceration] on numerous occasions in this Affidavit." (June 11 Hr'g Tr. 75; *see, e.g.*, Affidavit ¶¶ 28, 78-79 (references to Defendant's incarcerations).)

Moreover, even if references to Defendant's repeated periods of incarceration were, as Defendant claims, omitted from the Affidavit, it does not follow that it is "impossible" that Defendant could have remained involved in the drug trade during his incarceration. Prisoners and detainees have been involved in managing drug enterprises while incarcerated. *See, e.g.*, *Matsey v. Westmoreland Cnty.*, 185 F. App'x 126, 128 (3d Cir. 2006) (discussing prison inmate "running a drug trafficking operation out of his prison cell"); *United States v. Blake*, 288 F. App'x 791, 794 (3d Cir. 2008) (citing examples of prisoners orchestrating criminal activity while incarcerated). The fact that Defendant was involved in the KSO's operations during his on-again, off-again incarceration cannot be precluded.

Furthermore, even if Defendant's incarceration actually limited his ability to supervise the KSO, this is immaterial to the validity of Judge Rueter's probable cause determination. The primary basis for probable cause as to 3510 Palmetto was evidence collected in early 2003 of drug reprocessing and a murder occurring on the premises of 3510 Palmetto. During that time, Defendant was not incarcerated. Whether Kaboni Savage was a high-level cocaine trafficker during the periods in which he was incarcerated does not speak to the determinations Judge Rueter made regarding periods in which Defendant was not incarcerated. Defendant's claims lack merit.

Defendant's next contention is that Special Agent Lewis failed to note, in the Affidavit, that Kareem Bluntly had had a "falling out" with Defendant in August 2002, several months prior to the warrant application, and that the fact of this estrangement would have impeached Bluntly's credibility. (Def.'s Mem. 21.)

The exact details of Defendant's relationship with Bluntly are unclear, but they are also immaterial. Agent Lewis indicated that problems in the Bluntly-Savage relationship existed in 2001 and 2002. (June 11 Hr'g Tr. 188.) However, Bluntly was seen with Savage, entering and exiting 3510 Palmetto, on numerous occasions in February 2003. (Affidavit ¶ 87.) Even if Bluntly's relationship with Defendant was, at times, rocky, the two remained associates and were connected to 3510 Palmetto. There is no reason to suspect that information which Bluntly provided about Defendant that was ultimately incorporated into the Affidavit would have been of compromised value solely because of Bluntly's occasional business disputes with Defendant.

Furthermore, Bluntly's statements were not the sole basis for the probable cause finding. Probable cause for the Palmetto Street search was based on a number of intercepted wire and oral communications, information gleaned from confidential informants and other cooperators, and physical and video surveillance conducted by the FBI. Bluntly was not the sole source of the intelligence underlying the warrant application. Even if the Bluntly information were questionable, this would not cast doubt on the validity of the warrant. There was more than enough probable cause without the Bluntly information. Accordingly, this is not a basis for holding a *Franks* hearing.

Defendant raised other issues to justify his request for a *Franks* hearing. Defendant generally claims that "the staleness argument is part and parcel of the *Franks* idea." (June 11 Hr'g Tr. 172.) Defendant states that "the lion's share of information in these affidavits is gathered from . . . the 1999 informants and the 2000 and 2001 wires." (*Id*. at 171.) Defendant also cites the references to Gerald Thomas, another North Philadelphia drug trafficker, although Thomas's cocaine operations apparently ceased in 2002, prior to the issuance of the warrant;

19

Defendant argues that all of the references to Gerald Thomas are stale. (*Id*. at 172.) Finally, Defendant questions whether Special Agent Lewis fully apprised Magistrate Judge Rueter of issues with various confidential informants' credibility. (*Id*. at 193-96.)

Defendant's staleness argument does not speak to the materiality of any omissions or misrepresentations. The core justifications for the search warrant—information gathered in early 2003—are not stale. For the same reason, the fact that the Affidavit includes substantial historical information, as well as information about Defendant's past drug trafficking operations, is not a misrepresentation or omission.

Finally, with regard to Defendant's argument that Special Agent Lewis did not fully apprise Magistrate Judge Rueter of issues with informants and cooperating witnesses' credibility, this argument lacks merit. During the suppression hearing, Defendant claimed that Special Agent Lewis failed to mention in his Affidavit that Tyrone Toliver was dead. (June 11 Hr'g Tr. 195.) This, Defendant claims, is a material omission, because it casts doubt on the credibility of a statement made by cooperator "CW-2" that Defendant supplied cocaine to Toliver. In the Affidavit, Special Agent Lewis consistently used the past tense in describing these interactions. In any event, since one of the primary justifications for probable cause to search 3510 Palmetto relates to the discovery of Toliver's body and his murder, we are satisfied that Special Agent Lewis was not attempting to hide the fact of Toliver's death from Magistrate Judge Rueter. This fact is not omitted from the Affidavit.

Defendant cannot make the substantial showing required for a *Franks* hearing. The Affidavit does not contain material omissions or representations that undermine Magistrate Judge Rueter's finding of probable cause and issuance of a search warrant for 3510 Palmetto.

**III.    CONCLUSION**

For the foregoing reasons, Defendant's Motion will be denied.  An appropriate Order

follows.

**BY THE COURT:**


**_/s/R. Barclay Surrick_**
**U.S. District Judge**