IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| UNITED STATES OF AMERICA | : | |
| --- | --- | --- |
| | : | CRIMINAL ACTION |
| v. | : | |
| | : | |
| KABONI SAVAGE | : | NO. 07-550-03 |
| ROBERT MERRITT | : | NO. 07-550-04 |
| STEVEN NORTHINGTON | : | NO. 07-550-05 |
| KIDADA SAVAGE | : | NO. 07-550-06 |

**SURRICK, J.**                                                                         JANUARY 28, 2013

**MEMORANDUM**

Presently before the Court is Steven Northington's Motion to Increase Pool of Prospective Jurors and to Strike the Current Jury Panel (ECF No. 701). For the following reasons, Defendant's Motion will be denied.

**I.    BACKGROUND**

On May 9, 2012, a federal grand jury returned a seventeen-count Fourth Superseding Indictment charging Defendant Steven Northington with conspiracy to participate in the affairs of a racketeering ("RICO") enterprise, in violation of 18 U.S.C. § 1962(d) (Count 1), two counts of murder in aid of racketeering, in violation of 18 U.S.C. § 1959(a)(1) (Counts 5 and 7), and tampering with a witness, in violation of 18 U.S.C. § 1512(a) (Count 8). (Fourth Superseding Indictment, ECF No. 480).[1] Defendant was charged, along with three co-defendants, Kaboni Savage, Robert Merritt, and Savage's sister, Kidada Savage. Lamont Lewis was also charged in

---

[1] Count 8 has been dismissed pursuant to an agreement between Defendants and the Government. (*See* ECF No. 855.)

the First Superseding Indictment.[2] On March 14, 2011, the Government filed a Notice of Intent to Seek the Death Penalty against Defendant. (ECF No. 198.) The Government also seeks the death penalty against Kaboni Savage and Merritt (ECF Nos. 196, 197.)

On February 20, 2012, Defendant filed a Motion for Discovery of Information Concerning the Confection of the Grand and Petit Jury Venire. (Def.'s Discovery Mot., ECF No. 372.) On October 2, 2012, the Court issued a Memorandum and Order, granting in part and denying in part, Defendant's Motion for Discovery. (ECF Nos. 639, 640.) The Court granted discovery of The Plan of the Random Selection of Grand and Petit Jurors of 1968 for the Eastern District of Pennsylvania (revised December 4, 2009) (the "Jury Plan") and statistical breakdowns by race and ethnicity of Master and Qualified Jury Wheels from 2007, 2009, and 2011. (Order, ECF No. 640.) On November 6, 2012, Defendant filed the instant Motion to Increase Pool of Prospective Jurors and to Strike the Current Jury Panel. (Def.'s Jury Mot., ECF No. 701.)[3] On November 15, 2012, the Government filed a Response to Defendant's Jury Motion. (Gov't's Jury Resp., ECF No. 716.)

## II. DISCUSSION

Defendant requests that the grand and petit jury panels utilized by this court be struck and replaced by panels obtained from the expanded list of jurors currently in the possession of the

---

[2] The charges against Lewis were disposed of by guilty plea on April 21, 2011.

[3] On May 29, 2012, we entered an Order permitting all Defendants to join the pretrial motions of their codefendants to the extent that the Defendants have standing. (ECF No. 495.) All Defendants have standing to assert the arguments in the instant Motion.

Administrative Office of Pennsylvania Courts ("AOPC"). (Def.'s Mot. ¶ 31.)[4] Defendant argues that jurors drawn solely from voter registration lists, which is how it is done in the Eastern District of Pennsylvania, underrepresents both African-Americans and persons residing in Philadelphia, depriving him a jury comprised of his peers. (Def.'s Mot. ¶¶ 24, 30.) Defendant relies on the Sixth Amendment's fair cross section provision, which requires that a jury be drawn from a representative sample of the community. (*Id.* at ¶ 8.) He contends, quoting a report by the Pennsylvania Interbranch for Gender, Racial, and Ethnic Fairness, that reliance on Pennsylvania voter registration lists alone are not "reflective of the community-at-large, particularly the minority community." (*Id.* at ¶ 7.) In support of this argument, Defendant submits data from the United States Census Bureau. (Def.'s Mot. Ex. 1 (on file with Court).) The data cited by Defendant reveals that African-Americans represent 43.8% of the population of Philadelphia and 16.82% of the Eastern District of Pennsylvania. (Def.'s Mot. ¶¶ 18, 22.) In the pool of prospective jurors for Defendant's trial, 9.67% have identified themselves as

