**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**
**(Philadelphia)**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | **Criminal No. 2:07-cr-00550-RBS** |
| | ) | |
| | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **KABONI SAVAGE,** | ) | **Hon. R. Barclay Surrick** |
| | ) | |
| | ) | |
| **Defendant-Appellant.** | ) | |

---

**MOTION TO ALLOW TELEPHONE AND IN-PERSON CONTACT WITH
INVESTIGATORS AND MITIGATION SPECIALISTS**

---

Kaboni Savage, a federal prisoner under sentence of death, moves this Court for an order to modify Mr. Savage's Special Administrative Measures (SAMs) to allow Mr. Savage to have contact with investigators and mitigation specialists without the physical presence of attorneys. Such contact is necessary for his legal team to effectively investigate and prepare a motion to vacate, set aside or correct sentence pursuant to 28 U.S.C. § 2255, as contemplated by the Court's appointment order under 18 U.S.C. § 3599(a)(2). Indeed, this Court has already ruled that such restrictions on investigator contact were irrational and had modified them in a pretrial order. *See* Doc. 359, 360. This motion is necessary because the government has re-imposed the prior restrictions and has declined to consider a number of modifications proposed by § 2255 counsel.

In support of this motion, and via undersigned counsel, Mr. Savage asserts the following:

1

**FACTS**

1. Mr. Savage was convicted by jury trial in this Court of sixteen charges, including conspiracy to participate in a racketeering enterprise, twelve counts of murder in aid of racketeering activity, tampering with a witness, retaliating against a witness, and using fire to commit a felony. (Doc. 1329.) Following a capital sentencing hearing, the jury sentenced Mr. Savage to death on each of the thirteen capital counts, which this Court imposed on June 3, 2013. (Doc. 1433, 1443.) The Third Circuit Court of Appeals entered judgment affirming his convictions and death sentences on August 11, 2020. *United States v. Savage*, 970 F.3d 217 (3d Cir. 2020). Mr. Savage timely filed a petition for certiorari review in the United States Supreme Court on March 29, 2021. *See Savage v. United States,* No. 20-1389. The Supreme Court denied that petition on November 15, 2021. The conclusion of direct review started a one-year deadline for the filing of a motion for habeas corpus relief under 28 U.S.C. § 2255(f)(1).

2. In anticipation of §2255 proceedings, Mr. Savage's appellate counsel filed an unopposed motion for the appointment of separate counsel to investigate, prepare, and prosecute a motion for relief from sentence on September 3, 2021. (Doc. 1717, 1718.) Noting the unusual complexity of Mr. Savage's case, the motion specifically sought the appointment of two Federal Defender Offices:  the Western District of Pennsylvania and the Southern District of Ohio.  (Doc. 1718, pp. 5–6, 11–12.)

3. The Court granted this appointment order on September 3, 2021. (Doc. 1719.)

4. Since their appointment, the Defender Offices have worked diligently to assemble a team of attorneys and non-attorneys to begin the extensive task of collecting records, establishing a relationship with Mr. Savage, compiling and reviewing the record, and investigating and preparing a motion under 28 U.S.C. § 2255.

5. The task of communicating with Mr. Savage is difficult because the government subjects Mr. Savage to unusual and severe conditions of confinement. In 2007, following his initial federal conviction Mr. Savage was incarcerated in ADX Florence, the administrative maximum-security prison in Colorado, and the most restrictive prison in the country.  A former warden has described the prison as a "clean version of hell" in an interview with 60 Minutes.[1] Aside from his transport to New York and Philadelphia for his capital trial, Mr. Savage has remained incarcerated in that facility to this day.  In 2007, the Attorney General also authorized the BOP to impose Special Administrative Measures (hereinafter, SAMs) on Mr. Savage pursuant to 28 C.F.R. § 503.1, which have been renewed every year since.  Like most federal prisoners subject to SAMs, Mr. Savage remains on the Special Security Unit ("H-Unit") of ADX, which is restrictive even by the standards of that prison. *See, e.g.*, *Ayyad v. Holder*, 2014 WL 4747451, \*\*20–21 (D. Colo. Sept. 24, 2014) (describing conditions).

6. The relevant SAMs regulations authorize the Attorney General to require the BOP to implement measures that are "reasonably necessary to protect persons against the risk of death or serious bodily injury" when "there is substantial risk that a prisoner's communications or contacts with persons could result in death or serious bodily injury to persons." 28 C.F.R. §

---

[1] *See* CBS News, *Supermax: A Clean Version of Hell* (June 19, 2009), www.cbsnews.com/news/supermax-a-clean-version-of-hell. *See also* Mark Binelli, *Inside America's Toughest Federal Prison*, N.Y. Times Magazine (Mar. 26, 2015). ADX has been criticized by Amnesty International and Human Rights Watch for its inhumane treatment of prisoners. Amnesty Int'l, *Entombed: Isolation in the U.S. Federal Prison System* (2014); Human Rights Watch, *Submission to the United Nations Committee Against Torture* (Oct. 20, 2014). Mental illness and suicide attempts are unusually prevalent among inmates, and over the years there have been hundreds of force feedings a year of prisoners who go on hunger strikes because of the conditions. *Inside America's Toughest Federal Prison*, *supra*; Steve Hsieh, *Colorado's Federal Supermax Prison Is Force-Feeding Inmates on Hunger Strike*, The Nation (Feb. 27, 2014).

