# IN THE UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CASE NO. 07-550** |
| **v.** | : | |
| **KABONI SAVAGE** | : | |

### GOVERNMENT'S RESPONSE TO DEFENDANT SAVAGE'S
### MOTION TO MODIFY "SAMs" CONDITIONS OF CONFINEMENT

The United States of America, by and through its attorneys, Jennifer Arbittier Williams, United States Attorney for the Eastern District of Pennsylvania, and David E. Troyer, Assistant U.S. Attorney for the district, submits this response in opposition to defendant Kaboni Savage's motion to modify the Special Administrative Measures (SAMs) conditions of confinement, in furtherance of which it sets forth the following:

### Introduction

Kaboni Savage is on federal death row, housed in a U.S. Bureau of Prisons (BOP) facility in Colorado. His convictions and sentences have been affirmed by the Third Circuit Court of Appeals, and the Supreme Court has rejected his petition for certiorari. He has no case pending in this Court. Savage does have a civil case pending in the District Court for the District of Columbia, also seeking to modify the SAMs. He now files this motion, in this Court, seeking to modify the SAMs, despite the fact that: (1) there is no current case or controversy in this District; (2) Savage is not incarcerated in this District; (3) Savage has not exhausted administrative remedies, as required; and (4) Savage already has a pending conditions of confinement suit in a separate court. Moreover, Savage's motion seeks an order from this Court compelling the BOP

1

to permit three-way calls, something no BOP facility permits for any federal inmate or detainee, with or without SAMs restrictions. His motion should be summarily denied.

## Procedural Background

### The Capital RICO Case

On April 8, 2009, a federal grand jury in Philadelphia returned a 26-count superseding indictment in this case, charging the defendant and three co-defendants with a variety of crimes, including conspiracy to participate in the affairs of a racketeering enterprise, twelve counts of murder in aid of racketeering, retaliating against a witness by committing murder, and the use of fire to commit a felony.

The defendant was convicted of all counts of the fourth superseding indictment. The jury sentenced him to death on all thirteen capital counts. This Court imposed sentence on June 3, 2013.

Savage appealed. On August 11, 2020, the Third Circuit Court of Appeals affirmed his convictions and sentences. *United States v. Savage*, 970 F.3d 217 (3d Cir. 2020). Savage filed a petition for rehearing en banc, which was denied. Savage then petitioned the Supreme Court for a writ of certiorari, which the Supreme Court denied on November 15, 2021. *Savage v. United States*, #20-1389. Savage is on death row, awaiting execution, in the U.S. Bureau of Prisons'(BOP) Administrative Maximum Facility (ADMAX) in Florence, Colorado.

### Savage's Twelve Murders

Of the twelve murders for which Savage was convicted, six of his victims were family members of a witness, Eugene Coleman, to his 2004 federal drug case. Four of the murdered victims were children, ranging from 15 months to 15 years of age; the other two were women.

2

Savage ordered these murders while incarcerated as a pre-trial detainee at the Federal Detention Center (FDC) in Philadelphia. All six perished in a firebombing of their home on October 9, 2004, which Savage ordered.

Savage was also convicted of ordering the murder of Tybius Flowers, a witness to yet another murder case (of Kenneth Lassiter), in which Savage was initially charged in state court. Savage was detained in a local detention facility when he ordered that murder.

After the October 9, 2004 murders of the Coleman family, Savage continued to plot to kill witnesses and their family members. Many of Savage's plans were recorded in court-authorized interceptions at the Federal Detention Center. Also intercepted were specific threats made by Savage, using the FDC plumbing system as a communication device (colloquially known as "the bowl").

Implementation Of The SAMs

On December 16, 2005, Savage was convicted of multiple counts of the 2004 indictment, including counts of witness tampering and retaliating against witnesses. Savage was sentenced to 30 years' imprisonment. He was incarcerated at the U.S. Penitentiary in Atlanta for some time, after which he was designated to the maximum security unit at the U.S. Penitentiary in Florence, Colorado (ADMAX). His convictions and sentence were affirmed by the Third Circuit Court of Appeals.

While the 2004 case was pending, Savage convinced someone in his attorney's office to forward calls to friends and associates, thus using the three-way call feature to subvert FDC and BOP regulations (which apply to all inmates). This permitted Savage to have unmonitored, unrecorded calls with criminal associates.

