IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA            :

     v.                                  :          CRIMINAL NO. 07-550

KABONI SAVAGE                       :

**GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANT SAVAGE'S MOTION FOR DISCLOSURE OF IDENTITIES OF THE ANONYMOUS JURORS AND FOR LEAVE TO CONTACT THE ANONYMOUS JURORS**

The United States of America, by Jacqueline C. Romero, United States Attorney for the Eastern District of Pennsylvania, and David E. Troyer, Assistant United States Attorney for the district, file this response in opposition to the defendant Kaboni Savage's motion to disclose the identities of the anonymous jurors and for leave to contact those anonymous jurors (Docket No. 1738), in furtherance of which response we state the following:

Introduction

The defendant Kaboni Savage was tried, convicted, and sentenced to death by a jury of his peers, which jury was an anonymous jury. On March 28, 2012, the government filed a motion for an anonymous jury, which motion defense counsel did not oppose, and which motion this Court granted for good cause. Accordingly, this Court promised the jurors that they would remain anonymous, that is, that their identities "have not been and will not be disclosed to the judge, to the attorneys for the government or the attorneys for the defendants." Juror Questionnaire, Introduction, pp. 2-3. Savage now asks this Court to break that promise.

Savage offers neither factual support nor legal support for his motion. In lieu of facts, he offers mere speculation that jurors may have engaged in various, multiple forms of misconduct, either before, during, or after the trial. There is simply no evidence of that. In lieu of legal

1

support, he claims Constitutional rights that do not exist, and cites cases that do not support his motion. Indeed, there are no cases cited by Savage that stand for the proposition that this Court must reveal to counsel the identities of anonymous jurors.

Furthermore, Savage's proposed "restriction" on his proposed order, to limit disclosure only to Savage's current habeas counsel, is meaningless, in that *any* disclosure would undoubtedly result in a motion and hearing, in which jurors' identities would be publicized to everyone, including to Savage and to anyone willing to do Savage's bidding. In any event, Savage's habeas counsel are no more entitled to the identities of the jurors than were Savage's trial counsel, and the remedies he seeks are nothing short of reckless and irresponsible. Thus, his motion should be denied.

## Procedural Background

The government's motion for an anonymous jury requested that the names, addresses, and places of employment of the prospective jurors not be revealed to the parties, the attorneys, or the public.[1] To further protect juror anonymity, the government also requested that the jurors be sequestered during lunch and recesses under the protection of the United States Marshal's Service, and that they be transported each trial day to and from an undisclosed central location, from which the jurors may return to their respective communities.[2]

---

[1]This was hardly a novel motion. Anonymous juries had previously been utilized in many cases in this district, including *United States v. Savage, et al.* (J. McLaughlin), *United States v. Phillips* (J. Joyner), *United States v. Sosa, et al.* (J. Pratter), *United States v. Williams, et al.* (J. Joyner), *United States v. Merlino, et al.* (J. Hutton), *United States v. Turra, et al.* (J. Joyner), *United States v. Llera-Plaza, et al.* (J. Pollak), *United States v. Stanfa, et al.* (J. Buckwalter), and *United States v. Scarfo* (J. Van Antwerpen). The 2005 drug trial in *U.S. v. Savage, et al.* involved two of the same defendants charged in this indictment, Kaboni Savage and Steven Northington.

[2]The United States Marshal's Service faithfully performed this function at trial.

The serious nature of the crimes charged and multiple acts of witness intimidation by a large-scale organization involved in violence and drug trafficking, combined with the public and media attention expected during the trial, threatened to impair the jurors' ability to judge the case fairly and impartially, absent some procedures protecting their identities. More importantly, however, were the security considerations, discussed below, that threatened the very foundation of a fair trial and continue to threaten an orderly judicial process. Specifically, evidence linking the charged racketeering enterprise to several murders, attempted murders and assaults, and evidence that the defendants and others had threatened and planned to interfere with witnesses, compelled the conclusion that an anonymous jury was essential to maintain the integrity of the trial and to assure the safety and security of the jurors.

