# EXHIBIT
# 1

# Federal Public Defender

### WESTERN DISTRICT OF PENNSYLVANIA

**Lisa B. Freeland**
*Federal Public Defender*

**Kirk J. Henderson**
*Supervisory Assistant
Federal Public Defender*

**CAPITAL HABEAS UNIT**
**1001 LIBERTY AVENUE**
**SUITE 1500**
**PITTSBURGH, PENNSYLVANIA 15222**
**phone: (412) 644-6565**
**fax: (412) 355-2505**
**website: *http://paw.fd.org***

**Celeste Bacchi**
**Kathryn Bailey**
**Marshall Dayan**
**Ryan Norwood**

*Assistant Federal Public Defenders*

January 29, 2023

Zoe Raney
Paralegal, Federal Litigation Unit
Philadelphia District Attorney's Office
*via email zoe.raney@phila.gov*

**Re: DAO files directly relevant to Kaboni Savage**

Dear Ms. Raney,

Happy New Year. I hope this letter finds you well and as rested as our work allows. I represent Mr. Kaboni Savage, a former Philadelphia resident who is currently on federal death row at ADX in Florence, Colorado.

I am writing to formally request open file discovery for several homicide cases investigated and/or tried by your office that directly bear on Mr. Savage's capital convictions. I direct this letter to your attention, as I am aware that both Mr. George and Mr. Stiegler previously represented my client's codefendants. If this letter is more appropriately directed to someone else, kindly forward it on my behalf.

Though my client was ultimately sentenced to death as the result of a federal RICO prosecution, the DAO's years-long involvement in the underlying capital counts is clear. My team's access to the relevant DAO files is supported by the current DAO Policy on Open-File Discovery (effective 10/1/2020). Particularly given the primacy of informant testimony in this capital case, the DAO's commitment to fairness and error reduction cannot be achieved without full disclosure of the evidence within the DAO's possession and control.

The relevant cases for which we seek open file discovery are:

1) All DAO files and the PPD H-file relating to the murder of Kenneth Lassiter
   o Date of homicide: March 19, 1998
   o Location: 8th and Butler
   o Relevance to Mr. Savage: this homicide was charged under the RICO indictment
   o The DAO prosecuted Mr. Savage for this murder at CP-51-CR-0301121-2000
   o We also seek review of co-d Anthony Mitchell's file at CP-51-CR-0306561-1999

2) All DAO files and the PPD H-file relating to the murder of Mansur Abdullah aka Shafiq aka Shafeeq aka Robert Yates
   o Date of homicide: September 6, 2000

Exhibit 1

- o   Location: 4200 N. Park Avenue
- o   Relevance to Mr. Savage: this homicide was charged under the RICO indictment

3)  All DAO files and the PPD H-file relating to the murder of Ronald Walston, aka Pumpkin
- o   Date of homicide: August 29, 2001
- o   Location: 8th and Butler
- o   Relevance to Mr. Savage: at Mr. Savage's federal capital trial, the government alleged that Carlton Brown's murder (charged in the federal indictment) was motive/retaliation for Walston's murder

4)  All DAO files and the PPD H-file relating to the murder of Carlton Brown, aka Mohammed aka Charlton Brown
- o   Date of homicide: September 13, 2001
- o   Location: 64th and Lindbergh Boulevard
- o   Relevance to Mr. Savage: this homicide was charged under the RICO indictment
- o   The DAO tried Mr. Savage's federal co-defendant Lamont Lewis multiple times for this homicide at CP-51-CR-0400021-2005 [Lamont is sometimes spelled "Lomont"]

5)  All DAO files and the PPD H-file relating to the murder of Mustafa Bey
- o   Date of homicide: October 1, 2001
- o   Location: roadway outside of Big Faces Lounge (8th and Venango)
- o   Relevance to Mr. Savage: The prosecution alleged that Bey was killed in an attempt to shoot Mr. Savage's codefendant turned cooperator Lamont Lewis in retaliation for the Brown murder (see #4)
- o   The DAO has maintained in pleadings that the Walston murder (#3), the Brown murder (#4) and the Bey murder (#5) are inextricable from each other and should be considered together. *See, e.g.* Commonwealth's Motion to Admit Evidence of Prior Shootings, CP 0504-0002 1/1, filed April 16, 2006.

6)  All DAO files and the PPD H-file relating to the murder of Barry Parker
- o   Date of homicide: February 26, 2003
- o   Location: 3965 N. Franklin Street (n/e corner of Franklin and Luzerne)
- o   Relevance to Mr. Savage: this homicide was charged under the RICO indictment
- o   The DAO prosecuted Steven Northington, Mr. Savage's federal co-defendant, for this murder under the name Rickie Brown at CP-51-CR-0707961-2005

7)  All DAO files and the PPD H-file relating to the murder of Tyrone Toliver
- o   Date of homicide: March 14, 2003
- o   Location: Palmetto Street; body recovered: 2000 Valetta Street
- o   Relevance to Mr. Savage: this homicide was charged under the RICO indictment
- o   The DAO charged Eugene Coleman for this murder at CP-51-CR-1100661-2003, in which a plea agreement was reached; Coleman was the star prosecution witness at Mr. Savage's federal trial

Exhibit 1

8) All DAO files and the PPD H-file relating to the murder of Kareem Bluntly aka Brian Pride aka Bryant Pride
   - Date of homicide: January 9, 2004
   - Location: 1727 W Master Street
   - Relevance to Mr. Savage: Kareem Bluntly was a crucial informant for the government against Mr. Savage
   - The DAO prosecuted at least Michael Carthon for this murder at CP-51-CR-1003521-2004

9) All DAO files and the PPD H-file relating to the murder of Tybius Flowers
   - Date of homicide: March 1, 2004
   - Location: outside of 3755 N. 8th Street
   - Relevance to Mr. Savage: this homicide was charged under the RICO indictment

10) All DAO files and the PPD H-file relating to the deaths of Marcella Coleman, Sean Rodriguez, Tameka Nash, Khadijah Nash, Damir Jenkins and Tajh Porchea
   - Date of homicides: October 9, 2004
   - Location: 3256 N 6th Street
   - Relevance to Mr. Savage: these homicides were charged under the RICO indictment

Having gone through the DAO open file review process in other capital cases, I appreciate the volume of this request and the considerable work it requires on your end. However, as Mr. Savage faces a federal habeas petition deadline in May 2023, we would appreciate if our request could be considered on an expedited basis.

