**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA
(Philadelphia)**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | **Criminal No. 2:07-cr-00550-RBS** |
| | ) | |
| | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **KABONI SAVAGE,** | ) | **Hon. R. Barclay Surrick** |
| | ) | |
| | ) | |
| **Defendant.** | ) | **Death Penalty Case** |

---

**MOTION FOR DISCOVERY RELATING TO JURY COMPOSITION CLAIMS**

---

Kaboni Savage, through undersigned counsel, and pursuant to Rule 6 of the Rules Governing Section 2255 Proceedings for the United States District Courts ("Habeas Rule 6"), and the Fifth, Sixth, and Eighth Amendments to the United States Constitution, respectfully moves this Honorable Court for authorization to access Court jury documents. This motion requests access to material related to Mr. Savage's claim 13I, as pled in Section IX.I of his § 2255 Motion. *See* Doc. 1746 at 514-520. Mr. Savage intends to file additional discovery requests and will identify the relevant claims and sections of the § 2255 Motion within each subsequent filing to which the request relates.

**I.     The Court has the authority to allow the requested discovery.**

This Court should grant discovery "where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is entitled to relief." *Bracy v. Gramley*, 520 U.S. 899, 908-09 (1997),

1

*citing Harris v. Nelson*, 394 U.S. 286, 300 (1969). *See also* Doc. 1752 at 1-4 (Mr. Savage's previous arguments setting forth his entitlement to discovery in this case, incorporated here as if fully rewritten). The policies favoring discovery are even stronger in capital cases than in noncapital ones because the "finality" of death and its "qualitative[] differen[ce] from a sentence of imprisonment, however long," magnifies the "need for reliability" and, accordingly, the need for reliable fact-determination procedures. *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976). *See also Bracy*, 520 U.S. at 904-09 (denial of capital habeas corpus petitioner's discovery request abused district court's discretion). Habeas Rule 6(a) gives this Court far-reaching authority to grant discovery in § 2255 cases, including under the Rules of Criminal or Civil Procedure, "or in accordance with the practices and principles of law."

Here, where good cause exists, this Court should exercise its unquestionable authority to grant Mr. Savage's post-conviction jury selection expert Jeffrey Martin access to the jury data requested in this motion. Mr. Savage alleges in his § 2255 Motion that prior counsel failed to reasonably pursue his Sixth Amendment fair cross-section claim in this Court. Doc. 1746 at 514-520.

II.     **Discovery is necessary because although a fair cross section objection was raised and this Court granted access to in-depth jury data to support that objection, trial counsel never accessed or used it.**

Mr. Savage consistently has maintained that his grand jury and capital trial venires violated his right to have a jury drawn from a fair cross-section of the community under

the Sixth Amendment.[1] Shortly after learning the racial composition of the initial trial jury venire, Mr. Savage's co-defendants filed a motion for discovery for both the grand and petit jury venires to explore a possible fair cross-section violation. Doc. 372. This Court granted that in part on October 12, 2012, providing the jurisdiction's jury selection plan and spreadsheets containing statistical race and ethnic breakdowns for: the 2007, 2009, and 2011 Master and Qualified Jury Wheels; the jurors summoned for petit jury selection; the jurors that responded to the summons and filled out a questionnaire; and the jurors who served on the Grand Jury. Doc. 639 at 13.

Less than a month later, on November 6, 2012, the defendants filed a motion to strike the jury pool arguing there was prima facie evidence of a fair cross-section violation due to underrepresentation of Black jurors. *See* Doc. 701. The well-established prongs for a fair cross-section violation are: (1) the identification of a distinct group in the community; (2) the unfair and unreasonable representation of that group in the jury venire; and (3) that the underrepresentation was due to systematic exclusion. *Duren v. Missouri*, 439 U.S. 357, 364 (1979). The pre-trial motion—based on counsel's own calculations and without the support of an expert—argued that there was a 50% reduction in the number of Black jurors on the trial venire as compared to the population of the jurisdiction. Doc. 701. It argued

---

[1] All of the related fair cross-section motions in this Court were filed by co-defendants, but this Court granted each co-defendant standing as to each other's motions. *See* Doc. 495.

this was due to the jurisdiction's exclusive use of voter registration lists to compile jurors. *Id*.

