# Exhibit
# A

## DECLARATION OF ANDREW A. BEVERIDGE, PH.D.

I, Andrew A. Beveridge, Ph.D., declare under penalty of perjury the following to be true to the best of my information and belief:

1. I have been qualified as an expert in demographic and statistical analysis in numerous cases in federal and state courts.

2. In some of those cases serious issues were found with the representation of the Jury System, and a variety of different remedies were adopted by the court and/or the prosecution. A complete list of these and other cases are listed in my curriculum vitae, attached to this declaration.

3. In 2012, I was jointly retained by several defendants in *United States v. Savage et al.* I was hired to analyze the racial composition of the federal jury selection system in the Eastern District of Pennsylvania and look at whether any demonstrable disparity was the result of a systematic factor in the selection of jurors.

4. I was provided material from the Eastern District of Pennsylvania regarding: (a) the jury plan; (b) the distribution of the source lists for 2007, 2009, and 2011; (c) the qualified lists for 2007, 2009, and 2011; (d) the original summoned jurors list from this case; and (e) the list of jurors completing questionnaires for this case. From all the evidence I saw the composition of the source list, the qualified list, the jurors summoned and those completing questionnaires had very high levels of disparity with respect to Blacks and Hispanics in each of the lists.

5. In November 2012 I prepared a chart of my preliminary analysis, a copy of which is attached to this declaration as Exhibit 1, and a memorandum to the defense attorneys summarizing my findings, also attached here as Exhibit 2. I felt the disparity was very high, warranted additional analysis, and I explained to the defense attorneys the additional information I needed to conduct the analysis.

6. In December 2012, I provided a declaration, attached here as Exhibit 3, to explain to the judge the additional jury composition data I needed in order to conduct an actual statistical analysis and provide an expert opinion on the existence of any disparities, and whether any disparities were the result of systematic exclusion.

7. Courts have routinely granted access to the kind of data that I identified in my declaration, so I was expecting that access to this data would be granted and that I would be conducting a formal jury composition analysis for the defendants in this case.

8. I was never contacted again to conduct a formal jury composition analysis in this case. I did not access additional data in this case, and never told that the court had granted me access to additional material. I was available and willing to review the data in the spring of 2013.

9. I always wondered why the attorneys did not have me complete a formal analysis of the data since I thought the preliminary data strongly supported the need for further statistical analysis to determine whether the preliminary data findings were borne out. Based on my education and professional experience and expertise, this is a case where I believed then, as I do now, that further statistical analysis is warranted.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is a true and correct statement. Signed this _17th_ day of _March_, 2024.

Andrew A. Beveridge, Ph.D.

| Exhibit 2.  Preliminary Analyses of Jury Pools for Eastern District of PA (November 13, 2012) | | | | | |
|---|---|---|---|---|---|
| **Ideal Wheel (Citizen of Voting Age Population, Based Upon 2008-2010 American Community Survey, Census 2011)** | | | | | |
| | Total | 4,033,705 | | | | |
| | Black | 660,721 | 16.38% | | | |
| | Hispanic | 246,798 | 6.12% | | | |
| | | | | | | |
| **Source Lists** | | | | | | |
| | | | | | | |
| **2007** | | | | | | |
| | Total | 150,528 | | | | |
| | Unknown | 75,737 | | | | |
| | Known | 74,791 | | | | |
| | | | | | **Absolute Disparity** | **Comparative Disparity** |
| | Black | 6,353 | 8.49% | | -7.89% | -48.1% |
| | Hispanic | 2,402 | 3.21% | | -2.91% | -47.5% |
| | | | | | | |
| **2009** | | | | | | |
| | Total | 150,362 | | | | |
| | Unknown | 82,675 | | | | |
| | Known | 67,687 | | | | |
| | | | | | **Absolute Disparity** | **Comparative Disparity** |
| | Black | 6,019 | 8.89% | | -7.49% | -45.7% |
| | Hispanic | 2,386 | 3.53% | | -2.59% | -42.4% |
| | | | | | | |
| **2011** | | | | | | |
| | Total | 144,290 | | | | |
| | Unknown | 88,947 | | | | |
| | Known | 55,343 | | | | |
| | | | | | **Absolute Disparity** | **Comparative Disparity** |
| | Black | 4,308 | 7.78% | | -8.60% | -52.5% |
| | Hispanic | 1,981 | 3.58% | | -2.54% | -41.5% |
| | | | | | | |