---

[4] In 2007, the Pennsylvania Legislature passed Act 37 of 2007, instructing that the AOPC may expand the master list of prospective jurors in the Commonwealth beyond those found on voter registration lists. The relevant Act provisions are codified as 42 Pa. Cons. Stat. Ann. § 4521(a) (West 2012)). The list was expanded by including prospective jurors acquired from records maintained by the Department of Public Welfare, Pennsylvania Department of Transportation, and Department of Revenue. *See* Administrative Office of the Pennsylvania Courts, Press Release: Statewide Jury List in Use for First Time AOPC Gives Expanded Jury Data to Pennsylvania Counties (Oct. 1, 2008), http://www.pacourts.us/assets/files/newsrelease-1/file-905.pdf. The AOPC now maintains a master statewide jury list, from which it makes available to each county the names and addresses of prospective jurors living within that county. *Id.*

Black/African-American. (*Id.* at ¶ 19.)[5] All of the Defendants in this case are African-American and predominantly born and raised in Philadelphia. (Def.'s Mot. ¶¶ 9, 10.)

The Government responds by asserting that Defendant's claim is devoid of substantive merit, because this particular jury pool was drawn at random from a list developed under an approved jury selection plan. (Gov't's Resp. 3.) The Government contends that the composition of an individual defendant's jury pool is inconsequential, provided that it was drawn fairly from a cross section of the community. (*Id.* at 4.) The Government further contends that Defendant has not met his "fair cross section" burden, because he has not demonstrated a long-term systemic discrepancy between African-Americans in the relevant general population and those represented in Eastern District jury pool wheels. (*Id.* at 5-6.)

The Sixth Amendment fair cross section provision arises from the traditional notion that as an instrument of public justice, a "jury [must] be a body truly representative of the community." *Taylor v. Louisiana*, 419 U.S. 522, 527 (1975).[6] Objectives of such a requirement are to avoid arbitrary skewing against the "common-sense judgment of the community" and, to avoid the "appearance of unfairness that would result from excluding large groups of individuals,

---

[5] We define the pool of prospective jurors for purposes of this Motion as the 548 individuals who appeared before this Court to complete a fifty-nine page questionnaire on September 26 and 27, 2012. Defendant bases his fair cross section claim on these statistics. The pool of prospective jurors for Defendant's trial has increased since the filing of his Motion. The pool now consists of 1134 jurors. This increase is the result of the Court needing two additional panels to fill out questionnaires. In any event, as will be discussed further in this Memorandum, Defendant's statistics are of limited utility in demonstrating a systematic exclusion under the Sixth Amendment.

[6] The Sixth Amendment states that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law . . . ." U.S. Const. amend. VI.

4

not on the basis of their ability to serve as jurors, but on the basis of some immutable characteristic such as race, gender, or ethnic background." *United States v. Weaver*, 267 F.3d 231, 236 (3d Cir. 2001) (quoting *Lockhart v. McCree*, 476 U.S. 162, 175 (1986)) (internal quotation marks omitted). Individual juries are not required, however, to consist of any specific demographic makeup. *Taylor*, 499 U.S. at 538. Absent systematic exclusion of distinctive groups from "jury wheels, pools of names, panels, or venires from which juries are drawn," a jury is presumed to be representative of the relevant community. *Id.*

The Jury Selection Service Act of 1968 ("JSSA") codifies the Sixth Amendment cross section right. *Weaver*, 267 F.3d at 236. The JSSA provides that "all litigants in Federal courts entitled to trial by jury shall have the right to grand and petit juries selected at random from a fair cross section of the community in the district or division wherein the court convenes." 28 U.S.C. § 1861. Congress determined that "voter registration lists or [] lists of actual voters" should be the principle source from which potential juror names are to be randomly selected. 28 U.S.C. § 1863(b)(2). Names should be drawn from additional sources "where necessary to foster the policy and protect the rights secured by sections 1861 and 1862 . . . ." *Id.* JSSA claims are analyzed using a Sixth Amendment fair cross section standard. *Weaver*, 267 F.3d at 236 (citing *United States v. Test*, 550 F.2d 577, 584-85 (10th Cir. 1976) (en banc)). In the Eastern District of Pennsylvania, grand and petit juries are randomly selected for criminal and civil trials pursuant to the Jury Plan. (Jury Plan (on file with Court).)[7]

---

[7] The Jury Plan was last revised on December 4, 2009. (Jury Plan.) In accordance with the Jury Plan, a master jury wheel is created. (Jury Plan § 3.) The master jury wheel consists of a random selection of individuals from lists of registered voters from each of the nine counties in the Eastern District. (*Id.*) Names are randomly selected from the master jury wheel, and those prospective jurors are mailed juror questionnaires. (*Id.* at §§ 4, 5.) Based upon a review of the

In order to establish a prima facie fair cross section violation under the Sixth Amendment or the JSSA, a defendant has the burden of demonstrating:

> (1) the group alleged to be excluded is a 'distinctive' group in the community; (2) the representation of this group in jury venires is not 'fair and reasonable' in relation to the number of such persons in the community; and (3) the underrepresentation is caused by the 'systematic exclusion of the group in the jury selection process.'