503.1. In practice, the local U.S. Attorney and the FBI devise the SAMS restrictions and send them to the Officer of Enforcement Operations (OEO) in the Department of Justice for approval and annual re-approval. As determined by another court considering the SAMs approval process, "the OEO does not conduct any independent investigation of the issues; its review is guided entirely by the contents of the FBI's recommendation letter." *Mohammed v. Holder*, 47 F. Supp 3d 1236, 1243–44 (D. Col. 2014). In fact "the OEO ha[s] never rejected a recommendation by the FBI for approval of a renewal or modification of SAMs for any inmate." *Id*. at 1244, n. 7 (citing testimony of an OEO representative).

7. The first version of the SAMs restrictions presented to Mr. Savage's § 2255 team was a memo approved in January 2021. (*See* Ex. A, hereinafter "2021 SAMs," filed under seal).[2] As will be further discussed below, this memo recently has been supplanted by a 2022 SAMs memo, received by counsel on February 2, 2022. (*See* Ex. B, hereinafter "2022 SAMs," filed under seal). The SAMs restrictions concerning Mr. Savage's legal team discussed in this motion are the same in both memos.

8. The SAMs remain based primarily upon the offenses Mr. Savage has been convicted of and that this Court is familiar with, culminating with the firebombing that took place in October 2004. *See* 2021 SAMs pg. 3 ("Basis for Administrative Measures"). The government maintains the offenses were related to a drug enterprise called the Kaboni Savage Organization, which the SAMs describe as operating from 1997 to 2010. *See* 2021 SAMs pg. 2. The most

---

[2] Exhibits A and B, consisting of the 2021 and 2022 SAMs, will be delivered contemporaneously to the Clerk's office. Counsel will not file them pending the Court's resolution of a Motion regarding their public filing, which is submitted contemporaneously with this pleading.

recent incidents cited in support of the SAMs in the 2021 memo were instances in which Mr. Savage is claimed to have breached or sought to breach SAMs restrictions on his communications, by misusing his legal calls while incarcerated during trial, and by passing a note to his sister.  *See* 2021 SAMs, pg. 3. These most recent incidents happened in November 2012, and the SAMs do not claim that Mr. Savage's counsel was in any way complicit.

9. Nevertheless, the government has continued to reinstate essentially the same limitations on Mr. Savage's personal and legal communications every year. Mr. Savage's personal communications are limited to six family members and an imam and are all monitored by the government.  Mr. Savage's legal team is subject to a number of restrictions.  For example, they cannot forward third-party messages to Mr. Savage (SAMs general provision 2(a)), his attorneys are limited in their ability to disseminate to third parties their own conversations with Mr. Savage (SAMs general provision 2(c)), and the legal team must ensure that third parties are not privy to their phone calls with Mr. Savage.  (SAMs General Provision 2(g)).[3]

---

[3] The restrictions on counsel's communication have been the subject of prior litigation in the appellate proceedings in the Third Circuit.  Mr. Savage's counsel have challenged both the DOJ's authority to restrict counsel's communications, and the vagueness and overbreadth of these restrictions.  *See, e.g.*, Motion to Allow Counsel Communications Without Prosecution-Imposed "SAMs" Restrictions Or, Alternatively, to Modify Restrictions on Counsel, filed 7/20/2015, in *United States v. Savage*, case no 14-9003.  In response, the government has offered interpretations that are arguably narrower than what the text of the SAMs might suggest, stating for example that Mr. Savage's counsel were free to "use communications with Savage in any manner they deem appropriate in preparation of [his] post-sentencing proceedings."  *See* Government's Response, pg. 15, filed 9/4/2015. In its orders denying defense challenges, the Third Circuit specifically noted that the defense could rely upon these government representations.  *See United States v. Savage*, case no 14-9003, Order filed 9/27/17 (denying motion after oral argument, noting "the parties appeared to agree in significant respects on how the SAMs are to be interpreted"); Order filed 3/20/18 (denying modification but noting that "this Court relied on the Government's representations regarding the SAMs' limitations on counsels' conduct. Savage's counsel may

10. To enforce these measures, all members of Mr. Savage's legal team must review the SAMs, sign an affirmation, and return it to the government – that is, the prosecuting attorney who has represented the government throughout prior proceedings and will be defending against the 28 U.S.C. § 2255 petition.  (SAMs General Provision 2(a)).  This means, of course, that the prosecution is privy to the names and roles of all legal team members who are communicating with Mr. Savage.  Furthermore, non-attorney members of the legal team must be "precleared" by the prosecution, requiring them to undergo and pass a background check by both the FBI and the U.S. Attorney's Office.  (SAMs General Provision 2(a)).

11. As is relevant to this Motion, Mr. Savage's legal team includes three persons working as investigators and/or mitigation specialists, whose duties include conducting fieldwork on behalf of Mr. Savage's case.  The government has been provided the names of all these persons, who have presumably passed background checks as they have been allowed to meet with Mr. Savage at the ADX prison.  These persons are:

   a. Taunya Batista, an investigator employed by the Capital Habeas Unit of the Federal Public Defenders Office in the Southern District of Ohio since 2019.  Ms. Batista had previously worked as a mitigation specialist with the Defender Association of Philadelphia and Delaware Mitigation Services.  Ms. Batista has attended numerous trainings on fact and capital

---

therefore rely upon the representations in the Government's briefing and oral argument related to that motion, and formal reference in the SAMs affirmation is unnecessary.").