Due to the severe security threat posed by Savage, the Attorney General authorized the imposition of Special Administrative Measures (SAMs), which further restricted Savage's movements and communications. These have been reviewed and re-authorized annually.

<u>Savage's Many Assaults On, And Violations Of, The SAMs Pending Trial</u>

After Savage's indictment in the capital RICO case, he was transported to FDC-Philadelphia. Although a sentenced prisoner designated to ADMAX, the government agreed to house Savage in a SAMs facility in the Metropolitan Corrections Center in New York (MCC-NY), in order to best facilitate his need to communicate with counsel in preparation for trial.

Although the MCC-NY placement was initially well received by the defense, Savage soon began complaining about his restrictions. He, and defense counsel, specifically complained of the lack of contact visits, which MCC-NY did not allow. As a result of these complaints, government counsel, defense counsel, and Bureau of Prisons officials met in order to reach an acceptable accord. The agreement, which the defendant Savage also joined, was for Savage to be transported from MCC-NY to FDC-Philadelphia to have monthly "contact visits" with defense counsel. The plan was for these visits to increase in frequency as the trial date drew closer.

Shortly after the implementation of that plan, however, Savage began complaining again; this time, about the nature of the cell in which he was housed while in FDC-Philadelphia when brought here for his attorney "contact" visits. Savage specifically complained about having to use a portable toilet facility, in lieu of having access to the FDC plumbing system, which he had previously used to communicate threats. After one scheduled visit, Savage refused to be transported for further attorney visits.

4

On June 5, 2009, Savage filed a motion to compel the Bureau of Prisons to hold him at FDC Philadelphia until trial. Dk. #76. This Court held multiple hearings. Savage testified, complaining of the tidiness of his cell, the manner of his mail delivery, the nature of his physical restrictions while meeting with defense counsel, and the night-time lighting outside his cell, among other things. Savage's testimony concerning his mail delivery at MCC-NY was conclusively proven to be false. This Court entered an order denying his motion.

On April 21, 2010, MCC-NY officials conducted a routine search for weapons of the cells of Savage and five other inmates. As part of this search, mattresses were removed, for the purpose of X-raying them to determine the presence of weapons. Savage's mattress was discovered to contain the writing, "A rat is an animal (police's pet) that will chew off his own motherfuckin' tail, to get out of a trap. I wish I had a bullet for every rats head." (sic)

That same day, Savage was transported to FDC-Philadelphia for an attorney "contact" visit. While in transit, he had brief contact with an inmate, with whom Savage had a conversation. Savage learned that the inmate was housed with Savage co-conspirator D__ B__, whom Savage suspected was cooperating with law enforcement.[1]  About D__B__, Savage told the inmate, "He's working" (i.e., cooperating with law enforcement). Savage then said, "You know what you can tell D__B__? He can run, but he can't hide. A smoky sad night will solve all of that." Although the inmate did not relay the threat to D__B__, the allegation of D__B__'s cooperation eventually did reach D__B__, which resulted in a physical confrontation between

---

[1]  That Savage suspected D__B__ of cooperating with law enforcement is beyond dispute. On May 27, 2010, Savage specifically identified D__B__ as a "cooperating witness" in his previous "Request for Administrative Remedy" filed with the Bureau of Prisons.

D__B__ and another inmate.

On April 27, 2010, during a telephone call with his mother, Savage expressed delight when told that someone Savage suspected of being an informant had been killed.[2] His mother advised Savage that Joey's friend "Reggie" had been killed a while ago. Savage replied, "He's the police; that's good."

On July 16, 2010, Savage filed a motion to strike the SAMs. Dk. #137. The government filed a response in opposition, Dk. #146, and a hearing was held on October 1, 2010. Dk. #155. This Court issued an order and memorandum denying the motion. Dk. #162, 163. Further litigation ensued regarding the same motion. Dk. #166, 167, 180.

On January 6, 2011, Savage filed another motion to move him to FDC Philadelphia. Dk. #184. Savage was transported to FDC-Philadelphia, where an entire suite was constructed to accommodate his needs. Electricity was retrofitted to accommodate his claimed sensitivity to night-time lighting, secure toilet facilities were arranged, he was provided with a radio, and special accommodations were made for his contact visits with counsel. Still, Savage complained about the nature of the facilities, his inability to have total freedom of range for his hands while meeting with counsel, and even the size and shape of the table for his documents.