Courts had ordered anonymous juries in other cases on far less compelling facts than those presented here. In all such cases, the rights of the parties to an informed selection process and impartial jury were satisfied by a thorough voir dire (including use of an extensive juror questionnaire) and jury instructions that explained the procedures to be used in a neutral manner designed to avoid prejudice to either side. Given that this was a capital case that received substantial media attention, a thorough voir dire process was anticipated and conducted. There was ample precedent for these procedures, as the previous three capital cases tried in this District all employed the same procedures the Court utilized here. *United States v. Phillips* (J. Joyner); *United States v. Williams, et al.* (J. Joyner); and *United States v. Llera-Plaza, et al.* (J. Pollak).

As the jury determined, and as this Court is well aware, Savage murdered twelve people. He ordered the murders of seven of those victims from behind prison walls. Of those twelve murdered, six of the victims were family members of a witness, Eugene Coleman, in the 2004 federal drug case. Four of the murdered victims were children, ranging from 15 months to 15 years of age; the other two were women. Savage ordered those murders while incarcerated as a

pre-trial detainee at the Federal Detention Center (FDC) in Philadelphia. After the October 9, 2004 murders of the Coleman family, Kaboni Savage continued to plot to kill witnesses and their family members. Many of Savage's plans were recorded in court-authorized interceptions at the Federal Detention Center. Also intercepted were specific threats made by Savage, using the FDC plumbing system as a communication device (colloquially known as "the bowl").

Savage, whose direct appeal was rejected by the Third Circuit and Supreme Court, awaits execution and remains a severe threat. Indeed, he is still subject to enhanced security, pursuant to Special Administrative Measures. However, as proven at trial, even those enhanced measures did not prevent him from conveying threats to others. Even in recent years, while incarcerated at ADX Florence in Colorado, he has continued to convey threats to staff and another inmate.

There was ample evidence to support this Court's order for an anonymous jury. As the government recounted in its original motion, the record of Savage's actions, and those of his co-defendants, demanded such a result:

> On November 28, 2004, in anticipation of his federal trial, Savage expressed his plan to have people use cellular telephones equipped with cameras, to take pictures of witnesses as they testify at trial. Such photographs could then be disseminated, both in the community and via the internet, to bring pressure and retribution to those who testified at Savage's trial.
>
> On September 8, 2005, co-defendant Robert Merritt plotted to retaliate against witnesses in his federal firearms trial, planning to disseminate transcripts of trial testimony, and stating, "He'll get his. He's gonna get his."
>
> On November 28, 2005, during the federal trial of defendants Kaboni Savage and Steven Northington, defendant Northington threatened witness Robert Wilks in the courtroom, stating, "The same thing that happened to Twin's family is going to happen to your family."
>
> On April 21, 2010, MCC-NY officials conducted a routine search for weapons of the cells of Savage and five other inmates.   As part of this search, mattresses were removed, for the purpose of X-raying them to determine the presence of weapons. One of these mattresses was discovered to contain the writing, "A rat is an animal (police's pet) that will chew off his own motherfuckin tail, to get out of a trap. I wish I had a bullet for every rats head." (sic)

Also on April 21, 2010, Savage was at FDC-Philadelphia for an attorney "contact" visit. While in transit, he had brief contact with an inmate, with whom Savage had a conversation.    Savage learned that the inmate was housed with Savage co-conspirator D__B__, whom Savage suspected was cooperating with law enforcement. About D__B__, Savage told the inmate, "He's working" (cooperating with law enforcement). Savage then said, "You know what you can tell D__B__? He can run, but he can't hide. A smoky sad night will solve all of that." Although the inmate did not relay the threat to D__B__, the allegation of D__B__'s cooperation eventually did reach D__B__, which resulted in a physical confrontation between D__B__ and another inmate.

On June 22, 2011, co-defendant Kidada Savage was arrested pursuant to the Second Superseding Indictment, returned earlier that same day. At the time of her arrest, her automobile was seized, as subject to forfeiture. Pursuant to that seizure, an inventory search was conducted on the automobile, which revealed that Kidada Savage possessed a list of names and addresses of witnesses and their family members in this case. She possessed this information even though fully aware that co-defendant Lamont Lewis had pled guilty and that an investigation was then targeting her for prosecution.