I have attached my appointment order in this case. Please let me know if there is anything else you require. I will follow up with you soon. Thank you in advance for your assistance.

Sincerely,

Kathryn (Kara) Bailey
Assistant Federal Public Defender
Counsel for Kaboni Savage

\enclosure (federal appointment order signed by Judge Surrick)

3

Exhibit 1

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA
### (Philadelphia)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Criminal No. 2:07-cr-00550-RBS |
| | ) | |
| | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| KABONI SAVAGE, | ) | Hon. R. Barclay Surrick |
| | ) | |
| | ) | |
| Defendant-Appellant. | ) | |

## ORDER

AND NOW, this 3rd day of September, 2021, upon consideration of Kaboni Savage's

*Motion for Appointment of Counsel*, it is hereby

ORDERED as follows:

1. Kaboni Savage's motion is GRANTED.

2. The Federal Public Defender's Office for the Western District of Pennsylvania and the
   Federal Public Defender's Office for the Southern District of Ohio are hereby
   appointed to represent defendant Kaboni Savage in post-conviction proceedings,
   including the preparation of a motion under 28 U.S.C. § 2255.

Honorable R. Barclay Surrick
United States District Judge

Exhibit 1

# EXHIBIT

# 2

| | |
|---|---|
| **From:** | Katherine Ernst |
| **To:** | Kara Bailey |
| **Cc:** | Zoe Raney |
| **Subject:** | Open File Review Request-Kaboni Savage |
| **Date:** | Tuesday, January 31, 2023 8:47:27 AM |

Dear Ms. Bailey,

Zoe Rainey forwarded your request for discovery related to the Kaboni Savage matter. I am the assistant supervisor in the federal litigation unit, and I also ran your request by Nancy Winkelman, supervisor of the law division. I am sorry to tell you that because you do not represent your client in an open habeas matter to which this office is a respondent, your request does not fall under our open file policy. We will, of course, comply with any court order you obtain.

I wish you the best,

-------------------------------------------------

Katherine Ernst
Assistant District Attorney
Federal Litigation Unit
Philadelphia District Attorney's Office
(c) 215-850-1448
*she/her*

Exhibit 2

# EXHIBIT 3

# Philadelphia DAO Policies on: (1) Disclosure of Exculpatory, Impeachment, or Mitigating Information, (2) Open-File Discovery



Effective Date: 10/1/2020

Subject to any future changes in the law, this sets forth the office's policies regarding: (1) the disclosure of exculpatory, impeachment, or mitigating information, pursuant to Brady v. Maryland, 373 U.S. 83 (1963) and its progeny; Rule 573 of the Pennsylvania Rules of Criminal Procedures; Rule 3.8 of the Pennsylvania Rules of Professional Conduct; and Rule 3.8(g) & (h) of the American Bar Association Model Rules of Professional Responsibility, as well as (2) open-file discovery.

## I. The Disclosure of Exculpatory, Impeachment, or Mitigating Information

A. The Law and Ethics

- In Brady, the Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of good faith or bad faith of the prosecution." Brady v. Maryland, 373 U.S. 83, 87 (1963).

- Pa.R.Crim.P. 573(B)(1)(a) requires that a prosecutor disclose "[a]ny evidence favorable to the accused that is material either to guilt or to punishment, and is within the possession or control of the attorney for the Commonwealth."

- Pa.R.P.C. 3.8(d), in turn, requires a prosecutor in a criminal case to "make timely disclosure to the defense of all evidence or information known to the prosecutor that tends to negate the guilt of the accused or mitigates the offense, and, in connection with sentencing, disclose to the defense and to the tribunal all unprivileged mitigating information, except when the prosecutor is relieved of this responsibility by a protective order of the tribunal."

- ABA Model R.P.C. 3.8 (g) addresses a prosecutor's post-conviction obligation to disclose Brady evidence by specifically stating that "[w]hen a prosecutor knows of new, credible and material evidence creating a reasonable likelihood that a convicted defendant did not commit an offense of which the defendant was convicted, the prosecutor shall: (1) promptly disclose that evidence to an appropriate court or authority,

1

Exhibit 3

and (2) if the conviction was obtained in the prosecutor's jurisdiction, (i) promptly disclose that evidence to the defendant unless a court authorizes delay, and (ii) undertake further investigation, or make reasonable efforts to cause an investigation, to determine whether the defendant was convicted of an offense that the defendant did not commit.

- ABA Model R.P.C. 3.8 (h) also requires a prosecutor to seek to remedy a conviction when he or she is aware of clear and convincing evidence which establishes that a defendant in the prosecutor's jurisdiction was convicted of an offense that the defendant did not commit.

## B. Guidance

Information is *exculpatory* if it tends to excuse, justify, or absolve the guilt of a defendant. *Impeachment* information refers to a subcategory of exculpatory information that can be used to attack the credibility of a Commonwealth witness. Although it may sometimes be more difficult to identify, courts have treated impeachment information as significant because the truthfulness and reliability of a given witness may ultimately be determinative of a defendant's guilt or innocence. Information is *mitigating* if it tends to reduce the moral blameworthiness of the defendant.

While such definitions are facially simple, any application of these definitions to a given case requires a fact-specific analysis with the understanding that disclosure compliance is contextual.

It is important to understand, however, that questions of evidentiary materiality should *not* factor into a prosecutor's determination of which pieces of information qualify as exculpatory, impeaching, or mitigating. A prosecutor has the obligation to disclose exculpatory, impeaching, or mitigating evidence—full stop.

For purposes of these Policies, this office considers the court-determined constitutional obligations laid down in Brady and its progeny to be co-extensive with the rules-based obligations observed by the Commonwealth set out in the rules of criminal procedure and professional conduct as well as the ABA Model Rules' extension of prosecutorial disclosure obligations in the post-conviction realm.

## C. Policy

Assistant district attorneys must understand and comply with their constitutional, statutory, and ethical duties to disclose exculpatory, impeaching, and mitigating information to the defense. These duties exist regardless of the particular form of the information (i.e., written v. oral, recorded v. unrecorded) and regardless of whether the criminal case is resolved via plea or trial.