Although defense counsel possessed discovery that included the statistical breakdown of the race and ethnicity of the jury wheels going back to 2007, counsel did not include any of this data in their fair cross-section motion. *See* Doc. 701. Instead, they jointly hired an expert, Dr. Andrew A. Beveridge, to analyze that data. *See* Ex. A (Declaration of Andrew A. Beveridge, PhD); Doc. 785 (appointment order); Doc. 639 (order granting first round of jury data). Dr. Beveridge's analysis of the preliminary jury composition data going back to 2007 confirmed a significant and consistent disparity in prior jury wheels, ranging from 41 to 57% reductions for both Black and Hispanic potential jurors. Doc. 869-2. He also looked at the disparities in summons questionnaire returns, finding 31 to 41% reductions for Black and Hispanic jurors. *Id*. However, trial counsel never incorporated any of Dr. Beveridge's findings into the Sixth Amendment fair cross section motion.

Instead, Dr. Beveridge's findings were attached to a separate motion seeking additional jury discovery, not filed until December 31, 2012. Doc. 869. The additional discovery was necessary for Dr. Beveridge to conduct *complete* statistical and causal analyses of the jury composition under the Sixth Amendment. *See* Ex. A, ¶ 6, Doc. 869-3. Dr. Beveridge set out the specific additional data he required in a December 16, 2012, declaration, which was also attached to the discovery motion. Dec. 869-3 at 4-6. The needed data included information about the source lists from which the jury wheels were compiled, the actual master and qualified juror lists (rather than just spreadsheets reporting the demographics from the list), undeliverable questionnaires and summonses, excusal

4

orders, and the prior petit and venire term lists. *Id*. Dr. Beveridge felt then, as he does now, that the preliminary data revealed a "very high" disparity that "warranted additional analysis." Ex. A, ¶¶ 5, 9. His request for additional data was in furtherance of this anticipated additional analysis.

This Court denied the defendants' fair cross section motion on January 28, 2013—the second-to-last day of the three-month jury selection. Doc. 969. In so doing, the Court looked only at counsel's non-expert analysis provided in the Sixth Amendment motion and not at Dr. Beveridge's analysis provided in the supplementary discovery motion. *Id*. This Court compared the 2011 qualified wheel to the general population and noted that the general population number was imprecise since it failed to account for how many of the general population were eligible to vote. *Id.* at 8 n.8, 11. Nonetheless, this Court agreed there was a 50.23% comparative and 8.45% absolute disparity in the number of Black jurors on the qualified wheel than in the general population of the district, and used those figures for its own fair cross-section analysis.[2] *Id*. at 11.

This Court held that the fair cross-section claim was lacking on both the second and third prongs of the *Duren* test. *Id*. at 8-13. Specifically, the Court concluded that the statistical evidence was not sufficient to establish that the numbers of Black jurors was unfair and unreasonable, and the lack of evidence that the "use of voter registration lists

---

[2] This Court explained the concepts of absolute and comparative disparities in its order. Doc. 969 at 10. To illustrate, if a respective group is 4% of the jurors but 10% of the community, there would be a 6% absolute disparity (10% minus 4%), but a 60% comparative disparity (6% absolute disparity divided by 10%).

over time [had] the effect of sizeably underrepresenting a particular class or group on the jury venire" prevented the Court from finding that the disparity was systematic. *Id*. (quoting *United States v. Weaver*, 267 F.3d 213, 244-45 (3d Cir. 2001)).

About two months later, this Court addressed the supplementary discovery motion, which included Dr. Beveridge's preliminary findings, and Dr. Beveridge's explanation of why he needed a significant amount of additional data to provide a proper statistical analysis of the jury composition and the cause of any disparities. *See* Doc. 1136, 1137. Based on that motion, this Court held that there was good cause to order additional jury composition discovery. Doc. 1136, 1137. That discovery order, although it did not include everything Dr. Beveridge requested, did grant access to the actual master and qualified juror lists going back six years, access to the envelopes from undeliverable questionnaires and summonses maintained in the courthouse basement, excusal orders also maintained in the courthouse basement, weekly lists of jurors who were summonsed for the previous five years, and weekly lists of jurors who appeared in court for the previous five years. Docs. 1136 at 8-10, 1137. This Court's order required Dr. Beveridge to sign a confidentiality affidavit before accessing the material, to which Dr. Beveridge had already assented. *See id*.; Doc. 869-3 at ¶9. Given Dr. Beveridge's preliminary findings, which included multiple years of data and showed persistent and serious disparities in the jury venires, there was and continues to be good reason to believe the additional data would substantiate his findings and ultimately prove the Sixth Amendment violation in this case. Yet, inexplicably, none of the defense attorneys for any of the co-defendants ever had Dr.