Beveridge Ex. 1

| Qualified Wheels | | | | | |
|---|---|---|---|---|---|
| **2007** | | | | | |
| | Total | 43,328 | | | |
| | Unknown | 1,047 | | | |
| | Known | 42,281 | | | |
| | | | | **Absolute Disparity** | **Comparative Disparity** |
| | Black | 3,930 | 9.29% | | -7.09% | -43.3% |
| | Hispanic | 1,106 | 2.62% | | -3.50% | -57.2% |
| | | | | | |
| **2009** | | | | | |
| | Total | 37,475 | | | |
| | Unknown | 329 | | | |
| | Known | 37,146 | | | |
| | | | | **Absolute Disparity** | **Comparative Disparity** |
| | Black | 3,546 | 9.55% | | -6.83% | -41.7% |
| | Hispanic | 1,088 | 2.93% | | -3.19% | -52.1% |
| | | | | | |
| **2011** | | | | | |
| | Total | 30,250 | | | |
| | Unknown | 254 | | | |
| | Known | 29,996 | | | |
| | | | | **Absolute Disparity** | **Comparative Disparity** |
| | Black | 2,531 | 8.44% | | -7.94% | -48.5% |
| | Hispanic | 937 | 3.12% | | -2.99% | -48.9% |
| | | | | | |
| **Trial Venires** | | | | | |
| | | | | | |
| **Summons** | | | | | |
| | Total | 979 | | | |
| | Unknown | 7 | | | |
| | Known | 972 | | | |
| | | | | **Absolute Disparity** | **Comparative Disparity** |
| | Black | 96 | 9.88% | | -6.50% | -39.7% |
| | Hispanic | 36 | 3.70% | | -2.41% | -39.5% |
| | | | | | |
| **Questionnaires** | | | | | |
| | Total | 549 | | | |
| | Unknown | 3 | | | |
| | Known | 546 | | | |
| | | | | **Absolute Disparity** | **Comparative Disparity** |
| | Black | 52 | 9.52% | | -6.86% | -41.9% |
| | Hispanic | 23 | 4.21% | | -1.91% | -31.2% |

Beveridge Ex. 1

## DISPARITIES IN THE EASTERN DISTRICT OF PHILADELPHIA

**TO:**        PAUL M. GEORGE

**FROM:**    ANDREW A. BEVERIDGE

**SUBJECT:**  DISPARITIES IN THE EASTER DISTRICT OF PENNSYLVANIA

**DATE:**     11/13/2012

**CC:**        WILL SPADE, TOM EGAN, J HOWE

I have quickly reviewed the materials supplied regarding the jury plan, the distribution of the source lists, qualified lists, summoned jurors and jurors completing questionnaires for the Eastern District of Pennsylvania. I have also read the response to the discovery motion.

From all evidence I have seen the composition of the source list, the qualified list, the jurors summoned and those completing questionnaires have very high levels of disparity with respect to blacks and Hispanics in each of the lists. These data are shown in the attached table. But the absolute disparities with respect to blacks range 6.86 percent to 8.60 percent and the comparative disparities range from 52.5 percent to 39.7 percent. This means that with respect to blacks the jury venires and qualified lists have forty percent or even fewer blacks than they would if they reflected the "ideal wheel." Here I used the 2008-2010 American Community Survey data, which has information about citizenship, and the comparison I used are the citizen of voting age population (CVAP), since to be on a jury one must be of voting age and a citizen.

With respect to Hispanics the absolute disparities range from 1.91 percent to 3.50 percent and the comparative disparities range from 39.1 percent to 57.2 percent. This means that with respect to Hispanics, the jury venires and qualified lists have forty percent or even fewer Hispanics than they would have if they reflected the "ideal wheel."

These disparities mean that the venires and the likely panels will likely have many fewer blacks and Hispanics among the prospective jurors than they would if there were no disparities.

To examine the source of these disparities will require many of the items denied in the discovery motion, including:

The Source Lists—These are necessary to understand the distribution of prospective jurors geographically throughout the Easter District. With the address of the jurors (name is not necessary) it will be possible to impute the race and Hispanic status of those to which qualification questionnaires were mailed.