*Weaver*, 237 F.3d at 237 (citing *Duren v. Missouri*, 439 U.S. 357, 364 (1979)).

Defendant has failed to make a prima facie showing that the Jury Plan's system of selecting jurors from the entire Eastern District violates the fair cross section of the community requirement. We will address each of the three prongs identified in *Duren* and *Weaver*.

### A. Cognizable Group

A constitutionally cognizable group is one that is capable of being singled out for discriminatory treatment. *Ramseur v. Beyer,* 983 F.2d 1215, 1230 (3d Cir. 1992). The proper inquiry in identifying a cognizable group under the first prong of the fair cross section test is whether "the allegedly underrepresented group [is] sufficiently numerous and distinct from others in the population that if members of the group are systematically eliminated, the defendant's right to a jury composed of a fair cross section of the community would be violated[.]" *Weaver*, 237 F.3d at 239-40. For purposes of a fair cross section claim, residents of a particular locale

---

returned juror questionnaires, a qualified jury wheel is created, which contains the names of jurors not disqualified, exempt, or excused in accordance with the Jury Plan. (*Id*. at § 7.) Prospective jurors are then randomly selected from the qualified jury wheel and summoned for jury service. (*Id*.)

Master jury wheels are repopulated every two years. In the Eastern District, there is a master jury wheel that was repopulated in 2007 (the "2007 Master Jury Wheel"), in 2009 (the "2009 Master Jury Wheel") and in 2011 (the "2011 Master Jury Wheel"). Qualified jury wheels were then created based upon each of the Master Jury Wheels (the "2007 Qualified Jury Wheel," "2009 Qualified Jury Wheel," and "2011 Qualified Jury Wheel").

may be numerous, but are not sufficiently distinct from those drawn from surrounding areas. *See United States v. Grisham*, 63 F.3d 1074, 1080 (11th Cir. 1995) (holding that "the Sixth Amendment does not entitle a federal criminal defendant to a jury summoned from a fair cross-section of the community immediately surrounding the place of the crime, but merely to a jury drawn from a fair cross-section of some previously defined geographical area within the boundaries of the judicial district in which the offense occurred").

In his Motion, Defendant has identified three groups which he believes to be underrepresented on the prospective jury panel: Philadelphians; African-Americans; and African-American Philadelphians. (Def.'s Mot. ¶¶ 11-27.) Because Defendant has not attempted to demonstrate how Philadelphians are distinct and culturally different from those residing in the other eight counties making up the Eastern District, neither Philadelphians, nor African-American Philadelphians can be held to be a cognizable group. *See Zicarelli v. Dietz*, 633 F.2d 312, 320 (3d Cir. 1980) (holding that residents of a geographic group cannot be considered a distinctive group for cross-section analysis unless the group is "profoundly culturally distinct"); *United States v. Raszkiewicz*, 169 F.3d 459, 467 (7th Cir. 1999) (finding that absent a showing that Indians residing on reservations are distinct from those living in more urban environments, they cannot be held to be a distinct and cognizable group); *United States v. Smith*, 463 F. Supp. 680, 682 (E.D. Wis. 1979) (holding that Menominee Indians residing on a reservation are not distinctly different from Menominee Indians living elsewhere in the Eastern District of Wisconsin); *see also United States v. Alanis*, 265 F.3d 576, 583 (7th Cir. 2001) (holding that underrepresentation of African-Americans and Hispanics in districtwide jury pools cannot be demonstrated by comparing the representation of the groups in the districtwide pool to the

representation of the groups in the general population of one county of which the district is comprised).

In contrast, African-Americans do constitute a distinct group that is distinguishable from other racial group members in the Eastern District. *See Weaver*, 267 F.3d at 240; *see also Ramseur,* 983 F.2d at 1230 ("African-Americans are unquestionably a constitutionally cognizable group."); *United States v. Hafen*, 726 F.2d 21, 23 (1st Cir. 1984) ("[T]he Supreme Court has held that blacks are a 'distinctive group' for the purposes of jury composition challenges."). Therefore, Defendant's claim as to African-Americans being a cognizable group satisfies the first prong of the fair cross section test.