   Although the restrictions on counsel's communication remain a matter of concern that the defense reserves the right to challenge in future litigation, the current defense team assumes that they may continue to rely upon the government's representations in prior proceedings about the scope of these restrictions.

mitigation investigation conducted by organizations such as Federal Defender Services Office Training Division, the Federal Death Penalty Resource Counsel Project, and the National Association of Criminal Defense Lawyers.

b. Felicia Sullivan, a capital mitigation specialist based in Florida who is working on a contract basis with Mr. Savage's legal team. Ms. Sullivan is a licensed social worker in both Georgia and Florida. She has been in private practice in an LLC since 2012, where she has worked on federal and state capital cases at both the trial and post-conviction level throughout the country. She previously served as the Chief Mitigation Specialist with the Georgia Capital Defender Office, where she supervised nine mitigation specialists and two investigators, created a training manual, and assisted in the planning of annual state-wide capital defender trainings.

c. Owen Schmidt, an investigator based in Philadelphia who is working on a contract basis with Mr. Savage's legal team. He holds a detective license from the Commonwealth of Pennsylvania. He has been in private practice since 2016, and currently owns and operates his own LLC. Mr. Schmidt previously worked as an investigative fellow with the D.C. Public Defender Services.

12. Mr. Savage's legal team has endeavored to keep regularly in communication with Mr. Savage with both in-person and phone visits despite limitations imposed by the ADX prison, which is not a pretrial facility and not geared to accommodate prisoners who are in active litigation. ADX only allows SAMs prisoners on Mr. Savage's unit to have in-person legal visits (limited

to two persons) on Monday through Wednesday, and then only if there is no other visit scheduled on a given day, as the prison requires the rest of the visiting room to be cleared out during a legal or personal visit for any SAMs prisoner.  Legal calls with Mr. Savage are ordinarily limited to one hour.

13. On top of these limitations, the current SAMs (as interpreted by both the prison and the U.S. Attorney's Office) place additional restrictions on the ability of Mr. Savage's investigators/mitigation specialists to communicate with him.  These restrictions are similar to those that the Court previously addressed and removed because they unduly burdened the defense and lacked a "rational relationship" to any "legitimate penological concern."  (Doc. 359, pg. 15.)  Notwithstanding this Court's order, the government continued to impose them in the SAMs as they were renewed throughout Mr. Savage's direct appeal.[4]

14. *First*, the SAMs specifically prohibit Mr. Savage's investigators from meeting in-person alone with Mr. Savage.  (SAM general provision 2(f)).  In person visits by the above-listed persons, as such, require an attorney to accompany them on a cross-country trip.

---

[4] *See United States v. Savage*, case no 14-9003, Motion filed 7/20/15 at pp. 54–55 (describing appellate counsel's description of conversation with AUSA David Troyer, in which the latter claimed that this Court's prior order did not apply to proceedings on appeal.)

During the course of the appeal, Mr. Troyer did agree to a modification under which a licensed social worker could meet with Mr. Savage unaccompanied by attorneys.  *See* SAMs provisions 2(e).  Mr. Troyer has subsequently explained that this modification was made on the understanding that this social worker would not be doing fieldwork on Mr. Savage's behalf, and as further explained below will not agree to a modification for the investigators/mitigation specialists noted in Paragraph 10, *supra.*  Mr. Savage's appellate counsel, whose litigation was essentially record-based and did not involve independent investigation, apparently had no need to press the issue during those proceedings.

15. On October 29, 2021, Mr. Savage's legal team emailed Assistant United States Attorney David Troyer and requested this provision be modified so that Ms. Batista and Ms. Sullivan could meet with Mr. Savage without counsel present. Mr. Troyer responded that he was "not inclined to favor this modification request" but he had forwarded this request to the DOJ's Office of Enforcement Operations (OEO) and was awaiting a response. *See* Ex. C (October emails). Attorney Natalie Olmstead subsequently conferred with Mr. Troyer on November 10, 2021, both to introduce herself and hear the government's concerns and justifications for the SAMs restrictions. *See id*. (October 31, 2021 email requesting phone discussion).

16. *Second*, the SAMs as interpreted by ADX and the U.S. Attorney's Office prevent Mr. Savage's investigators from participating in phone calls with him unless an attorney is with them in the same room. This requirement is less than clear from the text of the SAMs. The SAMs require that calls must be placed in the first instance to an attorney, but the restrictions in Provision 2(g)(ii) specifically prohibit calls from being patched or forwarded to "third parties," and not to other precleared members of the legal team. Prior to beginning legal calls, Mr. Savage's counsel sought clarification from the ADX prison regarding whether an attorney could have a precleared investigator join a call on a different line, prior to receiving the call from ADX wherein the attorney verifies for the officer the parties on the call. ADX officials responded that they understood the SAMs to prevent this, and that other legal team members, including investigators, could not participate in a call unless they were in the same room as the attorney who received it.

17. This restriction effectively prevents Ms. Sullivan and Mr. Schmidt from participating in legal calls with Mr. Savage, as they are located in different cities than Mr. Savage's attorneys and cannot realistically and efficiently travel for the purpose of participating in a phone call. It

further prohibits members of the same legal office from practicing social distancing or even an attorney from Pennsylvania joining the call with an attorney from Ohio.

18. On December 8, 2021, Mr. Savage's counsel contacted AUSA Troyer about this issue requesting that he clarify the matter, or in the alternative, that the SAMs be modified to allow non-attorney members of the legal team to participate in legal calls via separate lines. *See* Ex. D (December 2021 emails). Mr. Troyer responded that he understood such calls to be barred by both the SAMs and BOP policy. *See id.* Yet ADX officials, as noted above, cited only Mr. Savage's SAMs restrictions and not any BOP policy.