On December 26, 2011, Savage filed another motion for relief from the SAMs. Dk. #347. The government file a response. Dk. #352. On February 9, 2012, this Court entered an order and memorandum granting in part, and denying in part, the motion. Dk. #359, 360. The Court's order addressed the need for defense counsel and others to prepare for the trial and for the mitigation

---

[2] The killing of "Reggie" is not believed to be related to, or attributable to, Savage.

defense inherent in trying a capital case.

Despite the SAM restrictions, whereby Savage had only rare and fleeting opportunities to communicate with other inmates, Savage nonetheless seized those few opportunities to communicate threats to others.

In 2012, during the early stages of jury selection, Savage was found to have corrupted an FDC corrections officer, and to have communicated with multiple civilians on the unrecorded legal telephone, which was reserved for attorney-client calls. This led to a search warrant on Savage's cell, where he was also found to have given instructions to friends as to how they could make their mail appear to be coming from his attorneys' offices. Thus, Savage had unmonitored conversations and communications with criminal associates, including one who had just been tried in state court for murder.

Savage filed yet another motion to alter the SAMs conditions, to allow for visits by his children at FDC-Philadelphia. The government responded on November 1, 2012, noting that FDC regulations prohibited children from certain areas within the FDC. Still, the prosecutors worked with defense counsel to afford Savage with the means to defend himself at trial.

Savage's courtroom conduct at trial showed a continued unwillingness to abide by rules. In late September 2012, at a hearing, he twice directed crude slurs to one of the federal prosecutors. In early November 2012, Savage surreptitiously passed a note to his sister and co-defendant, Kidada Savage, without the knowledge of his attorneys and in blatant violation of the SAMs. The note was later confiscated from Kidada Savage by U.S. Marshals.[3] In late November

---

[3] The note, which was reviewed by a "taint" team and examined by the trial judge, was not turned over to prosecutors. It was generically described as "ranting" about cooperators.

7

2012, Savage engaged in courtroom outbursts in an attempt to either persuade or intimidate a potential juror, deriding federal prosecutors as "racist faggots" within earshot of the juror and courtroom personnel. When the juror, who was African American, was excused from service, Savage blurted out, "Sorry for being Black."

While the trial generally proceeded in an orderly fashion under the circumstances, there were several breaches of protocol and security, by Savage and his co-defendants. On the first day of trial, counsel for co-defendant Merritt handed his client a cellular telephone, but was stopped by Deputy U.S. Marshals. Co-defendant Northington uttered frequent outbursts, many directed at cooperating witnesses. The investigator for co-defendant Kidada Savage was revealed to have committed several ethical, if not legal, violations, while interviewing witnesses, upon the revelation of which he abruptly absented himself from the courtroom for the balance of the proceedings.

Savage's Post-Conviction Misdeeds At ADMAX

Although the SAMs are specifically designed to minimize the opportunities for an inmate to commit misdeeds, Savage has nonetheless displayed that he remains a danger and worthy of continued restrictions.

On November 7, 2014, the New York Daily News reported that convicted terrorist Zacarias Moussaoui, who is also incarcerated in the H-block (SAMs unit) at ADMAX, submitted a letter to U.S. District Judge Brian Cogan, complaining that Kaboni Savage and others had "pledge(d) to kill me" because Moussaoui had been branded a "snitch" for divulging his prior activities with Al Qaeda and Osama Bin Laden to lawyers for the families of 9/11 victims. While the U.S. Bureau of Prisons ultimately did not sustain a finding as to this complaint, Savage's

close proximity to Moussaoui lends credence to this claim.

On January 13, 2021, officers at ADMAX presented Savage with a standard contract presented to all inmates, by which Savage would make payments to satisfy his court debts in his cases. Savage refused to sign, stating, "I would rather murder a whole daycare before I would pay that."

On or about July 28, 2021, Savage threatened to kill a corrections officer at ADMAX. Upon completion of his recreation time, officers arrived to escort Savage back to his cell, at which time Savage began yelling at staff and complaining about the next day's haircut schedule. During that rant, Savage called an officer a "faggot," threatened to punch the officer in the face, and stated, "I am a murderer and I will kill you."