Perhaps most disturbing, **defendant Kaboni Savage expressed an intent to seek retribution against jurors** in the event that they would convict him. On November 11, 2004, he was recorded plotting to obtain the addresses and telephone numbers of the jurors in his 2005 federal jury trial, stating, "If I don't beat this joint or I have to go up and come back on appeal and pay you motherfuckers a visit." While the grammar and syntax of this statement is lacking, the intent of the statement is clear.

Memorandum of Law

Many federal courts, including the Third Circuit Court of Appeals, have long recognized the court's duty to take whatever steps necessary to protect juries from interference and ensure an impartial verdict. The Third Circuit in particular has consistently held that a trial court has the discretion to empanel an anonymous jury where there are legitimate concerns as to juror safety, courtroom security and protecting the trial process from outside influences such as extensive media coverage. *See United States v. Scarfo*, 850 F.2d 1015, 1023-24 (3d Cir. 1988); *United States v. Thornton*, 1 F.3d 149, 154 (3d Cir. 1993); *United States v. Eufrasio*, 935 F.2d 553, 574 (3d Cir. 1991). *See also United States v. Stewart*, 325, F. Supp. 2d 474, 498-99 (D. Del. 2004).

Empaneling an anonymous jury does not infringe on a defendant's right to a fair trial, because "the practice of withholding jurors' names, addresses and places and employment does

not deprive the defense of the information it needs to conduct an effective voir dire and exercise its peremptory challenges." *Stewart*, 325 F. Supp.2d at 499 (citing *Scarfo*, 850 F.2d at 1022); *see also Eufrasio*, 935 F.2d at 574 (analyzing *Scarfo*). Any concerns that a jury may have the impression that a defendant is dangerous or guilty can be corrected through "careful instructions to the jurors that keeping their identity confidential [has] no bearing on the evidence or arguments in this case." *Thornton*, 1 F.3d at 154.

The Third Circuit first addressed the propriety of using anonymous juries in *United States v. Scarfo*. In that case, the defendant was the reputed head of the Philadelphia La Cosa Nostra ("LCN") family, a longstanding racketeering criminal enterprise which was credited with the commission of numerous murders, extortions and other violent criminal activities to facilitate the generation of illegal proceeds which inured to the benefit of the defendant and other members of the enterprise. *Scarfo*, 850 F.2d at 1017. During pretrial proceedings, the government proffered that it intended to present evidence at trial that, in an effort to preserve the LCN and the defendant's position, members of the enterprise had killed a prospective witnesses, murdered a judge, and attempted to bribe other judges. Members of the enterprise had also threatened the lives of two cooperating witnesses, who would remain under heavy guard during their court appearances. *Id*.

In *Scarfo*, the court noted that, at that time, Title 18 U.S.C. § 3432 required the disclosure of the names and addresses of both witnesses and prospective jurors in a capital case three days before trial. The *Scarfo* Court specifically stated that it was not addressing that situation in its opinion. Subsequently, recognizing the need to protect both jurors and witnesses in capital cases, Congress amended § 3432 to permit the impanelment of an anonymous jury. Effective September 13, 1994, § 3432 was amended to read that "such list of the veniremen and witnesses need not be furnished if the court finds by a preponderance of the evidence that providing the list

6

may jeopardize the life and safety of any person." *See* 18 U.S.C. § 3432.