In the event that an assistant district attorney is uncertain about disclosure or concludes that disclosure is in fact not required, that attorney shall consult with his or her supervisor regarding the matter. In cases where an assistant district attorney decides to withhold information, he or she must document and be prepared to articulate a basis for that decision. If additional guidance is needed regarding whether information falls within an assistant district attorney's

Exhibit 3

constitutional, statutory, or ethical disclosure obligations, the Conviction Integrity Unit should be consulted.

Any disclosure of exculpatory, impeaching, and mitigating evidence shall be recorded in an approved office disclosure form and shall occur as soon as practicable. Because a prosecutor's statutory and ethical duty to disclose such information is a continuing obligation, if new information becomes known to or comes into the possession of an assistant district attorney, the existence of that information shall be promptly disclosed to the defendant or the court.

A prosecutor's <u>Brady</u> obligation is based on due process and exists to ensure a defendant a fair trial as it unfolds. However, in light of the ABA Model R.P.C.'s extension of <u>Brady</u> obligations to the post-conviction stage, if an assistant district attorney acquires information which casts doubt upon the correctness of a conviction, he or she shall adhere to Rule 3.8(g) and (h) by promptly disclosing to the defense any new <u>Brady</u> information that is acquired or learned post-trial.

Intentional failures to disclose exculpatory, impeaching, or mitigating information will not be tolerated and will be subject to discipline.

## II. Open-File Discovery

### A. <u>Overview</u>

*Open-file discovery* ("OFD") refers broadly to a concept of prosecutorial transparency, wherein the prosecution provides the defense with everything in its file, irrespective of evidentiary materiality. Proponents of OFD emphasize the ways in which the practice coheres with arguably the most elemental tenet of our legal system, the pursuit of truth.

More pointedly, OFD has several significant advantages:

- *Fairness*: Since defendants in criminal trials typically wield less resources, OFD gives them the opportunity to level the legal playing field by accessing information that would otherwise be cost-prohibitive.
- *Informed Decision-Making*: Informed defendants can make more deliberate decisions about whether to accept a plea or proceed to trial when they know the full weight of the evidence against them.
- *Efficiency*: OFD conserves prosecutorial and judicial resources by encouraging defendants who fully understand the weight of the evidence against them to plead guilty.
- *Error reduction*: Because OFD requires full disclosure without regard to materiality, prosecutors are not faced with the kind of discretionary disclosure decisions that can result in inadvertent or erroneous evidentiary suppression.

### B. <u>Current Legal Terrain</u>

Presently, there is no national model for OFD, with states falling along a continuum with respect to how much information prosecutors must disclose to the defense. Although this policy draws from the precepts of OFD insofar as it seeks to excise the question of materiality from

Exhibit 3

evidentiary analysis, the OFD policy is not assuming any position on the logistical issues associated with implementing OFD office wide. With that said, this office is actively working with IT and the Executive Team to create an electronic infrastructure and case management system capable of maintaining case files in such a way as to allow for efficient identification of information disclosable pursuant to OFD while also ensuring privileged information exempt from OFD is maintained separately so as to protect the confidentiality of that information (i.e., witness safety, grand jury and work product).

## III. Goal

All criminal defendants deserve a fair trial and reasonable access to justice thereafter. Whether intentional or negligent, prosecutorial suppression of exculpatory, impeaching, and/or mitigating information at the plea, trial, or post-trial stage can result in flawed adjudications and unwarranted convictions, which directly undermines perhaps the most basic tenet of our legal system, the pursuit of truth.

In enacting these policies and committing to adopting OFD as soon as practicable, this office demonstrates an ongoing commitment to the kind of fair criminal law practice that will invariably reinforce its legitimacy in the eyes of the community it serves.

Exhibit 3

# EXHIBIT

# 4



U.S. Department of Justice

*United States Attorney*

*Eastern District of Pennsylvania*

#2

---

CHRISTINE E. SYKES
Direct Dial: (215) 861-8441
Facsimile:   (215) 861-8694

*615 Chestnut Street*
*Suite 1250*
*Philadelphia, Pennsylvania 19106-4476*
*(215) 861-8200*

October 19, 2009

Christopher D. Warren, Esquire
1500 Walnut Street, Suite 1900
Philadelphia, PA  19102

Timothy J. Sullivan, Esquire
6305 Ivy Lane, Suite 700
Green Belt, MD  20770

William C. Nugent, Esquire
1628 JFK Boulevard, Suite 1600
Philadelphia, PA  19103

Christopher W. Adams, Esquire
1800 Peachtree Street, N.W., Suite 300
Atlanta, GA  30309

William R. Spade, Jr., Esquire
1525 Locust Street, 14th Floor
Philadelphia, PA  19102

Paul M. George, Esquire
239 South Camac Street
Philadelphia, PA  19107

Thomas C. Egan III, Esquire
621 Swede Street
Norristown, PA  19401

William L. Bowe, Esquire
1420 Walnut Street, Suite 1400
Philadelphia, PA  19102

RE:  ***United States v. Kaboni Savage, et al.***, Crim. No. 07-550

Dear Counsel:

   Enclosed please find one (1) DVD containing discovery items and early *Jencks* material concerning the homicides of Marcella Coleman, Damir Jenkins, Tameka Nash, Khadjah Nash, Tahj Porchea, Sean Rodriguez, Carlton Brown, Barry Parker, Tyrone Toliver, and Tybius Flowers, and the double shooting at 824 Venango Street on July 25, 2008.  The DVD also contains discovery and early *Jencks* materials related to the Savage drug organization and the 2005 *Savage* federal trial.

   For your convenience, shortly, we will be providing you with a detailed index of the enclosed materials and a duplicate copy of the materials in a "searchable" computer format.

Exhibit 4

Letter to Counsel
October 19, 2009
Page 2

Once you have had an opportunity to review the enclosed materials, please feel free to contact us with questions you may have.  Please contact us immediately if you do not find enclosed the materials listed above.