6

Beveridge review this material they requested and were granted access to by this Court. *See* Ex. A, ¶ 7-9.

This Court, relying on Dr. Beveridge's preliminary findings, has already found that good cause exists for this discovery. Thus, this Court should re-allow access to this discovery now where it is unavailable to current counsel through any other means.

**III.    The Court of Appeals, like this Court, faulted the defense for not presenting the type of data that trial counsel failed to access.**

Mr. Savage's appellate attorneys pursued this issue in the Court of Appeals. *See United States v. Savage*, case no. 14-9003, Opening Brief filed Oct. 28, 2018 at 132-149. They pointed to the analysis adopted by this Court—the 50.23% comparative and 8.45% absolute disparity based solely on the 2011 qualified juror wheel. *Id*. The appellate attorneys did not cite to any of Dr. Beveridge's findings, such as his analysis of six years' worth of preliminary jury data that had been attached to the supplemental discovery motion. *Id*.

The lack of any data spanning a greater time frame than just Mr. Savage's trial was a major problem for the Court of Appeals, as reflected during the oral argument. The circuit judges on the panel asked Mr. Savage's appellate attorney "isn't it, in fact the case, that, in order to make a systemic argument of the sort you're making, you can't give the Court a snapshot; you have to give the Court, in effect, a movie, a series of points of data…over a significant enough period of time…for there to…be an assertion about that?" *United States v. Savage*, case no. 14-9003, Jan. 7, 2020, Transcript of Oral Argument, Doc. 411 at 185-86. Mr. Savage's counsel readily agreed with the Court's statement, conceding "that was

not done, you're correct that that was not done here." *Id. See also id*. at 196 ("…notwithstanding the lack of longitudinal data that I concede was not produced in the District Court…").

Government counsel aptly noted that "usually, people bring in experts to mine the data, to figure out what really was the actual racial percentage of the actual venire that the Court was using." *Id*. at 202. The government argued: "[t]his Court has been explicit that you have to show systematic exclusion over a period of time" and that longitudinal data is required because "at any moment in time, one wheel could be different from another." *Id*. at 202-03. Government counsel then *conceded* that "If you were to tell me that there was a disparity like that or a 50 percent disparity in this district over a period of years, yes, *I would be very concerned about that, and yes, the Court should be doing something about that*. But there has been no showing at all." *Id*. at 205-06 (emphasis added). Though Dr. Beveridge had opined that this very disparity had existed in the Eastern District of Pennsylvania over a period of at least six years, appellate counsel, like trial counsel, failed to properly present this evidence to the Court.

The Court of Appeals ultimately rejected the fair cross-section claim, finding just as this Court did that the claim failed the second and third *Duren* prongs. *United States v. Savage*, 970 F.3d 217, 252-62 (3d Cir 2020). As to the second prong, the Court of Appeals used essentially the same statistics as this Court, drawing only from the 2011 qualified wheel.  *Id*. at 256. The Court held this disparity was insufficient to establish that there was unreasonable underrepresentation under Third Circuit precedent. *Id*. at 256-59. The Court noted that it could also consider other statistical measures to evaluate disparity, such as

standard deviations. *Id*. at 256 n.35. But, since trial counsel had failed to utilize Dr. Beveridge's expertise or even access the necessary juror data made available by this Court's order, Mr. Savage was left without statistical information like the standard deviation to present the Court of Appeals in support of this claim.