The Response to the Mailing—It is important to know the disposition of the mailing. Which questionnaires were returned, which were returned undeliverable, and which were not returned. Apparently the voting lists have race and Hispanic information for some large proportion (roughly 40 or 50 percent) of the source list. For the source list with known race and Hispanic status, the disparities are similar to those of the qualified list, where a questionnaire was completed. I should note that, as in U.S. v. Green, there is no guarantee that if a jury questionnaire is mailed to an address on a voter list, that the individual to whom the mailing is directed is

actually resident at that address.   Non-response rates as high as 40 to 50 percent are not uncommon in my experience.   We do not know the rate, or where the non-response is high or low from the data currently available.   However, in my experience homeowners and more affluent households are more likely to yield a response.   Renters and the less affluent move quite often and thus are less likely to be at the address at which they registered to vote.   Due to the "motor voter" law, voters cannot be automatically purged until they have not voted in four succeeding general elections, which means that they can linger on the voter list for up to four years, even if they have moved.

Analysis of Creation of the Qualified List—It is very important to understand how the qualification process works, as well as who is exempted or deferred from jury service.  Since service on a county jury will lead to the ability to be exempted, it is quite possible that underrepresentation from Philadelphia and other urban areas with high crime rates and very active local courts could in part be a result of that policy.

Difference between summoned jurors and jurors who respond—Which prospective jurors do and do not show up for service should also be analyzed, though I note that the disparities between summoned jurors and those filling out the venire questionnaire is roughly the same.

Granting access to these jury materials usually is routine.   I have used these materials in numerous cases including cases in the Southern District of New York, the Eastern District of Massachusetts, the Eastern District of Louisiana, as well as in the Western District of Pennsylvania, and in many state cases.   Using them for analytical purposes in no way threatens the integrity of the jury.   Indeed, the lawyers will actually never see the raw lists but only results of my analysis.   However, the actual records of address of the jurors are particularly important, as well as other materials that are usually on voter lists, including age and gender.   Though I have had access to occupation, it is not a relevant for these analyses.   I should note that the voter lists themselves are publicly available in Pennsylvania.

## DECLARATION OF DR. ANDREW A. BEVERIDGE

ANDREW A. BEVERIDGE, under penalty of perjury, makes the following declaration:

## QUALIFICATIONS

1. I, Andrew A. Beveridge, am a professor of sociology at Queens College and the Graduate Center, City University of New York.  My curriculum vitae is attached as Exhibit 1.

2. I have been qualified as an expert in demographic and statistical analysis in numerous cases in federal and state court.  Most particularly I have been involved in many challenges to Federal and State Jury Systems, these include the following:

**Federal Jury System Challenges**:  Andrea Hirsch, *Martinez v. Kelly*.  U.S. Appeals Court for the Second Circuit.  Analyzed effects of peremptory challenges for *habeas corpus* petition.  2006-2007;  Stern Shapiro Weissberg & Garin. *United States v. Darryl Green, et al.* U.S. District Court for the Eastern District of Massachusetts.  Analyzed jury selection system for using Census data, local lists and other materials.  Filed 7 declarations and testified twice. 2004-2006;  Federal Public Defender, Eastern District of LA, New Orleans, LA.  *United States v. Torres*.  Analyzed jury selection system for the Eastern District of Louisiana based upon Census Data and Estimates, as well as filings in the Eastern District.  Declaration filed.  2006;  Federal Public Defender, Eastern District of LA, New Orleans, LA.  *United States v. Caldwell*.  Analyzed jury selection system for the Eastern District of Louisiana based upon Census Data and Estimates, as well as filings in the Eastern District.  Declaration filed.  2006. ;  Federal Public Defender, Western District of PA, Pittsburgh.  *United States v.Lawrence Skiba*.  Analyzed jury selection system for the Pittsburgh Division of the Western District of Pennsylvania based upon Census Data and Estimates, as well as filings in the Western District.  Affidavit filed.  2004;  Federal Public Defender, Western District of PA, Pittsburgh.  *United States v. Minerd*.  Analyzed jury selection system for the Pittsburgh Division of the Western District of Pennsylvania based upon Census Data and Estimates, as well as filings in the Western District.  Affidavit filed.  2002;  Federal Public Defender, Western District of PA, Erie, PA.  *United States v. Rudolph Weaver.*  Analyzed jury selection system for the Pittsburgh Division of the Western District of Pennsylvania based upon Census Data and Estimates, as well as jury lists and voting.  Affidavit Submitted 2001;  Newman Schwartz and Greenberg.  *United States v. Albert J. Pirro, Jr.*  Filed affidavit that analyzed representation in master jury wheel for White Plains and Foley Square Court Houses in the Southern District using census data with respect to the dilution of Italian Americans likely to be on a jury, if venue changed from White Plains to Foley Square.  Venue change motion was denied.  2000. ;  Polstein, Ferrara, Dwyer and Speed and Stephen P. Scaring.  *United States v. Dennis McCall, Trevor Johnson.* Analyzed representation in master jury wheel for White Plains Court House in the Southern District.  Filed affidavit, which was cited in judge's opinion.  1998;  Curtis, Mallet-Prevost, Colt and Mosle, *United States v. Don King and Don King*