**B.     Fair and Reasonable Representation**

Determining whether a group in jury venires is represented fairly and reasonably in relation to the number of such persons in the community is a mathematical exercise that must be supported by statistical evidence. *Weaver*, 267 F.3d at 240. The defendant must first demonstrate the percentage of the community made up of the alleged underrepresented group. *Id.* Here, Defendant indicates that 16.82% of the population of the Eastern District of Pennsylvania is of African-American heritage.[8] The Government does not dispute this figure.

The general population figure of the alleged underrepresented group is then viewed against the representation of the group on the master jury wheel. *Weaver*, 267 F.3d at 241. Here, Defendant presents the Court with the percentage of African-Americans (9.67%) initially called

---

[8] Defendant presents "total population" statistics apparently representative of census figures that were compiled by J. Howe Consulting. (Def.'s Mot. ¶¶ 16-17, Ex. 1.) These figures are of questionable utility, as no clarification is offered as to the representation of voting-eligible groups within this population.

as the pool of prospective jurors for his trial.[9] As will be explained below, such a figure is of little help, because a Sixth Amendment cross section claim alleges systematic exclusion of a cognizable group. *Taylor*, 499 U.S. at 538; *see also United States v. Jackman*, 46 F.3d 1240, 1246 (2d Cir. 1995) (finding that the usual method of assessing the representativeness of the system is to compare the number of minority persons in the population with those in the wheel from which trial pools are picked). Therefore, it is the master and qualified wheels from which individual jury panels are drawn that would be most demonstrative of any systemic exclusionary processes inherent in sourcing names from voter registration lists.

On the 2011 Master Jury Wheel, only 2.98% were identified as "black." However, this figure cannot point us toward any definitive findings because 61.64% were of "unknown" race. For purposes of the present analysis, the 2011 Qualified Jury Wheel provides the most utility, as it represents a random selection of all persons in the Eastern District that have returned jury questionnaires, and only 0.84% of the prospective jurors listed are of "unknown" racial origin.[10]

---

[9] This pool represents only those prospective jurors in Panels A and B. The prospective jurors in Panels C and D, which were empaneled after the filing of this Motion, are not represented in these percentages.

[10] The defendant in *Weaver* presented evidence based upon the master wheel for the Western District of Pennsylvania Erie Division. *Weaver*, 267 F.3d at 237. The Court in *Weaver* held that absent a blind sampling of the master wheel or a statistical impact analysis of the unreturned questionnaires sent to individuals listed on the master wheel, a finding of unfair and unreasonable representation cannot be supported by statistical evidence. *Id.* at 244. We will conduct an analysis based upon the 2011 Qualified Wheel, because it includes all jurors from the 2011 Master Wheel not disqualified, exempt, or excused, with most individuals on the Wheel identified by race.

Of the jurors listed on the 2011 Qualified Jury Wheel as of August 29, 2012, 8.37% identified as "black."[11]

We must next consider both the absolute and comparative disparities between the percentages of the alleged underrepresented group on the jury wheel and those in the general population. *Weaver*, 267 F.3d at 241 n.11. The absolute disparity is "calculated by subtracting the percentage of the group on the wheel from the percentage of the group in the relevant population . . . ." *Id.* at 238. Comparative disparity is derived by "dividing the absolute disparity by the percentage of the population that a particular group comprises . . . ." *Id.* Both methods have their share of critics, and the Third Circuit has endorsed looking at the figures from both methods to make a well-informed decision. *Id.* at 242-43.[12] Here, using Defendant's census

---

[11] The number of jurors on the qualified jury wheel will fluctuate during its effective period. The qualified wheel is reduced when potential jurors are drawn for service, and is continually repopulated with jurors who were drawn for service, but not utilized.

[12] Though absolute disparity is the preferred method of analysis, when working with small populations, complete exclusion of a particular group on a jury wheel will result in a minimal disparity figure. *Weaver*, 267 F.3d at 242. On the other hand, comparative disparity figures can grossly exaggerate proportional representation when working with minority populations. *Id.*

figures viewed against percentages obtained from the 2011 qualified jury wheel, the absolute disparity of African-Americans is 8.45%, with a comparative disparity of 50.23%.[13] [14]

The absolute disparity for African-Americans is below that which has already been found insufficient to establish unfair and unreasonable representation. *See Ramseur,* 983 F.2d at 1232-34 (holding that 14.1% absolute disparity to be of "borderline significance" and an "insufficient" figure to meet a Sixth Amendment standard); *see also Grisham*, 63 F.3d at 1078-79 (holding that any absolute disparity below 10% to be fair and reasonable); *United States v. Maskeny*, 609 F.2d 183, 190 (5th Cir. 1980) (supporting a finding that "underrepresentation by as much as ten percent did not show purposeful discrimination based on race").