19. *Third*, SAMs provision 2(c) states that any dissemination of a communication with Mr. Savage to a third party may be done only by an attorney, and then only for the "sole purpose of providing necessary legal services related to the inmate's post-sentence proceedings." The provision thus appears to prevent investigators/mitigation specialists from disseminating communications with Mr. Savage to a third party for any reason, even if done solely for the purpose of providing legal services related to the post-sentence proceedings.

20. On December 30, 2021, Mr. Savage's counsel sent an email to AUSA Troyer noting the issues brought to his attention in October and November. *See* Ex. E (December 30, 2021 email and response). Mr. Savage's counsel reiterated a request that his investigators be able to meet with and receive phone calls from Mr. Savage without any attorney present. As an alternative, Mr. Savage requested the SAMs be modified to allow investigators to join legal calls via a separate line. *Id.*

21. Mr. Troyer responded on December 30 that he would "pass along your concerns to the OEO and the Bureau of Prisons." *See* Ex. E. Counsel sent a follow-up email on January 11, 2022

inquiring about the timeline for an OEO response, but did not receive a response. *See id*. (January 11, 2022 email).

22. On February 2, 2022, the defense team received the latest annual memo detailing the SAMs restrictions "established for Kaboni Savage" – that is, the memo prepared by the local AUSA and FBI, and adopted by the government. *See* 2022 SAMs, Ex. B. Despite the intervening appointment of counsel for the § 2255 motion, the conclusion of Mr. Savage's direct appeal, and the multiple requests and concerns that Mr. Savage's § 2255 counsel brought to Mr. Troyer's attention, the restrictions on Mr. Savage's legal team in the 2022 SAMs remain exactly as described above.

23. The major difference between the 2022 and 2021 SAMs memos is an expanded section detailing the "Basis For Administrative Measures." The government now lists a handful of incidents concerning Mr. Savage's alleged misbehavior post-dating his trial, which the government was presumably aware of before the 2021 Memo but did not see fit to mention in the prior SAMs memo. For example, the government now states Mr. Savage received a disciplinary action at the ADX for being "insolent" to a staff member in June of 2020. 2022 SAMs, pg. 5. The government also spends an entire paragraph detailing an allegation of a

threat by Savage made by convicted terrorist and ADX prisoner Zacarias Moussaoui[5] in a letter, citing a 2014 New York Daily News article as its source. 2022 SAMs, pg. 5. The BOP investigated this claim and was "unable to confirm" it. *Id*.

24. Even then, the government concedes that Mr. Savage has been "compliant" with the SAMs since 2015 (and does not cite any incident subsequent to Mr. Savage's 2013 conviction and before 2015 other than the abovementioned "unconfirmed" Moussaoui claim). 2022 SAMs, pg. 5.  The government continues to cite and rely upon Mr. Savage's "improper use" of the legal phone in 2012 as a justification for SAMs, but does not claim that violation was in any way related to or enabled by the Court's prior modification of his SAMs restrictions.  In fact, the 2022 SAMs memo does not mention this Court's prior order at all.

25. Finally, the 2022 Memo acknowledges the requests from § 2255 counsel to Mr. Troyer to modify the SAMs restrictions on legal team communications, described above. Notwithstanding Mr. Troyer's prior representations to counsel that these concerns and requests would be forwarded to the OEO for consideration, the memo states that "no determination" was reached because "these requests have not been submitted through the appropriate process

---

[5] Moussaoui was the "20th hijacker," who was tried and convicted (but did not receive a death sentence) for his role in the September 11 terrorist attack on the World Trade Center.  A psychologist at his trial testified he has paranoid schizophrenia and suffers from delusions. *See Psychologist: Moussaoui Schizophrenic*, NBC News, April 17, 2006, available at https://www.nbcnews.com/id/wbna12348153.  Mr. Moussaoui has a "long history of writing letters to the court," in which he has made various and sometimes contradictory claims and offers in an apparent attempt to alleviate his conditions of confinement. *See September 11 convict renounces terrorism, Al-Qaeda*, Al-Jazeera News, May 20, 2020 (noting that Moussaoui continued to refer to himself as a "natural born terrorist" in court papers as recently as 2018, and that he was now asking for Rudy Giuliani or Alan Dershowitz to represent him), available at https://www.aljazeera.com/news/2020/5/20/september-11-convict-renounces-terrorism-al-qaeda.

for exhausting administrative remedies." 2022 SAMs, pg. 7. At the same time, the 2022 SAMs do reach a determination as to the restrictions raised by defense counsel, as they re-instate all of them exactly as they were before. Indeed, the memo goes on to offer justifications for the restrictions, claiming, for example, that "attorney presence" is important to "ensure attorney professional responsibility requirements." *Id.*

## LEGAL ARGUMENT

26. A capital defendant litigating a federal motion to vacate sentence is entitled to the appointment of counsel. 18 U.S.C. § 3599(2). This court has accordingly granted Mr. Savage's motion and appointed qualified counsel for the purposes of investigating, preparing and prosecuting a 28 U.S.C. § 2255 motion. (Doc. 1719.)