Savage Has Repeatedly Proclaimed His Continued Danger To The Community

During the trial, this Court heard the many proclamations of Kaboni Savage, in which he pronounced his own danger to witnesses, their family members, law enforcement officers, and anyone else who might dare to cross him. Neither the mere passage of time, nor the effectiveness of the BOP in preventing more murders, should assuage anyone into thinking that Savage would not kill again, given the chance. After all, he is condemned to death for a reason.

This Court heard literally scores of proclamations and plans to kill witnesses and children, which included shooting a child with a shotgun, opening up the head of a little girl with "dum-dum" bullets, hitting a child in the head with a baseball bat, and setting a corrections officer on fire after dousing him with gasoline. Indeed, Savage's demonstrated "future dangerousness" was undoubtedly a key factor in the jury imposing 13 death sentences. Savage has declared it his lifelong mission to kill witnesses and their family members, stating, "The fight

don't stop 'til that casket drop." Government Exhibit 1L202-2. On December 27, 2004, Savage told co-conspirator Dawud Bey (who is currently free on supervised release):

> (T)hese son-of-bitches gonna pay, man! They gonna pay or my name ain't what it is, my Pop name wasn't what it was, they gonna pay. They kids gonna pay, they mommas gonna pay. I know you get tired of me saying it, man, but, that's the kind of conviction I got for this shit, man. I'm dedicated to their death, man. They better hope and pray I go to jail for a long time. It don't matter, 'cause while I'm still living, I'm a get them.

Government's Exhibit 1L987-5.

## MEMORANDUM OF LAW

### I.    Savage's Conditions Of Confinement Motion Should Be Filed In Colorado.

Savage asks this Court to modify his conditions of confinement. This Court is not the proper venue for that motion. Savage is housed in the District of Colorado. That is the proper place to bring such a suit.4  Savage currently has no business in the Eastern District of Pennsylvania. His trial is over. His appeals have been litigated and rejected. He is a sentenced prisoner. While he may very well file a post-conviction petition under 28 U.S.C. § 2255, he has not yet done so. And even when he does file such a petition, it will still not entitle him to litigate conditions of confinement in this district.

Generally, petitions challenging the conditions of a prisoner's confinement should be brought in the district of confinement. *Rumsfeld v. Padilla*, 542 U.S. 426, 443-44 (2004); *Preiser v. Rodriguez*, 411 U.S. 475, (1973); *Nwanze v. Hahn*, 97 F. Supp. 2d 665, 669 (W.D. Pa. 2000); *Armstrong v. Grondolsky*, 2008 WL 442111 at *6 (D. N.J. Feb. 14, 2008). Thus, Savage's motion challenging the conditions of his confinement should be brought in the District of

---

4 It is also apparently permissible to bring such a suit against the Department of Justice in the District of Columbia which, as discussed below, Savage has already done.

Colorado, and the motion filed in this district should be denied.

    II.       **Savage Should Not Be Permitted To Litigate Simultaneous Conditions Of Confinement Actions In Multiple Districts.**

Savage's separate team of pro bono lawyers from Venable LLP have filed a conditions of confinement suit, attacking his SAMs restrictions, in the U.S. District Court for the District of Columbia. *Savage v. U.S. Dep't. of Justice*, #21-CV-1057 (CKK). There is a pending motion to dismiss in that case. Thus, the motion filed in the instant case, in the Eastern District of Pennsylvania, is an attempted "end run" in the event of dismissal in the D.C. case.

The filing of multiple, simultaneous pleadings in multiple districts, is heavily disfavored. "As between federal district courts . . . the general principle is to avoid duplicative litigation." *Colorado River Water Conservation District v. United States*, 424 U.S. 800, 817 (1976). In *Lewis v. Smith*, 480 Fed. App'x. 696 (3d Cir. 2020), a litigant filed "multiple proceedings in an unreasonable and vexatious manner," resulting in sanctions. *Id*. at 698, citing *In Re Prudential Insurance Co. Am. Sales Practice Litig. Agent Actions*, 278 F.3d 175, 188 (3d Cir. 2002).

Prisoner litigants are not exempt from the prohibition against multiple actions or repetitive claims. *Bailey v. Johnson*, 846 F.2d 1019 (5th Cir. 1988). In *Daker v. Bryson*, 2019 WL 826474 (M.D. Ga. Feb. 21, 2019), the district court dismissed a prisoner's petition that he had also filed in another district, stating:

> (T)he filing of multiple identical complaints – in different jurisdictions – with the stated intent of only prosecuting whichever case was "allowed to proceed" is a glaring example of bad faith and malicious conduct. "Filing identical lawsuits in multiple district courts is abusive and wasteful of judicial resources and warrants dismissal under § 1915 as frivolous and malicious."