In *United States v. Eufrasio*, 935 F.2d 553 (3d. Cir.), *cert. denied*, 502 U.S. 925 (1991), the Third Circuit, citing *Scarfo*, reaffirmed the trial court's discretion to permit an anonymous jury "if the court believes there is potential for juror apprehension." *Id.* at 574. In that case, which involved charges of racketeering, RICO conspiracy, and extortion, defendants contended on appeal that they had a right to, and had been denied, an evidentiary hearing on the issue of "juror safety." The Third Circuit disagreed, holding that so long as defendants are afforded full voir dire, they are not entitled to an evidentiary hearing as a matter of law. "A trial judge is usually well-aware of the ambiance surrounding a criminal trial and the potential for juror apprehensions." *Id.* The court did, however, suggest that a trial court ordering the empaneling of an anonymous jury record its findings and reasons on the record. *Id.*

The Second Circuit, too, has frequently approved the use of anonymous juries to safeguard the integrity of the judicial process and to provide safety for the jurors.   Moreover, that court has noted that a district court judge has an obligation to take all necessary steps to attain those ends. *See United States v. Barnes*, 604 F.2d 121, 141 (2d Cir. 1979), *cert. denied*, 446 U.S. 907 (1980); *see also United States v. Tutino*, 883 F.2d 1125 (2d Cir. 1989), *cert. denied*, 493 U.S. 1081 (1990); *United States v. Persico*, 832 F.2d 705 (2d Cir. 1987*), cert. denied*, 486 U.S. 1022 (1988); *United States v. Ferguson*, 758 F.2d 843 (2d Cir.), *cert. denied*, 474 U.S. 841 (1985); *United States v. Thomas*, 757 F.2d 1359 (2d Cir.), *cert. denied*, 474 U.S. 819 (1985); *United States v. Borelli*, 336 F.2d 376, 392 (2d Cir. 1964), *cert. denied sub nom*, *Cinquegrano v. United States*, 379 U.S. 960 (1965).

The defendants in *Barnes* had what the court called "a sordid history" of violence. *Barnes*, 604 F.2d at 134 n.3.   The court found that while no specific threat to any juror had been made, the "suggestion of disruption was manifest."   *Id.* at 141. The *Barnes* court affirmed the

district court's use of an anonymous jury, stating that "in a case that generated as much pretrial

publicity as this one and in which allegations of dangerous and unscrupulous conduct abounded,

precaution was best taken so that fears would not become realities." *Id.* at 141.

In *United States v. Gotti*, 777 F. Supp. 224 (E.D.N.Y. 1991), the district court ordered

that the jury be selected anonymously and that the jury be sequestered.   In determining that there

was a need for an anonymous jury, the district court stated:

> The factors that have driven me to conclude that an anonymous jury is required in
> this case are compelling.   There is an urgent need to protect the integrity of this
> trial against efforts to subvert its processes.   The defendant Gotti, members of the
> Gambino Family, and others have all demonstrated a willingness to attempt, if not
> to accomplish, such subversion in the past.

*Id.* at 226.   The court in <u>Gotti</u> further stated:

> Jurors cannot be expected to gamble on what might befall them if a verdict of
> guilty is returned.   The ability of a jury to render a fair and impartial verdict may
> be adversely affected by even a general fear of retaliation, and a distinct
> possibility of a serious threat to the safety of jurors requires that precautionary
> measures be taken.   *United States v. Thomas*, 757 F.2d 1359, 1364 (2d Cir.
> 1985).   The extensive publicity this case has garnered thus far (and is certain to
> attract during each day of trial until a verdict is returned) is another factor
> requiring an anonymous jury.

*Id.* (emphasis added).

A criminal defendant is, of course, constitutionally entitled to a fair and impartial

jury. A sequestered and anonymous jury is entirely consistent with, not antithetical to,

impartiality. In *Barnes*, the court stated:

> If a juror feels that he and his family may be subjected to violence or death at the
> hands of a defendant or his friends, how can his judgement be as free and
> impartial as the Constitution requires? If 'the anonymous juror feels less pressure'
> as the result of anonymity, this is as it should be - a factor contributing to his
> impartiality.