Very truly yours,

MICHAEL L. LEVY
United States Attorney

CHRISTINE E. SYKES
DAVID E. TROYER
Assistant United States Attorneys

enclosures

Exhibit 4

# EXHIBIT
# 5



U.S. Department of Justice

*United States Attorney*

#6

*Eastern District of Pennsylvania*

David E. Troyer
*Senior Litigation Counsel*
*Direct Dial:  (215) 861-8475*
*Facsimile:    (215) 861-8618*

*615 Chestnut Street*
*Suite 1250*
*Philadelphia, Pennsylvania 19106-4476*
*(215) 861-8200*

July 29, 2011

Christian J. Hoey, Esquire
50 Darby Road
Paoli, PA  19301-1416

Timothy J. Sullivan, Esquire
6305 Ivy Lane, Suite 700
Green Belt, MD  20770

William R. Spade, Jr., Esquire
1525 Locust Street, 14th Floor
Philadelphia, PA  19102

Paul M. George, Esquire
239 South Camac Street
Philadelphia, PA  19107

Thomas C. Egan III, Esquire
621 Swede Street
Norristown, PA  19401

William L. Bowe, Esquire
1420 Walnut Street, Suite 1400
Philadelphia, PA  19102

Christopher P. Phillips, Esquire
1518 Walnut Street, Suite 1406
Philadelphia, PA 19102

Teresa Whalen, Esquire
801 Wayne Avenue, Suite 400
Silver Spring, MD 20910

RE:  *United States v. Kaboni Savage, et al.,* Criminal No. 07-550

Dear Counsel:

Enclosed please find the sixth discovery batch, consisting of five DVDs that contain discovery items and early *Jencks* material.  Disk #1 contains the following materials: The Philadelphia Police Department (PPD) file for the Mansur Abdullah murder; the PPD fugitive file for Eugene Coleman; the PPD file for the Kenneth Lassiter murder; materials from the Philadelphia District Attorney's Office for the Barry Parker murder; materials regarding the federal firearms case against Robert Merritt; a recording by MCC-NY of the April 27, 2010 call between Kaboni Savage and Barbara Savage; the 1999 UFAP warrant for Kaboni Savage; the Philadelphia Fire Marshal's final report for the Coleman arson murders; a PPD report of interview for Robert Merritt's proffer; Robert Merritt's audio intercepts (consensual recordings by an informant); and FBI 302 reports and documents.  Disk #1 also contains three folders of materials from three boxes of the PPD's arson murder file, which are titled "Arson Case PPD File," Parts 1, 2, and 3.

Disk #2 contains videotapes made by the Philadelphia Police Department and Fire Marshal, of the arson scene.  It also contains news reports, which are being supplied pursuant to defense request.

Exhibit 5

Disks #3, 4, and 5 contain video footage from the Palmetto Street pole camera. Disk #3 contains footage from March 13 and 14, 2003. Disk #4 contains such video footage from March 15 and 16, 2003. Disk #5 contains video footage from March 14 and 15, 2003. Collectively, this footage would relate mostly to the Tyrone Toliver homicide, and was specifically requested by counsel for defendant Kaboni Savage. This footage also has some relevance to the overall drug conspiracy aspect of the RICO conspiracy, and to witness Eugene Coleman. There are pole camera recordings of this same location on other dates, which recordings have not been copied, but which are available for inspection and review upon request.

The FBI has obtained all physical evidence regarding the homicides charged in this indictment, from the PPD. This physical evidence, as well as all physical evidence in the case, is available for viewing at the FBI. Due to the number of defense counsel in this matter, the government suggests that defense counsel confer with one another to agree on a date on which the viewing of physical evidence can occur. We also suggest that any viewing of physical evidence occur sometime in the next one or two months. Due to the large volume of physical evidence, the government will not be able to entertain requests for multiple, separate viewing sessions, nor requests to view evidence shortly before trial.

During the course of the electronic surveillance, including the court-authorized wiretaps and pen registers, that occurred in support of the 2004 Savage federal case, there were numerous subpoenas and requests for telephone number subscriber information, and calling data for those numbers. The records amassed as a result of these requests is voluminous. These records include subscriber information, pen and trap records, and information from public sources. Subject to limited exceptions, this information has no relevance in the current case; and, subject to limited exceptions, the government does not intend to use this information at trial. Thus, the government does not intend to copy such information for defense counsel. Although the government does not view this material as discoverable, or as Brady material, defense counsel is advised of its existence, and is welcome to view the evidence upon request.

There are additional financial items in the government's possession, related to Mel Stein, a co-defendant in the 2004 Kaboni Savage federal prosecution. These items have no relevance or bearing on the current prosecution, the government does not intend to introduce these items into evidence at trial, and the government does not intend to call Mr. Stein as a witness. Accordingly, the government does not view these materials as discoverable, and does not intend to copy or distribute them to defense counsel in this case. However, in an abundance of caution, the government is making defense counsel aware of the existence of these items, and will make the items available for inspection and copying by defense counsel upon request. There are also some recordings made by Mr. Stein of people who may be called as witnesses at trial. Those recordings are also available for inspection, and can be copied into digital format for distribution to counsel, upon request, if counsel believe them to have any impeachment value.

As counsel can see from a review of the materials disclosed, the government has made extraordinarily broad and inclusive disclosures of law enforcement and investigative files. Items not normally subject to disclosure, including investigative reports, intelligence reports, and handwritten notes, have now been disclosed well over a year prior to trial.

Exhibit 5

The government has already supplied many items that constitute Jencks material. However, there is more Jencks material that will be disclosed at a later time, with accompanying Giglio / Napue information that would likewise disclose the identity of witnesses. As previously stated, the government will disclose these items sufficiently in advance of trial, to allow for preparation and use by defense counsel. However, the nature and facts of this case dictate that the government must also protect the security and lives of the witnesses and their family members. Thus, these items will not yet be disclosed.

Once you have had an opportunity to review the enclosed materials, please feel free to contact us with any questions you may have. Please contact us immediately if you do not find enclosed the materials listed above.

Very truly yours,

ZANE DAVID MEMEGER
United States Attorney

_____

David E. Troyer
John M. Gallagher
Assistant United States Attorneys

Enclosures

Exhibit 5

# EXHIBIT

# 6

Newspapers
by ancestry

https://www.newspapers.com/image/786518506

Philadelphia Inquirer (Philadelphia, Pennsylvania) · Mon, Nov 15, 2021 · Page B1

Downloaded on Jun 21, 2023




Copyright © 2023 Newspapers.com. All Rights Reserved.

POWERED BY
Newspapers.com

Exhibit 6

Newspapers
by ancestry
https://www.newspapers.com/image/786518578

Philadelphia Inquirer (Philadelphia, Pennsylvania) · Mon, Nov 15, 2021 · Page B2

Downloaded on Jun 21, 2023



## Scene Through the Lens

Photographer **Tom Gralish's** visual exploration of our region. Read his blog at inquirer.com/sceneontheroad

The remnants of 180 jack-o'-lanterns await recycling outside Saddler's Woods in Haddon Township. They were lighted and lined the paths in the old-growth forest for Halloween.