The Court of Appeals also held that the fair cross-section claim failed on the third prong: that the disparity was systematic. *Id*. at 259-61. It explained that "drawing on voter registration lists alone might be actionable 'under some circumstances' when use of those lists 'over time did have the effect of sizeably underrepresenting a particular class or group on the jury venire.'" *Id*. at 260 (quoting *Weaver*, 267 F.3d at 244-45). Noting appellate counsel's concession at oral argument that counsel "had not provided the District Court with any record of underrepresentation over time," the Court of Appeals ruled that Mr. Savage could not establish the third prong of a fair cross-section violation. *Id*. *See also id.* at 260 ("Savage's failure to show the District Court that Blacks were underrepresented on an ongoing basis prevents him from establishing systematic exclusion.").

## IV.     There is good cause to believe that if Mr. Savage is granted access to this data, he will prevail on this claim.

The need for additional data to prove the fair-cross section claim remains as critical now as it was in March of 2013 when this Court recognized its import and first granted access to the data. It should do so again.

In his § 2255 motion, Mr. Savage argued that his trial counsel ineffectively litigated his fair cross-section motion. Doc. 1746 at 514-20. He argued that trial counsel should have presented the preliminary data from Dr. Beveridge in support of the fair cross-section

claim, trial counsel should have sought data for a greater span of time than had been requested, and that trial counsel failed to utilize the pre-trial discovery granted by this Court. *Id*. Mr. Savage also alleged that trial counsel were ineffective for failing to raise that the underrepresentation of Hispanic jurors was also a fair cross-section violation. *Id*. Mr. Savage now seeks access to previously granted discovery to further develop these claims.

Both this Court and the Court of Appeals held that the single snapshot statistic comparing the 2011 qualified wheel to the general population of the district was insufficient to establish prongs two and three of a fair cross-section analysis. Additional evidence was indeed necessary to establish both of those prongs, including a proper statistical analysis with expert opinions on any standard deviation, longitudinal data reflecting the rates of the disparity over a period of time, longitudinal evidence of disparities in the grand jury process, and longitudinal evidence of the disparities in other distinct groups such as Hispanic jurors. *See* Ex. A, B.

The Court of Appeals has held that longitudinal data is relevant for determining prong one—whether a disparity is unfair and unreasonable. The "magnitude of a disparity" depends, in part, on the length of time it has existed—for example, "a disparity of fifteen percentage points is much more significant if it has continued for ten years, than if it has occurred in only one isolated year." *Ramseur v. Byer*, 983 F.2d 1215, 1233 (3d Cir. 1992), quoting *Bryant v. Wainwright*, 686 F.2d 1373, 1377 (11th Cir. 1982).

The Third Circuit and Supreme Court have also held that one method of proving the systematic nature of a disparity is to show "a large discrepancy over time such that the system must be said to bring about the underrepresentation." *See Weaver*, 267 F.3d at 244-

45. *See also Duren*, 439 U.S. at (the "undisputed demonstration that a large discrepancy occurred not just occasionally but in every weekly venire for a period of nearly a year manifestly indicates that the cause of the underrepresentation was systematic—that is, inherent in the particular jury-selection process utilized").

Per the prior court rulings, the defense simply could not show that a comparative disparity of 50% was serious enough to warrant a remedy without showing that the 50% disparity was not just a one-time occurrence. Instead, defense counsel had to show that the 50% disparity persisted and was representative of the typical jury venire in the district, which it could not do without longitudinal data. Longitudinal data spanning a period of years is needed to demonstrate that the observed disparity is not just an anomaly when compared to, or taken in context of, the rest of the data set. The case law at the time of Mr. Savage's trial was clear on the need for additional data points, not just the one snapshot in time which they offered and which courts have found insufficient.

The jury data was almost certain to establish, at minimum, what the government *conceded* would establish a violation: "a 50 percent disparity in this district over a period of years." *See United States v. Savage*, case no. 14-9003, Jan. 7, 2020, Transcript of Oral Argument, Doc. 411 at 185-86; *compare* Doc. 869-2 (Dr. Beveridge's analysis that venires in the district going back to 2007 reflected 41-57% disparities for Black and Hispanic potential jurors). The data sought is highly likely to prove that the disparity seen in Mr. Savage's case was not an anomaly, was consistent over a period of time, and will give the jury composition expert the necessary information to understand the cause of the disparities.

In addition to evidence that there was a substantive fair cross-section violation in Mr. Savage's case, there is good cause that the discovery will help establish that his prior counsel were constitutionally ineffective. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984) (ineffective assistance of counsel claims require showing that counsel's performance was deficient and the deficiency prejudiced the defense).