1

*Productions.* Analyzed representation in master jury wheel for New York City Courthouse in the Southern District.  Affidavit and Consulting.  1997-1998; Dominick Porco. *United States v. Kevin Veale.*  Analyzed representation in master jury wheel for White Plains Court House in the Southern District.  Filed affidavit. 1997.  ;  Diarmuid White, *United States v. Jose Reyes, et al.*  Analyzed representation in master jury wheel for New York City Courthouse in the Southern District.  Report and testimony in case cited in the judge's opinion. 1996;

**State Court Jury System Challenges**  Fitch Richardson, *Commonwealth of Virginia v. Prieto.*  Fairfax County Virginia Circuit Court. Affidavit and Trial Testimony, 2010. ;  Capital Defenders Office, Atlanta GA. *State of Georgia vs. Jason McGhee.* Forsyth County Georgia State Court. Trial Testimony, 2010. ;  Public Defenders Office and Joseph Flood, *Commonwealth of Virginia v. Sanchez.*  Prince William County Virginia Circuit Court. Analyzed Jury Selection in Prince William County, VA.  Affidavit, 2008;  Ferrell Law, *Commonwealth of Virginia v. Ajlan.*  Prince William County Virginia Circuit Court. Analyzed Jury Selection in Prince William County, VA.  Affidavit, 2008;  New Hampshire Public Defender, *New Hampshire v. Addison.*  Hillsborough County, New Hampshire, North Division, Superior Court. Declaration, Deposition and Testimony, 2008;  Public Defenders Office, *Commonwealth of Virginia vs. Portilla-Chicas.*  Stafford County Virginia Circuit Court. Analyzed Jury Selection in Stafford County, VA.  Affidavit, 2006.  ;  Virginia Indigent Defense Commission, *Commonwealth of Virginia vs. Rogers.*  Stafford County Virginia Circuit Court.  Analyzed Jury Selection in Stafford County, VA. Report and Testimony, 2006.  ;  Criminal Legal Clinic of Syracuse University Law School, *People v. Tyisha Taylor.*  Syracuse City Court.  Analyzed Jury Selection System for Syracuse and Onondaga County, New York.  Testimony, 2005;  Capital Defenders Office, *New York State v. Sweat.*  Analyzed representation in jury selection in Broome County, New York.  Two affidavits filed, one relating to factors likely to lead to underrepresentation of African Americans in Jury Pool, another related to the operation of the allocation of jurors among courts in Broome County.  (Capital Murder Case.)  2003 ;  Michael J. Spiegel, *New York State v. Dennis Salvador Alvarez-Hernandez,* Analyzed representation in jury selection in Westchester County, New York.  Analysis based upon census data and estimates, and an emulation of the reported jury selection process using voter lists and other sources.  Filed affidavit reporting results. (Capital murder case.) 2001--.2003; Capital Defenders Office, *New York State v. Taylor.*  Analyzed representation in jury selection in Queens County, New York.  Analysis based upon census data and estimates, and an emulation of the reported jury selection process using voter lists and other sources.  Filed affidavit reporting results; testified at hearing.  Produced demographic analyses by town to assist in jury selection.  Testified in 2002. (Capital murder case.) 2000-2002;  Mann and Mitchell, *State of Rhode Island vs. David Tremblay.*  Analyzed representation in jury selection in Bristol and Providence Counties, Rhode Island. Affidavit filed that includes an analysis of the geographic, racial, and Hispanic representation of jurors in counties in Rhode Island and includes an estimate of the disparities by race and Hispanic status.  1999-2001; Capital Defenders Office, *New*