Looking next at the comparative disparity figure, we find that 50.23%, while higher than the absolute disparity figure, adds little support to a finding of unfair and unreasonable representation. Where a distinct group comprises a small percentage of the population, larger comparative disparity figures are of minimal relevance. *See Weaver*, 267 F.3d at 243 (holding that where Hispanics comprise 0.97% of the population, a comparative disparity of 72.98% is of "questionable probative value"); *United States v. Shinault*, 147 F.3d 1266, 1273 (10th Cir. 1998)

---

[13] The chart represents the statistics before us:

| Percentage of African-Americans in Eastern District | Percentage of African-Americans in 2011 Qualified Wheel | Absolute Disparity Calculation | Comparative Disparity Calculation |
|---|---|---|---|
| 16.82% | 8.37% | 16.82% - 8.37% = 8.45% | 8.45% ÷ 16.82% = 50.23% |

[14] Utilizing the panel chosen for this trial in place of the qualified wheel, as Defendant has suggested, yields an absolute disparity of 7.15% and a comparative disparity of 42.5%.

(reasoning that 50.9% comparative disparity to be "not surprising" when African-Americans made up 5.11% of the population); *United States v. Clifford*, 640 F.2d 150, 155 (8th Cir. 1981) (concluding that a 46% comparative disparity was insufficient to make out a fair cross section claim when Indians comprised only 15.6% of the population). While the 16.82% African-American population here is greater than the distinct groups discussed in the cited authorities, the proportions of relative group size and comparative disparity found here do not establish that African-Americans are unreasonably represented on the 2011 Qualified Jury Wheel. *Cf. Duren v. Missouri*, 439 U.S. at 667 (fair cross section requirement violated where comparative disparity of women summoned was 51% when the group comprised 54% of the population); *LaRoche v. Perrin*, 718 F.2d 500, 502–03 (1st Cir.1983) (prima facie violation established where comparative disparity was "some 70%" and group comprised 38.4% of the population), overruled on other grounds by *Barber v. Ponte*, 772 F.2d 982 (1st Cir.1985). Where the alleged underrepresented group is relatively small, and where absolute disparity does not raise any significant Sixth Amendment concerns, we find that a comparative disparity analysis adds little support to an unfair and unreasonable representation claim. *See United States v. Royal*, 7 F. Supp. 2d 96, 106 (D. Mass. 1998), *aff'd*, 174 F.3d 1 (1st Cir. 1999) (holding that if the jurisdiction were to adopt a comparative disparity analysis, a 60.9% figure would likely not rise to the level of a Constitutional violation where the absolute disparity is sufficiently low). Therefore, Defendant has failed to meet the second element of a prima facie fair cross section violation claim.

### C. Systematic Exclusion

While we need not reach the third prong, we note that Defendant has not met his burden in establishing an underrepresentation of the cognizable group that is "due to a systematic exclusion in the jury selection process." *Weaver*, 267 F.3d at 244. A defendant must demonstrate that the alleged underrepresentation stems from more than exclusive reliance on voter registration lists where a cognizable group has "freely excluded itself quite apart from the system itself . . . ." *Id.* Though Defendant asserts that relying solely on voter registration rolls to identify prospective jurors is "*de facto* discrimination," (Def.'s Mot. ¶ 32), he has not attempted to establish that anything in the system has prevented African-Americans from participating in the voting process.

We note that under some circumstances a systematic exclusion can be sufficiently demonstrated where the "use of voter registration lists over time did have the effect of sizeably underrepresenting a particular class or group on the jury venire . . . ." *Weaver*, 267 F.3d at 244-45. Here, however, Defendant has made no such representation. Accordingly, Defendant's claim that the jury selection process for the Eastern District of Pennsylvania violates his Sixth Amendment rights must be rejected. *See Savage v. United States*, 547 F.2d 212, 215-16 (3d Cir. 1976) (holding that the petitioner's constitutional and statutory rights were not violated by the Jury Plan for the Eastern District of Pennsylvania).

## III. CONCLUSION

For the foregoing reasons, Defendant Steven Northington's Motion to Increase Pool of Prospective Jurors and to Strike the Current Jury Panel will be denied.

An appropriate Order will follow.

BY THE COURT:


*/s/R. Barclay Surrick*
**U.S. District Judge**