27. The entitlement to counsel necessarily contemplates and encompasses the right to counsel who can effectively represent the defendant. "It has long been recognized that the right to counsel is the right to the effective assistance of counsel." *McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970). Even in the post-conviction context, where the Supreme Court has not specifically found a constitutional right to counsel, it recognizes "a prisoner likely needs an effective attorney" to raise collateral claims of prior counsel's ineffectiveness. *Martinez v. Ryan*, 566 U.S. 1, 12 (2012). As such, *Martinez*'s equitable rule drew no distinction between ineffective counsel and the absence of counsel in post-conviction proceedings. *Id*.

28. As with Mr. Savage's trial proceedings (and unlike his prior appellate proceedings, which were necessarily record-based) effective post-conviction representation requires investigation. *Strickland v. Washington*, 466 U.S. 668, 691 (1984) ("counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary."); *Martinez*, 566 U.S. at 11 ("Claims of ineffective assistance at trial often require

13

investigative work . . .").  Title 18 U.S.C. § 3599(f) accordingly recognizes that post-conviction counsel may seek funding for services, including investigation, that are "reasonably necessary for the representation of the defendant."  *Id.*, *see also Ayestas v. Davis*, 138 S.Ct. 1080, 1092–95 (2018) (rejecting a requirement that a petitioner must demonstrate "substantial need" for such services).

29. Although Mr. Savage has the assistance of investigators, the SAMs-based restrictions imposed by the government place unreasonable restrictions on their ability to do their jobs, and thus the ability of Mr. Savage's legal team to effectively represent him.  *See Strickland*, 466 U.S. at 686 (recognizing that unreasonable government restrictions on lawyers may impair the right to counsel).  Mr. Savage respectfully requests the Court to direct the government to make reasonable modifications to properly effectuate its order of appointment.

30. This Court already has recognized it has the power to modify SAMs restrictions.  In 2010, this Court ruled that Mr. Savage's motion for relief from SAMs restrictions need not comply with the Prison Litigation Reform Act's (PLRA) exhaustion requirement, so long as the restrictions "directly affect our ability to manage these criminal proceedings."  (Doc. 162, pg. 13.)  The Court restated this ruling in its 2012 Order modifying the SAMs legal restrictions.  (Doc. 359, pg. 6, fn. 7 ("Because Defendant's complaints implicate regulations that affect his ability to

14

prepare his defense in this criminal action, he need not have exhausted his administrative remedies prior to raising these concerns to the Court.").[6]

31. Aside from being unnecessary, exhausting "administrative remedies" would be futile for Mr. Savage.   The administrative remedy cited within the SAMs regulations is the Administrative Remedy Program, 28 C.F.R. § 542.  *See* 28 C.F.R. 501.3(e).  This program, however, is the "process for challenging BOP policies." *Mohammed v. Holder*, 47 F. Supp 3d at 1241. It assumes the inmate's complaint will be forwarded and considered by BOP officials: the Warden, then the Regional Director, and then the General Counsel.  *See* 28 C.F.R. § 542.15. But the restrictions at issue here are not imposed by the BOP.  They were devised by the FBI and local prosecutor, and then approved by the OEO via a memo signed by a Deputy Attorney General that is addressed as a directive to the BOP.  *See* 2022 SAMs, pg. 1. The BOP cannot override these restrictions via their own administrative processes. *See Mohammed* at 1241 (finding that the OEO "directed the BOP to enforce the SAMs," and that the relevant administrative decision to review was that of the OEO and FBI, rather than the BOP). BOP administrative remedies, as such, are not available to Mr. Savage with respect to his SAMs. *See Ross v. Blake*, 578 U.S. 632 (2016) (holding that BOP administrative remedies are not

---

[6] Mr. Savage has ongoing civil litigation in the United States District Court for the District of Columbia regarding his SAMs restrictions, in which he is represented by pro bono counsel. *See Savage v. United States Department of Justice*, 1:21-cv-01057-CKK (D.D.C.).  That litigation, however, concerns restrictions placed on Mr. Savage's personal communications.  This Court has already recognized it is an appropriate forum for issues regarding government-imposed legal restrictions affecting the counsel it has appointed; in any event, the issues raised herein could not expeditiously resolved via collateral civil litigation.

"available" to inmates and thus need not be exhausted unless they are "capable of use to obtain some relief for the action complained of.").

32. Finally, the government's recent conduct should estop any current claim that Mr. Savage must first exhaust his purported administrative remedies regarding the restrictions on the legal team. As explained above, counsel have been explaining the need for modifications to Mr. Troyer, the prosecuting attorney who devises the SAMs, since October.  Mr. Troyer repeatedly informed counsel that their concerns would be forwarded to the OEO, leading counsel to reasonably believe they would at least be considered in good faith.  Certainly Mr. Troyer never informed counsel that any communication with him was futile until and unless they exhausted administrative remedies through the BOP.  Yet when counsel finally received a response in the form of the 2022 SAMs memo, the government asserted that "no determination" would be made on these requests because they had not been "submitted though appropriate process for exhausting administrative remedies."  2022 SAMS, pg. 7.  At the same time, the memo expressly defends the restrictions challenged by counsel and reimposes them exactly as they were before.  *Id*. pp. 7, 8–12.  This double-speak, received after three months of good faith attempts to resolve the matter, demonstrates that further attempts to resolve through the government's channels will be fruitless and that any remedy will need to come from this Court.