*Id*. at *4, citing *Rivadeneira v. Dept. of Homeland Sec.*, 2015 WL 4776906, at *3 (W.D. Ky. Aug. 12, 2015). The district court's decision in *Daker* was affirmed in *Daker v. Bryson*, 841 Fed.

App'x. 115 (11th Cir. 2020) (affirming dismissal and affirming transfer of the case from M.D. Ga. to S.D. Ga.). In *Rivadeneira*, the court noted, "A federal court may dismiss a suit when it is duplicative of a suit already pending in another federal court." 2015 WL 4776906 at *3, citing *Lea v. United States*, 120 Fed. Cl. 440, 446 (2015); *McReynolds v. Merrill Lynch & Co., Inc.*, 694 F.3d 873, 888-89 (7th Cir. 2012); and *Colorado River Water*, 424 U.S. at 817.

In *Abiodun v. Holder*, 86 F. Supp.3d 11 (D.D.C. 2015), the district court dismissed an immigrant litigant's suit as "malicious and frivolous" where it stated the same claims as twelve prior suits. In an opinion by Judge Ketanji Brown Jackson, the court noted, "An individual's right of access to the courts 'is neither absolute nor unconditional.'" *Id*. at 12. While Savage may not yet have reached twelve prior claims, he has nevertheless repeated the same, or similar claims in multiple filings, and has two suits that, while not identical, seek modification of the same SAMs as to the same prisoner litigant. This Court should not entertain a second, simultaneous action.

### III.   Savage Has Failed To Exhaust Administrative Remedies.

Savage's motion should be dismissed for failure to exhaust his administrative remedies. The Prison Litigation Reform Act ("PLRA") requires inmate-plaintiffs to exhaust their administrative remedies within the Bureau of Prisons before seeking redress from the courts. The Act clearly states, "No action shall be brought with respect to prison conditions under section 1983 of this title, or any other federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). *Woodford v. Ngo*, 548 U.S. 81 (2006); *United States v. Ali*, 528 F.3d 210, 244 (4th Cir. 2008); *Yousef v. Reno*, 254 F.3d 1214 (10th Cir. 2001); *Armstrong v. Grondolsky*, 2008

WL 442111 at *4 (D. N.J. Feb. 14, 2008).

Savage is a sentenced prisoner, not a pre-trial detainee, although even pre-trial detainees must comply with the exhaustion of administrative remedies requirement. *Lyons v. U.S. Marshals*, 840 F.2d 202, 204 (3d Cir. 1988); *United States v. Ali*, 396 F. Supp.2d 703, 705-06 (E.D. Va. 2005); *United States v. Al-Marri*, 239 F. Supp.2d 366, 367-68 (S.D.N.Y. 2002); *United States v. Troya*, 2008 WL 2537145 (S.D. Fla. 2008).

In *United States v. Antonelli*, 371 F.3d 360 (7th Cir. 2004), a prisoner raised a "conditions of confinement" claim by filing a motion in his then-dormant criminal case, instead of filing a civil action. The Seventh Circuit, looking past the form to the substance, held that the defendant must nevertheless comply with the exhaustion of remedies requirement of the PLRA, stating that the prisoner could not "evade[ ]" the requirements of the PLRA by couching his claim as a motion in a criminal case. *Id*. at 361. The Seventh Circuit further stated, "Prisoners who play games to avoid the PLRA should not expect courts to cooperate." *Id*. at 362.

Savage's argument that the government has somehow waived this requirement is specious. Over the course of this case, through every phase, government counsel has consistently been amenable to receiving and weighing requests for modifications, which are then forwarded to the Department of Justice's Office of Enforcement Operations and the BOP for consideration. The mere fact that government counsel is willing to engage in these discussions, however, in no way relieves Savage from the obligation to pursue and exhaust administrative remedies. Indeed, were the Courts to consider such professional courtesy and consideration a waiver, it would serve as a considerable disincentive for government counsel to ever engage in such discussions with defense counsel.