*Barnes*, 604 F.2d at 141 (citations omitted); *see also Scarfo*, 850 F.2d at 1026 ("If . . . anonymity

dispels apprehension, it serves the ideal of dispassionate judgment.").[3]

Other courts have approved the use of anonymous juries to safeguard the integrity of the judicial process and to provide safety for the jurors.   In granting the government's motion for an anonymous and sequestered jury, the district court in *United States v. Edmond*, 730 F. Supp. 1144 (D.D.C. 1990) observed that:

> "a court deciding whether to empanel an anonymous jury must balance, on the one hand, the interests of the criminal justice system -- protecting the jurors and their families from violence, actual or threatened, and shielding the jurors from the potential taint of extensive pre-trial publicity -- and, on the other hand, the defendants' interests -- conducting a meaningful <u>voir</u> <u>dire</u> to permit the intelligent exercise of their peremptory challenges and retaining their presumption of innocence."

730 F. Supp. at 1145 (*citing, inter alia, Tutino*, 883 F.2d at 1132-33; *Scarfo*, 850 F.2d at 1022-23; and *Thomas*, 757 F.2d at 1362-65 and n. 1).

Savage blithely claims that the Savage organization no longer exists, and thus there is no danger to jurors. This is flatly wrong, in that there are to this day a number of violent people on the street who could and would do Savage's bidding. This case continues to present safety and integrity concerns analogous to those found in *Eufrasio*, *Scarfo*, *Barnes*, *Gotti*, and *Thomas*. Savage is even more desperate now, facing execution. Savage already demonstrated a willingness and an ability to use murder, kidnappings, shootings, and beatings, to advance his goals.

Savage's claimed entitlement to juror identities is misplaced. In both *Scarfo* and *Barnes*, the courts of appeals rejected all suggestions from the defense that public disclosure of the

---

[3]   In fact, in *Scarfo* (contrary to Savage's contention), the Third Circuit dismissed as "suspect" the defense's assumption that an anti-defendant bias on the part of the jurors is the only possible, or even the most likely, reaction to anonymity: "Predicting juror responses to the anonymity practice is pure speculation.   A juror who fears a defendant's retaliation might be more apt to return a guilty verdict despite such fears rather than because of them." 850 F.2d at 1026. (footnote omitted).

identities of members of the venire is legally required. *See Scarfo*, 850 F.2d at 1022; *Barnes*, 604 F.2d at 140. The law requires only that there be sufficient information elicited at voir dire to permit the intelligent exercise of peremptory and cause challenges. *See Swain v. Alabama*, 380 U.S. 202 (1965). Even though an anonymous venire does somewhat limit the permissible areas of inquiry, such a limitation does not constitute a denial of the right to an intelligent exploration of the thoughts and attitudes of potential jurors. *See Scarfo*, 850 F.2d at 1022; *Barnes*, 604 F.2d at 142; *Thomas*, 757 F.2d at 1364. Indeed, in this case, the voir dire process took almost four months, and included extensive and almost unlimited individual voir dire, aided by a lengthy questionnaire. Thus, any biases or other existing problems with a juror could easily be unearthed and explored.

In *Scarfo*, as in this case, the district court submitted a written questionnaire to the venire encompassing a broad range of personal demographics. As in Savage's case, the court and counsel also conducted individual voir dire without inquiring into identities or addresses. After reviewing the procedures employed by the district court and the precedent established by several Second Circuit decisions, the Third Circuit held that "the legal standards articulated by those courts and our review of the record here convinces us that the defendant was not deprived of information reasonably necessary to the intelligent exercise of his peremptory challenges." *Scarfo*, 850 F.2d at 1022. Indeed, in view of the breadth of the written questionnaire and individual voir dire, the Third Circuit agreed with the district court's conclusion that "counsel were in a much better position to assess the suitability of prospective jurors in this case than in most other trials, criminal or civil." *Scarfo*, 850 F.2d at 1022-23.

Given the violent history of the defendants in this case, enhanced security for the jury was also appropriate. The Court directed the Marshals Service to provide enhanced security to the jury, to include transportation of the jurors to and from the Courthouse by the Marshals

10

Service and to "sequester" the jury during the court day by restricting the jurors to the courtroom and the jury room, and by providing lunch to the jurors in the courthouse.

The Jurors and Their Privacy

The jurors in this case were promised by this Court that they would be anonymous; that is, that their identities would never be disclosed to counsel. The jurors are entitled to rely on that promise.