## Suit filed over pay off online slots win

A Bucks woman says she was told a $100K jackpot was really a "bug" that would pay far less.

ASSOCIATED PRESS

ATLANTIC CITY — A Bucks County woman is suing the manufacturer of a popular online slots game, saying it wrongly refused to pay her a $100,000 jackpot due to "a bug" in the product.

New Jersey regulators revealed Friday that 14 gamblers have filed the same complaint against the company, saying they had been told they won far more than the manufacturer says they were actually entitled to.

Lisa Piluso of Yardley says Las Vegas-based American Gaming Systems offered her only $280 but later increased the offer to $1,000.

In a suit filed Thursday in U.S. District Court in Camden, Piluso accuses the company of consumer fraud and other wrongful actions related to the jackpot she was told she had won while playing on her cellphone in New Jersey on Oct. 2, 2020.

"I was shocked when AGS officials, including the company president, told me they weren't going to pay, even when I showed them the screenshot that I made of the $100,000 jackpot," she said in a statement issued through her lawyer, Paul D'Amato.

"They said I actually won about $300, but they then offered me $1,000, saying we were 'nice people,'" Piluso said. "How many other players have been in the same situation but agreed to settle for a fraction of their winnings after being told they, too, were 'nice people'?"

AGS did not respond to requests for comment.

The Capital Gains game she was playing was on an online platform hosted by Caesars Interactive New Jersey, although neither Caesars casino nor its online branch was named as a defendant in the lawsuit. Caesars had no immediate comment.

The state Division of Gaming Enforcement investigated and wrote to Piluso on Aug. 27, revealing that AGS "had discovered an issue/bug within the game" that wrongly failed to clear bonus symbols from previous rounds from a player's screen.

"This error caused the patron(s) to believe that their bonus round winnings were higher than the actual winnings," Deputy Attorney General Jennifer Russo-Belles wrote. She added that the state had taken regulatory action against AGS, but she did not say what that action was.

In response to a request from the Associated Press, the Attorney General's Office on Friday said it had fined AGS $1,000 for failing to ensure that the game was functioning properly.

## Evidence

Continued from B1

conflict of interest because his former business associates were previously connected to the case. One of them, Lloyd Long, represented Brown on a post-conviction petition; another, Jamie Funt, represented one of the unindicted coconspirators and was a witness at a post-conviction hearing.

"They had 17 months to call the wife of the murder victim," said Guy D'Andrea, who said he is representing Richardson pro bono. "Why did they call her 11 hours before the court date?"

Carl Mahler, the assistant DA who handled the case during a 2010 post-conviction hearing, said in an email that no exculpatory evidence was withheld. "The evidence overwhelmingly established that Lavar Brown was the mastermind behind the robbery plot that resulted in the victim's brutal murder," she said.

She accused the DA's Office of improperly disclosing internal communications and seeking to circumvent the judiciary rather than hold a complete adversarial hearing.

Brown was one of four people convicted of Richardson's murder; a plot in which Christopher Kennedy was supposed to shoot the store manager in the leg but ended up shooting him in the head. Kennedy was caught fleeing the store with a gun and cash. Brothers James and Jamaar Richardson, who admitted to roles in the robbery, were also convicted. (They are not related to Michael Richardson.)

The case against Brown was the thinnest of the group, according to the CIU: He was convicted based only on the testimony of two unindicted coconspirators. The CIU now says trial prosecutors hid the fact that one of them, Kyonna Lyons, had given a previous, conflicting statement to Malone and Detective David Baker. Baker and Malone, according to the DA's filing, said they didn't document that statement because they believed the star trial was lying. The CIU prosecutors also hid that the other informant, Ronald Vann, had cooperated in multiple cases and had lied in his statement on the Rite Aid case by falsely implicating an additional person.

Malone said the CIU did not give him the opportunity to review the file but added, "I am confident that my representation about exculpatory evidence is false."

When the information about Lyons' prior statement came to light, prosecutors debated how to proceed. In a 2010 email to his colleagues, included in the DA's court filings, then-homicide unit deputy chief Ed Cameron said the omissions were acceptable.

"We never advise defense attorneys about [prior inconsistent statements]," wrote Cameron, who died last year. He said the "only issue is" that Brown's lawyers found out. He even suggested retaliating against Lyons' lawyer, Funt: "If Funt is going to come in and say things to hurt us, we should not give him deals in the future. Also, maybe we should send a detective to go interview him."

That Brown will remain on death row no matter the outcome of this case, CIU supervisor Patricia Cummings said, did not factor into the decision to agree to a new trial. "When we have evidence of this kind of misconduct, you have to act on it," she said. "He didn't get a fair trial, period."

The U.S. Supreme Court has repeatedly affirmed that prosecutors must disclose evidence favorable to a defendant — including evidence that may cast doubt on the integrity of a witness. R. Michael Cassidy, a professor of law specializing in prosecutorial ethics at Boston College, said evidence that witnesses lied falls squarely into that disclosure requirement.

Police, he said, have often avoided writing down contradictory statements so they would not have to disclose them, he said. "That is completely inconsistent with the Supreme Court precedent. It doesn't matter if the statement is oral or written. That's impeachment material that the other side is entitled to know about."

In Brown's case, the court has not yet determined whether to accept the DA's agreement to a new trial — or decided whether to act on Richardson's request to conflict the DA out of the

case, or have him removed because of a conflict of interest.

Cassidy said there might be a basis for the allegation that Krasner has a conflict under Pennsylvania's rules of professional conduct. The rule bars a lawyer from representing a client if doing so would conflict with a personal interest — in this case, Krasner's loyalty to his ex-partner. But, Cassidy added, he believes such a claim is unlikely to succeed, especially because courts have traditionally been reluctant to conflict out government lawyers.

Cummings said there is no conflict, because Funt's and Long's involvement ended before either worked with Krasner. A Krasner spokesperson declined to provide a written conflict policy but said all relevant cases are referred to the DA's chief ethics officer for a "rigorous conflicts screening process."

It will be up to Common Pleas Court Judge Scott DiClaudio, who repeatedly sparred with Krasner after the DA unsuccessfully sought to have him removed from criminal court over his own purported conflict. (DiClaudio's then-girlfriend had filed an employment discrimination complaint against the DA's Office.)