First, there is no reasonable strategic explanation for not accessing this jury information to excuse trial counsel's actions. The hired expert, Dr. Beveridge, had told counsel that this information was exactly what he needed to conduct a complete analysis of the jury composition in the district. *See* Ex. A-2. Counsel had indeed *sought* this information in a discovery motion. *See* Doc. 869. The expert, not counsel, would have done the actual work of accessing the material and reporting back to them—so there was not even a question of balancing time constraints. Further, this work would have been done outside the presence of the jury so there were no countervailing strategic issues to balance. Failing to access and use the data was deficient.

Jury composition errors are structural; they affect the fundamental fairness of a trial and require reversal even without a showing of prejudice. *See Taylor v. Louisiana*, 419 U.S. 522, 530 (1975) (the fair cross-section requirement is "fundamental to the jury trial guaranteed by the Sixth Amendment"); *see also United States v. Rodriguez-Lara*, 421 F.3d 932, 940-41 (9th Cir. 2005) ("The selection of a grand or petit jury in violation of either the equal protection or the fair cross-section guarantee is structural error that entitles a defendant to relief without a demonstration of prejudice.") *overruled on other grounds by United States v. Hernandez-Estrada*, 749 F.3d 1154 (9th Cir. 2014). Thus, Mr. Savage was

prejudiced because there was a reasonable probability that he would have won this motion in this Court or on appeal, resulting in the reversal of his conviction.

For all these reasons, there is good cause to grant Mr. Savage's current expert, Jeffrey Martin, access to the same material as was granted to trial counsel's expert.

## V.      Requested Discovery

Mr. Savage specifically requests this Court allow Jeffrey Martin to access the same material made available to trial counsel's expert via court order on March 5, 2013, (Doc. 1137), and further explained in the Court's memorandum, (Doc. 1136), subject to appropriate redactions such as social security numbers or other non-relevant information:

1. The actual Master lists for 2007, 2009, and 2011, containing home addresses and any available information regarding sex, age, race, or ethnicity of each voter.

2. Questionnaires mailed to individuals on the master list that were returned as undeliverable.

3. The actual Qualified lists for 2007, 2009, and 2011, containing home addresses and any available information regarding sex, age, race, or ethnicity of each voter.

4. Summonses mailed to individuals on the qualified list that were returned as undeliverable.

5. Access to excuse orders issued by the district court judge.

6. A list of jurors summoned each week from September 1, 2008 until the date of trial.

7. A list of jurors that appeared at the Courthouse for juror orientation from September 1, 2008 until the date of trial.

## VI.    Order of Confidentiality

Mr. Savage's expert, Jeffrey Martin, will sign an affidavit of confidentiality, will scrupulously follow any protective order, and will anonymize the data before providing information to counsel. *See* Ex. B, ¶¶ 30-36.

### CONCLUSION

WHEREFORE, Kaboni Savage respectfully requests that this Honorable Court grant the foregoing Motion and order that the Court provide access to the materials requested therein.

Respectfully submitted,

*/s/ Bridget L. Kennedy*
Bridget L. Kennedy
CA Bar 253416; OH Bar 100802
Assistant Federal Public Defender
Capital Habeas Unit
Office of the Federal Public Defender
Southern District of Ohio
10 West Broad Street, Suite 1020
Columbus, OH 43215
Bridget_kennedy@fd.org
(614) 469-4141

Kathryn Bailey
PA ID 308242
Assistant Federal Public Defenders
Capital Habeas Unit
Office of the Federal Public Defender
Western District of Pennsylvania
1001 Liberty Avenue, Ste. 1500
Pittsburgh, PA 15222
kara_bailey@fd.org
(412) 644-6565

ATTORNEYS FOR KABONI SAVAGE

14

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing was filed electronically through the ECF system and notice sent to counsel of record for all parties on this date.

*/s/ Kathryn Bailey*

Kathryn Bailey
PA ID 308242
Assistant Federal Public Defender
Capital Habeas Unit
Office of the Federal Public Defender
Western District of Pennsylvania
1001 Liberty Avenue, Ste. 1500
Pittsburgh, PA 15222
kara_bailey@fd.org
(412) 644-6565

ATTORNEY FOR KABONI SAVAGE

1