2

*York State v. McCoy.* Analyzed representation in jury selection in Suffolk County, New York. Analysis was based upon census data and estimates, and an emulation of the reported jury selection process using voter lists and other sources. Filed affidavit reporting results. Produced demographic analyses by town to assist in jury selection. (Capital murder case.) 1997-1998; Reynolds, Caronia and Gianelli. *New York State v. Robert Shulman.* Analyzed representation in jury selection in Suffolk County, New York. Analysis was based upon census data and estimates, and an emulation of the reported jury selection process using voter lists and other sources. Filed affidavit reporting results. (Capital murder case.). 1997. Opinion reproduced in New York *Law Journal*; Capital Defenders Office, *New York State v. Gordon.* Analyzed representation in jury selection in Queens County, New York. Analysis was based upon census data and estimates, and an emulation of the reported jury selection process using voter lists and other sources. Filed affidavit reporting results. (Capital murder case.) 1997. Opinion reported on and reproduced in New York *Law Journal;* Capital Defenders Office, *New York State v. Sam Chinn, III.* Analyzed representation in jury selection in Onondaga County. Affidavit filed that presented an analysis of the geographic, racial, and Hispanic representation of jurors. It includes an estimate of the disparities by race and Hispanic status. Plea bargain offered and accepted. Discussed at presentation at the New York State Defenders Association, Glen Falls, NY. (Capital murder case.) 1997; Capital Defenders Office, *New York State v. George Bell* Analyzed representation in jury selection in Queens County, New York. Analysis was based upon census data and estimates, and an emulation of the reported jury selection process using voter lists and other sources. Filed affidavit reporting results. (Capital murder case.) 1996-1997; Capital Defenders Office, *New York State v. Hale.* Analyzed representation in jury selection in Kings County, New York. Analysis was based upon census data and estimates, and an emulation of the reported jury selection process using voter lists and other sources. Filed affidavit reporting results. (Capital murder case.) 1996-1997;

3.   I have been retained by the attorneys for Defendants in [XXXXXXXX  Fill this in] to analyze the racial composition of the jury system in the Eastern District of Pennsylvania, and understand if the demonstrable disparity is the result of a systematic factor in the selection of jurors.

## PROPOSED ANALYSIS

4.   The starting point for an analysis of the representation of African-Americans  and Hispanics in the jury system for the Eastern District of PA is a comparison of the percentage of African-Americans and Hispanics in the jury system with the representation of African-Americans and Hispanics the voting age population of the Eastern District of Pennsylvania. Preliminary numbers suggest a substantial disparity.

5.    From all evidence I have seen the composition of the source list, the qualified list, the jurors summoned and those completing questionnaires have very high levels of disparity with respect to blacks and Hispanics in each of the lists. These data are shown in Exhibit 2. But the absolute disparities with respect to blacks range 6.86 percent to 8.60 percent and the comparative disparities range from 52.5 percent to

Beveridge Ex 3

39.7 percent.  This means that with respect to blacks the jury venires and qualified lists have forty percent or even fewer blacks than they would if they reflected the "ideal wheel."  Here I used the 2008-2010 American Community Survey data, which has information about citizenship, and the comparison I used are the citizen of voting age population (CVAP), since to be on a jury one must be of voting age and a citizen.

6.    With respect to Hispanics the absolute disparities range from 1.91 percent to 3.50 percent and the comparative disparities range from 39.1 percent to 57.2 percent.  This means that with respect to Hispanics, the jury venires and qualified lists have forty percent or even fewer Hispanics than they would have if they reflected the "ideal wheel."

7.    These disparities mean that the venires and the likely panels will have many fewer blacks and Hispanics among the prospective jurors than they would if there were no disparities.

8.    There are several factors that could mean that these disparities are systematic, these include:

a.    The voting list being used, was compiled around 2010, very likely missed the efforts expended before the 2012 election to register many who were unregistered.  These likely included many African Americans and Hispanics, as well as younger people.

b.    Furthermore, renters and African Americans and Hispanics are much more likely to be mobile so those on the list in 2010 may have moved and not be reached.  It is well known that many voter lists have "dead wood," those on the list not really resident in the jurisdiction.  So a jury questionnaire or summons to such individuals would not be answered.

c.    Since service on a county jury will lead to the ability to be exempted, it is quite possible that underrepresentation from Philadelphia and other urban areas with high crime rates and very active local courts could in part be a result of that policy.

d.    There are remedies, including taken into account the actual response to mailings, which is the jury plan now in place for the Eastern District of Massachusetts.