33. The authority previously relied upon by this Court demonstrates that the Court's authority to consider SAMs modifications is not limited to pre-trial detainees.  In *United States v. Mikhel*, 552 F.3d 961 (9th Cir. 2009), an appellate court modified a number of SAMs conditions to allow the appellant's legal team to effectively communicate with him during his direct appeal. *Id*. at 963 (noting a court's "inherent power" to "regulate practice in a particular case" and "to control its own proceedings.").  Even in a civil context unrelated to a challenge regarding an

16

underlying sentence, a defendant need not "exhaust" administrative remedies before raising SAMs challenges that are "related to his right of access to the court." *Sattar v. Gonzales*, 2010 WL 685787 (D. Col. 2010) at *2 (petitioner need not "exhaust" complaint against SAMs restriction that would prevent him from meeting with rebuttal expert in civil suit alleging violations of his constitutional rights during confinement); *Ayyad v. Gonzales*, 2008 WL 203420 at *3 (D. Col. 2008) ("a plaintiff who is incarcerated should be able to raise at any time the fact that he is being denied access to counsel").

34. Thus, while Mr. Savage is no longer a pretrial detainee, the Court retains the authority to modify SAMs to ensure that counsel may effectively investigate, prepare, and prosecute a motion under 28 U.S.C. § 2255. *See United States v. Thomas*, 713 F.3d 165, 171 (3d Cir. 2013) ("a §2255 proceeding is a continuation of a defendant's federal criminal case."). This Court's responsibility to appoint effective counsel would be an empty gesture if those counsel and their team are unreasonably obstructed by restrictions imposed, for all intents and purposes, by the prosecutors who are seeking to uphold his conviction and secure Mr. Savage's execution.

35. Under the standards previously recognized by this Court for evaluating SAMs challenges, the Court must first "determine whether there is a valid rational connection between the prison regulation and the legitimate interest put forth to justify it." (Doc. 359, pg. 7, citing *Monroe v. Beard*, 536 F.3d 198, 207 (3rd Cir. 2008).) If this nexus is found, the Court must then consider three additional factors: "(1) whether inmates retain alternative means of exercising the circumscribed right, (2) the burden on prison resources that would be imposed by accommodating the right, and (3) whether there are alternatives to the regulation that fully accommodate[] the prisoners' rights at de minimis cost to valid penological interests." (Doc. 359, pp. 7–8, citing *Jones v. Brown*, 461 F.3d 353, 360 (3rd Cir. 2006).)

36. In its prior order, the Court found restrictions on investigator visits and communications were so irrational that they failed the first part of the inquiry, and thus needed to be modified. (Doc. 359, pp. 13–17.)  Specifically, the Court (a) "modif[ied] the SAMs restriction to allow court-appointed fact investigators to meet with Defendant without the presence of legal counsel or paralegals, so long as the investigator first signs an affirmation agreeing to abide by the SAMs provisions and receives pre-clearance from the Government," (*Id*. pg. 15), and (b) modified SAMs "to allow pre-cleared fact investigators to disseminate the content of Defendant's communications to other members of Defendant's defense team; however, any dissemination must be for the sole purpose of preparing for trial and sentencing." (*Id.* pp. 16–17). *See also Mikhel*, 552 F.3d at 964 (modifying SAMs so that "pre-cleared investigators in the regular full-time employment of the attorney may meet with the inmate without the necessity of the inmate's attorney being present."); *id*. (modifying SAMs, with the assent of the government, so that investigators working on behalf of Mikhel's counsel could "disseminate the contents of Mikhel's communication to third parties consistent with the requirement that they do so for the sole purpose of preparing his post-sentencing proceedings.")

37. The restriction forbidding investigators from meeting alone in-person with Mr. Savage remains irrational. Prevailing standards for investigation in death penalty cases, in any stage of litigation, require multiple face-to-face interviews with the client:

> Team members must conduct in-person, face-to-face, one-on-one interviews with the client, the client's family, and other witnesses who are familiar with the client's life, history, or family history or who would support a sentence less than death. Multiple interviews will be necessary to establish trust, elicit sensitive information and conduct a thorough and reliable life-history investigation. Team members must endeavor to establish the rapport with the client and witnesses that will be necessary to provide the client with a defense in accordance with constitutional guarantees relevant to a capital sentencing proceeding.

18

*See* SUPPLEMENTAL GUIDELINES FOR THE MITIGATION FUNCTION OF DEFENSE TEAMS IN DEATH PENALTY CASES, Guideline 10.11.C., in 36 HOFSTRA L. REV. 677, 698 (2008).[7]

38. Face-to-face interviews in lieu of phone conversations (much less second-hand reports from other team members) are necessary for multiple reasons relating to a defense investigator's interview of the client.  They are necessary to perceive information accurately, as much communication between human beings is nonverbal.  *See* Sean D. O'Brien, Quinn C. O'Brien & Dana Cook, *Put Down the Phone!  The Standard for Witness Interviews Is In-Person, Face-to-Face,  One-on-One*, HOFSTRA  L.  REV., forthcoming (abstract available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4011414), pp.  4–8. They are necessary to develop rapport and trust with the client.  *See id*. at 9–10.  Mitigation investigation into a client's background—which often touches upon subjects such as their history of abuse and family dysfunction—is a particularly sensitive and time-consuming process that requires face-to-face interviewing and cannot be done effectively via one-hour legal phone calls.