**IV.    Savage's Right To Counsel Has Been Scrupulously Honored, And Not Impinged By The SAMs.**

Savage's chief argument, repeated from his previous filings, is that the SAMs restrictions somehow deprive him of his right to counsel. This argument is factually meritless. Savage has been provided ample opportunities to have meaningful consultation with counsel in order to adequately prepare his post-conviction pleadings. Savage has a veritable army of lawyers. Indeed, there have been at least 35 members of his various legal teams, all of whom have been granted access to him and clearance under the SAMs.

SAMs are approved and issued by the Attorney General, and implemented by the U.S. Bureau of Prisons, which has discretion in how to implement the SAMs. 28 CFR § 501.3(a). The SAMs are specifically tailored to a prisoner, depending on the types and severity of risks posed by that prisoner, and the remedies available to address those risks. "Federal regulations provide that the Bureau of Prisons may implement SAMs, 'upon direction of the Attorney General,' when 'reasonably necessary to protect persons against the risk of death or serious bodily injury.'" *In Re Basciano*, 542 F.3d 950, 954 (2d Cir. 2008), *cert. denied*, 129 S. Ct. 1401 (2009), citing 28 CFR § 501.3(a). Courts have found that the attorney-client provision of the SAMs does not violate an inmate's constitutional rights. See, e.g., *United States v. Hashmi*, 621 F. Supp.2d 76, 86-87 (S.D.N.Y. 2008); *United States v. Kassir*, 2008 WL 2695307 at *2-4 (S.D.N.Y. July 8, 2008).

The Turner Factors

The Supreme Court has determined that a prison regulation that "burdens" a federal constitutional right is permissible, provided that it is "reasonably related to legitimate penological objectives." *Turner v. Safley*, 482 U.S. 78, 87 (1987); *Yousef v. United States*, 2014 WL 1908711 at *2 (D. Colo. May 13, 2014). These legitimate penological objectives include concerns with

14

"institutional security." *See O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987). The Supreme Court has since explained that "*Turner* applies to all circumstances in which the needs of prison administration implicate constitutional rights," *Washington v. Harper*, 494 U.S. 210, 224 (1990), and the Second Circuit has specifically applied *Turner's* "reasonably related" standard to a constitutional challenge to SAMs. *United States v. El-Hage*, 213 F.3d 74, 82 (2d Cir. 2000).

To determine whether a particular restriction is merely punitive or is incidental to some other legitimate governmental purpose, *Bell v. Wolfish*, 441 U.S. 520, 538 (1979), the Court must apply a four-factor analysis under *Turner*, evaluating: (1) "whether there is a 'valid rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it," (2) "whether there are alternative means of exercising the right that remain open to prison inmates," (3) the "impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally," and (4) the "absence of ready alternatives." *Turner v. Safley*, 482 U.S. 78, 89-90 (1987).

Savage's convictions for murdering twelve people, and his thirteen death sentences, have been affirmed on appeal. Of his twelve victims, six were family members of a witness in his previous federal case (the Coleman family), one was a witness to a state murder case (Flowers), and four were either rival drug dealers (Parker and Brown) or drug dealers whom Savage suspected had become informants (Abdullah and Tolliver).

Savage ordered the murders of seven of his twelve victims from behind prison walls. Savage ordered the Coleman family murders from within FDC - Philadelphia, and ordered the Flowers murder from within a local Philadelphia corrections facility. Even after the Coleman murders, under the intense scrutiny that accompanied that horrific crime, Savage persisted in

15

plotting to kill witnesses and their family members. His stated intentions persist to this day. Savage has communicated his threats and plans to fellow inmates, and to friends and family members. Savage has utilized the telephone, written correspondence, personal prison contacts, the visiting rooms, messages left in prison library books, and even the FDC plumbing system, to communicate his threats. Even since the inception of the current case, while under the SAMs restrictions, Savage has continued his efforts, writing messages on a mattress, communicating with fellow inmates, and corrupting a prison guard to allow him to talk to violent criminals using an unrecorded, unmonitored legal phone line.

Applying the *Turner* factors to Savage, given his extreme conduct, there is certainly a valid rational connection between the SAMs restrictions and the government's interests, which is to protect lives. Savage has sufficient means to exercise his Sixth Amendment rights, despite the restrictions. He has a veritable army of lawyers, paralegals, and investigators, some of whom are in Colorado. By contrast, the impact on the lives of witnesses, other inmates, and corrections officials has been, and would again be, quite severe were the restrictions to be lifted. Last, there do not appear to be reasonable alternatives to the SAMs restrictions, other than those accommodations already made.