Jury duty in this case was undoubtedly a stressful event. The length of the trial, the horrific facts of the case, the things they saw and heard, and the deliberations in the penalty phase, were all undoubtedly difficult for them. Moreover, the somber task of condemning someone to death is something few people ever have to face in life. Hopefully, whatever trauma they may have endured has dissipated in the ten years that have passed since the trial. To have to now be hounded, interrogated, and forced to relive the experience is something to which they simply should not be subjected – especially when the request is based on nothing but rank speculation. As bad, Savage also now seeks to "(r)eview[ ] jurors' publicly-available information on the Internet," essentially cyber-stalking the jurors in hopes of culling, or twisting, postings or statements into something they can fashion into yet another frivolous motion. The audacity of this request is beyond peradventure.

The mere passage of time does not dissipate the need for anonymity. As the district court stated in *United States v. Calabrese*, 515 F. Supp.2d 880 (N.D. Ill. 2007), in denying the press access to anonymous jurors' identities, to later disclose anonymous jurors' identities threatens the integrity of the Court and the utility of anonymous juries:

> Granting the relief Tribune requests could threaten the viability of this tool on a going-forward basis. It is not difficult to imagine a future juror reacting incredulously – perhaps with good reason – to a judge's promise of anonymity if it becomes clear that it is merely a fleeting promise, revocable upon the conclusion of the trial. In order to ensure that judges are able to use anonymous juries to promote fairness, anonymity must not be

11

illusory. It is essential that jurors have confidence in a judge's promise of anonymity. *Id*. at 885.

<u>Savage's Motion</u>

Savage's motion is replete with claims, conclusions, misstatements, and half-truths, but exhibits a dearth of actual precedent. Factually, there is no evidence of juror misconduct and, indeed, Savage offers none. Only in such cases would it be permissible for post-trial jury interviews to be permitted. Otherwise, even with non-anonymous juries, the practice is disfavored. "'The prevention of fishing expeditions in search of information with which to impeach jury verdicts' is the principal purpose of such a rule." *United States v. Militello*, 673 F. Supp 141, 144 (D. N.J. 1987), citing *United States v. Davila*, 704 F.2d 749, 754 (5th Cir. 1983). "A high threshold for such interviews is maintained to avoid harassment of jurors, preserve the finality of judgments, discourage meritless applications for post-verdict hearings, reduce the likelihood of and temptation for jury tamperings, as well as other concerns." *Militello* at 144.

Savage cites not a single case that stands for the proposition that he is entitled to obtain the identities of anonymous jurors. The government's research has revealed none. His claim that, because in some other circumstances involving non-anonymous juries, local rules sometimes permit a court, in its discretion, to allow juror interviews, is of no avail to Savage in the circumstances of this case. His claim that "the Third Circuit has recognized (that) anonymous juries are more likely to withhold information in voir dire" is not only flatly wrong, it is followed by a cite to a *First Circuit* case, *In Re Globe Newspaper Co*. (for which he provides the wrong citation), that says no such thing. His Equal Protection and Eighth Amendment arguments are not only unsupported, they are essentially unexplained. This Court should not grant his request, particularly given the dangerous nature of Savage and his cohorts, and the unwarranted invasion into the privacy of the jurors and the sanctity of the anonymous jury.

Conclusion

WHEREFORE, the government respectfully requests that this Court enter an Order denying the defendant Savage's motion for disclosure of jurors' identities and for leave to contact the jurors.

Respectfully submitted,

JACQUELINE C. ROMERO
United States Attorney


 *s/ David E. Troyer*
David E. Troyer
Assistant United States Attorney
Chief, Narcotics and Organized Crime

13

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that this pleading was electronically filed, and thus served on this

the 24th day of February, 2023, upon defense counsel:

Ryan Norwood, Esquire
Assistant Federal Defender
ryan_norwood@fd.org

Bridget L. Kennedy, Esquire
Assistant Federal Defender
bridget_kennedy@fd.org
Attorneys for Kaboni Savage

    *s/ David E. Troyer*
David E. Troyer
Assistant United States Attorney