DiClaudio scheduled a hearing for December on whether to remove the case from the DA's Office and refer it to the attorney general. He asked Krasner to testify.

"It makes sense for him to explain in open court to the widow that his office should be making a decision in his ex-partner's cases," DiClaudio said in court.

Cummings called the conflict question a distraction from the larger issues raised by the case: "It really does potentially call into question homicide convictions where cooperators were used. We know that the cops have lied and cheated for a long time ... but in this case you have for the first time documentation of the extent to which prosecutors were playing this game, as well."

nsretained@inquirer.com
215-854-5053
samanthamelamed



DA Larry Krasner (front) at an earlier news conference about Conviction Integrity Unit findings. Lawyers for the unit now say that a review of the case file revealed a pattern of misconduct. JESSICA GRIFFIN / Staff



Kristi Richardson in 2019, looking at photos of her husband, Michael Richardson. She is assailing the findings.



Judge Scott DiClaudio has scheduled a hearing for December on whether to remove the case from the DA's Office. JESSICA GRIFFIN / Staff

### LOTTERIES

**Multistate**

*Nov. 13*
Powerball ...................... 08 15 26 35 46
Powerball 09          Powerplay 05

*Nov. 13*
Double Play ............... 13 16 28 37 60
Powerball 07

*Nov. 12*
Mega Millions ........... 30 52 42 46 48
Mega Ball 15          Mega Plier 02

*Nov. 14*
Cash4Life ................... 06 27 37 50 57
                                Cash Ball 05

**Pennsylvania** 1-800-692-7481

*Daily Drawings, Nov. 14*
Pick 2 Afternoon .................... 3 0 (1)
Pick 2 Evening ......................... 1 2 (0)
Pick 3 Afternoon .................. 0 0 5 (1)
Pick 3 Evening ...................... 4 1 1 (0)
Pick 4 Afternoon ............... 6 7 4 8 (1)
Pick 4 Evening ................... 5 7 5 1 (0)
Pick 5 Afternoon ............. 6 0 9 8 7 (1)
Pick 5 Evening ................ 1 9 9 7 6 (0)
Treasure Hunt .............. 08 12 16 18 30
Cash 5 ....................... 12 16 22 23 38
Match 6 ..................... 08 11 14 37 40 45

**New Jersey** 800-599-6000

*Daily Drawings, Nov. 14*
Pick 3 Afternoon .................... 4 4 5 (6)
Pick 4 Afternoon .............. 7 5 5 6 (6)

*Nov. 13*
Pick 3 Evening ..................... 0 8 7 (7)
Pick 4 Evening .................. 3 2 8 6 (7)
Jersey Cash 5 .......... 03 14 31 38 41
                                  Xtra 03

*Nov. 13*
Pick 6 Xtra ............. 04 20 23 27 39 48
                                  Xtra 02

**Delaware** 302-739-5291

*Daily Drawings, Nov. 14*
Play 3 Afternoon
Play 3 Evening ........................ 5 7 4
Play 4 Afternoon
Play 4 Evening ..................... 8 2 6 6

*Nov. 13*
Multiwin Lotto ........... 02 14 17 22 26 30

*Nov. 13*
Lotto America ........... 01 10 11 27 35
Star Ball 10          Bonus 04

*Nov. 13*
Lucky for Life ............. 01 29 33 36 38
                              Lucky Ball 05

Copyright © 2023 Newspapers.com. All Rights Reserved.

POWERED BY Newspapers.com

Exhibit 6

# EXHIBIT

# 7

**Newspapers**
*by* ancestry

https://www.newspapers.com/image/786495743

Philadelphia Daily News (Philadelphia, Pennsylvania) · Thu, Dec 2, 2021 · Page A5

Downloaded on Jun 21, 2023

**NEWS | COURTS**

# JUSTICE . . . THREE DECADES LATE

## Third man exonerated in debunked 30-year-old murder probe; two others suing

By Samantha Melamed
*STAFF WRITER*

FOR 30 years, Troy Coulston said he was innocent of the 1989 murder of Michael Haynesworth, one of a web of cases prosecutors now say were all tainted by the same informant's testimony.

This week, the Philadelphia District Attorney's Office and a Common Pleas Court judge agreed to vacate his conviction, setting into motion a process his lawyers believe will lead to his release.

Coulston's exoneration is the latest fallout from six murder cases that were handled by the same prosecutor and relied on false testimony by James White, who was 19 at the time of his arrest and is now serving concurrent life sentences for the six homicides.

Christopher Williams — who was prosecuted for all six murders but was acquitted of two and exonerated of four — was released from prison in February. He filed a lawsuit Wednesday morning in U.S. District Court in Philadelphia, naming as defendants the city, former District Attorney Lynne Abraham, trial prosecutor David Desiderio, and 17 police detectives.

Joseph J. Santarone, a lawyer for Desiderio, said the former prosecutor could not comment while litigation is pending. In 2020, Desiderio told The Inquirer the exonerations were "garbage," and questioned the DA's motives. "A jury believed [White]. I don't know how they can invade the province of the jury."

Williams is represented by a legal team that includes Ben Crump, the high-profile civil rights lawyer who represents the families of George Floyd and Ahmaud Arbery. Crump said that, as in those cases, Williams' story



**Christopher Williams** (right), with attorney Ben Crump, was exonerated after years on death row. A judge and the DA agreed to vacate the conviction of a codefendant.   JESSICA GRIFFIN / Staff Photographer

reflects both a historic injustice and "a historical teachable moment for America."

"Chris Williams ... is almost like the symbol for wrongful conviction of Black men in America," he added. "We have to be better than this. We cannot continue to let racism cloud our judgment when it comes to not even just wrongful convictions but administering justice."

At a news conference Wednesday, Crump called for accountability. "What is the price for stealing his life?" he asked.

Williams said he was "elated" that the case against Coulston was dropped. He said that when he spoke with his codefendant this week, he counseled patience.

"There has to be a process to

this, because you can't consume a whole meal with one bite. And what we've been through? I would view that as a buffet," he said. "No one in the history of the United States of America has walked away exonerated of six homicides, who spent 25 years on death row with two execution warrants signed for his death."

The District Attorney's Office, in agreeing that Coulston should be cleared, called the evidence in the case "a house of cards" that began to collapse in 2019.