**NECESSARY DATA**

9.    To examine the source of these disparities will require a number of items that are readily available to  discovery motion, including:

a.    The Source Lists—These are necessary to understand the distribution of prospective jurors geographically throughout the Eastern District.  With the address of the jurors (name is not necessary) it will be possible to impute the race and Hispanic status of those to which qualification questionnaires were mailed.  It will also be possible to assess whether the compilation of the list reflects the geographic distribution of prospective

4

jurors. The raw voter lists used by the jury commissioner and/or the commissioner's contractor are needed. The Response to the Mailing—It is important to know the disposition of the mailing. Which questionnaires were returned, which were returned undeliverable, and which were not returned. Apparently the voting lists have race and Hispanic information for some large proportion (roughly 40 or 50 percent) of the source list. For the source list with known race and Hispanic status, the disparities are similar to those of the qualified list, where a questionnaire was completed. I should note that, as in U.S. v. Green, there is no guarantee that if a jury questionnaire is mailed to an address on a voter list, that the individual to whom the mailing is directed is actually resident at that address. Non-response rates as high as 40 to 50 percent are not uncommon in my experience. We do not know the rate, or where the non-response is high or low from the data currently available. However, in my experience homeowners and more affluent households are more likely to yield a response. Renters and the less affluent move quite often and thus are less likely to be at the address at which they registered to vote. Due to the "motor voter" law, voters cannot be automatically purged until they have not voted in four succeeding general elections, which means that they can linger on the voter list for up to four years, even if they have moved. For all of these reasons the disposition of the mailing for each supposed prospective juror is needed. .

b.    Analysis of Creation of the Qualified List—It is very important to understand how the qualification process works, as well as who is exempted or deferred from jury service. Since service on a county jury will lead to the ability to be exempted, it is quite possible that underrepresentation from Philadelphia and other urban areas with high crime rates and very active local courts could in part be a result of that policy.

c.    Difference between summoned jurors and jurors who respond—Which prospective jurors do and do not show up for service should also be analyzed, though I note that the disparities between summoned jurors and those filling out the venire questionnaire are roughly the same in the preliminary data.

d.    Granting access to these jury materials usually is routine. I have used these materials in numerous cases including cases in the Southern District of New York, the Eastern District of Massachusetts, the Eastern District of Louisiana, as well as in the Western District of Pennsylvania, and in many state cases. Using them for analytical purposes in no way threatens the integrity of the jury. Indeed, the lawyers will actually never see the raw lists but only results of my analysis. However, the actual records of address of the jurors are particularly important, as well as other materials that are usually on voter lists, including age and gender. Though I have

5

had access to occupation, it is not a relevant for these analyses. I should note that the voter lists themselves are publicly available in Pennsylvania.

e.      I need the following information from the jury commissioner or the contractor in electronic form:

    i.      The Master Jury Wheel and the Qualified Jury Wheel based upon Master Wheel data from 2007, 2009 and 2011, and the voter lists upon which they were based. On the Master Jury Wheel and Qualified Wheels themselves the entire list, including Juror Index Number, address, and race and Hispanic status (if available).

    ii.     The disposition of the mailing to the Master Jury Wheel, including any subsequent mailings. The results of the jury questionnaire and the qualification process, including the reasons for any disqualification or deferment..

    iii.    The mailing of summons and the disposition of those mailings, including any disqualifications or deferments that resulted and the reasons such were granted.

    iv.     The monthly petit term list as of the end of each month from September 1, 2008 through to the date of the trial including Juror Index Number.

    v.      The venire panels from September 1, 2008 through the date that of the trial, including Juror Index Number.

    vi.     Any supplementation to any of the Master or Qualified Wheels.

10.    I understand that there are privacy concerns with respect to release of addresses. I have been provided with addresses on the master and qualified jury wheels in connection with federal jury selection challenges in the Eastern District of Massachusetts, the Southern District of New York, the Erie Division of the Western District of Pennsylvania and the Pittsburgh Division of the Western District of Pennsylvania, the Eastern District of Louisiana. To my knowledge, there was never any problem with misuse of the disclosed information. I also have been granted licenses to use confidential medical records by the New York Department of Health and to review school records by the National Center for Education Statistics. Again, there were no problems with misuse of confidential information.

9.     The confidentiality of any address information released to me will be preserved. The address information will not be shared with anyone other than my assistants and will not appear in the results of my analysis. I have a secure computer facility and my assistants and I will sign affidavits agreeing to preserve confidentiality.

10.    I believe the above information will show rates of return of juror qualification forms and appearance for service on venire panels.

6

Respectfully submitted,

_____
Andrew A. Beveridge, Ph.D.
December 16, 2012
Yonkers, NY (Bronxville, P.O.)

7