39. While Mr. Savage's legal team would certainly conduct some visits with both an attorney and investigator in any event, the requirement that *every* visit involve a lawyer places a substantial

---

[7] The Guidelines supplement the ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases (2003 revision) and are the result of an extensive investigation of prevailing professional standards conducted by capital defense lawyers, mitigation specialists, and mental health experts.  *See* Sean D. O'Brien, *When Life Depends on It: Supplementary Guidelines for the Mitigation Function of Defense Teams in Death Penalty Cases*, 36 HOFSTRA L. REV. 693 (2008).  "The Supplementary Guidelines do not describe a Cadillac defense; they articulate the appropriate standard of practice for defending a client in high stakes criminal cases in which life and/or liberty are at issue."  *See* Sean D. O'Brien, Quinn C. O'Brien & Dana Cook, *Put Down the Phone!  The Standard for Witness Interviews Is In-Person, Face-to-Face,  One-on-One*, HOFSTRA  L.  REV., forthcoming (abstract available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4011414), pg. 3.

burden on the legal team, requiring a lawyer to usually spend three days of their time (one for the visit itself, and two other days for travel to the ADX from either Ohio or Pennsylvania) to effectuate a visit by an investigator. *See Mikhel*, 552 F3d. 964 (finding the requirement that attorney join investigators for an in-person meeting to be a "significant burden" when client was located 2,000 miles away from the attorney's office); *see also Procunier v. Martinez*, 416 U.S. 396, 419–20 (1974), *overruled on other grounds by Thornburgh v. Abbot*, 490 U.S. 401 (1989) (finding restrictions on non-attorney personal visits "imposed a substantial burden on the right of access to the courts," when "the remoteness" of penal institutions "makes a personal visit to an inmate client a time-consuming undertaking" and requiring attorney's presence "would waste time that might be employed more efficaciously in working on the inmates' legal problems"). Moreover, the requirement creates a risk that a visit will be canceled because of an attorney's unavailability, a matter of particular concern during an ongoing COVID pandemic. For example, less than a month ago most of the legal team from the Southern District of Ohio, as well as Ms. Sullivan, contracted COVID and were unable to travel.

40. Although in-person visits are essential, the time and distance involved in traveling to visit Mr. Savage in Colorado along with the limitations on such visits imposed by ADX requires the defense to also rely on phone calls with Mr. Savage to communicate regarding the § 2255 motion.[8] Because (per the government's interpretation of the SAMs) investigators cannot

---

[8] These calls will become even more important if COVID cases lead to a shut-down of in-person visits at the ADX, as was done for extended period earlier in the pandemic. In Pennsylvania, the State Department of Corrections has recently shut down all non-legal in-person visiting until Feb. 28, 2022 as a result of COVID-related staffing issues. *See* https://www.media.pa.gov/Pages/corrections_details.aspx?newsid=529.

receive these calls or participate in them unless they are in the same room as an attorney, both of the contracted defense investigators (Ms. Sullivan and Mr. Schmidt) are effectively unable to participate in them, because neither live in the same city as any of the attorneys on this team. This prevents them, for example, from following up on matters that were discussed in prior meetings, or from conducting time-sensitive or exigent conversations with the client.

41. The restrictions on investigators participating in phone calls are just as irrational as those pertaining to personal visits and are even more burdensome, as they have the effect of completely preventing two members of Mr. Savage's legal team from communicating with him via phone. The provision should be modified so that investigators may receive calls themselves and participate, via a separate line, on calls with attorneys.

42. The government does not have any valid or compelling reason to distinguish between investigators and other team members for purposes of the challenged SAMs provisions. The 2022 SAMs summarily assert that "Attorney presence is an important element that serves to ensure that the contact comports with attorney professional responsibility requirements that cannot been [sic] overseen in unsupervised contact with non-attorney staff." 2022 SAMS, pg. 7. At best, this is a short version of the argument presented in the government's opposition to the 2012 modification request, (Doc. 352, pp. 11–12), that was rejected by the Court, in which the government asserts that investigators are somehow less ethical and/or responsible than other persons whom the SAMs permit to meet with Mr. Savage alone. As explained above, all of the investigators/mitigation specialists are qualified professionals known to the government, who have reviewed and agreed to the SAMs restrictions, and who have passed background checks. Like the attorneys, they are all subject to legal, criminal, and professional consequences if they violate these restrictions:  Ms. Batista is an employee of the federal

government, Ms. Sullivan is a licensed social worker in two states, and Mr. Schmidt holds a detective's license.  These persons are as important to the team as the attorneys, and are equally capable of following the restrictions placed by the SAMs as are the attorneys and paralegals who are permitted to meet with Mr. Savage alone.  *See Mikhel,* 552 F.3d at 964 ("We do not see, nor has the Government provided, any 'valid, rational' justification for distinguishing between paralegals and investigators employed by the office of the Federal Public Defender."); Doc. 359, pg. 15 ("We agree with the Ninth Circuit in recognizing the lack of a rational justification for distinguishing between paralegals and fact investigators").  Notably, the 2022 SAMs do not assert that the unsupervised investigator contact allowed by the Court's prior modification led to any problems or violations.

43. Likewise, the government lacks any valid interest in barring investigators from conveying communications from Mr. Savage to third parties, so long as that dissemination is for the sole purpose of "preparing his post-sentencing proceedings."  *See Mikhel*, 552 F.3d at 964 (noting the government did not object to modifying SAMs to allow two investigators to disseminate contents of communications with appellant to third parties).  This Court has previously found it appropriate to modify SAMs to allow investigators to convey communications to other members of the defense team.  *Savage*, 2012 WL 424993 at *9.  By the same token, the SAMs should be further modified as in *Mikhel* so that investigators may convey communications with third parties to the extent it is necessary to perform their duties.  (Doc. 359, pg. 15 ("We fail to see how an investigator is any more likely than a paralegal, or an attorney for that matter, to be duped by Defendant and sent on a "mission" where they "unwittingly communicate[ ] information that could cause criminals to harm witnesses.").)