Because Savage is a sentenced prisoner, he is appropriately deprived of many of the liberty interests enjoyed by most citizens. The Supreme Court has made it clear that, once confined to a "supermax" facility, inmates are not entitled to a full complement of due process procedures, such as adversary hearings or the right to present witnesses. "Where the inquiry draws more on the experience of prison administrators, and where the State's interest implicates the safety of other inmates and prison personnel, the informal non-adversary procedures set forth

16

in *Greenholtz . . .* and *Hewitt v. Helms . . .* provide the appropriate model." *Wilkinson v. Austin*, 545 U.S. 209, 228-29 (2005) (citing *Hewitt v. Helms*, 459 U.S. 460 (1983) and *Greenholtz v. Inmates of Neb. Penal & Corr. Complex*, 442 U.S. 1 (1979). Thus, periodic reviews of SAM decisions, involving informal and non-adversarial procedures, are sufficient to satisfy due process. Savage specifically has the right to give input every year as to his SAMs restrictions, and yet, every year he has declined to do so.

> **V.      Savage Has No Constitutional Right To Meet With Investigators Or Other Civilians Without His Attorneys.**

Savage claims that he has a right to meet with private investigators outside the presence of his attorneys. This claim is meritless. Indeed, neither the Supreme Court, the Third Circuit, nor the Constitution recognize such a right. *United States v. Hashmi*, 621 F. Supp.2d 76, 79 (S.D.N.Y. 2008); *United States v. Kassir*, 2008 WL 2695307 at *4 (S.D.N.Y. July 8, 2008). While many of his attorneys are based far from Colorado, he has at least one attorney, Madeline Cohen, whose office is in Colorado, and who can more readily accompany an investigator to an interview with Savage. Thus, there is no basis for any claim that his rights are impinged.

One of the most serious dangers posed by Savage is his ability to effectuate murder and witness intimidation while incarcerated. Unfortunately, Savage has proven that he has the intent, determination, and ability to accomplish such crimes by communicating orders to others. Thus, it is imperative that the Bureau of Prisons restrict the means by Savage can kill and intimidate witnesses, by restricting the scope and nature of his communications.

The government recognizes that defense counsel must have access to Savage, and that Savage have access to counsel. The government also recognizes that Savage and counsel must freely communicate in order to prepare any post-conviction pleadings. By necessity, the

17

government also reposes a great deal of trust and faith in defense counsel to abide by the rule of law, to ensure that communications to and from Savage are limited to those that are legal and necessary to accomplish their goals of preparing such litigation.

Government counsel also recognizes that defense counsel must engage the assistance of experts and investigators. However, government counsel has considerably less confidence in the legal acumen, discretion, and common sense of private investigators, who are not trained in the law, and whose backgrounds, experience, breadth of legal knowledge, and motivations are largely unknown to the government.

Without casting aspersions on the field of private investigations in general, it is fair to say that the practice is populated by those with a variety of backgrounds, spanning a wide spectrum of integrity. The requirements to become a private investigator vary, and seven states have no licensing requirements at all. To become licensed as a private investigator in the Commonwealth of Pennsylvania, one must have attained the age of 25 years, possess five letters of recommendation, have three years' experience in either law enforcement or an investigative firm (including as a security guard), no felony convictions, and the willingness to pay a modest filing fee. 22 Pa. C.S.A. § 11-30. Some private investigators also employ others, including "runners," for whom there are no licensing requirements. Notably, there is no requirement of any legal training whatsoever.

Defense counsel has provided the names, and SAMs affirmations, of investigators who can meet with Savage. As to the one licensed in Pennsylvania, there is very little publicly available information regarding him. In any event, in such a highly sensitive capital case, in which witnesses have been murdered and threatened, it is hardly unreasonable for the

18

government to require the presence of defense counsel for meetings between Savage and the private investigators.

Even an experienced, ethical investigator could easily become an unwitting tool in a defendant's scheme to intimidate witnesses. A wily defendant could easily send someone on an investigative mission in which the investigator unwittingly communicates information that could cause harm to witnesses. This is hardly speculative, as Savage has already corrupted members of attorney's offices and a federal corrections officer. Thus, it is important to have counsel present for such meetings, in order for defense counsel to make the necessary legal determinations as to what steps should, and should not, be taken by investigators on the defendant's behalf. Given this background, it is especially disturbing that Savage now contests the prohibition against investigators relaying messages from Savage to third parties. Motion at p. 22.