"Once the collapse began, a complete collapse was inevitable," Assistant District Attorneys Arlyn Katen and Michael Garmisa wrote. They noted there was no physical evidence against

Coulston, only testimony from White and two other discredited witnesses, and said critical evidence had been suppressed.

Kevin Haynesworth, the brother of the 19-year-old victim who was found beaten, bound, and shot repeatedly in a car in Fairmount Park, appeared by videoconference at a hearing for Coulston on Tuesday and expressed dismay. "It sounds like another murderer, or murder conspirator, is going to be released," he told Judge Scott DiClaudio. Haynesworth did not respond to an interview request.

DiClaudio, however, said the case had been irreparably tainted by the undisclosed evidence.

In the original theory of the

case, Williams, a father of five in Germantown, was cast by the prosecution as the leader of a violent drug gang that routinely robbed other drug dealers.

But Williams was acquitted at trial of the 1989 drug-related murder of Marron Genrette, 19, and the fatal shooting of William Graham, a 60-year-old cabdriver who was shot in the head in his taxi. He fought from death row for decades to be cleared of Haynesworth's killing and the murder of three young men, Otis Reynolds, Gavin Anderson, and Kevin Anderson, drug dealers who were all shot at close range and left on the street in locations around North Philadelphia on the same day in September 1989. They were killed in shootings that prosecutors say appeared to be linked to a member of the Jamaican Shower Posse, a gang so named because members showered their victims with bullets.

Jennifer Merrigan, a lawyer with the nonprofit firm Phillips Black who represented Coulston and Williams' other codefendant, Theophalis "Binky Bilal" Wilson, said information in the police and prosecutor's file made clear all three men were innocent. "Where was the oversight in the office?" she said.

In his lawsuit, Williams alleged police "buried leads; they hid and destroyed evidence of alternative suspects; and they coerced troubled teenagers to tell fictitious stories to fit the evidence. And they did it all to obtain convictions at any cost, despite the truth." The complaint alleges a campaign of coercion by police and prosecutors to obtain false testimony from White, alternately threatening him with the death penalty and promising him early release from prison.

*See* **EXONERATE** *Page 20*

Copyright © 2023 Newspapers.com. All Rights Reserved.

**Newspapers**
POWERED BY

Exhibit 7

Newspapers.com
by ancestry

https://www.newspapers.com/image/786495729

Philadelphia Daily News (Philadelphia, Pennsylvania) · Thu, Dec 2, 2021 · Page A20

Downloaded on Jun 21, 2023

# NEWS

## SUPREME COURT
*Continued from Page 3*

ditions. They've damaged the democratic process. They've poisoned the law," said Stewart, a former clerk to Justice Clarence Thomas. "For 50 years, they've kept this court at the center of a political battle that it can never resolve."

But Julie Rikelman, a lawyer for the Center for Reproductive Rights representing Mississippi's only abortion clinic, countered that turning the issue over to the states would allow legislatures to deny a woman a role in making one of the most crucial decisions she would ever face.

"For a state to take control of a woman's body and demand that she go through pregnancy and childbirth with all the physical risks and life-altering consequences that brings is a fundamental deprivation of her liberty," Rikelman said.

The court's decision in *Roe* said women have a fundamental right to an abortion. *Casey* said that there could not be prohibitions on abortion before viability and that regulations on the right could not impose an "undue burden" on a woman's choice.

Thomas, who joined the dissenting opinion in *Casey* nearly 30 years ago that said *Roe* was wrongly decided, challenged the lawyers for the clinic and the federal government to locate a woman's right to abortion in the Constitution.

"If I were to ask you what constitutional right protects the right to abortion, is it privacy? Is it autonomy? What would it be?" Thomas asked.

"It's liberty, your honor," Rikelman replied. "It's the textual protection in the 14th Amendment that a state can't deprive a person of liberty without due process of law, and the court has interpreted liberty to include the right to make family decisions and the right to physical autonomy, including the right to end a pre-viability pregnancy."

Justice Samuel A. Alito Jr. also seemed ready to overturn *Roe*. After a long back-and-forth with Prelogar, the justice concluded: "So there are circumstances in which a decision may be overruled, properly overruled, when it must be overruled simply because it was egregiously wrong at the moment it was decided?"

But liberal Justice Elena Kagan disagreed, saying the court's abortion jurisprudence did not fit such a scenario.

"Usually there has to be a justification, a strong justification, in a case like this beyond the fact that you think the case is wrong," she said. "And I guess what strikes me when I look at this case is that, you know, not much has changed since *Roe* and *Casey*, that people think it's right or wrong based on the things that they have always thought it was right and wrong for."

While Sotomayor in particular made impassioned remarks about the importance of abortion rights, the liberal justices were largely bystanders as the six conservatives debated what to do.

Kavanaugh and Barrett replaced two justices, Anthony M. Kennedy and Ruth Bader Ginsburg, respectively, who favored abortion rights.

Kavanaugh was the most outspoken among the three newest justices — and none of his remarks favored the abortion-rights supporters. He rattled off a list of cases — involving on gay rights, integration, one-person, one-vote — that he said marked times when the court reversed previous decisions.

## EXONERATE
*Continued from Page 5*

Wilson, who was exonerated of the triple murder and released in February 2020, filed his own lawsuit against the city, police, and prosecutors earlier this year.

Desiderio, the former prosecutor, and Abraham are seeking to dismiss that suit. In their filing, Desiderio said he was acting within the scope of his duties, and therefore is entitled to absolute immunity.

Since Pennsylvania is one of a minority of states providing no compensation to exonerees, Wilson and Williams were released from their decades in prison into precarious financial positions.

Williams, a union carpenter before his arrest, launched back into the workforce at age 61 — tackling everything from construction punch lists to metal fabrication. He dreams of starting a construction company that will offer training and employment to men coming out of prison. But now he is living paycheck to paycheck.

Williams said his lawsuit is about accountability — but also about the full restoration of his freedom. To him, that means regaining control over his time and his destiny. "I am alive. I don't feel that way sometimes," he said, adding, "To this day, I don't know what freedom feels like, but I'm trying to figure it out."

Wilson, 50, once a jailhouse lawyer, has been working as a paralegal with Phillips Black, while starting a foundation called Before It's Too Late that has helped link others with innocence claims to legal aid.