44. The need for restrictions on Mr. Savage's legal team is, at the very least, not any greater than when the Court considered the matter ten years ago. The last credible incident of SAMs violations the government can cite is the 2012 misuse of the legal phone line at FDC Philadelphia.[9] Such violations, which had nothing to do with Mt. Savage's legal team or the modifications ordered by the Court, cannot and have not reoccurred at ADX Florence, where, pursuant to its own policy and the directive of the SAMs, a prison official dials the phone and verifies the identity of the legal team member before allowing Mr. Savage a legal call. *See* SAMs General Provision 2(g)(ii). Even the 2022 SAMs memo (notwithstanding its gratuitous citations to matters such as an irrelevant disciplinary action and an uncorroborated allegation made by a mentally ill terrorist) acknowledges that Mr. Savage has been "compliant" with SAMs since 2015. 2022 SAMs pg. 5.

45. Finally, even if there was some valid logical connection between any of the SAMs restrictions at issue and a legitimate government interest, consideration of the three factors noted in *Jones*, 461 F.3d at 360, still weighs in favor of modification. Mr. Savage does not have an alternate effective means of communicating with his legal team other than by in-person visits and telephone—mail delivery to ADX is slow and cannot substitute for face-to-face and phone conversations. None of the requested modifications imposes any burden on prison resources,

---

[9] The government's evidence at the penalty phase of trial was that Mr. Savage was making calls to Kenneth Tuck, who, in turn, was patching in Mr. Savage's friends and family for personal conversations, including for example Mr. Savage's mother who was dying of cancer at the time. *See* 5/21/13 TT, pp. 160–183. The government has long insinuated these calls had some nefarious purpose because Mr. Tuck had a prior felony conviction. *Id.* pg. 182; 2021 SAMs, pg. 3. The latest version of the SAMs, without any attribution, now describes Mr. Tuck as one of Mr. Savage's "criminal associates." 2022 SAMs, pg. 5.

and the changes requested would accommodate Mr. Savage with, at most, a *de minimis* cost to valid penological interests.

46. The government claims that one of Mr. Savage's requested modifications, the allowance of three-party legal calls so investigators and attorneys could participate at the same time, violates a "long-standing BOP policy." 2022 SAMs pg. 7. The referenced policy, in a provision governing inmate calls to attorneys, states that "third-party or three-way" calls are not authorized. BOP Program Statement 5264.08, pg. 12.[10] However, undersigned counsel, who has represented other inmates in federal facilities, has understood that policy to be interpreted to only bar attorney calls patching in third parties outside of the legal team. Notably, in counsel's communications with ADX staff and BOP legal counsel about this restriction, those parties have specifically cited the SAMs, and not any independent ADX or BOP policy, as the basis for the restriction. In any event, there is no reason why a case-specific adjustment to a policy under the compelling circumstances of this voluminous capital case—during a pandemic, no less—would constitute a significant burden to the BOP, let alone lead to an "agency-wide loss of security." 2022 SAMs, pg. 7.

47. The requested modifications are essential to Mr. Savage's legal team's preparation for a fast approaching § 2255 motion deadline. Three months of communications with the government about this matter have proved futile, and the defense now respectfully requests the Court to modify the restrictions, as it previously did in 2012. Counsel asks for a hearing on this motion, and/or for the Court to grant the relief requested below.

---

[10] Available at https://www.bop.gov/policy/progstat/5264_008.pdf.

24

**PRAYER FOR RELIEF**

Mr. Savage specifically asks the Court to modify the SAMs so that:

a. Mr. Savage's precleared investigators/mitigation specialists (Taunya Batista, Felicia Sullivan, Owen Schmidt) may meet with Mr. Savage in-person in ADX Florence without an attorney present;

b. Mr. Savage's precleared investigators/mitigation specialists may receive phone calls from Mr. Savage;

c. Mr. Savage's other attorneys and precleared investigators/mitigation specialists may join legal calls with his attorneys on a separate line; and

d. Mr. Savage's precleared investigators/mitigation specialists may disseminate communications with Mr. Savage insofar as such dissemination is needed for the purpose of providing necessary legal services in relation to Mr. Savage's post-sentencing proceedings.

Respectfully submitted,

*/s/ Ryan Norwood*
Ryan Norwood
NH Bar 15604
*/s/Kathryn Bailey*
Kathryn Bailey
PA ID 308242

Assistant Federal Public Defenders
Capital Habeas Unit
Office of the Federal Public Defender
Western District of Pennsylvania
1001 Liberty Avenue, Ste. 1500
Pittsburgh, PA 15222
ryan_norwood@fd.org
kara_bailey@fd.org
(412) 644-6565

ATTORNEYS FOR KABONI SAVAGE

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing was filed electronically through the ECF system and notice sent to counsel of record for all parties on February 7, 2022.

*/s/ Ryan Norwood*

Ryan Norwood
NH Bar 15604
Assistant Federal Public Defender
Capital Habeas Unit
Office of the Federal Public Defender
Western District of Pennsylvania
1001 Liberty Avenue, Ste. 1500
Pittsburgh, PA 15222
ryan_norwood@fd.org
(412) 644-6565

ATTORNEY FOR KABONI SAVAGE