The sole, anomalous, case he cites in support of his request, *United States v. Mikhel*, 552 F.3d 961 (9th Cir. 2009), is distinguishable, as well as remarkable for its lack of analysis. In *Mikhel*, unlike Savage, there was no attorney based in his state of confinement. More problematic was the fact that Mikhel required the use of a translator. *Id*. at 963. Moreover, unlike the instant case, in *Mikhel* the government failed to provide any valid, rational justification for the prohibition against meeting with investigators without the presence of counsel. *Id*. at 964. By contrast, in *United States v. Kassir*, 2008 WL 2695307 (S.D.N.Y. July 8, 2008), the district court denied an identical request, noting that the court had appointed two lawyers, at least one of whom could be made available to accompany an investigator on an interview. Id. at *4.

Savage also points to one of this Court's prior orders loosening the SAMs restrictions. But that was in a pretrial posture, when trial preparation was the issue. That is no longer the case.

19

The preparation of a § 2255 petition has more to do with the record in the case than with interviewing witnesses or the defendant. To the extent that the latter is necessary, it can most certainly be done with an attorney present. Another family should not have to perish in an inferno merely because defense counsel could not be troubled to accompany an investigator on an interview of their own client.

**VI.     Savage Has No Right To Three-Way Calls.**

Last, Savage makes the rather astounding request that this Court order the BOP to violate its universal rule against allowing three-way calls – a rule that applies to every inmate in every federal correctional institution throughout the United States. This audacious request should be summarily denied.

All BOP facilities prohibit "third-party" calls, which means calls involving more than one line. Thus, calls with multiple lines, or "patched-in" calls, are prohibited. That rule applies to all prisoners and detainees in all facilities, not just SAMs prisoners or people confined at ADMAX. Although this may serve as a slight inconvenience, it does not inhibit counsel's ability to communicate with Savage. These rules are standard, are there for good reasons, and are specifically designed to deter people like Kaboni Savage, who has on various occasions used law office insiders to "patch through" unrecorded unmonitored calls to third-party social contacts, and has duped unwitting people to help him violate SAMs restrictions.

Third-party calls are prohibited by both BOP and the SAMs. On page 4 of the current SAMs, General Provision 1a states that "the inmate must comply with all usual USMS, BOP, and non-BOP DF policies regarding restrictions, activities, privileges, communications, etc." The SAMs also specifically provides, on page 7, under "Inmate's Initiation of Legally Privileged

Telephone Calls," sub-section (2)(b), which states, "The attorney's staff (including the attorney) are not to patch through, forward, transmit, or send the inmate's calls, or any other communications, to third parties." If this Court were to order some modification as to Savage, it would set a horrible precedent, decimating the rule against third-party calls throughout the United States.

## CONCLUSION

Defendant Savage presents an extreme risk of danger to witnesses, witnesses' family members, correctional officers, fellow inmates, and the public at large. He has consistently expressed his heartfelt desire to murder anyone he perceives as an enemy, and there are at least twelve murder victims who serve as grim reminders that Savage's threats are anything but idle. Indeed, Savage persisted in his efforts despite the implementation of SAMs restrictions. The fact that he is now on death row only increases the concern that he may attempt to do further harm.

WHEREFORE, the United States respectfully suggests that this Court enter an Order denying the defendant Savage's motion for relief from Special Administrative Measures.

Respectfully submitted,

JENNIFER ARBITTIER WILLIAMS
United States Attorney


_s/ David E. Troyer_
David E. Troyer
Assistant United States Attorney

21

CERTIFICATE OF SERVICE

I hereby certify that this pleading was electronically filed, and was thus served on this the 23rd day of March, 2022, on defense counsel:

Ryan Norwood
Kathryn Bailey
Assistant Federal Defenders
Capital Habeas Unit
Western District of Pennsylvania
1001 Liberty Avenue, Suite 1500
Pittsburgh, PA 15222

Natalie Olmstead
Assistant Federal Defender
Capital Habeas Unit
Southern District of Ohio
10 West Broad Street, Suite 1020
Columbus, OH 43215

Attorneys for Kaboni Savage

        *s/ David E. Troyer*
David E. Troyer
Assistant United States Attorney