As for Coulston, his path to release is not straightforward, because he was also convicted in Montgomery County of assault by a life prisoner, for a 1997 fight with another prisoner in the State Correctional Institution Graterford. That charge carries an automatic life sentence. He'll seek to vacate that conviction, as the Pennsylvania Supreme Court recently ruled that an assault-by-a-lifer conviction can't stand when the underlying life sentence is removed.

Coulston, 52, said he's eager to return home — but uncertain what awaits him. He has no place to stay, and no job lined up.

"I've been locked up for so long, I don't know what type of skills I have," he said.

✉ smelamed@inquirer.com
© 215-854-5053 ✉ samanthamelamed

## legal notices
INQUIRER.COM

### ESTATE NOTICES

Letters have been granted on the Estate of each of the following decedents to the representatives named, who request all persons having claim against the Estate to present them in writing and all persons indebted to the Estate to make payment to them (unless otherwise noted all addresses being in Philadelphia):

BRADY, EDWINA-- Marc Kent, Executor, 218 Long Lane, Apt 1, Upper Darby, PA 19082; Rhonda Anderson, Esq., 610 OLD YORK ROAD, SUITE 400, JENKINTOWN, PA 194046

LUBERSKI, VALERIA L. - Sandra M. Luberski, Executrix, 105 Taylor St., Bristol, PA 19007

SIMMONS, LEROI-- Kenneth Simmons, Executor, 411 W. Chelten Avenue, Phila., PA 19144; Rhonda Anderson, Esq., 610 OLD YORK ROAD, SUITE 400, JENKINTOWN, PA 194046

### LEGAL NOTICES

NOTICE IS HEREBY GIVEN THAT Articles of Incorporation were filed with the Department of State of The Commonwealth of Pennsylvania on the 25 day of October 2021, for the purpose of obtaining a Certificate of Incorporation pursuant to the provisions of the Business Corporation Law of the Commonwealth of Pennsylvania, approved May 5, 1933 as amended.
The name of the Corporation is **Preachers for Progress Inc.**
The purpose or purposes for which it was organized are as follows: Social welfare purposes, namely to engage in grassroots organizing and advocacy to fight for climate justice, consistent with its tax-exempt status under 501(c)(4) of the Internal Revenue Code of 1986, as amended.

### LEGAL NOTICES

On October 5, 2021, the State Board of Cosmetology suspended the license of Sa Ly, license no. **CL178736**, of Philadelphia, Philadelphia County, for failing to pay a previously imposed civil penalty.

### Notice of Intent to Remediate (NIR) Submittal Under the Pennsylvania Land Recycling and Environmental Remediation Standards Act

Pursuant to the Land Recycling and Environmental Remediation Standards Act, the act of May 19, 1995, P.L. 4, No. 1995-2, ("Act 2"), notice is hereby given that MAP REAL ESTATE, LLC ("Remediator") has submitted to the Pennsylvania Department of Environmental Protection a revised Notice of Intent to Remediate (NIR) for a property located at 3421 Aramingo Avenue in Philadelphia, Pennsylvania. The original NIR was submitted in February 2021 for soil only. The revised NIR also addresses groundwater. The subject property is city of Philadelphia parcel 25-N19-15B.
The subject property ("Site") currently includes a parking lot and a 3,800-square-foot vacant commercial building. Historically, the Site was used as an iron works, and current and historical use of the adjoining and surrounding properties include manufactures, a metal refinery, filling stations, and facilities with oil and solvent storage.
Initial environmental assessment activities have identified semivolatile organic compounds (SVOCs) and metals contamination in soil and lead in groundwater. The Remediator has indicated that the proposed remediation measures will include engineering and institutional controls to prevent contact with contaminated media, if necessary. The proposed future use of the property will be non-residential for commercial use.
The Remediator plans to use the site-specific standard to address lead in groundwater at the site. The Act provides for a 30-day public comment period for site-specific standard remediations. The 30-day comment period is initiated with the publication of this notice. Until December 10, 2021, the city of Philadelphia may submit a request to the Remediator to be involved in the development of the remediation and reuse plans for the site. The City of Philadelphia may also submit a request to the Remediator during this 30-day comment period to develop and implement a public involvement plan. Copies of these requests and of any comments should also be submitted to the Department of Environmental Protection at 2 East Main Street, Norristown, PA 19401.

### MEETING NOTICES

NOTICE is hereby given that the Southeastern Pennsylvania Transportation Authority will be holding a virtual Pension Committee Meeting **on Thursday, December 16, 2021, at 1:55 PM** at the SEPTA offices at 1234 Market Street, Mezzanine Level, Philadelphia, Pennsylvania.
Carol R. Looby
Secretary

## merchandise marketplace

### AUTOS
**WE BUY CARS & TRUCKS IN ANY CONDITION!**
$300 - $5000 Cash 267-229-1970

### MERCHANDISE MARKET
Coins, Comics, Trains, Mags, Toys, Military, Model Kits, Books 610.639.0563

### PERSONAL ADS
HELP WANTED In need of two house maids, that speak both, english and urdu languages. I live in the far northeast in Philadelphia, in the area of Normandy Village. Contact # 2156710138.

### PETS/LIVESTOCK
PLEASE BE AWARE
POSSESSION OF EXOTIC/WILD ANIMALS MAY BE RESTRICTED IN SOME AREAS.

American Bulldog Pups, born 9/20/21, NKC reg, $900. 215-500-0177

KITTENS Free to good home. 3F, 2M. 856-512-2085

### HOMES FOR RENT NJ
CAMDEN CITY 2-4BR.
$1000-$1500/mo. 844-607-6425

### ROOMS
Hunting Pk: Furn. Rooms. Incl. Utils - Cable & A/C Avail. Males 50+ pref. 267-331-5382

Olney, $460/mo + sec. Furn rm, shared kit & BA. Verify Income. 516-527-0186

ROOMS/APTS For Rent.
$400-$900/mo. Call 267-632-4455

S. Philly Fully Furn Room, $175/wkly. 1st & last Mo sec. Jay, 267-304-0272

SP, WP & SW Rooms for Rent. $500 & up. SSI, Vets welc. 267-595-4414

SW & N PHILLY, 40+ & Seniors Pref. Incl utils. Ask for Steve 610-212-6760

W. OAKLANE. Furn rm, pvt ent, $135 /wk. Senior male prefer. 215-205-2437