# IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA      :

     :      **CRIM. NO. 07-550**

KABONI SAVAGE      :

## ORDER

AND NOW, this     day of           , 2026, upon consideration of the defendant's Habeas Corpus Motion Pursuant to 28 U.S.C. § 2255, and the Government's Response thereto, it is ORDERED that the defendant's motion is DENIED. Furthermore, as the defendant has failed to make a substantial showing of a denial of any constitutional right, no certificate of appealability will be issued.

BY THE COURT:

_____
HON. CHAD F. KENNEY
*Judge, United States District Court*

1

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | **CRIM. NO. 07-550** |
| KABONI SAVAGE | : | |

**GOVERNMENT'S RESPONSE IN OPPOSITION TO THE
DEFENDANT'S HABEAS CORPUS MOTION PURSUANT TO 28 U.S.C. § 2255**

The United States of America, by its attorneys, David Metcalf, United States Attorney for the Eastern District of Pennsylvania, and David E. Troyer, Assistant United States Attorney for the district, respectfully files this Response in Opposition to the Defendant's Habeas Corpus Motion Pursuant to 28 U.S.C. § 2255, suggests that the motion be denied, and requests that the Court deny the defendant's motion without an evidentiary hearing as to all but a select few issues alleging ineffective assistance of counsel. Furthermore, as the defendant has failed to make a substantial showing of a denial of any constitutional right, the government respectfully requests that the Court decline to issue a certificate of appealability. In support thereof, the government represents as follows:

## I.    INTRODUCTION AND SUMMARY OF THE PROCEDURES BELOW

The defendant / petitioner Kaboni Savage was convicted of conspiracy to participate in the affairs of a racketeering (RICO) enterprise and multiple counts of murder in aid of racketeering, among other counts, pursuant to a jury trial. Savage was represented by competent and experienced defense counsel, was afforded due process, and had the benefit of a vigorous, well-funded defense. His attorneys valiantly and zealously defended him at trial, in the face of

1

overwhelming evidence of guilt. Savage's Constitutional rights were scrupulously honored by the district court and the government. Savage received full discovery by government counsel, who did not withhold any *Brady* or *Giglio* material. He received a full and fair trial, upon which he was properly convicted on all counts, and sentenced to death on all thirteen capital counts. Those 13 death sentences were commuted to life sentences by President Biden on December 22, 2024.

Savage was ably and competently represented by experienced defense counsel on appeal, who pursued all non-frivolous issues, filed a comprehensive 369-page appellate brief, a reply brief (supplemented by an amicus brief), and competently argued his case on appeal. Savage's convictions and sentences were affirmed by the Third Circuit, who then denied Savage's motion for rehearing en banc. *United States v. Savage*, 970 F.3d 217 (3d Cir. 2020). Savage's petition for writ of certiorari was then denied by the Supreme Court.

Government counsel was compelled to agree not to oppose a six-month breach of the statute of limitations, in order for Savage's capital habeas corpus counsel to file a petition under 28 U.S.C. § 2255. The district court agreed to Savage's request for an oversized petition.

On May 15, 2023, Savage's current attorneys filed the instant 715-page motion to vacate his convictions and sentences pursuant to 28 U.S.C. § 2255. They appended 399 exhibits to that motion. Savage's motion purports to raise 31 "claims," Motion at pp. 9-24, which they divide into five separate genres of claims: (1) "denial of right to counsel" (Claims 1-4); (2) "ineffective assistance of trial counsel" (Claims 5-15); (3) "ineffective assistance of appellate counsel" (Claim 16); (4) "prosecutorial misconduct" (Claims 17-25); and (5) "other constitutional or statutory violations" (Claims 26-31). Eleven of these claims contain multiple sub-claims,

resulting in a total of approximately 161 claims. Notwithstanding the sheer number of claims in this "shotgun" approach, none have merit and most are patently frivolous.

The majority of Savage's claims allege ineffective assistance of counsel as to trial attorneys Christian Hoey, Timothy Sullivan, and William Purpura. Savage re-packages some of these same claims as to appellate counsel. The balance of his claims, easily refuted by the record, falsely allege misdeeds by the district court and/or the government.

On November 2, 2023, the government moved for an order declaring Savage's waiver of attorney-client privilege, permitting defense trial counsel to speak to government counsel in order for the government to properly respond to Savage's claims of ineffective assistance of counsel. Habeas counsel futilely opposed that motion. On August 23, 2024, the district court granted that motion, as to that request.

While all three defense trial counsel initially agreed to be interviewed by government counsel, they later reversed their position, in response to pressure and/or threats by habeas counsel, by stating they would not speak to government counsel unless the district court first determined that a waiver of attorney-client privilege existed. However, when the district court eventually entered that Order on August 23, 2024, defense trial counsel shifted their position and maintained their refusal to speak to government counsel. On December 22, 2024, President Biden commuted Savage's death sentences to life imprisonment, subsequent to which Attorneys Purpura and Hoey then agreed to be interviewed by government counsel, while attorney Sullivan maintained his refusal to be interviewed. Eventually, after several months and multiple scheduling attempts, government counsel was able to interview attorneys Purpura and Hoey.1

---

1 Timothy Sullivan, appointed as learned counsel for Kaboni Savage, now serves as Chief U.S. Magistrate Judge for the District of Maryland, and maintains his refusal to speak to government

The vast majority of Savage's claims are conclusively refuted by the record, require no evidentiary hearing, and are subject to summary dismissal. Even those alleging ineffective assistance of counsel should be denied, as they are either conclusively refuted by the record or necessarily involve strategic decisions well within the purview of constitutionally competent counsel. Some of Savage's claims, including all of his rote claims of *Brady / Giglio* violations and other forms of prosecutorial misconduct, are unsustainable on their face, as they are complete fabrications. Indeed, many of Savage's claims against the district court, defense counsel, and government counsel are nothing short of outlandish, some sadly exceeding the bounds of professionalism.2

---

counsel. Thus, the government will have to subpoena him to testify at any hearing without the benefit of prior consultation.

2 It is difficult to fully characterize the bizarre nature of Savage's pleading. It is not only many times larger, at 715 pages, than any other federal capital habeas pleading, or and any post-conviction pleading the undersigned Assistant U.S. Attorney has seen in more than 43 years of practice, it also: (1) makes spurious claims that are totally made up, even to include alleging an affair between two defense counsel that did not occur and would not have constituted a conflict of interest even if it actually had occurred; (2) makes many false wholesale allegations of withholding *Brady* material, while citing as support documents *provided in discovery*; (3) conjures up fanciful alternate theories of defense as to all 12 murders, which "defenses" themselves are so far-fetched they may have constituted ineffective assistance had they been employed; (4) improperly re-argues issues already raised on direct appeal and decided against him by the Third Circuit; (5) complains of the trial court admitting documents the defense strategically agreed to admit; (6) complains that every defense witness called was either not properly prepared or was eviscerated on cross examination by the prosecutors; and (7) complains that trial counsel should have called witnesses who either (a) would have invoked their 5th Amendment rights against self-incrimination, (b) whom Kaboni Savage himself forbade trial counsel from calling or even speaking to (mostly, family members as to his childhood upbringing), or (c) whose testimony would have been rendered not credible on cross examination. The petition is also an unstructured mess, with 31 "claims" and sub-claims (totaling approximately 161), spread out and addressed almost randomly under 23 separate headings, with approximately 115 sub-headings. The government endeavors to address this by "claim."

## II.    LEGAL STANDARDS

The standard for demonstrating ineffective assistance is high. Ineffective assistance of counsel claims must be evaluated under the two-part test announced in *Strickland v. Washington*, 466 U.S. 668 (1984). To establish ineffective assistance of counsel, Savage must prove: (1) constitutionally deficient performance by his attorneys, and (2) prejudice as a result of that deficient performance. In order to satisfy the first prong, deficient performance, Savage must demonstrate that the errors by his attorney were so serious that his counsel did not perform the function guaranteed by the Sixth Amendment. *Id.* at 687. The defendant must show that counsel's representation "fell below an objective standard of reasonableness" based on the facts "viewed as of the time of counsel's conduct." *Id*. at 688, 690. Accordingly, the Court in *Strickland* held that "[j]udicial scrutiny of counsel's performance must be highly deferential," and courts "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. The Court went on to state that "[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689. *Accord, Keller v. Larkins*, 251 F.3d 408 (3d Cir. 2001); *Zettlemoyer v. Fulcomer*, 923 F.2d 284, 295 (3d Cir. 1993) (habeas corpus petitioner claiming ineffective assistance of counsel must show "that counsel made errors so serious that counsel's representation fell below an objective standard of reasonableness").

As to the second *Strickland* prong, Savage must show that he was prejudiced by counsel's allegedly deficient performance. *Strickland,* 466 U.S. at 687; *see also United States v. Headley*,

5

923 F.2d 1079, 1083 (3d Cir. 1991). To establish prejudice, the petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Headley*, 923 F.2d at 1083 (quoting *Strickland*, 466 U.S. at 694). The Court in *Strickland* explained that "[a] reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 695. Thus, the gravamen of the *Strickland* inquiry remains "whether, despite the strong presumption of reliability, the result of the particular proceeding is unreliable because of a breakdown in the adversarial process that our system counts on to produce just results." *Id.* at 696. A court must consider the totality of the evidence . . . in its prejudice evaluation. *United States v. Gray*, 878 F.2d 702, 711 (3d Cir. 1989), (quoting *Strickland*, 466 U.S. at 696).

A petitioner's claim of ineffective assistance of counsel will fail unless he affirmatively demonstrates both attorney error and resulting prejudice by alleging facts or specific details to identify precisely how his attorney failed to fulfill his obligations. *See Spillers v. Lockhart*, 802 F.2d 1007, 1010 (8th Cir. 1986), citing *Machibroda v. United States*, 368 U.S. 487, 495, (1962). Counsel cannot be ineffective for failing to raise meritless claims, and counsel's strategic choices are reviewed with a strong presumption of correctness. *United States v. Martin*, 2008 WL 241356 at *3 (3d Cir. Jan. 30, 2008) (not precedential); *Sistrunk v. Vaughn*, 96 F.3d 666, 670 (3d Cir. 1996).

A petitioner must identify specific acts or omissions which reveal that counsel did not provide "reasonably effective assistance," *Strickland*, 466 U.S. at 687, as measured by "prevailing professional norms." *Rompilla v. Beard*, 545 U.S. 374, 380 (2005). Prejudice is not presumed; rather, counsel is strongly presumed to have provided effective assistance, and the

6

petitioner has the burden to show otherwise. *Strickland*, 466 U.S. at 689. The prosecution has no duty to attempt to prove that defense counsel's strategy was actually reasonable (or even to define that strategy); rather, a petitioner must rebut the presumption that counsel's decisions were strategic. *See Strickland*, 466 U.S. at 690 ("strategic choices . . . are virtually unchallengeable"). Counsel's decisions about seeking to preclude certain testimony, whether and to what extent to conduct cross-examination, and whether to call certain witnesses are necessarily strategic and thus effectively insulated from ineffectiveness review. *Strickland*, 466 U.S. 689, *see also United States v. Martin*, 2008 WL 241356 at *3 (3d Cir. Jan. 30, 2008) (not precedential opinion); *Sistrunk v. Vaughn*, 96 F.3d 666, 670 (3d Cir. 1996). Similarly, failure to make a particular objection does not usually constitute ineffectiveness, because objections necessarily fall within trial strategy.

A petitioner may not relitigate claims that were actually decided on direct appeal (unless substantive law has changed). *United States v. Derewal*, 10 F.3d 100, 105 n. 4 (3d Cir. 1993), cert. denied, 511 U.S. 1033 (1994). As the Third Circuit has explained, "[a] § 2255 motion does not function as a second appeal." *United States v. Braddy*, 837 F. App'x 112, 115 (3d Cir. 2020) '(citing *United States v. Frady*, 456 U.S. 152, 165 (1982)). "(A) § 2255 motion 'is not a substitute for an appeal' and therefore cannot 'be used to relitigate matters decided adversely on appeal.'" *Nieves v. United States*, 2016 WL at *5 (D.N.J. Aug. 25, 2016), quoting *Government of Virgin Islands v. Nicholas*, 759 F.2d 1073, 1075 (3d Cir. 1985). As a consequence, in the absence of extraordinary circumstances, a petitioner may not use a collateral attack to re-litigate issues previously raised on direct appeal. *Braddy*, 837 F. App'x at 115.

## III.  PROCEDURAL HISTORY AND FACTS OF THE CASE[3]

### Procedural History

On April 8, 2009, a grand jury in the Eastern District of Pennsylvania returned a superseding indictment, charging Kaboni Savage, Steven Northington, Robert Merritt, and Lamont Lewis with 26 counts.[4] App. 17046; DDE # 51.[5] All four were charged with conspiracy to participate in the affairs of a racketeering enterprise, in violation of 18 U.S.C. § 1962(d), and multiple murders in aid of racketeering, in violation of 18 U.S.C. § 1959(a)(1). That first superseding indictment charged Kaboni Savage alone with murder in aid of racketeering for the murders of Kenneth Lassiter (Count 2), Mansur Abdullah (Count 3), and Tyrone Toliver (Count 6). Lamont Lewis was charged alone with the murder of Carlton Brown (Count 4). Kaboni Savage and Northington were charged together with the murders of Barry Parker (Count 5) and

---

[3]  As this matter was originally assigned to the trial judge, the Hon. R. Barclay Surrick, the government had planned to submit a more streamlined recitation of the procedural history and facts. However, on November 6, 2025, given Judge Surrick's apparently imminent retirement, this case was reassigned to this Court, thus requiring a more fulsome recitation of the facts. Then, on November 25, 2025, this Court entered orders requiring the government to respond to this defendant's petition, and those of the three co-defendants, by December 30, 2025. Citations are to the Appendices and Supplemental Appendix on direct appeal, all of which can be furnished to this Court. Likewise, there are references to government exhibits at trial (GX) and to district court docket entries (DDE).

[4]  Lamont Lewis had been charged in an initial seven-count indictment with drug, firearms, and murder-for-hire charges. App. 17043; DDE # 19. Although the superseding indictment added RICO conspiracy and VCAR murder charges against Lewis, none of Lewis' initial charges were charged against the defendants on direct appeal.

[5] The government herein references the appeals court pleadings: Kaboni Savage's appendix as "App.," and references the co-defendants' supplemental appendices as KD App. (for Kidada Savage's), SN App. (for Northington's), and RM App. (for Merritt's). The government's supplemental appendix is referred to as "Supp. App." We likewise refer to Kaboni Savage's brief as "Br.," while using the same initials for the co-defendants' briefs (e.g., "KD Br.").

8

Tybius Flowers (Count 7), and in Count 8 with witness tampering as to Flowers. Savage, Lewis, and Merritt were charged in Count 9 with conspiracy to murder six members of the family of cooperating witness Eugene Coleman, in violation of 18 U.S.C. § 1959(a)(5); in Counts 10 through 15 with murder in aid of racketeering for each of the Coleman victims they murdered; in Count 16 for retaliating against witness Eugene Coleman by murdering his family members, in violation of 18 U.S.C. § 1513 and 2; and in Count 17 for using fire to commit a felony, in violation of 18 U.S.C. § 844(h)(1), related to the Coleman family home firebombing. DDE # 51.

Attorney Christopher Warren was appointed to represent defendant Kaboni Savage. DDE # 80, 83. The district court appointed Timothy Sullivan as learned counsel for Kaboni Savage, pursuant to 18 U.S.C. § 3005. DDE # 95. On February 19, 2010, attorney Warren withdrew from the case at Savage's request, and attorney Christian Hoey was appointed to represent Savage. DDE # 127, 128. Contrary to Savage's current assertion that "Hoey had never before tried a capital case," Motion at p. 40, Hoey was a Pennsylvania state-certified death penalty attorney who had tried at least three death-certified cases to verdict and was properly on the federal list of available death penalty attorneys.

On June 12, 2012, attorney Sullivan's associate, Brett J. Cook, was admitted *pro hac vice* to Kaboni Savage's defense team. DDE # 520. On November 1, 2012, due to attorney Sullivan's potential appointment as a United States Magistrate Judge in Maryland, the district court granted Kaboni Savage's request for the appointment of attorney William Purpura as additional learned counsel. DDE # 692.

On December 19, 2012, attorney Sullivan having been appointed to the bench, the district court permitted attorneys Sullivan and Cook to withdraw from the case. DDE # 848. Attorney

9

Marta Kahn also joined the defense team and, during the penalty phase on May 16, 2013, participated in the trial. App. 15590.6 All appointed counsel were experienced trial attorneys, experienced in capital cases, and were duly appointed by the district court in consultation with the Federal Defender, pursuant to the Federal Death Penalty Act and 18 U.S.C. § 3005.

The district court appointed attorney Thomas Egan, III to represent Northington, DDE # 70, 77, 85, and appointed attorney William Bowe as learned counsel, DDE # 98. Attorney Michael Wiseman later entered his appearance as additional counsel to assist defendant Northington with his mitigation argument and claim of intellectual disability. DDE # 657, 1435.

The district court appointed attorney William Spade to represent defendant Merritt, DDE # 75, 78, 84, and appointed attorney Paul George as learned counsel, DDE # 90, 91.

On March 14, 2011, the government filed notices of intent to seek the death penalty as to defendants Kaboni Savage, DDE # 196, Robert Merritt, DDE # 197, and Steven Northington, DDE # 198.7

On April 21, 2011, Lamont Lewis entered a guilty plea, under Rule 11(c)(1)(C), pursuant to a cooperation plea agreement. App. 1442, 1449. Under the terms of the plea agreement, Lewis faced a minimum of 40 years' imprisonment and a maximum sentence of life imprisonment.

---

6 Additional facts regarding the appointment of counsel to represent Kaboni Savage were presented in part I of the argument in the government's appellate brief, responding to Savage's claim that the process violated his constitutional and statutory rights. The Third Circuit ruled against Savage on that issue.

7 The government's notice of intent to seek the death penalty applied to all murders, except that, as to Northington, it applied only to Count 7 (the Tybius Flowers murder), and not to Count 4 (the Barry Parker murder). Because Northington was already serving a life sentence in state prison for Parker's murder, the Department of Justice granted the Petit policy waiver to allow him to be prosecuted federally for the Parker murder, conditioned on the prosecutors' agreement to not seek death as to Northington on that murder.

App. 1449-50. As part of the plea agreement, Lewis also pled guilty to a separate information, charging him with three additional murders. DDE # 214, 215.

On June 22, 2011, the second superseding indictment was returned, adding Kidada Savage as a co-defendant, charging her and others with RICO conspiracy in Count 1, and with the murders of the Coleman family in Counts 10 through 17. DDE # 229. Attorney Christopher Phillips was appointed to represent her. DDE # 233, 236.8 Although the government did not seek the death penalty as to Kidada Savage, the district court appointed qualified "mitigating counsel," Theresa Whalen, as a second attorney to represent Kidada Savage. DDE # 267. Attorney Whalen fully participated in Kidada Savage's defense. The second superseding indictment also added Kaboni Savage as a defendant on the Carlton Brown murder, with a corresponding notice of intent to seek the death penalty with respect to that charge. DDE # 229.

On September 7, 2011, the third superseding indictment was returned. DDE # 284. That indictment made three relatively small changes: (1) expanding the duration of the RICO conspiracy; (2) changing the threshold amount of cocaine base ("crack") where pertinent from 50 grams to 280 grams, in order to conform to the Fair Sentencing Act of 2010; and (3) adding to the notice of intent to seek the death penalty as to Robert Merritt a non-statutory aggravating factor, for Merritt's role in the March 2002 murder of Norman "Skeet" Simon. *Id*.

---

8  Information later emerged regarding a potential conflict involving attorney Phillips, which was fully litigated in district court. The district court rejected Kidada Savage's claim of a conflict of interest, which order was affirmed by the Third Circuit on direct appeal. The issue will be further addressed in the response to Kidada Savage's 2255 petition.

On February 15, 2012, a revised notice of intent to seek the death penalty was filed as to Kaboni Savage, adding Count 4 (the Barry Parker murder) as a count for which the government was also seeking the death penalty. DDE # 361. All counsel made formal presentations to the Department of Justice's Capital Crimes Review Committee, in which they argued for the Department to not seek the death penalty as to their clients.

From February 17, 2012, through February 22, 2012, in anticipation of a deadline for filing pretrial motions, defendants Kaboni Savage, Merritt, and Northington filed approximately 51 motions. DDE # 362-411, 418. Defendant Kidada Savage filed additional pretrial motions in advance of her deadline of March 30, 2012. DDE # 433, 434, 440, 443-445.9 The district court set a deadline of April 16, 2012, for the filing of the government's responses, and a date of June 11, 2012, for hearings on the motions. DDE # 430, 516.

On May 9, 2012, the fourth superseding indictment was returned, correcting the date of the Mansur Abdullah murder charged in Count Three, and correcting a voice identification in Overt Act # 90 of Count One. DDE # 480; App. 446-509. This was the indictment upon which the parties proceeded to trial. The charges are outlined as follows:

---

9  Despite the district court's deadline for filing motions, more substantive pretrial motions were filed prior to, and after, the commencement of trial, eventually totaling several hundred.

**CHARGES IN INDICTMENT**

| Count | Charge | Date | Murder Victim | Defendant |
|---|---|---|---|---|
| 1 | RICO conspiracy | Late 1997 to 4-21-2010 | | KABONI SAVAGE; MERRITT; NORTHINGTON; KIDADA SAVAGE |
| 2 | Murder in aid of racketeering | 3-19-1998 | Kenneth Lassiter | KABONI SAVAGE |
| 3 | Murder in aid of racketeering | 9-6-2000 | Mansur Abdullah ("Shafiq") | KABONI SAVAGE |
| 4 | Murder in aid of racketeering | 9-13-2001 | Carlton Brown ("Mohammed") | KABONI SAVAGE |
| 5 | Murder in aid of racketeering | 2-26-2003 | Barry Parker | KABONI SAVAGE NORTHINGTON |
| 6 | Murder in aid of racketeering | 3-14-2003 | Tyrone Tolliver | KABONI SAVAGE |
| 7 | Murder in aid of racketeering | 3-1-2004 | Tybius Flowers | KABONI SAVAGE NORTHINGTON |
| 8 | Witness tampering10 | 3-1-2004 | Tybius Flowers | KABONI SAVAGE NORTHINGTON |
| 9 | Conspiracy to commit murder in aid of racketeering | 9-2004 to 10-9-2004 | Marcella Coleman, Tameka Nash, Sean Rodriguez, Tajh Porchea, Khadijah Nash, and Damir Jenkins | KABONI SAVAGE MERRITT |
| 10 | Murder in aid of racketeering | 10-9-2004 | Marcella Coleman | KABONI SAVAGE MERRITT KIDADA SAVAGE |

---

10  Count 8 was dismissed prior to trial, upon agreement of the government.

13

| Count | Charge | Date | Murder Victim | Defendant |
|---|---|---|---|---|
| 11 | Murder in aid of racketeering | 10-9-2004 | Tameka Nash | KABONI SAVAGE MERRITT KIDADA SAVAGE |
| 12 | Murder in aid of racketeering | 10-9-2004 | Sean Rodriguez | KABONI SAVAGE MERRITT KIDADA SAVAGE |
| 13 | Murder in aid of racketeering | 10-9-2004 | Tajh Porchea | KABONI SAVAGE MERRITT KIDADA SAVAGE |
| 14 | Murder in aid of racketeering | 10-9-2004 | Khadijah Nash | KABONI SAVAGE MERRITT KIDADA SAVAGE |
| 15 | Murder in aid of racketeering | 10-9-2004 | Damir Jenkins | KABONI SAVAGE MERRITT KIDADA SAVAGE |
| 16 | Retaliating against a witness by murder in aid of racketeering | 10-9-2004 | Marcella Coleman, Tameka Nash, Sean Rodriguez, Tajh Porchea, Khadijah Nash, and Damir Jenkins | KABONI SAVAGE MERRITT KIDADA SAVAGE |
| 17 | Using fire in the commission of a felony | 10-9-2004 | | KABONI SAVAGE MERRITT KIDADA SAVAGE |

On September 14, 2012, the district court granted the government's motion for an anonymous jury panel, with heightened security measures. DDE # 602. On October 12, 2012, the district court entered an order establishing the number of peremptory strikes for each party: Defendants Kaboni Savage, Merritt, and Northington were each allotted ten peremptory challenges, and Kidada Savage was allotted six, for a total of 36; while the government was allotted 20 peremptory challenges. In selecting the six alternate jurors, the government and

14

defense were each allotted four peremptory challenges. DDE # 632.

On September 26, 2012, the first jury panel of 286 (Panel A) completed questionnaires, after the district court gave preliminary instructions. DDE # 622. On November 5, 2012, the district court commenced the individual questioning of prospective jurors. DDE # 702. A second panel of prospective jurors (Panel B) was summoned to complete a questionnaire on December 19, 2012. DDE # 844, 857. A third panel (Panel C) was summoned on January 10, 2013. DDE # 892. A fourth panel (Panel D) was summoned on January 23, 2013. DDE # 912, 943.

The district court held an *Atkins* hearing,[11] commencing on October 15, 2012, as to defendant Northington's pretrial claim that he was intellectually disabled. DDE # 663. Testimony concluded on October 19, 2012. DDE # 671, 672. On February 1, 2013, the district court determined that Northington was not intellectually disabled, thus permitting the government to continue to seek the death penalty as to him on Count 7. DDE # 1043.

The jury was sworn on February 4, 2013, and the trial commenced without objection. App. 3351; DDE # 1047. On April 17, 2013, the government rested its case-in-chief in the guilt phase. App. 13406; DDE # 1249. On April 22, 2013, the defense case commenced. App. 13408; DDE # 1259. On April 25, 2013, the defense rested, App. 14047, and, after a brief rebuttal case, the government rested, App. 14095. Motions for dismissal pursuant to Federal Rule of Criminal Procedure 29 were made, argued, and denied. DDE # 1266. Closing arguments concluded on May 3, 2013. App. 15082; DDE # 1294. On May 7, 2013, the district court charged the jury. App. 15089-15232; DDE # 1297.

---

11  Pursuant to *Atkins v. Virginia*, 536 U.S. 304 (2002).

On May 13, 2013, the jury found Kaboni Savage guilty on all counts (Counts 1-7 and 9-17). The jury found Steven Northington guilty on all counts in which he was charged (Counts 1, 5, and 7). The jury found Kidada Savage guilty of all counts in which she was charged (Counts 1 and 10 through 17). The jury found Robert Merritt guilty of Count 1 (including the six Coleman family murders), but not guilty of Counts 9-17. The jury also determined special sentencing factors as to the racketeering conspiracy charged in Count 1, as to all defendants, which factors were found unanimously and beyond a reasonable doubt. App. 15334-51; DDE # 1329.

Based on the jury's verdicts, sequential penalty phase hearings were scheduled for defendants Kaboni Savage and Steven Northington. DDE # 1329.12 On May 21, 2013, the penalty phase hearing commenced as to Kaboni Savage. DDE # 1404. On May 22, 2013, the government rested. DDE # 1405. On May 29, 2013, the defense rested, DDE # 1411, and the government rested its rebuttal case, DDE # 1412. On May 30, 2013, the district court charged the jury in the penalty phase. DDE # 1415.

On May 31, 2013, the jury unanimously sentenced Kaboni Savage to death on all 13 capital counts (Counts 2 through 7, and 10 through 16). DDE # 1433. On June 3, 2013, the district court imposed death sentences upon Savage on all 13 counts, sentenced him to life imprisonment on Count 1, and ten-year terms of imprisonment on Counts 9 and 17. The district court also imposed a $1,600 special assessment. DDE # 1443, 1454.

---

12  As Merritt was convicted only on Count 1, he no longer faced the death penalty. The maximum sentence for RICO conspiracy in violation of 18 U.S.C. § 1962(d), charged in Count 1, is 20 years' imprisonment, increased to life imprisonment if (as here) the RICO activity was an offense punishable by life imprisonment. So, based on the conviction, the maximum was life.

On June 5, 2013, the penalty phase commenced as to Steven Northington, as to Count 7 (the Flowers murder). DDE # 1448. On June 13, 2013, the jury unanimously sentenced Northington to life imprisonment on Count 7. DDE # 1465. On June 19, 2013, the district court sentenced Northington to three concurrent terms of life imprisonment on Counts 1, 5, and 7. The district court also imposed a five-year term of supervised release, and a $300 special assessment. DDE # 1485, 1488.

On February 21, 2014, the district court sentenced Kidada Savage to concurrent terms of life imprisonment on Counts 1 and 10 through 16. The district court imposed a ten-year sentence on Count 17, five years of supervised release, and a $900 special assessment. DDE # 1555, 1556.

On September 19, 2014, the district court sentenced Robert Merritt to life imprisonment on Count 1, and imposed a five-year term of supervised release, and a $100 special assessment. DDE # 1583, 1585.

All four defendants took timely appeals from their judgments and sentences. On August 11, 2020, the Third Circuit Court of Appeals issued a 201-page precedential opinion affirming all convictions and sentences, including all 13 death sentences. *United States v. Savage*, 970 F.3d 217 (3d Cir. 2020). On October 30, 2020, Savage's motion for *en banc* review was denied. His petition for writ of certiorari to the Supreme Court was also denied. On October 24, 2023, the Third Circuit issued a 65-page opinion affirming all convictions and sentences as to co-defendants Kidada Savage, Steven Northington, and Robert Merritt.

On December 22, 2024, President Biden issued a commutation of sentence, commuting Kaboni Savage's 13 death sentences to life sentences. That action renders moot all claims in the petition attacking the penalty phase and death penalty-related issues, and those claims should

17

thus be denied as moot.

## Statement of Facts

### A.    Introduction.

Kaboni Savage led a drug trafficking organization in North Philadelphia, from approximately 1997 to April 21, 2010, that distributed large amounts of cocaine, "crack" cocaine base, and liquid phencyclidine (PCP) known as "wet." He expanded his cocaine business by diluting, then recompressing and repackaging, kilograms of cocaine. He laundered his drug profits by purchasing houses and cars. He controlled sales at multiple city blocks and corners through numerous drug sellers, and maintained control of his drug territory through intimidation, violence, and murder. He established a reputation as a ruthless killer, then buttressed that reputation by ordering his assassins to murder drug rivals, informants, enemies, and, eventually, six people related to Eugene Coleman, a federal witness scheduled to testify against Savage. App. 446-509. Having committed 12 murders, he plotted to kill more witnesses, and their mothers and children, and vowed to continue to do so as long as he is alive. App. 1406; GX 1L987-5. A jury convicted him and sentenced him to death on 13 counts.

Steven Northington was one of Kaboni Savage's drug sellers and assassins. Northington controlled a North Philadelphia drug block and, when a rival dealer, Barry Parker, encroached on his territory, he participated in the murder of Parker, at Kaboni Savage's urging. Northington also participated in the murder of Tybius Flowers, on the eve of Flowers' anticipated state court testimony against Kaboni Savage in a murder case. Northington was found guilty and sentenced to life imprisonment.

18

Robert Merritt was a drug dealer and self-described "gun" (killer). App. 11962-63. He sold drugs in North Philadelphia, often times with his cousin Lamont Lewis, for the Savage organization. Merritt agreed to assist Lamont Lewis in firebombing the Coleman family home. Merritt threw the gas cans into the home, killing six people, including four children ranging in age from 15 months to 15 years. The jury convicted Merritt of RICO conspiracy, and unanimously found him to have committed the six murders as predicate acts. He was sentenced to life imprisonment.

Kidada Savage is the younger sister of Kaboni Savage. She recruited Lamont Lewis to firebomb the Coleman family home, pointed out the home to Lewis, gave him instructions, and paid Lewis for committing the murders. She was found guilty of all six murders at the Coleman home, and was sentenced to life imprisonment.

### B.    The Kaboni Savage Drug Organization.

Kaboni Savage's Darien Street home was a central meeting place for the Kaboni Savage Organization, frequented by Lamont "Poppy Eye" Lewis, Eugene "Twin" Coleman, Dawud Bey, Kareem "Bree" Bluntly, App. 10902, Steven Northington, App. 8732, 10941, Oscar Francis, App. 11928, Gerald "Bubby" Thomas, App. 11924, and Tyrone Toliver, App. 10954. Eugene Coleman was Kaboni Savage's "right-hand man." App. 10960. Lamont Lewis sold crack cocaine for Kaboni Savage, which Lewis would "bag up" in the basement of Savage's home, App. 10875, where drugs were also distributed and money was counted, App. 10897. Savage also stored liquid phencyclidine (PCP, known as "wet") in the refrigerator in his house. App. 10899.

Kaboni Savage and Ronald "Pumpkin" Walston sold crack at 8th and Butler Streets, while Savage also sold liquid PCP at Percy Street and Erie Avenue. App. 10877-78. Savage and

Walston were "like brothers." App. 10907. Savage had a photograph of Walston hanging in his house. App. 11916. Lamont Lewis was also friendly with Walston, and later got a neck tattoo, "In memory of Pumpkin." App. 10924. Savage dealt with Walston until Walston went to prison in the 1990s, at which time Walston's drug corner at 8th & Butler was then run by Walston's brother, Tybius "Tibby" Flowers. App. 8730.

Kaboni Savage also employed Eugene Coleman, Carlton Brown, Markeese Brown, Steven Robinson, and others to sell drugs for Savage. App. 10882, 10890. When the Percy and Erie corner became too "hot," Savage moved that operation to the corner of 9th and Erie. App. 10889. Savage put Steven Northington in charge of selling crack cocaine on a block of Franklin Street, between Pike Street and Luzerne Avenue. App. 10942.

Eugene Coleman began his drug career at the age of 13, as a "lookout" for police at 8th & Butler Streets, having been recruited by Kaboni Savage's cousin, Raymond Wilmore, who then introduced Coleman to Kaboni Savage. App. 8699. Later, Coleman briefly moved to South Philadelphia, where he sold drugs and met Savage associate Dawud Bey. App. 8703. Coleman knew Bey to be a killer. App. 8705. After serving a brief sentence for drug dealing, Coleman moved back to North Philadelphia, and began working for Kaboni Savage, selling crack cocaine in Hunting Park. App. 8707-08. At that time, Savage was getting his cocaine from Gerald "Bubby" Thomas. App. 8710.

In the mid-to-late 1990s, Kaboni Savage's organization grew, and began selling liquid PCP, known as "wet" and "oil," at Percy Street and Erie Avenue. App. 8711-12. Savage and Coleman prepared the liquid PCP for sale in Savage's basement, branded it for sale, and stored it in Savage's freezer. App. 8713-14. Key members of the organization commonly "hung out" in

20

Savage's house. App. 8717. Savage's business grew from getting four-ounce quantities of PCP to two-liter bottles. App. 8716. Savage's organization flourished when he obtained a large shipment of liquid PCP that had been stolen from another drug dealer. App. 8718. At the same time, Savage's cocaine business grew from selling ounces of cocaine to half-kilograms. App. 8719-20. Savage continued to get his cocaine from Gerald Thomas and a cousin in Miami, Florida. App. 8721.

In the late 1990s, Kaboni Savage began maximizing his profits by taking kilograms of pure cocaine, mixing them with dilutants, and then recompressing and repackaging the kilograms to look like original, pure kilograms. App. 8722-23. This was done by using steel presses, plates, and hydraulic jacks. App. 8723-24. Recompressions were done in Savage's basement and several other locations. App. 8726-27. As Savage's cocaine business grew, he obtained additional sources, including Juan Rosado and Craig Oliver. App. 8728. Savage began selling powder cocaine in larger amounts, including ounces and kilograms. App. 10895.

Eventually, Lamont Lewis began selling Savage's drugs at 8th and Venango Streets, running operations out of a corner bar. App. 10883-84. Savage supplied Lewis with PCP. App. 10887. Savage fronted the drugs to Lewis, who paid for them after the drugs were sold. App. 10888. Lewis paid Savage in cash at Savage's house. App. 10902. Lewis' cousin, Robert Merritt, sold drugs for him at that corner, App. 10894, as did John "Shareef" Tillman and Eugene Coleman, App. 8831. Lamont Lewis and Robert Merritt obtained identical "Ride or Die" tattoos. App. 10969-71. Lewis explained that an example of "riding" is going to trial, and an example of "dying" is testifying. App. 10969.

Many of the drug dealers who worked with Savage in his neighborhood bore tattoos that said "EAM," for "Erie Avenue Mob," or "Erie Avenue Member." App. 10891. Lamont Lewis and Robert Merritt had EAM tattoos, App. 10892, as did Bienvenido Morales, App. 11952, 11954.

By September 1999, Kaboni Savage had surpassed Gerald Thomas as the leader of the drug organization. App. 8749. By May 2000, Savage was dealing five to seven kilograms of powder cocaine at a time. App. 8759. From late 2001 to approximately September 2002, Bienvenido "Babyrock" Morales sold kilograms of cocaine to Kaboni Savage. App. 11914-15, 11922. Morales usually sold Savage five kilograms at a time. App. 11923.

### C.    The Gerald "Bubby" Thomas Wiretaps.

Gerald "Bubby" Thomas supplied drugs to Kaboni Savage in the early part of the conspiracy. App. 10904. Savage referred to Thomas as his uncle. App. 10905. On September 26, 2000, the FBI obtained a court-authorized wiretap on Thomas' telephone, and then surveilled numerous telephone calls detailing drug deals and drug money transfers. App. 3726. The wiretaps ended on March 6, 2001. App. 3727. The intercepted conversations corroborated the accounts of the government's witnesses, particularly that of Eugene Coleman, who was intercepted numerous times. App. 3749-50, 8766.

### D.    Kaboni Savage's Money Laundering.

Kaboni Savage laundered the organization's drug money, mostly through purchasing real estate and automobiles. The jury heard his testimony from his 2005 federal drug trial, as to these purchases. App. 5161-62. Kaboni Savage admitted he purchased residential homes. App. 5097, 5102, 5104, 5115, 5137. He purchased cars for friends and family members. App. 5099, 5100,

5104, 5111-12, 5153. He used false names and names of infant children to avoid detection in making his purchases. He made up the names "Yusef Billa" and "Joseph Amill." App. 3669, 5162; GX 1F1Z. He obtained false Social Security numbers. *Id*.; GX 1F1W.

Kaboni Savage purchased Philadelphia houses on Upsal Avenue, Kendrick Street, and Lynford Avenue. App. 5162; GX 1F1X, GX 1F1E. He purchased a property on Percy Street. App. 5164; GX 1F1Y. He used fake pay stubs to feign a legitimate income. App. 5163; GX 1F1JJ. He used a realtor, Mel Stein (a co-defendant convicted in the 2005 trial) to launder his money through real estate ventures. App. 5181.

Kaboni Savage purchased a Jeep Cherokee, a Subaru, and a new Nissan Altima for Kidada Savage. App. 5161; GX 1F1C, GX 1F1D, GX L-203, p. 1. He bought a Mercedes Benz for his girlfriend, Crystal Copeland. App. 8772; GX 1L-203, p. 2.

In conversations later intercepted in his cell, Kaboni Savage bragged about the many purchases he had made with his drug money. App. 5157-58; GX 1L140-2; GX 1L203; GX 1L272; GX 1L283-1; GX 1L283-2; GX 1L450; GX 1L873. He was intercepted on November 10, 2004, stating, "That's all they got is money laundering. My house, my sista house. I bought my sista crib. That Outback. That Cherokee." App. 5157; GX 1L140-2, p. 1 (referencing sister Conchetta Savage). He admitted he bought another house for $180,000 and invested another $40,000 in it before selling it. App. 5158; GX 1L197, pp. 1-2. He bragged that he bought three houses on Percy Street. App. 5159; GX 1L450, p.1.

### E.    The Kenneth Lassiter Murder.

On the afternoon of March 19, 1998, Johnathan Baker was selling PCP for Tybius "Tibby" Flowers at the corner of 8th and Butler Streets, a North Philadelphia corner Flowers

23

"owned" and controlled. App. 6459-60. Flowers and several other of his drug workers were present. App. 6468. Baker saw a dispute between an older man he later identified as Kenneth Lassiter, and a younger man, whom he later identified as Kaboni Savage, after Lassiter's car bumped Savage's car. App. 6461, 6742. Kenneth Lassiter, visiting the area, lived in Lansdale, Pennsylvania. App. 8687. Despite the lack of any damage to the cars, Savage demanded payment from Lassiter. Lassiter promised to pay, but said he did not have money with him, at which time Savage demanded that Lassiter give Savage his car. When Lassiter refused to give Savage his car, Savage produced a gun and shot Lassiter in the torso. App. 6461. Lassiter was unarmed. App. 6479. Savage then had his driver pull his car around, and they fled the area. Lassiter later died from the single gunshot wound to the torso that resulted in internal bleeding. App. 6401-02.

Samuel Rosado was in his house that day, when he went outside. App. 6616-17. Rosado approached his friend, Tibby Flowers, to shake his hand, when he saw Kaboni Savage, whom he knew, with a gun in his hand, shooting a man at the corner of 8th and Butler Streets. App. 6618-19. Rosado did not give a statement to homicide detectives because he was "scared." App. 6620.

Tybius "Tibby" Flowers, the "owner" of the drug corner, witnessed the Lassiter murder. Flowers gave a statement to police on November 2, 1998, identifying Kaboni Savage as Lassiter's killer. App. 9972, 9985. Flowers was scheduled to testify at Savage's state court trial in March 2004, when he was murdered at that same corner, at Savage's direction, just hours before his scheduled trial testimony. App. 9970. In Flowers' statement to police, he stated the following: Lassiter pulled up in his car and asked if "Apples" was around. Flowers had never seen Lassiter before, but knew "Apples." App. 9978. When Lassiter then backed his car into a parking spot, he hit Kaboni Savage's car, which was pulling into the same spot. App. 9975.

24

Savage and "Rick" got out of Savage's car, and Savage repeatedly demanded money from Lassiter, who responded, "I ain't got no money." *Id*. Savage said to Flowers and the others gathered, "You know the dude?" and they said, "No." App. 9976. Savage told Rick to pull his car up by the store. Savage then pulled out a gun, "put it to the dude's chest and went 'bang,'" fatally shooting Lassiter. App. 9976. Lassiter "screamed and fell to the ground." *Id*.

Flowers, who knew Savage well, identified a photo of Savage as the shooter, from an eight-person color photo array. App. 9976. In July 1998, Johnathan Baker gave a signed statement to police, and identified a photograph of Kaboni Savage, within a photo array, as the shooter. App. 6466-67.

Kaboni Savage told Lamont Lewis that Savage had killed Kenneth Lassiter at the corner of 8th and Butler, when that drug corner was being run by Flowers. App. 10912. Flowers was the brother of Ronald "Pumpkin" Walston. App. 10912-13. Savage and Flowers, however, hated one another. App. 10913. Savage and Flowers were also rival boxers. App. 8731.

Savage told Lamont Lewis that Savage was at the corner of 8th and Butler Streets when Lassiter bumped Savage's car. Savage said that he "shot the dude." App. 10914. The effect of killing Lassiter on Flowers' drug corner was to "shut down" the corner, so that Flowers could not sell drugs. App. 8855, 10914. Savage also told Lewis that Savage's friend Rick was present for the murder, so Savage bought Rick a car. App. 10914.

Sometime in 1998 or 1999, Kaboni Savage told Eugene Coleman that Savage wished Coleman had been there (Coleman was incarcerated), because Savage knew that Coleman would have somehow prevented Savage from killing Lassiter. App. 8735-36. Savage also confided that Tibby Flowers and a "young boy" named Corey had seen the murder. App. 8737. Savage was

25

concerned they might "snitch" on him, but had been assured by Ronald Walston that Walston would not let that happen. App. 8739.

While awaiting trial for the Lassiter murder, Kaboni Savage told Bienvenido Morales that he was on house arrest because he "caught a dumb-ass body on 8th and Butler," meaning a murder he had committed. App. 11936. Savage further explained that he got into a dispute over a parking space and "slumped the guy." *Id*. Savage also told Morales that Tibby Flowers might testify against him. App. 11937. Morales offered to speak to Flowers on Savage's behalf, but Savage demurred, saying that it was not necessary, and that if Flowers testified against Savage, Flowers "would never tell on no one else again in his life." App. 11938.

Kaboni Savage was arrested for the Lassiter murder, but was eventually released on bond. Savage became a fugitive, and hid in an apartment in Maple Shade, New Jersey, from which he continued to run his drug organization. App. 3665, 8745-46. Eugene Coleman compressed 21 kilograms of cocaine at the Maple Shade apartment. On September 10, 1999, shortly after those 21 kilograms had been distributed, the apartment was raided and Savage was arrested as a fugitive. App. 8747. A small amount of cocaine, drug paraphernalia, and some recompression devices were seized. App. 8753-55.

In May 2000, Kaboni Savage was released on house arrest, pending trial for the Lassiter murder. App. 8759-60. While on house arrest, Savage grew his drug organization from his Darien Street home, with Eugene Coleman running errands for him. App. 8760. The number of associates congregating at the Savage house also grew, to include Steven Northington, Dawud Bey, Craig Oliver, John "Shareef" Tillman, Kareem "Bree" Bluntly, and Mansur "Shafiq" Abdullah. App. 861-62.

26

F.    **The Mansur Abdullah Murder.**

Mansur "Shafiq" Abdullah was a friend of Craig Oliver, one of Kaboni Savage's cocaine suppliers. With Savage, they were like "a family." App. 8809. Abdullah and Savage would sell cocaine to one another. App. 8809-10. Savage showed Abdullah how to recompress kilograms of cocaine. App. 8810. Abdullah sold some of his drugs on the 1300 block of Jerome Street, between Broad Street and Hunting Park. App. 8811.

On September 6, 2000, Kaboni Savage was cooking crack cocaine in his Darien Street home when Abdullah arrived. App. 8812. Savage and Abdullah discussed approximately $22,000 to $25,000 that Savage owed Abdullah for a kilogram of cocaine. Eugene Coleman was present for the conversation. App. 8813. Savage and Abdullah went to the basement, where Kareem Bluntly was. Abdullah returned from the basement with a red sneaker box containing the money, which Coleman and Savage had earlier counted. App. 8814. There was tension between Savage and Abdullah, as Savage was angry that, after teaching Abdullah how to recompress cocaine, Abdullah overcharged Savage for a recompressed (diluted) kilogram. App. 8815. As Abdullah was leaving the Savage home, Savage told Bluntly to ride with Abdullah, so that Bluntly could kill Abdullah. App. 8816. Bluntly was armed with a firearm, hidden under a jacket. App. 8817. Approximately 20 minutes later, Savage received a telephone call, after which he told Coleman, "Go pick up Bree." App. 8818. Coleman drove to 9th and Tioga Streets, where he picked up Bluntly, who was carrying his jacket, a pair of gloves, and the red sneaker box. App. 8819.

Coleman and Bluntly returned to Savage's house, where Bluntly returned the box full of money to Savage. Bluntly told Savage that Bluntly had shot Abdullah in his car, that Abdullah

27

had tried to block the shot with his hand, and that Bluntly left Abdullah in the car on 5th Street, near Roosevelt Boulevard, adding that he was not certain that Abdullah was dead. App. 8821-22. Savage then ordered Coleman to go there and check to ensure that Abdullah was dead. App. 8822. Coleman did so, and found Abdullah in his car, "keeled over." App. 8822-23.

Coleman returned to Savage's house, and reported what he saw. Savage replied, "That body can't stay there," and ordered Bluntly to move the body to the 4200 block of Park Avenue, near Abdullah's drug block on the 1300 block of Jerome Street. Bluntly made a phone call, after which a man nicknamed "Shoddy" showed up. App. 8825. Savage paid Shoddy $1,000 to move Abdullah's body. App. 8827. An unsuccessful attempt was made to set the car on fire, which resulted in the discovery of the smoldering car and Abdullah's lifeless body. App. 6768-69. Abdullah died from a gunshot wound to the back of his head. App. 6770-71.

## G.    The Carlton Brown Murder.

Lamont Lewis murdered Carlton "Mohammed" Brown at the direction of Kaboni Savage. App. 10845. Kaboni Savage and Carlton Brown had been childhood friends who lived across the street from one another. App. 10879. Brown had worked for Savage selling drugs. App. 10878. Savage supplied Brown with liquid PCP, which Brown sold at Percy Street and Erie Avenue. App. 8836.

On August 29, 2001, Ronald "Pumpkin" Walston was murdered at the drug corner he ran at 8th and Butler Streets. App. 10918. Kidada Savage called Eugene Coleman and, while crying hysterically, told him that Pumpkin had been shot, and summoned him to the Savage house. Kidada Savage said she had seen Brown running down the street from the direction of 8th & Butler shortly after the shooting. App. 8840-41. Coleman went to the hospital, where he learned

28

that Walston was dead. App. 8842. The next day, Coleman met with Kaboni Savage, who was "upset and mad" about Walston's murder. App. 8843. Carlton Brown approached Savage and Coleman on Savage's front steps, to "pay respect," but Savage brushed off Brown. App. 8845. Savage, referring to Brown, later told Coleman, "That's a done deal." *Id*.

Kaboni Savage then confided to Lamont Lewis that Savage knew that Carlton Brown had killed Walston. App. 10923. Savage told Lewis, "You know who done it . . . I can't do nothing. I'm on house arrest. You're going to have to do it . . . ." *Id*. Savage told Lewis that Savage would pay Lewis to kill Brown, saying, "I got you, whatever you want." App. 10924-25.

On September 13, 2001, Carlton Brown asked Lamont Lewis to drive him to Brown's girlfriend's house in Southwest Philadelphia. App. 10926. Lewis did so. App. 10928. While Brown was on the sidewalk, talking to his girlfriend on the phone, Lewis walked across the street to a field, where he pretended to relieve himself, and retrieved his gun from his waistband. App. 10929. Lewis then returned to Brown, briefly distracted Brown, and shot him in the head, killing him. *Id*.

Lamont Lewis then returned to Kaboni Savage's house, where Lewis reported that he had killed Brown. App. 10931. Savage was happy, and instructed Lewis to "fist bump" the picture of Walston hanging on the wall. App. 10931-32. Savage then had Kareem Bluntly retrieve Lewis' car and wipe it down to eliminate fingerprints. App. 10933-34. Savage paid Lewis for the murder with a 16-ounce bottle of PCP oil, worth about $5,000 wholesale, and which could yield $15,000 in sales. App. 10934-35.

Lamont Lewis was later arrested for the Carlton Brown murder. He went to trial in state court three times, resulting in two hung juries, followed by an acquittal. App. 10935. After the

29

third trial, Savage's associate Eric Johnson gave Lewis $5,000 cash, a truck, and a handgun for "beating the case." App. 10935, 10937. Lamont Lewis eventually pled guilty in federal court to murdering Brown. DDE # 213, 215.

### H.    The Barry Parker Murder.

Lamont Lewis, aided and accompanied by Steven Northington, murdered Barry Parker, at the direction of Kaboni Savage, because Parker was selling drugs on Northington's block. App. 10846.

Northington sold Kaboni Savage's crack cocaine on Franklin Street, between Pike Street and Luzerne Avenue. App. 8764-65. Savage cooked the crack cocaine for Northington in Savage's kitchen. App. 8765.

Steven Northington complained to Kaboni Savage that Barry Parker was selling drugs on Northington's block. App. 8849. Savage "snapped on" Northington, scolding him, "Nobody come and take nothing. You have to handle your business. This is what we do." App. 8850. When Northington later continued his complaints to Savage about Parker, Savage said, "What the fuck are you coming and telling me for? What the fuck is wrong with you? You have to handle your business." App. 8853.

On February 26, 2003, having grown tired of Northington's complaints, Kaboni Savage summoned Lamont Lewis to Savage's house, explaining that Savage needed Lewis to do something for him "right now." App. 10943. At trial, Lewis recounted Savage's instructions to him, in Northington's presence:

> [H]e said he wanted me to go around. He said Steve was having some problems with this dude on this corner. He wanted me to go around there and kill him, that the guy is standing out there right now.

30

App. 10944. Savage further explained to Lewis that the "guy" was selling drugs on Northington's corner. *Id.*

Lewis agreed without question to do the murder, explaining that he never questioned Savage's orders, because, "It's our team." App. 10945. After Savage gave Lewis a firearm, Lewis got into Northington's car, along with an unknown female friend of Northington, and rode around the block until Northington pointed out Barry Parker standing on the corner of Franklin and Luzerne Streets. App. 10946. Northington parked the car around the block from that corner, at which time Lewis got out of the car, walked up to Parker, who was flanked by two other men, and shot Parker three times in the chest, killing him. App. 10946-47. Lewis jogged down the street, jumped back into Northington's car, gave Northington the murder weapon, and swapped coats with him. App. 10947. Northington drove Lewis back to Lewis' drug corner at 8th and Venango Streets. App. 10948.

After Parker was murdered, Northington, Bluntly, Coleman, and Kaboni Savage were in Savage's basement. Savage and Northington "jumped around," joking and saying, "This is what we do. We handle our business." App. 8854.

The next day, Lamont Lewis went to Kaboni Savage's house, where Savage gave Lewis 4½ ounces of cocaine as payment for the Parker murder. App. 10948. Savage told Lewis that Northington would also have some additional payment for Lewis; however, Northington later explained to Lewis that, when Northington was arrested, the police seized $3,000 that was to be Northington's payment to Lewis for the Parker murder. App. 10948-49. Indeed, upon Northington's arrest, Philadelphia police seized $3,078 in cash from Northington. App. 10953-

31

54.

### I.     The Tyrone Toliver Murder.

Kaboni Savage maintained a house at 3510 Palmetto Street, to prepare and bag drugs. App. 8856, 10957. At this remote location in an industrial part of North Philadelphia bordering Kensington (some distance from the Hunting Park neighborhood), Eugene Coleman lived in the upstairs apartment, and recompressed kilograms of cocaine for the organization in the downstairs garage. App. 8857-58, 10961.

Tyrone Toliver was Eugene Coleman's friend. App. 8867. Toliver sold cocaine. App. 8868. Toliver bought cocaine from Coleman, and also occasionally bought cocaine from Kareem Bluntly. App. 8869.

Kaboni Savage, while incarcerated, called Eugene Coleman months before Toliver's murder, and told Coleman that Toliver was "a snitch," and that Savage had seen documentation, while in jail, that Toliver was an informant (in a shooting case unrelated to Savage). Savage instructed Coleman, "Don't deal with him, because [I have] paperwork on him." App. 8870. However, Coleman did not heed Savage's advice, and continued to deal with Toliver. App. 8872. When Savage was released from custody on house arrest, Savage repeated his admonition about Toliver to Coleman. App. 8872-73. Savage had repeatedly told Coleman that Savage hated snitches, and even "[b]elieved that their mothers should die." App. 8912.

On March 14, 2003, in the midst of a "drought" of cocaine in Philadelphia, Toliver sought to buy cocaine from Coleman. Coleman rebuffed him. Toliver persisted, and then suggested that they could get cocaine from Kaboni Savage. App. 8874. Toliver refused to believe that Savage had no cocaine, and accused Coleman of "holding out" on him. App. 8874-75.

32

Coleman relented, and rode with Toliver to Savage's house, where Savage was on the front porch with Kareem Bluntly. App. 8875-76. Through Bluntly, Toliver asked Savage to sell him nine ounces of cocaine for $7,000 cash. App. 8876. Bluntly conferred with Savage, and then instructed Coleman to take Toliver "down to the spot," referring to the recompression house at 3510 Palmetto Street. App. 8877-78. This instruction "shocked" Coleman, because of Savage's prior admonition, and "[b]ecause Kaboni don't let too many people know about" the Palmetto Street location. App. 8878. Nevertheless, Coleman complied, telling Toliver, "you're in then." Coleman thought that Savage must have had some drugs he was willing to sell to Toliver. App. 8880.

Coleman took Toliver to the Palmetto Street location, where they went upstairs to the apartment, and waited for Bluntly to arrive with the cocaine. App. 8880-81. Bluntly arrived, followed Coleman upstairs, pulled out his gun, and shot Toliver in the back of the head as Toliver sat on the couch. App. 8881-84. Coleman heard the pop of the firearm as he was turning on a light switch, and saw Toliver slumped over on the couch. App. 8884-85. Surprised, and fearing he might be next, Coleman went to Bluntly and grabbed the gun, prompting Bluntly to say, "Ain't nothing going to fuckin' happen to you. Don't grab nobody's gun. Don't ever grab nobody's fucking gun . . . I'm not going to shoot you. But you're going to help me get rid of this." App. 8885-86. Bluntly then removed the cash from Toliver's pocket. App. 8886. Coleman then moved Toliver's car. App. 8898.

Coleman and Bluntly later returned to Kaboni Savage's house, where they told Savage about the murder. Bluntly gave the $7,000 he retrieved from Toliver's pocket to Savage, who said he was going to "use it as an investment to invest back in the game." App. 8890. Savage

33

warned Coleman, "This is some serious stuff . . . you got to, you know, play your part in this," further instructing Coleman and Bluntly to "get rid of that body." App. 8890.

The next day, Coleman and Bluntly bought some cleaning supplies and other materials, returned to Palmetto Street, and cleaned the scene. App. 8891. They wrapped Toliver's body in trash bags and duct tape, and carried him down the steps, where they loaded him into the trunk of Toliver's car. App. 8899, 8903. They then cleaned the couch, cut a bloody patch out of the rug, discarded the patch, rolled up the rug, and bleached and sanded the floor. App. 8900-01. That night, they drove the car containing Toliver's body, and left it on a remote street in Kensington. App. 8906. Toliver's decomposed body was eventually discovered by the police after the car had been towed. App 8570-72.

Prior to Toliver's murder, Kaboni Savage had also told Lamont Lewis that Toliver was "a snitch." App. 10957. After the murder, co-conspirator and drug supplier Eric Johnson told Lamont Lewis that Savage got "Twin" (Coleman) and "Bree" (Kareem Bluntly) to kill Toliver, and that Savage ordered the murder, in part, so that they would have some "dirt" on Coleman. App. 10959. Up until then, concerning Coleman, Lewis elaborated, "because he knew a lot about all of us, but we don't have no dirt on him, so to put some dirt on him . . . we had a pact and the conversation came up because everybody thought that Twin was weak and if he got into some trouble, he would tell." App. 10959-60. Lewis described Coleman as "soft" and "[n]ot the violent type." App. 10962.

After the Toliver murder, Eugene Coleman was concerned that he "knew too much" and rebuffed an invitation to meet Kareem Bluntly late at night, "because I knew I was probably next." App. 8915. On April 17, 2003, Coleman was arrested for the Toliver murder, while hiding

34

in a New Jersey motel. App. 8915-16. He gave a statement implicating Bluntly, but did not initially mention Savage's role in the murder. App. 8918.[13] Coleman explained his early reticence to implicate Savage:

> We was a gang. We was really a family. We like the little black mafia. We had our own little thing and Smoke [Northington] had a part. Other people had their parts. Really they took care of their business . . . I was more afraid of that damaging [sic] because they could do more damage to me. I had a family out there. I had family members and everything else. And he know every [one] of my family. He knew all the family members I had.

App. 8923.

Eugene Coleman later saw Kidada Savage in a prison visiting room, where Kidada Savage cautioned him, "Don't let these crackers break you. You know what we got to do." App. 8938. Coleman also received a letter from Kidada Savage, dated September 11, 2003. GX 953; App. 8940. In the letter, Kidada Savage questioned why Coleman had not been in communication with them, warning him about "the feds," saying:

> I know them motherfuckers be talking shit to you, but you know the deal with that. It's their fucking job. And you know never to tell them shit. Fuck them. Feed them niggers dog shit [App. 8943]. They're going to try to divide and conquer. Don't let them divide us.

App. 8946. At the end of the letter, Kidada Savage wrote, "Death before dishonor [to your family]. If you said something, let us know. If you didn't, let us know. We have to know what's going on. Don't say shit to nobody." App. 8946 (emphasis in original).

### J.    The Tybius Flowers Murder.

As explained earlier, Tybius "Tibby" Flowers was a witness to the murder of Kenneth

---

13  Bluntly himself was murdered shortly thereafter, on January 9, 2004, in an incident unrelated to the Kaboni Savage conspiracy.

Lassiter, for which Kaboni Savage was occasionally imprisoned while awaiting trial for the killing. At one time, while Kaboni Savage and Lamont Lewis were incarcerated together, they discussed Savage's pending state trial for the Lassiter murder, with Savage telling Lewis that he "ain't sweating it, that Tibby would never make it to court." App. 10913, 10915. Savage told Lewis that Dawud Bey would take care of Flowers. App. 10915.

Mary Phy testified that she accompanied Steven Northington, whom she knew as Syeed Burhannon, App. 9996, on a "date" to CFCF (a local detention facility) to visit Kaboni Savage. App. 10002. There, as she sat a few feet away, she heard Savage mention "Tibby," and asking Northington, "Did you take care of it?" App. 10002.

On March 1, 2004, shortly before midnight, Tybius Flowers left his aunt's house near 8th and Butler Streets in Philadelphia, after watching a movie, and sat in his car on the corner. App. 11717. Moments later, gunshots were heard. App. 11718. Two minutes before midnight, police were called to that corner, where they found Flowers in the car, shot multiple times. App. 11663-64. Flowers was pronounced dead at the scene. App. 11664.

Police found 15 firearms cartridge casings outside of the car containing Flowers' body. App. 12397; GX 805.1, 805.2. The medical examiner identified nine gunshot wounds, including two that entered Flowers' brain, App. 13264-65, and one that perforated his lung and aorta, App. 13267.

Cell site information regarding Steven Northington's cellular telephone and Dawud Bey's cellular telephone showed that one of Northington's phones and one of Bey's phones were in the area of CFCF at times witnesses said Savage met separately with Northington and Bey to discuss Tybius Flowers. App. 10662-63; GX 816-2. Cell site information as to Northington's other

36

phone showed that he was in the area of 8th and Butler Streets at the time of Flowers' murder, and then immediately proceeded west to the area of the Schuylkill Expressway, then up the Northeast extension of the Pennsylvania Turnpike to the Scranton/Wilkes-Barre area, where Northington had been living. App. 10669-10683; GX 816-2.

In a December 13, 2004, court-authorized interception at FDC Philadelphia, Dawud Bey chided Savage that, while Savage had paid a lot of money for a lawyer to represent Savage in the Lassiter state murder case, that it was actually Bey who "represented" Savage in that case.

Savage: As long as they get that acquittal, fuck that money.

Bey: Yeah. I guess you're right. Them pussies ain't beat that case anyway. I represented you, nigga.

Savage: (Laughs) Yeah, no bullshit.

Bey: They didn't do shit.

Savage: No, they didn't do nothin'.

Bey: They didn't have anybody to cross-examine.

Savage: (Laughs)

   . . . .

Bey:  . . . you could [have] paid me that money.

App. 1324; GX 1L708-2.14

---

14  Bey was convicted in the first Kaboni Savage prosecution (District Court No. 04-629) of conspiracy, and sentenced to 120 months' imprisonment. He later pled guilty to a charge of witness tampering in connection with the first prosecution, and in no. 09-498, he was sentenced to 36 months' imprisonment, of which 18 months ran consecutively to the first sentence. Bey was released from federal custody on February 6, 2015.

Artavius Coleman (no relation to Eugene Coleman) was a childhood friend of Steven Northington who grew up selling drugs in the Hunting Park neighborhood, with Tybius "Tibby" Flowers, Ronald "Pumpkin" Walston, and Bienvenido "Babyrock" Morales. App. 11734-38. At FDC Philadelphia in 2005, Northington, while ranting about "rats," told Artavius Coleman that Flowers was a "rat," and that Northington "slumped Tibby and sent him to rat heaven and gave his [deceased] Mom a family reunion." App. 11738-39. "Slumped" is neighborhood slang for "killed." App. 11740.

Bienvenido "Babyrock" Morales grew up in the Hunting Park neighborhood, and knew Steven Northington his whole life. App. 11912. Morales confirmed Artavius Coleman's account. App. 11947. Morales recounted Northington's explanation to him:

> Tibby thought he was going to get away with snitching on Kaboni . . . they found out at the last minute that Tibby was the one that was going to testify in Kaboni's homicide, and they ran down on him at 8th and Butler, and he [Northington] slumped him.

App. 11948.

In February 2004, while in local custody pending the Lassiter murder trial, Kaboni Savage also told Michael Crosby that Savage was not going to be incarcerated for long, because Flowers was not going to make it to court. App. 11828, 11830-31. After Flowers' murder, Savage bragged to Crosby that he "spanked the case." App. 11831.

**K.      The 2004 Federal Drug Indictment, and Threats to Witnesses.**

On May 12, 2004, a federal grand jury returned an indictment charging Kaboni Savage with conspiracy to distribute controlled substances. Supp. App. 1-3. On May 19, 2004, a superseding indictment charged Savage and 19 others with drug trafficking, money laundering, and firearms charges. Supp. App. 4-42. On February 7, 2005, a second superseding indictment

charged Kaboni Savage, Steven Northington, Gerald Thomas, and 17 others with drug trafficking, money laundering, witness tampering, and other charges. Supp. App. 43-86. This major federal indictment targeted the years-long conduct of the Kaboni Savage organization, resting on copious evidence developed from cooperating witnesses, surveillance, and other means. App. 4045; Supp. App. 43-86. Gerald Thomas died of cancer awaiting trial. App. 4046.

While detained pending trial in FDC Philadelphia, Kaboni Savage continued to direct his drug organization by telephone, threatening witnesses and their family members, and using his sister Kidada Savage and others to convey some of those threats. On June 20, 2004, Kaboni Savage directed Kidada Savage and their cousin, Raymond "Manny" Wilmore, to give instructions to Steven "Dollar Bill" Northington, to whom they referred as "Money Sign." App. 1068; GX 1A2. Wilmore responded, "You a boss, give a order, I'll get it done." App. 1069.

Eugene Coleman was a cooperating witness in this case. In July 2004, Kaboni Savage conveyed a threat to Coleman via Dawud Bey, with Bey warning Coleman, "You still got your family out there. You still got your brother." App. 8948. Bey added, "Death before dishonor." App. 8948-49.

In a July 22, 2004, call, Kaboni Savage and Kidada Savage discussed a woman they knew and her boyfriend, whom they referred to as a "rat." App. 1069.5; GX 1A3. Kaboni Savage declared, "He coming home to a murder . . . She need her head blew off," to which Kidada Savage replied, "Ah-huh." App. 1069.6.

On September 19, 2004, Kaboni Savage and Kidada Savage talked about whether someone was "snitching," after which Kaboni Savage expressed frustration concerning Lamont "Poppy-Eyes" Lewis, saying, "Tell him, fuck him man, he supposed to been done that, man! . . .

Tell that nigga man, gangsters don't behave that way, man," to which Kidada Savage replied, "Yeah, I'm a tell him, too." App. 1070-71; GX 1A4. On September 24, 2004, Kaboni Savage instructed Kidada Savage to "tell 'Poppy-Eyes' I said, 'Get on his fucking job.'" Kidada Savage replied, "Yeah. Definitely." App. 1069.7; GX 1A5.

On October 5, 2004, Kaboni Savage and Kidada Savage again discussed "rats." App. 1073.1; GX 1A10. Kidada Savage advised, "Hey man, everybody's suspect." App. 1073.2. She later said, "You're gonna have to find a time, so I can tell Poppy-Eyes to be here," to which Kaboni Savage replied, "Tomorrow I'm definitely calling . . . Tell him I'm upset 'cause he knows what the fuck I want and he ain't do it yet." App. 1073.3.

On October 8, 2004, at 6:19 a.m., Kaboni Savage called his girlfriend, Crystal Copeland, and told her that he was being taken to court that morning. Supp. App. 87-88; GX 1A11. Savage said, "I don't feel like going over there and looking at all these rat ass niggas faces." *Id.*; Supp. App. 88.

On October 8, 2004, the day before his family was murdered, Eugene Coleman was also brought to court, and placed in a holding cell with fellow witness Myron Wilson and one of Kaboni Savage's friends, Calvin "Cheesesteak" Davis. App. 8951-52. Davis told Coleman and Wilson, "You shouldn't be ratting on your man like that. . . ." App. 8953. Savage then entered the cellblock, at which time the Marshals moved Savage and Davis into an adjoining cell, from which the threats continued, with Davis telling Savage, "They should die . . . kill all the motherfuckers." *Id.* Savage then stated loudly, regarding Coleman's family:

> They all should die. Kill all the motherfuckers, because they had that bitch ass nigga that he ratted. He is a rat. His mother, all of them. Even the people that had him. He got his bitch ass brother out there, kill his kid, everything.

40

App. 8954. On the way back from court that day, Davis made a gun-pointing gesture to Coleman, while Savage made a throat-slashing gesture toward Coleman. App. 8956.

On October 8, 2004, at 7:02 p.m., Kaboni Savage called home and spoke to Kidada Savage and their mother, Barbara Savage. App. 1074; GX 1A12. He told Kidada, "They took me to court today." *Id*. Describing Eugene Coleman and another witness, Kaboni Savage said. "I seen that lying faggot ass nigga today. The short one with must . . . with the beard . . . And the other bald head, little fat lying faggot motherfucker." App. 1075-76. Kaboni Savage described FDC to his mother, Barbara Savage, "It's a rat cave," to which she replied, "Yeah, it's a cheese factory . . . Motherfuckers. Fuck 'em. You know what I'm saying?" App. 1078. Kaboni Savage indicated he would call back later. App. 1077.

On the evening of October 8, 2004, Kidada Savage summoned Lamont Lewis to the house to speak on the phone with Kaboni Savage. App. 10973-74. Earlier, Kidada Savage told Lewis that Kaboni Savage wanted to talk to Lewis. App. 10972-73. Kidada told Lewis she would call Lewis to come to the Savage home, so Lewis could "catch his call." App. 10973. When Lewis arrived on the evening of October 8, 2004, Kidada Savage, Barbara Savage, and Crystal Copeland (Savage's girlfriend) were present. App. 10974.

In that telephone call, as recorded by FDC Philadelphia at 8:31 p.m., Kidada Savage told Kaboni Savage that "Poppy-Eyes was over here," to which Savage told her, "Tell him to get that done, man." App. 1080, GX 1A13. A few minutes later, while Kaboni Savage spoke to Crystal Copeland, the doorbell rang, and Kaboni Savage asked, "Who's at the door?" to which Copeland replied, "Oh, 'Mont." Savage asked, "That's Poppy-Eyes?" to which she replied, "Yeah, that's

41

him." App. 1080-81.

Kaboni Savage then asked to speak to Lamont Lewis. They talked about a neighborhood man who was a "rat." App. 1082. Lewis then asked how Savage's case looked, to which Savage replied, "Oh man, we good man. We just waiting to go to trial, man!" App. 1083-84. Lewis then asked about Northington, who had recently been arrested, "What's up with ah, Cash Money?" After some initial confusion, Savage replied, "He good, he good. He all man, you ain't got to worry about nothing . . . He all man! I, you got my word on that." App. 1084. Savage then asked Lewis:

KS: But you know what I want, I need you to do man?

LL: Whatever man, anything.

KS: Ah, Little Sis told you?

LL: No, not yet then.

KS: She ain't tell you?

LL: Not yet.

KS: Alright, that's all I need. I mean, cause ah . . . she'll tell you.

LL: Anything!

KS: But ah, just stay in touch. I need you to look out for my family, man.

LL: Oh man.

KS: You the only motherfucker, like, that out there, that's gonna go hard. You know what I mean?

LL: That's right, man. All the way, dog.

App. 1084-85.

42

Later in the call, Lamont Lewis reassured Kaboni Savage, "I'm here though, man, you know that . . . I'll be the last man standing, whatever it takes," to which Savage replied, "That's how you supposed to be! That's the only way to be!" App. 1087. Lewis then chided Savage regarding Lewis' earlier admonition that Eugene Coleman would betray Savage: "I swear to God I told you man!" Savage acknowledged that Lewis had warned him, and Lewis stated, "But you know I love you to death, man. Whatever!" App. 1088. Then, returning to the plan Kidada Savage would divulge to Lewis,

Savage said:

> KS: Yeah, no question, man. I, I got you too, ah . . . you, you gonna feel it when she say it cause . . .
>
> LL: Ah-ha.
>
> KS: . . . you gonna understand . . . My nigga, you gonna feel it, so, you know what I mean?
>
> LL: I'm with you, man.
>
> KS: Alright.

App. 1089. Lamont Lewis testified at trial that he knew Kaboni Savage's statement to him, "You're the only motherfucker that's going to go hard" meant that Savage wanted Lewis "to kill somebody for him." App. 10981. Lamont Lewis also confirmed that "Dollar Bill" is Northington, App. 10979, while "Lil Sis" is Kidada Savage, App. 10980.

### L.    The Coleman Family Arson Murders.

On the morning of October 9, 2004, Lamont Lewis and Robert Merritt firebombed the Coleman family home and murdered six people, at the direction of Kaboni Savage and Kidada Savage. App. 10847.

The Coleman family lived at 3256 North 6th Street, a four-bedroom row home in North Philadelphia. App. 8695. Eugene Coleman grew up in that house with his mother Marcella, his father Eugene (since deceased), his twin brother Vernon, his sister Regina Nash, and his cousin Tameka Nash (whom Coleman regarded as his sister). App. 8696. In 2004, Marcella Coleman, Regina Nash, and Tameka Nash lived in the house with Tameka's 12-year-old daughter, Khadijah Nash; Regina's 10-year-old son, Tajh Porchea; and Eugene's 15-month-old son, Damir Jenkins. App. 8697-98. On the evening of October 8, 2004, Vernon's 15-year-old son, Sean Rodriguez, also was in the house. App. 8698.

Kaboni Savage had been to Eugene Coleman's house, and had met every member of Coleman's family. App. 8805-06. Kaboni Savage had also admitted, on cross-examination in the 2005 drug trial, that he knew the Coleman family had children living in the house. App. 1097; GX 1F1N. Kidada Savage had also been to Coleman's house and had met Coleman's family. App. 8947.

After the October 8, 2004, 8:31 p.m. phone call between Kaboni Savage and Lamont Lewis, Kidada Savage told Lewis what Kaboni Savage wanted done. Barbara Savage was present for that conversation, but she said nothing. App. 10985. Kidada Savage told Lewis that Kaboni Savage wanted Lewis to firebomb the Coleman family house. App. 10985-86. Kidada Savage explained that it should be done late, at 3:00 or 4:00 a.m., when "everybody is in the house." App. 10986. Kidada expected that Coleman's mother would be home, with a pit bull dog, and that she might have a firearm because she was a corrections officer. App. 10986-87.

Initially, Lewis proposed to Kidada Savage that Lewis would have a friend, "Snuff," help him do the firebombing, but Kidada Savage vetoed the idea, saying that she did not trust Snuff.

44

Lewis then proposed that he would get help from his cousin, Robert "B.J." Merritt, to which Kidada Savage agreed. App. 10987. Kidada Savage promised to give Lewis $5,000 to burn down the Coleman home. App. 10988. Kidada Savage asked Lewis to signal her when the firebombing was completed, by calling her and hanging up. App. 10990-91. Because Lewis did not know the location of the Coleman house, and had never met Eugene Coleman's mother, Kidada Savage and her friend then drove Lewis to the house and pointed it out for him. App. 10988.

Lewis called his cousin, Robert Merritt, and told Merritt he needed help with something. App. 10991. Lewis then waited at the bar at 8th and Venango Streets, while Merritt drove there from Norristown. App. 10992. Cell site records confirmed that Merritt's cellular telephone traveled from Norristown to the area of the North Philadelphia bar at that time. App. 10688-93; GX 951-1.

When Merritt arrived, Lewis explained that Kaboni Savage wanted Lewis to burn down "Twin's house." App. 10992. Merritt already knew that Coleman was testifying against Savage, and agreed to do the firebombing. App. 10992-93. Lewis and Merritt then went to a local gas station, bought two gas cans, filled them with gasoline, and put them in the car trunk. App. 10993. They then drove to Merritt's family house in West Philadelphia to get a gun, since Lewis had been told the Colemans might have a firearm in the house. App. 10993-95. On the way to Merritt's house, they were stopped by a Philadelphia highway patrol officer for speeding. App. 10995. Lewis was driving but had no license. Because the officer was called away to another scene, he allowed them to leave, with Merritt driving, and mailed Lewis the speeding ticket. App. 10996. The ticket revealed the date and time to be October 9, 2004, at 4:08 a.m. App. 10998; GX 952.

Lamont Lewis and Robert Merritt proceeded to the Merritt house, where they retrieved a 9 mm handgun, then returned to North Philadelphia. App. 10999. Lewis and Merritt parked around the corner from the Coleman home, waited for a marked police car to leave the area, then retrieved the gas cans from the trunk. App. 11001. They stuffed a cloth in one of the gas cans as a wick, then approached the home on foot, carrying the two gas cans. *Id*. They stepped onto the front porch. Lewis handed Merritt a lighter. Lewis kicked in the front door, entered the house, and fired two shots. When Lewis kicked in the door, he heard a woman yell, "Who's that?" Merritt then ran in, with a lit gas can, and threw it into the living room. There was a "big explosion." App. 11001-02. Merritt ran out, retrieved the other can and, without lighting it, threw it into the house. App. 11002-03. As they ran from the home, Lewis heard a woman screaming. App. 11003.

Lamont Lewis called Kidada Savage's phone and left a message, saying "it was done." App. 11003-04. Telephone records corroborate that the call was made. App. 11004.

Marcella Coleman, 54, Tameka Nash, 34, Sean Rodriguez, 15, Tajh Porchea, 12, Khadijah Nash, 10, and Damir Jenkins, 15 months, died in the fire that early morning. Regina Nash, Eugene Coleman's sister, was at work at the time of the attack when her mother and son, Tajh Porchea, were murdered.

Later that morning, Lewis saw television news accounts and learned that children had been killed in the firebombing. App. 11004-05. Lewis drove to the Savage home, and asked Kidada Savage why she did not tell him that there would be children in the house, to which Kidada Savage replied, "Fuck 'em." App. 11006. She then gave Lewis $2,000 cash, and told Lewis that her cousin would later give Lewis an additional $3,000. *Id*. Eric Johnson ("E") later

46

completed payment by giving Lewis a bottle of PCP oil worth between $4,500 and $5,000. App. 11008. Lewis, in turn, bought Robert Merritt a used car as payment for Merritt's role in the arson murders. App. 11009.

Lewis and Merritt later disposed of the box of bullets from which the shots fired into the Coleman house had come. App. 11006. Lewis and Eric Johnson drove to Delaware, where they threw the firearm into a river. App. 11009.

Dr. Ian Hood, a veteran medical examiner, testified that the six Coleman family victims had all been subject to "very hot, heavily soot-laden air," App. 13349, and "were essentially baked in place," App. 13350. "There was a great deal of soot in their hair, in the nostrils and their mouths." *Id*. All of them "had high carbon monoxide levels," and all six died of "smoke and soot inhalation." App. 13352,

After his family members were murdered, Eugene Coleman entered the U.S. Marshals' Witness Security Unit, commonly referred to as the "witness protection program." App. 8960.

In October 2005, Robert Merritt was housed at FDC Philadelphia with Bienvenido "Babyrock" Morales. App. 11953. Morales noticed that Merritt had an "EAM" tattoo on his hand, which Morales also had, and which Morales recognized as meaning, "Erie Avenue Mob." App. 11952, 11954. Merritt, who called himself "B.J.," told Morales that he was from 7th and Venango. App. 11954. Merritt told Morales that Merritt and his cousin Lamont Lewis owned the corner of 8th and Venango, selling "wet." App. 11959-60. Merritt described himself as "a gun," meaning a "killer." App. 11962-63. Later, when Morales noticed that Merritt was being separated from inmates not involved in his case, Merritt said that he was being separated from people involved with Kaboni Savage, explaining that it had to do with "the firebombing on 6th

47

Street." App. 11967. Merritt then admitted that he was the "driver" for the firebombing. App. 11968. Merritt further offered that "it wasn't supposed to go down like that . . . they were supposed to burn the house down to square Twin's family to stop Twin from testifying and whoever else thought about telling on Kaboni." App. 11968-69. Although Merritt expressed regret that there were children in the house, he admitted that he "got looked out for," meaning that he got paid. App. 11969.

### M.    The FDC Cell Interceptions.

After the Coleman home firebombing, the government obtained a court order permitting it to place a "bug" between Kaboni Savage's FDC cell and the adjoining cell, to intercept and record conversations Savage had with his friends in an adjoining cell, including, at various times, associates Al-Shannon Muse and Dawud Bey. App. 3742-43. In these conversations, Savage made numerous admissions, expressed glee with the Coleman murders, and plotted to kill more witnesses and their family members.

In one of those conversations, on November 3, 2004, Kaboni Savage recounted to Al-Shannon Muse an encounter Savage had with FDC officers, in which Savage complained about the futility of placing Savage in the Special Housing Unit (SHU) to avoid further problems with witnesses, saying, "How can y'all prevent it? Y'all can't prevent it . . . It's going to happen anyway . . . You can't stop it, it's inevitable." App. 1128, 15685; GX 1L2.

On November 3, 2004, Kaboni Savage and Muse discussed cooperating witnesses Paul "P" Daniels and Robert "Miami" Wilks, with Savage admitting that he had threatened Daniels. Muse said, "By time of trial, everybody be dead," to which Savage stated, "And we just getting started . . . the night's still young." App. 1130, 15695; GX 1L3-1.

48

On November 4, 2004, Kaboni Savage complained to Al-Shannon Muse about the FBI escorting Eugene Coleman from FDC to his family's funeral, contrasting him with Savage associate Dawud Bey, who had not been allowed to attend Bey's father's funeral. App. 1144; GX 1L13. After first guessing that Coleman's family would blame Coleman for the deaths, Savage then bragged that Coleman "couldn't view" the bodies because they had been burned in the fire. Savage then stated, "They shoulda, you know where they shoulda took him? They should took him got some barbeque sauce and poured it on them some bitches." *Id*. Savage and Muse laughed, and Savage repeated:

> Pour it on them burnt bitches! . . . That's what you shoulda did! Fuck, yeah. Motherfuckers! Bastards, fuck them! Fuck them little, fuck their little babies! Shoulda died. Pop a rat, he woulda been a mouse! . . . He's a mouse!

App. 1145. (On the same day, in a portion of the recording introduced in the penalty phase of the trial, referring to the FBI case agents, Kaboni Savage told Al-Shannon Muse, "And first chance I get out, I'll try and blow your fucking head off, nigga, we don't like each other." App. 15695; GX 1L14-2.)

Kaboni Savage had numerous additional conversations with Muse in which Savage complained about cooperating witnesses ("rats"), and plotted to kill them, and their family members. On November 10, 2004, Savage complained about the Smith brothers, Stanley and Lamont, and how one brother was "telling on" the other. App. 1160; GX 1L130. In response, Savage told Muse that Savage had called one of the brothers a "rat ass bitch." App. 1161. Savage further stated, "Yeah, yep. He's got a daughter down my way, I gonna blow her little head off. She like five." *Id*. He restated, "I'm gonna blow her head off. You're coming about this freedom, nigga. I don't give a fuck . . . that's just, that's how I was taught." *Id*. Savage concluded:

49

> Yeah that's why these rats doing what they doing. They talking about it ain't his mom got nothing to do with this shit . . . She got everything to do with this shit . . . Mother had him, mother made him and mother fuck him and her.

App. 1162.

Later on November 10, 2004, Savage told Muse, "These rats got a problem. They should have left me alone . . . Cause these rats better not come around me . . . Cause I'm gonna get your motherfuckin' ass and your kids. Everybody gonna pay." Supp. App. 89; GX 1L140-1.

On November 14, 2004, Kaboni Savage and Al-Shannon Muse were discussing Savage's efforts to fight his pending federal drug charges. Savage said, "over here the fight don't stop . . . The fight don't stop 'til that casket drop . . . We, we gonna fight 'til the day I die." App. 1179, 15696; GX 1L202-2.

On December 9, 2004, Kaboni Savage complained to Dawud Bey that Savage missed his daughter's 8th grade graduation, stating, "That's why them niggas got to pay . . . Those fucking rats." App. 1306; GX 1L642. Savage continued, "Their kids got to pay, for making my kids cry. I want to smack one of their four-year-old sons in the head with a bat . . . Straight up. I have dreams about killing their kids . . . Cutting their kids' heads off." App. 1306-07.

Kaboni Savage also discussed his plans to kill members of law enforcement, expressing particular hatred for a Captain at FDC Philadelphia, saying to Dawud Bey on December 12, 2004:

> That captain a motherfucker, man. He gonna die a miserable death and I hope I'm there, I hope I'm the cause of that motherfucker. I'm gonna torture his ass, I'm gonna set him on fire. Alive. That's what I wanna do to a nigga, I wanna set a nigga on fire alive. Watch him jump around like James fuckin' Brown. Get a metal chair and some cuffs. Douse him with that gasoline. Set his ass on fire. Say welcome to hell, bitch. (Laughs) I'm gonna get somebody, that fire a motherfucker.

50

App. 1321; GX 1L687-1

On December 27, 2004, Kaboni Savage had extensive conversations with Dawud Bey. Savage told Bey he believed Savage would only be sentenced to 36 months in prison, and that this would cause concern among cooperating witnesses. Bey offered, "They gonna pay, too, boy," to which Savage replied, referring specifically to witness Paul Daniels and his daughter:

> Yeah, they got to pay. That's all I think about. They kids, they moms, I had dreams about hitting "P" daughter in her head, man. Opening her head, wide open with 40's, dum-dums, man. That's all I dream about. Getting that nigga killed . . . I wanna erase his whole family tree, man. You're hurting my kids, sending me to jail, man. Your kids, your mom, nobody's getting a pass, man. They're gonna pay, man. They gonna – before I make a dollar, they gonna pay, man. That's all I dream about, man, getting them niggas.

App. 1399; GX 1L986.

After Savage told Bey again, "Their mommas gonna pay," Bey observed that one day the cooperating witnesses would get out of prison (implying that they could then be killed), to which Savage replied, "No, fuck that. I'm killing what they love while they in there . . . I ain't waiting for them. You hurt my mother, you hurt my sister . . . I gotta hurt yours. You hurting my kids, I'm hurting your [sic]." App. 1402; GX 1L987-4.

Savage then contrasted himself with the movie character "Scarface," played in the 1983 version by Al Pacino, who in that film disobeys an order from a drug lord to kill a witness because the bomb would also kill the witness' children. Savage said, "I ain't Scarface, kids count to me, man! They count to me!" *Id*.

Savage and Bey then proceeded to vie for who would be first to kill the mother of witness Craig Oliver. App. 1403-04. Savage concluded by stating that, while his assassin Lamont Lewis was currently "hot," Savage could wait a few months, then, through "Little Sis" (Kidada

51

Savage), Savage could once again reach out to "my man" Lamont Lewis to kill others, saying, "another three or four months, I'm gonna ask, or I'm gonna tell . . . Tie them boots back up, nigga . . . While he's still in the groove, huh?" App. 1404-05.

Later, Savage was comforting Bey, who recounted things Bey had done for which he had not been caught. Savage assured Bey that it was "only cheatin' . . . when you get caught," then contrasted Savage's own life: "The shit I got away with. (laughter) Swoo . . . man! I belong on Death Row! I should a been, been got the needle." App. 1408; GX 1L987-6.

Still later that evening, Savage discussed the effect he expected the Coleman murders to have on other prospective witnesses, stating, "Don't nobody want to be [in] that next house, man . . . Don't nobody want to be part of or in that next house." Bey replied, "No doubt." Savage laughed. Bey continued, "When it's burning." Savage laughed again and said, "See what I'm saying? Like right now, don't nobody want to be part of that." App. 1410; GX 1L995.

Savage vowed to continue to kill witnesses, "rats," and their family members for the rest of his life, in his December 27, 2004 "Tears of Rage" speech:

> Tears of rage. I'm flooded, I'm, I'm flooded internally from 'em. Almost drown myself every night, man. Tears of rage 'cause these son-of-bitches gonna pay, man! They gonna pay or my name ain't what it is, my Pop name ain't what it was, they gonna pay. They kids gonna pay, they mommas gonna pay. I know you get tired of me saying it, man, but that's the kind of conviction I got for this shit, man. I'm dedicated to their death, man. They better hope and pray I go to jail for a long time. It don't matter, 'cause while I'm still living, I'm a get them.

App. 1406; GX 1L987-5.15

---

15  The government introduced similar conversations during the penalty phase of the trial. For instance, it introduced a further statement from December 19, 2004, when Kaboni Savage and Dawud Bey discussed those they considered "rats," with Savage stating, "And I'm gonna kill all of son of bitches, and they babies." App. 15686; GX 1L836. The government also

### N.    The 2005 Federal Drug Trial.

In his 2005 federal drug trial, Kaboni Savage testified in his defense that he was merely a "cut" dealer, not a cocaine dealer. Savage did not pursue that unsuccessful defense in the trial of the instant case.

On cross-examination, the government confronted Kaboni Savage with many of the threats he had made, which had been intercepted pursuant to the court-authorized cell bug. Savage admitted that he threatened witnesses and their family members, and that he meant it when he said it. App. 1100-09, 1113-14. The prosecutor asked Savage pointedly, "And you're talking about killing witnesses?" Savage replied, "At the time, yes." App. 1117; GX 1F2F.

On December 16, 2005, Kaboni Savage was convicted of 14 counts, including conspiracy to distribute cocaine, money laundering, and two counts of threatening to retaliate against witnesses. Savage was sentenced to 30 years' imprisonment. His conviction and sentence were affirmed on appeal. *United States v. Walker*, 392 F. App'x 919 (3d Cir. 2010).

### O.    The Imposition of Special Administrative Measures (SAMs).

On February 1, 2007, the Attorney General authorized the Bureau of Prisons (BOP) to impose Special Administrative Measures (SAMs), pursuant to 28 C.F.R. § 501.3, restricting Kaboni Savage's communications. Since then, the SAMs have been renewed annually. After the SAMs were authorized, the BOP redesignated Savage from USP Atlanta to the Administrative

---

introduced recorded telephone calls from Atlanta USP, where Kaboni Savage began serving his federal drug sentence, in which calls Savage threatened his girlfriend, Crystal Copeland. On June 5, 2006, Savage criticized Copeland for "going to parties," and threatened to send his cousin: "Don't make me sick Manny on your ass." App. 1094, 15697; GX 1B12. Savage reminded her, referencing his late hitman Kareem "Bree" Bluntly, "You know I'm capable . . . I got 15 other Bree's out there." *Id*.

Detention Facility (ADX, sometimes referred to as ADMAX) at Florence, Colorado. After resolution of the instant case, Savage was returned to ADX, where he is presently confined. The restrictions strictly limit Savage's ability to communicate with the outside world, given that he directed multiple murders while incarcerated, vowed repeatedly to continue to do so, and demonstrated an ability to violate rules and communicate messages to persons outside prison walls.[16]

The SAMs limit Kaboni Savage's access to others, and specifically limit oral, written, or recorded communications with other inmates, friends, and associates. Savage is not permitted to communicate with other inmates. Supp. App. 171-87.

Kaboni Savage may have telephone calls to, and social visits with, certain family members, including his girlfriend Crystal Copeland, sister Conchetta Savage, his children, and his nieces and nephews. He is permitted to visit with multiple family members at once. All social communications must be scheduled in advance, and are monitored by federal law enforcement agents. Social telephone calls to family members are recorded. Correspondence is likewise limited to those select, approved family members. All persons with whom Savage communicates (attorneys, legal team members, and family members) must read, acknowledge, and agree to abide by the terms of the SAMs in order to remain approved to communicate with him. Supp. App. 174-75.

---

[16] For instance, on November 6, 2004, Kaboni Savage told Al-Shannon Muse that he had called Gerald Thomas from FDC, using the legal lines, explaining that he got his former lawyer's secretary to forward the call, in violation of prison regulations. App. 1156, 15644; GX 1L63-1.

54

Kaboni Savage's communications with his attorneys, paralegals, and other members of the defense team are neither recorded nor monitored. They are also not restricted in number. However, any communications or visits with "investigators" must be accompanied by an attorney. Supp. App. 175-77.[17]

Savage's legal mail privileges with counsel are the same as those applicable to other inmates. Savage is not limited in the number of visits or telephone calls he may have with members of the defense team, all of which are unmonitored and unrecorded. However, all visits and telephone calls must be scheduled with Savage's BOP facility, as BOP officials must first ensure the identity of the attorney on the call before the conversation can commence. Supp. App. 177-81.

On April 8, 2009, the instant RICO indictment was returned, charging Kaboni Savage and co-defendants with conspiracy to commit racketeering, 12 counts of murder in aid of racketeering, and related offenses. DDE # 51. The district court ordered Savage returned to Philadelphia from ADX to answer the charges. DDE # 57.

Kaboni Savage litigated the SAMs restrictions pretrial, as he continues to do today. An agreement was reached whereby Savage would be housed pretrial in a SAMs unit in New York. Later, Savage complained of the conditions and restrictions there. On July 16, 2010, Savage filed a motion to strike the SAMs. DDE # 137. The government filed responses. DDE # 146, 166. Evidentiary hearings were held on October 1, 2010, DDE # 155, and on October 22, 2010, DDE # 165. At the hearing, Savage testified falsely that his legal mail was being opened and read.

---

17  The government has never alleged any impropriety by an attorney representing Savage.

Video surveillance footage conclusively rebutted that claim; accordingly, the district court denied his motion. DDE # 162, 163.

On January 6, 2011, Kaboni Savage requested that he be moved from MCC New York to FDC Philadelphia. DDE # 184. Savage was moved to FDC Philadelphia, which constructed an entire suite for Savage (from a former medical unit). Savage's suite consisted of a large room which had its own bathroom and shower facilities. The toilet facilities were retrofitted to prohibit communications with inmates on other floors, a common practice at FDC Philadelphia (referred to as "the bowl") which Savage had previously utilized to convey threats. Savage's retrofitted suite would permit him to prepare for trial, have visits, and communicate with counsel, while still allowing for the restriction of his communications in conformance to the SAMs. Supp. App. 93-94, 99.

Nevertheless, Kaboni Savage persisted in his complaints concerning the SAMs. Savage again requested relief from the SAMs, to which the government responded. DDE # 335. On November 18, 2011, the district court denied the motion for relief. DDE # 337. On December 26, 2011, Savage filed another motion for relief from the SAMs. DDE # 347. On January 19, 2012, the government again responded. DDE # 352. On February 9, 2012, the district court entered an order granting in part, and denying in part, relief from the SAMs. DDE # 359, 360.

On October 21, 2012, Savage filed another "motion for appropriate relief," in which he complained about a lack of visits with his children and lack of outdoor recreation time. DDE # 673; App. 510-14. On November 1, 2012, the government responded. DDE # 695; App. 515-28. Savage filed supplemental replies. On November 19, 2012, the district court entered an order granting in part, and denying in part, Savage's request for relief, which order provided

56

accommodations for Savage to meet with his family members, including his children. DDE # 730, 731.

Kaboni Savage has continued his attack on the SAMs restrictions, by filing claims in this Court during the pendency of the direct appeal, complaining that the SAMs restrictions prevented his appellate counsel from preparing his appeal. This Court rejected that claim and denied his motion, by its order of September 27, 2017. Appellate counsel next attempted to manufacture a crisis by refusing to sign the 2018 SAM affirmations, then filing an "emergency motion to restore communications," which motion this Court denied by its order of February 28, 2018.

During the penalty phase of the trial, the FBI case agent testified as to how Kaboni Savage on occasion thwarted the Special Administrative Measures (SAMs) by using an FDC legal line to make unrecorded, unmonitored calls to friends and associates, including a convicted felon. App. 15647-70. Savage used that opportunity to instruct his friends how to disguise their mail to him, to make it resemble legal mail from his attorneys. App. 15673-75.

Savage's confinement to the H-Unit (comprised of other SAMs prisoners) of ADX Florence has not been without incident. In November 2014, the New York Daily News reported that convicted 9/11 terrorist Zacarias Moussaoui was threatened by Savage. In 2020, he argued with a staff member, stating, "I'm a murderer and I will kill you." On January 13, 2021, when presented with a proposed contract to make payments on his court-ordered monetary commitments, Savage remarked, "I would rather murder a whole daycare before I would pay that." On January 6, 2023, Savage wrote a letter to ADX staff, in which he referred to corrections officials as slave owners and stated, "I'm not a slave. I'm a slave owner killer & damn proud!!"

In short, while Savage continues to litigate the SAMs restrictions, he continues to prove they are necessary.

## IV.    DISCUSSION OF SAVAGE'S CLAIMS

### A.    Savage Was Not Denied His Right To Counsel (Claims 1-4).

**Claim 1: Replacement Of Learned Counsel**

Savage's first claim, that he was denied his right to counsel when attorney Timothy Sullivan was permitted to withdraw as learned counsel, and was replaced by William Purpura, was raised by appellate counsel and rejected by the Third Circuit on Savage's direct appeal. *United States v. Savage*, 970 F.3d 217, 242-250 (3d Cir. 2020). The Third Circuit concluded, "We are well satisfied that Savage did not suffer a constructive denial of counsel and that the District Court did not commit trial error in the handling of substitution of counsel." *Id*. at p. 250. Thus, this claim is precluded and should be summarily dismissed. A petitioner may not relitigate claims that were actually decided on direct appeal (unless substantive law has changed). *United States v. Derewal*, 10 F.3d 100, 105 n. 4 (3d Cir. 1993), *cert. denied*, 511 U.S. 1033 (1994).

Furthermore, Savage's statement that Purpura entered the case "without any preparation, knowing nothing about it," Motion at p. 9, is plainly false and conclusively refuted by the record. Indeed, attorney Purpura repeatedly demonstrated that he had an ample understanding of the evidence, as evinced by his cross examinations of multiple key witnesses in the guilt phase of the trial. Hoey and Purpura did not request a continuance of trial because they did not need one.

**Claim 2: Alleged Conflicts Of Interest**

Savage claims that his learned counsel, attorneys Sullivan and Purpura, had conflicts of interest that rendered them ineffective. These claims are specious, based only on wild theories

58

that are unsupported by facts or law.

Attorneys Sullivan and Purpura vigorously defended Savage at trial. Both are highly respected, very experienced trial attorneys. Indeed, Sullivan left the case because he was appointed to the federal bench, and Purpura later defended Joaquin "El Chapo" Guzman in one of the nation's largest federal drug cases. Neither attorney had a legally cognizable conflict of interest, either personally or professionally, and Savage alleges no legally cognizable claim. As to attorney Sullivan, one can certainly represent a defendant in a criminal case while being considered for a position as a federal magistrate judge. There is no rule to the contrary. To suggest otherwise is ludicrous, and unsupported by any legal precedent.

Savage offers the speculative opinion of a law professor to opine that Sullivan's pending judicial appointment was so overwhelming that it precluded Sullivan from performing competently in Savage's defense. That opinion lacks a sound legal basis, defies logic, lacks any medical, psychological, or factual basis, and would fail to qualify under any standard, much less a *Daubert* standard for admission. Even in its best light, the law professor's proposed testimony would be worthless, in that he suggests that Sullivan should have notified the court early, and should have gotten Purpura involved early so that Purpura could have gotten up to speed in the case – when that is precisely what was done.

While Savage belabors Sullivan's status in 2012 as a potential magistrate judge, neither Savage nor the professor acknowledge that Sullivan's ascension to the bench in 2012 was anything but certain. Attorney Sullivan's appointment as a U.S. Magistrate Judge was contingent upon the Senate confirmation of a sitting U.S. Magistrate Judge, Judge Grimm, to an Article III seat as a U.S. District Judge in the District of Maryland. All of this occurred in the Fall of 2012,

59

a Presidential election year, at a time when federal judicial confirmations typically become stalled and die on the vine. Thus, it was anything but certain that Sullivan would have to leave the case. Sullivan thus did the prudent and responsible thing: He notified the district court of his situation, arranged to have a replacement ready if necessary, and got his potential replacement, Purpura, up to speed so that, if necessary, Purpura could step in and defend the case. Indeed, Purpura was able to do so and did not need to request a continuance of the trial. While Savage now bemoans this event, the fact is that Savage did not seek a continuance, and points to nothing in his motion as an example of what advantage Purpura could have gained as a result of seeking a continuance.

Attorney Purpura not only actively engaged in the penalty phase as learned counsel, he proved himself to be well versed in the case from the inception, being fully involved in the guilt/innocence phase of the trial. The district court witnessed Purpura's zeal and level of preparation, and saw that he was certainly not ineffective. Savage makes much of attorney Purpura's statement in the closing argument of the penalty phase, in which he tried to portray the mitigation defense as being less than well prepared. This was obviously a tactical ploy for sympathy, hoping that a juror might be persuaded to vote for mercy by rationalizing that Savage got less than a stellar defense. But because Savage was indeed competently represented, the jury rejected that notion. Finally, Savage's desperate suggestion that Purpura was somehow compelled into the case because he might someday appear before Sullivan as a Magistrate Judge is unsupported, speculative beyond peradventure, and not a factually nor legally supportable claim.

**Claim 3: Cooperation With Co-Defendants' Counsel**

Savage also attempts to fabricate an alleged "conflict of interest" out of his trial counsel's "working in tandem with Kidada Savage's attorneys," suggesting that Savage's counsel should have pinned blame on his co-defendant sister, Kidada Savage. Motion at p. 9. This, too, is legally baseless and, as a practical matter, absurd on its face. Kaboni Savage was the vicious, homicidal leader of a drug organization, fully engaged in every phase of its operation. Kidada Savage was his younger sister, who worked at an insurance company, and whose role in the racketeering conspiracy was much more limited, at least until she assisted in the firebombing of the Coleman family home and the murders of its six inhabitants. To not present a united front with Kidada's defense team would have been to court disaster, as she could do much more damage to his case than he could to hers. Moreover, no reasonable juror would ever have believed that Kidada Savage orchestrated the firebombing on her own, without orders from Kaboni Savage, and certainly not in the face of the overwhelming evidence to the contrary, which included the pre-firebombing recorded FDC phone calls between Kaboni Savage, Kidada Savage, and Lamont Lewis. The assertion that Savage's lawyers should not have worked in tandem with Kidada's lawyers is nothing short of foolhardy. Also, because the government was not authorized to seek the death penalty against Kidada Savage, there was no conflict or problem with using some of the mitigation assistants initially assigned to her case to then work on Kaboni Savage's mitigation team. Savage cannot point to a single authority for his position to the contrary.

Savage tries to bolster his lame claim of "conflict" with statements from members of the mitigation team: Townes, Burry, and Penry. These people, who were exposed at trial as anti-death penalty zealots, now attempt to savage one another and trial counsel (while each painting

61

themselves as helpless victims) in their quest to obtain a new trial (or, at the time of their submissions, a new penalty phase) for their client. One even recklessly speculates about an extramarital affair between defense counsel, a claim that is patently false and manufactured of whole cloth. This, however, is to no avail, as nothing in those statements rises to a level of ineffective assistance of counsel, even if it were to be believed.

## Claim 4: Special Administrative Measures (SAMs)

Savage's last claim in this group, that he was held "in inhumane and tortuous conditions that interfered with his right to counsel and denied him the right to a fair trial," Motion at p. 9, is flatly wrong and abundantly contradicted by the record. The Special Administrative Measures (SAMs) imposed on Savage did nothing to interfere with his right to counsel or to a fair trial, and were abundantly reasonable under the circumstances. Savage murdered twelve people. Seven of his twelve victims he ordered murdered from behind prison walls. After the firebombing of the Coleman family home, in which six people, including four children, were murdered, Savage not only rejoiced in those murders, he plotted to murder more family members of more witnesses. In that situation, the imposition of SAMs was certainly reasonable, and necessary to protect the public. Indeed, it would have been reckless of the government to continue to permit Savage to make unmonitored telephone calls in which he could have ordered more mass murders.

There has been no issue more heavily litigated in this case (pre-trial, mid-trial, and post-trial) than the SAMs imposed on Savage. Indeed, Savage continues to litigate it to this day, in both this case and in two separate civil cases in the District of Columbia (populated by yet another army of pro bono lawyers). Current habeas counsel have not only sought to lift the SAMs conditions, they have even attempted to get the Bureau of Prisons to allow third-party

calls, something that is never allowed for *any* prisoner. The fact that these efforts have all failed is no mere coincidence.

The district court held multiple pre-trial hearings on this issue, and took extensive testimony from witnesses about Savage's conditions of confinement and the scrupulous preservation of rights afforded Savage. Indeed, when the district court ordered Savage returned to the Eastern District of Pennsylvania from MCC-Manhattan prior to trial, FDC-Philadelphia retrofitted an entire suite for Savage, in order to preserve his rights while still maintaining the integrity of the SAMs conditions. In response to that, Savage managed to corrupt a corrections officer, make unrecorded, unmonitored calls on a legal line to criminals, and taught his friends how to disguise their mail to look like it came from his attorney's office. Evidence of that scheme was uncovered in a search warrant and properly presented in the penalty phase of trial.

The government need not list the many quotes from the Savage cell bug, admitted at trial, to justify the SAMs conditions in this case, but a few should suffice:

"The fight don't stop till the casket drop." GX 1-L202-2.

"No witness, no crime." GX 1-232-1.

"By time of trial, everybody be dead . . . and we just getting started. The night's still young." GX 1-L3-1.

"Everybody gotta pay. Their kids, their Moms, nobody gets a pass." GX 1-L986.

"Nobody wants to be in that next house . . . when it's burning." GX 1-987-4.

"As long as I'm alive, I'm a get 'em." GX 1-L987-5.

Under the circumstances of this case, Savage's conditions of confinement were, and remain, eminently reasonable. Calling those conditions "inhumane and tortuous" simply lacks

63

credulity, as well as any factual support. Because this claim is conclusively refuted by the record, it should be summarily dismissed.

**B. Savage Received Competent, Constitutionally Effective Representation From Trial Counsel (Claims 5A1-6, 5B1-18, 6A1, 6A2(i) and (ii), 6A3(i)-(xii), 6A4-11, 6B, 6C1-3, 6D-F, 6G1-2, 7-11, 12A-E, 13A-J, 14, and 15).**

In Claims 5 through 15, Savage launches an all-out assault on every aspect of his trial counsel's performance, arguing they were constitutionally ineffective. These arguments all lack merit. Some are factually wrong, conclusively refuted by the record, and require no further inquiry in the form of an evidentiary hearing. Some are merely fanciful theories unsupported by facts or law. Other claims necessarily involved trial strategy and are thus also meritless. In those, Savage merely argues the opposite of what was done; that is, if counsel called a witness, Savage argues that the witness should never have been called because he or she was effectively cross examined by the prosecutors, while also arguing that counsel should have called other witnesses who would in fact have fared much worse, or in some cases never would have testified due to criminal culpability exposure and Fifth Amendment concerns. Unfortunately, as emblematic of his entire petition, Savage exceeds the bounds of professionalism and dignity in impugning the reputations of fine lawyers who in fact mounted an extraordinary effort in defending a very difficult case for a very difficult client.

**Claim 5: Alleged Ineffective Assistance Regarding The Penalty Phase**

Savage's claims regarding the penalty phase are unfortunately rendered moot by President Biden's December 22, 2024 commutation to a life sentence. As these claims are no longer viable, this Court should summarily deny them as moot. Thus, the government's response to these claims will be limited. In the unlikely event that this Court disagrees, the government

would request permission to file a supplemental response further addressing those claims.

Savage claims his trial counsel were constitutionally ineffective in the preparation for, and presentation of, the penalty phase of the trial, and that they failed to conduct a thorough investigation of the defendant's background. He makes five sub-claims (5A-E), which include 24 specific purported examples. These claims are all meritless.

Savage claims multiple items of proposed mitigation evidence that he says should have been presented by trial counsel. However, there are valid strategic reasons why this evidence, and the witnesses through whom it would have been presented, were not presented.

> "When a lawyer fails to present evidence in the penalty phase of a capital case, the conclusion that his performance is deficient does not always follow. Counsel, after adequate investigation, may believe that the presentation of other evidence would open the door to damaging rebuttal evidence from the prosecutor, *Campbell v. Kencheloe*, 829 F.2d 1453 (9th Cir. 1987), or might be inconsistent with the overall defense strategy. *Burger v. Kemp*, 483 U.S. 776 (1987); *Harris v. Vasquez*, 949 F.2d 1497 (9th Cir. 1990)."

*Harris by and through Ramseyer v. Blodgett*, 853 F. Supp. 1239, 1269 (W.D. Wash. 1994) (parallel citations omitted).

It is all very convenient for Savage's current counsel to now claim that evidence of various forms of mental impairment should have been presented. However, to effectively do so would require that the jury disregard and disbelieve the avalanche of evidence it had already seen and heard. Savage's wiretap conversations, cell bug recordings, and audio-recorded trial testimony from 2005 all render these claims desperate and unworthy of belief. Those recordings, which corroborated the testimony of many witnesses, showed Savage to be an intelligent criminal who ran a complex drug network and devised diabolical schemes to eliminate those whom he deemed a threat to his empire.

Attorneys Hoey and Purpura, were they required to testify as to these claims, would both state that Kaboni Savage would not allow them to interview family members or present any evidence that would suggest that Savage was in any way mentally impaired or disadvantaged by his family background. Savage must now live with these prideful decisions, and cannot now complain that evidence he actively sought to suppress was not presented at trial.

Evidence of specific alleged events in Savage's life would have had no effect on the jury in this case. No jury would have spared his life based on a belief that bumping his head once while riding a bicycle as a child somehow negated his otherwise sophisticated running of a drug trafficking enterprise, devious scheming, and ordering of multiple contract murders. Likewise, a more fulsome exploration of the Savage family criminal history, including a relative who had been on state death row, would have led the jury to believe there was a Savage Crime Family, and would have likely solidified the jury's determination that death row was precisely where Savage himself belonged. Instead, the more surgical, tactical approach taken by trial counsel was much more prudent. Such tactical decisions are unassailable in a 2255 petition.

## Claim 6: Alleged Ineffective Assistance Regarding The Guilt Phase

Savage claims his trial counsel were constitutionally ineffective in the preparation for, and presentation of, the guilt/innocence phase of the trial, and that they failed to present a defense to any of the murder charges. He makes seven sub-claims (6A-G), which include 30 specific purported examples. These claims are all meritless.

Throughout his petition, Savage makes statements that border on the outrageous and absurd, claiming for instance that "(a)lthough he distributed drugs, he never led a drug organization." Motion at p. 269. The evidence to the contrary, including his federal conviction in

66

2005 for doing precisely that, is overwhelming, and should require no more specific reply.

**Claim 6A(1) and (2): Making "Reasonable Investigation" and "Reasonable Decisions"**

Savage complains that trial counsel did not reasonably investigate, and thus did not reasonably impeach, two of the government's key witnesses, Eugene Coleman and Lamont Lewis. As the record proves, nothing could be further from the truth. As to Claim 6A(1), Eugene Coleman was on the witness stand for five days, four of which were on cross examination. Three of those days of cross examination were conducted by attorney Hoey on behalf of Savage, on March 18 through March 25, 2013. Coleman, who had testified in the 2005 Savage drug trial, was repeatedly hammered on cross examination about his conduct, and with regard to his prior inconsistent statements. No stone was left unturned. Trial counsel were obviously very well prepared for cross examination and made valiant efforts in cross examination.

As to Lamont Lewis, the subject of Claim 6A(2), he spent three days on the witness stand, from April 1 through April 3, 2013, most of which was on cross examination. Savage now cites to two specifics, both of which he gets wrong. First, he claims that counsel ineffectively crossed Lewis on his jail calls; whereas, counsel quite effectively did so, especially those in which Lewis had made statements denying or minimizing culpability, or claiming government pressure, to his relatives. Trial Transcript of 4/2/13 at pp. 160-170. Second, Savage states that defense counsel were ineffective in revealing Lewis' substance use, when in fact they thoroughly explored this topic, one which Lewis freely admitted. Trial transcript of 4/3/13 at pp. 50, 297-98. Defense counsel's strategy as to Lamont Lewis was reasonable and rational: Portray him as a serial murderer (having pled guilty to 11 murders) who committed murders on his own, and not at the behest of Savage. Indeed, it was the only rational strategy as to that witness.

67

**Claim 6A3: Defenses to Murder Charges**

Savage broadly claims that his trial counsel failed to mount defenses to all of his individual murder charges, citing twelve scenarios in which he alleges ineffective assistance of counsel. In an attempt to buttress these claims, Savage offers far-fetched alternate theories of defense that never would have worked, and suggests that defense counsel should have called witnesses who either never would have testified (due to 5th Amendment concerns) or would have done poorly had they been called. None of these claims establish ineffective assistance of counsel, and none have merit.

**Claim 6A(3)(i): The Mansur Abdullah Murder**

The Mansur Abdullah murder, as described by Eugene Coleman, was fully proved by his testimony, which was corroborated by the physical evidence in the case. Savage now either misrepresents or misunderstands the evidence, falsely claiming that Abdullah was seated in the driver's seat in the car where he was found murdered. This is simply untrue, as conclusively shown by the crime scene photographs, GX 403, which were produced in discovery. Discovery Batch #10/Homicide Files/Abdullah/Crime Scene Photos Mansur Abdullah/Scene 4200 Park Avenue, photos #26425, 24643, 24649, 24652, 24667, and 24670, all produced on June 4, 2012.

Although Savage attempts to question the testimony of Eugene Coleman, Motion at pp. 281-282, Coleman did not say in what seat Abdullah was seated when Coleman saw him at the initial scene; rather, Coleman only testified that he looked in the passenger side of the car and saw Abdullah "keeled over." Trial transcript of 3/18/13 at pp. 171-172. Since it was someone else (David "Shoddy" Morris) who moved the car and the body to Park Avenue, Coleman would not have taken note as to where Abdullah was actually seated. The description of Abdullah being

68

"keeled over," however, is also consistent with the position in which Abdullah was eventually found. GX 403.

Coleman's account is well corroborated by the physical evidence. For example, Coleman testified that Bluntly (the shooter) reported to Coleman and Savage that Abdullah had tried to block the shot with his hand. Trial transcript of 3/18/13 at p. 170. This is confirmed by the autopsy evidence, which shows the wound to Abdullah's hand.

Savage's current theory also makes no sense. There is no way for someone who is seated in the driver's seat when fatally shot in the head, to somehow end up with his legs in the passenger's seat, as shown in the crime scene photos. Because Savage's theory makes no sense, it is certainly not "ineffective assistance" for Savage's trial attorneys to not have pursued it.

As for Savage's theory that Bluntly killed Abdullah on his own, without orders from Savage, this theory was in fact advanced on cross examination by trial counsel. Attorney Hoey cross examined Eugene Coleman about this. Trial transcript of 3/20/13 at pp. 259-260. Likewise, the fact that Abdullah, a drug dealer, may have been robbed a few weeks before he was killed, is of no moment.

Savage's suggestion that the defense should have called David "Shoddy" Morris as a witness is misplaced. Morris moved the body, at the urging of Savage and Bluntly, from the place of the shooting to the 4200 block of N. Park Avenue, where it was found. It is unlikely Morris would have testified, waiving his 5th Amendment rights against self-incrimination, at trial. Had he done so, a prior admission would have impeached him to the considerable detriment of Savage's defense. Savage's assertion that Morris would now say something different, even if true, is hardly surprising, as no one would expect him to admit to moving a recently murdered

69

body. Savage's claim that the government withheld favorable evidence is flatly wrong, as it did no such thing. Morris' only account of what occurred was fully disclosed in discovery, on July 29, 2011, in Discovery Batch #6/Disk 1/Abdullah PPD Murder file.

Savage falsely claims that Corey Jenkins would have testified for Savage, saying that there was no ill will between Abdullah and Savage. First, Eugene Coleman said the same thing on direct and cross examination. After all, Savage and Abdullah were in the drug business together. Second, Jenkins' statement to homicide detectives, which Savage falsely claims was withheld, was indeed disclosed in discovery, in Batch #6/Disk 1/Abdullah PPD Murder file.

Likewise, Savage's claim that the entire Philadelphia Police homicide file was not disclosed in discovery, Motion at p. 301, is untrue, as the entire file was fully disclosed. All items were disclosed as to this murder, mostly in Discovery Batch #6 on July 29, 2011, and in Discovery Batch #10 on June 4, 2012. The government did not suppress anything.

### Claim 6A(3)(ii): The Tyrone Toliver Murder

The Tyrone Toliver murder, while heavily reliant on Eugene Coleman's testimony, was fully corroborated by the physical evidence in this case, including pole camera footage showing Kareem Bluntly's arrival at Coleman's Palmetto Street apartment shortly before the murder.

Savage again falsely claims that the government suppressed evidence from the Toliver murder file. In fact, the entire file was disclosed on October 19, 2009 in Discovery Batch #2/Homicide and other Crime Files/Toliver. It was again produced on June 4, 2012, in Discovery Batch #10/Homicide Files/Toliver.

Savage's claim as to what Mario Melendez would say about his knowledge of guns in the first floor of the Palmetto Street structure is meaningless. It is unsurprising that Melendez would

70

deny knowledge of firearms of a building he owned or managed. Savage's claim that the government subpoenaed Melendez to the grand jury, interviewed him, and then suppressed favorable evidence is flatly false.

Savage's proposed testimony of Marlin Meachum would likewise have been a fool's errand, as Meachum was someone involved in Savage's drug and money laundering schemes (as a co-conspirator his house was subject to forfeiture in the 2004 drug case). The suggestion that trial counsel should have called Eric Johnson as a witness is misplaced, as Johnson was a co-conspirator who entered into the pact with Savage and Lamont Lewis to kill the mothers of anyone who "snitched," and paid Lamont Lewis and Robert Merritt for the Coleman firebombing murders. Johnson would most certainly have invoked his 5th Amendment rights against self-incrimination; yet, had he testified, would have done Savage more harm than good. Savage's unfounded claim that Coleman had a motive to kill Toliver is pure folly, as they were friends.

Savage's observation that Eugene Coleman's and Lamont Lewis' testimony were consistent, is not surprising, given that they were both telling the truth. It's called corroboration. Savage's snarky suggestion, Motion at p. 313, fn. 103, that they got their stories together is impossible, as they were never housed together, had no contact with one another at all, and thus had no opportunity to concoct their "stories."

## Claim 6A(3)(iii), (iv) and (v): The Barry Parker Murder

Savage posits the dubious theory that Barry Parker was not shot by Lamont Lewis, but rather by a "young friend of Northington." Motion at p. 276. Lamont Lewis, who was previously not a suspect in this crime, freely confessed to being the shooter, and pled guilty to the Parker murder in federal court. For defense counsel to have claimed otherwise at trial makes no sense,

71

in lieu of accepting the fact that Lewis had murdered Parker and ten other people. The physical evidence corroborated Lewis' account, as did the testimony of Eugene Coleman, and the testimony of other witnesses to whom Northington confessed his own involvement.

The identity of the shooter in the Parker murder was unknown to law enforcement until Lamont Lewis admitted to it in a proffer. Lewis later pled guilty to shooting Parker. The forensic evidence in this case precisely matches the account Lewis provided as to the shooting.

Savage observes that Lamont Lewis once denied, to a street associate named "Ant," being involved in the Parker murder. First, it is hardly surprising that on May 17, 2008, before Lewis cooperated and pled guilty, that he would deny this, to a friend, on a recorded prison line. Second, this entire conversation was disclosed in discovery, on September 28, 2012, in Batch #15.

Savage spends pages hypothesizing that tis trial counsel could have suggested that a different "Lamont" killed Parker. Motion at pp. 327-331. This would have been a fool's errand, given that Lamont Lewis admitted to the murder, and both Eugene Coleman and the forensic evidence corroborated that fact.

Finally, Savage once again levels false claims that the government did not disclose the entire homicide file, and did not provide trial counsel with the transcripts of the state court trial of Northington for the Parker murder. Once again, this is conclusively false. The state court trial transcripts were disclosed on October 19, 2009 in Discovery Batch #2/Homicide and other Crime Files/Parker/Trial Transcripts. Likewise, the homicide file was also disclosed at that time. The District Attorney's file was separately provided on July 29, 2011 in Discovery Batch #6/Disk 1/Parker DA Murder File. The Parker file was re-produced on June 4, 2012 in Discovery Batch

72

#10/Homicide Files/Parker.

Savage asserts that the prosecutors told Lamont Lewis, in unrecorded phone calls, that he had to admit to the murders although he did not commit them. Motion at p. 337. That is a scurrilous lie. No such conversation occurred. Furthermore, Lamont Lewis was incarcerated since August of 2007. There were no unrecorded phone calls from any federal facility between Lamont Lewis and anyone. The idea that a veteran FBI agent, veteran FBI Task Force Officer, and three veteran prosecutors, all of stellar reputation, would have all conspired to suborn perjury and force an innocent man to plead guilty, is utterly preposterous, and unworthy of further inquiry.[18]

## Claim 6A(3)(vi): The Carlton Brown Murder

The evidence of the Carlton Brown murder consisted of more than just Lamont Lewis' testimony. However, Lewis was admittedly the shooter. Savage's current suggestion that defense counsel should have blamed someone else for the murder flies in the face of the evidence.

Once again, Savage impugns the integrity of the prosecutors as well as the witness, claiming that the government used a "trademark tactic" in asking Eugene Coleman to bolster Lamont Lewis' testimony as to the Brown murder. Motion at p. 342. That claim is absurd.

---

18 The undersigned Assistant U.S. Attorney has been an attorney and prosecutor for more than 43 years (35 years with the U.S. Department of Justice), is the Discovery Coordinator for the U.S. Attorney's Office, is on the DOJ Discovery Coordinator Working Group, is a DOJ Evaluator on the Evaluation and Review Staff, teaches Criminal Procedure at an ABA-accredited law school, and has never had a trial conviction reversed on appeal. His co-counsel, John Gallagher, was a police commander, DOJ official, an AUSA, and is now a U.S. District Judge. His other co-counsel, Steven Mellin, prosecuted numerous federal capital cases, including the Boston Marathon bombing case. Savage's cavalier accusations, made up of whole cloth, are false, repugnant, unprofessional, and detract from the dignity of these proceedings.

The fact of the matter is that Coleman had limited testimony regarding the Carlton Brown murder, which is why he had not mentioned it earlier. More to the point, if Coleman were to make up a false story, it surely would have been better than the limited statement of Savage, "That's a done deal," when Savage saw Carlton Brown shortly after Brown had murdered Savage's friend, Ronald "Pumpkin" Walston.

Savage again proposes that his trial attorneys should have called as a witness Marlin Meachem, a Savage associate whose house was listed for forfeiture in the Savage drug case, just to say that no one knew who killed Pumpkin, and should have called Eric Johnson to say that he never gave Lamont Lewis money for the contract murder. As stated above, those witnesses, if they would testify, would have been a disaster for Savage. Meachem's testimony likely would have been inadmissible. Savage also proposes that other witnesses could have been called to establish that Savage and Brown were neighbors and, at one time, friends. Motion at pp. 350-352. That would be unnecessary, as it was uncontested that Savage and Brown were once friends who dealt drugs together in their neighborhood.

Savage also suggests that trial counsel should have adopted the theory that Lamont Lewis was not the shooter; rather, that Stephen Robinson killed Brown. Motion at p. 348. As with the Parker murder, that tactic would have been foolhardy, and would have undermined the general, legitimate theory that Lamont Lewis was indeed a multiple murderer whose life was being spared via a plea bargain.

Savage also puts forth statements about alternate theories, which statements are conclusively false. He complains that the attorneys should have called Richard Hewlett to testify that Shariff Walston killed Carlton Brown. Hewlett's six-page statement to homicide detectives,

74

provided in discovery on October 19, 2009 in Discovery Batch #2/Homicides/Brown, in fact never mentioned Sharif Walston, or anyone else, as Brown's killer. However, Hewlett did identify Carlton Brown as Ronald "Pumpkin" Walston's killer. Thus, Hewlett's testimony would only have served to benefit the government's case.

Savage again claims the government withheld materials from the entire homicide file. Motion at p. 359, 361. This is patently false. Everything was disclosed: on October 19, 2009 in Discovery Batch #2/Homicide and other Crime Files/Brown; and again on June 4, 2012 in Discovery Batch #10/Homicide Files/Brown. Savage also falsely claims that the government suppressed a statement from Clayton Adams, Motion at pp. 359-360, whereas in fact, the only statement of Clayton Adams was disclosed on October 19, 2009 in Discovery Batch #2/Homicide and other Crime Files/Brown/Big Faces Shooting 9-30-01/investigation interview record – Clayton Adams Jr.

**Claim 6A(3)(vii) and (viii): The Coleman Family Arson Murders**

The murders of Marcella Coleman, Tameka Nash, Sean Rodriguez, Khadijah Nash, Tajh Porchea, and Damir Jenkins, in the horrific firebombing of their home on October 9, 2004, was supported by overwhelming evidence. Written threats, recorded FDC phone calls, cell site records, a police report of a car stop shortly before the firebombing, and numerous gruesome cell bug admissions by Savage fully corroborated the testimony of Eugene Coleman and Lamont Lewis, to the point that their testimony was virtually unnecessary to convict Savage of this crime.

Savage claims, erroneously, that his convictions for these murders "rise and fall on the testimony of Lamont Lewis." Motion at p. 364. This is obviously untrue, as Savage was indicted

75

for these murders before Lamont Lewis ever decided to cooperate and became a witness.

Savage mostly complains that his attorneys could have done a better job impeaching Lamont Lewis, who undoubtedly was a better witness than Savage expected him to be. Savage also throws out the same proposals that his attorneys should have called Clayton Adams (whom Savage acknowledges was represented by counsel, Motion at p. 371, and thus would likely not have testified), and murder-pact participant Eric Johnson.

Savage repeats his baseless claim that the government suppressed exculpatory information provided by Lamont Lewis. Again, this is just plain false. Savage cannot force this court to convene an evidentiary hearing by merely making up claims of things that never happened.

In one of many bizarre claims, Savage claims that the government used Dawud Bey and Al-Shannon Muse as government agents in order to record his conversations in the court-ordered Title III cell bug. Savage prefaces his claim with, "Upon information and belief, . . ." which means he is just making this up. Motion at p. 395. Neither Bey nor Muse were government agents. The government did not suppress any benefit agreements because there were none.

Savage doubles down, claiming that the government suppressed evidence that "tends to show people other than Mr. Savage conspired with L. Lewis to commit this arson." Motion at p. 396. This is false. The government had no such evidence. Moreover, as with the other homicide files, the government disclosed absolutely everything in its possession in discovery on the following dates:

July 20, 2009 in Batch #1/Prison Tape Transcripts

October 19, 2009 in Discovery Batch #2/Homicide and other Crime Files/Arson Murders

76

July 19, 2010, in Discovery Batch #3/FDC Phone Tapes.Disk10/Savage FDC Phone Tapes

July 29, 2011, in Discovery Batch #6/Disk 1/The Arson Murders. PPD Files. Part 1

July 29, 2011, in Discovery Batch #6/Disk 1/The Arson Murders. PPD Files. Part 2

July 29, 2011, in Discovery Batch #6/Disk 1/The Arson Murders. PPD Files. Part 3

July 29, 2011, in Discovery Batch #6/Disk 2. PPD Arson Case Videos

June 4, 2012, in Discovery Batch #10/Homicide Files/Arson – 3256 N 6th St

November 9, 2012, in Discovery Batch #16/Additional Prison Call Recordings of Merritt & Savage

November 9, 2012, in Discovery Batch #16/Coleman Family Photos

January 28, 2013, in Discovery Batch #22/Cell Site Powerpoints

## Claim 6A(3)(ix) and (x): The Kenneth Lassiter Murder

Kaboni Savage's first murder, and the only one of the twelve charged that he personally committed, was proven by multiple witnesses' testimony, including the account of a witness, Tybius Flowers, whom Savage ordered murdered on the eve of his testimony. Flowers, Jhonathan Baker, Sam Rosado, Lamont Lewis, Eugene Coleman, and Bienvenido Morales all offered either eyewitness accounts (Flowers, Baker, and Rosado) or testimony of Savage's admissions (Lewis, Coleman, and Morales).

Savage also claims that counsel were ineffective for failing to claim that the Lassiter murder was not committed for the purpose of maintaining or increasing one's position in the enterprise. This claim is plainly false, as counsel repeatedly argued precisely that point. It was even set forth in writing in their motion to sever counts. Dk. # 383, filed on 2/21/12.

**Claim 6A(3)(xi) and (xii): The Tybius Flowers Murder**

The Tybius Flowers murder was proved by testimony, including multiple admissions by Savage, augmented by cell phone records, cell site records, and prison visitation records. It was certainly not "thin and circumstantial" as Savage now claims. Motion at p. 277.

Savage forwards the odd argument that his attorneys failed to challenge the government's assertion that John Tillman was involved in the Flowers murder. Motion at p. 430. This claim makes no sense, as his attorneys were rightly more concerned with defending Savage than with defending Tillman, who was not on trial and not their client. However, such a strategy would have lacked credulity, as phone records showed phone calls between Tillman and Northington just an hour before the Flowers murder, and local prison records showed that Tillman (under an alias) and Dawud Bey were the last people to visit Savage (together) before the Flowers murder. Trial transcript of 3/27/13 at pp. 60-61 (testimony of FBI case agent Kevin Lewis).

**Claim 6A(4): The "Gym" Conversation re the Flowers Murder**

Savage hypothesizes that CFCF housing records would show that witness Michael Crosby and Kaboni Savage were not housed together, and that Crosby's testimony as to inculpatory statements made by Savage to him regarding the Flowers murder could not have occurred. Even if the assertion of separations is true, this would hardly preclude the possibility that Savage and Crosby could have interacted in or near the gymnasium, or elsewhere within this porous local facility. This claim fails on its face, as yet more unsupported speculation. Savage even admits in his motion, at p. 400, that there were windows between the two sides of the gymnasium, through which separated inmates often communicated. Crosby's testimony was specific that he was called down to the gym at Savage's request; thus, any mention of being

78

assigned to different parts of CFCF is irrelevant. Transcript of 4/4/13 at p. 179. Savage cannot

establish that the two of them did not speak. Thus, his claim is meritless.

**Claim 6A5: Cross Examination of FBI Case Agent Kevin Lewis**

Defense counsel cross examined FBI case agent Kevin Lewis multiple times, for days.

Kevin Lewis testified five times in the guilt phase of the trial, plus once as a defense witness,

called by Savage's attorneys. Savage's attorneys' cross examinations of Kevin Lewis were

marathon events, as reflected in the trial transcripts:

|   | DATE | EVENT (KEVIN LEWIS TESTIMONY) | PAGE NOS. |
|---|------|-------------------------------|-----------|
| 1 | 2/5/13 | DIRECT EXAM (TROYER) | 75-167 |
|   | 2/6/13 | DIRECT EXAM (TROYER) | 6-187 |
|   | 2/7/13 | DIRECT EXAM (TROYER) | 3-79 |
|   | 2/7/13 | CROSS EXAM (HOEY) | 79-226 |
|   | 2/11/13 | CROSS EXAM (HOEY) | 3-156 |
|   | 2/12/13 | RE-CROSS (HOEY) | 107-126, 138-139 |
| 2 | 2/20/13 | DIRECT EXAM (TROYER) | 175-231 |
|   | 2/21/13 | DIRECT EXAM (TROYER) | 16-96 |
|   | 2/21/13 | CROSS EXAM (HOEY) | 96-162 |
|   | 2/25/13 | RE-CROSS (HOEY) | 10-19, 20-22 |
| 3 | 3/6/13 | DIRECT EXAM (TROYER) | 164-233 |
|   | 3/7/13 | DIRECT EXAM (TROYER) | 4-28 |
|   | 3/11/13 | CROSS EXAM (HOEY) | 3-156 |

|   | DATE | EVENT (KEVIN LEWIS TESTIMONY) | PAGE NOS. |
|---|---|---|---|
|   | 3/12/13 | RE-CROSS (HOEY) | 65-115 |
| 4 | 3/26/13 | CROSS EXAM (HOEY) | 15-156 |
|   | 3/27/13 | RE-DIRECT EXAM (MELLIN) | 4-123 |
|   | 3/27/13 | RE-CROSS (HOEY) | 123-217 |
|   | 3/28/13 | RE-CROSS (HOEY) | 89-101 |
| 5 | 4/11/13 | DIRECT EXAM (MELLIN) | 35-130 |
|   | 4/15/13 | DIRECT EXAM (MELLIN) | 16-99 |
|   | 4/15/13 | CROSS EXAM (HOEY) | 99-234 |
|   | 4/16/13 | CROSS EXAM (HOEY) | 4-174 |

Under any objective lens, defense counsel engaged in extensive, comprehensive cross examinations of Special Agent Lewis. Defense counsel exploited Special Agent Lewis' position as case agent to explore numerous aspects of the investigation and of the other witnesses in the case. To claim otherwise ignores the substantial record.

Oddly, Savage also claims that his attorneys failed to properly investigate by failing to call witnesses who would "testify that by late 2003 (Gerald) Thomas' influence in the community as a distributor had waned and Mr. Savage's had risen." Motion at p. 428. But defense counsel did not need to call witnesses to testify to this, as they fully explored this essentially undisputed assertion in the marathon cross examination of FBI case agent Kevin Lewis.

### Claim 6A(6): Kareem Bluntly

Savage claims his attorneys were ineffective for failing to investigate Kareem Bluntly. Bluntly is dead. He was killed by drug traffickers in a deal having nothing to do with Savage. All of this occurred long before the indictment in this case. Thus, "investigating" him in order to cultivate him as a witness would have been fruitless.

Bluntly was one of Kaboni Savage's hitmen. He murdered Mansur Abdullah and Tyrone Toliver, in separate instances, at Savage's direction. Counsel certainly argued that Savage did not order these murders, but the overwhelming evidence prevailed.

### Claim 6A(7): Dawud Bey

Dawud Bey was someone who dealt drugs and intimidated witnesses for Savage. There was also substantial evidence presented that he was aware of the Tybius Flowers murder, and may have participated in that murder, as he bragged about doing in a recorded conversation. Bey was convicted at Savage's 2005 drug trial as a co-conspirator, and was separately convicted for witness tampering. Bey also engaged in numerous conversations with Savage in the FDC Special Housing Unit, which conversations were intercepted in a court-ordered wiretap (cell bug).

Calling Bey as a defense witness would have been foolhardy, if not fruitless. Had Bey not invoked his 5th Amendment right against self-incrimination, he would have been confronted with CFCF jail records showing him visiting Savage before the Flowers murder, and with a recorded conversation in which Bey chided Savage for spending money on an attorney for the Lassiter state court murder trial, declaring, "Brian (McMonagle) didn't represent you in that case. I represented you."

**Claim 6A(8): Investigating "Friends"**

Savage's nebulous claim that his attorneys were ineffective for not investigating Savage's friends and associates is unsupported and at least partially false. Those friends and associates who testified against Savage were certainly investigated, and the government assisted in defense counsel's preparation by providing them with voluminous *Brady*, *Giglio*, and *Jencks* material.

As for other Savage "friends," most of those now posited by him as potential witnesses were in fact co-conspirators who would have either (1) invoked their 5th Amendment rights against self-incrimination; (2) been exposed as drug dealers, murderers, and/or liars; or (3) would have supported the government's case with favorable testimony. Savage suggests, for example, Raymond "Manny" Wilmore as a potential defense witness, while materials provided in discovery show that Wilmore was a potential government witness. Trial counsel were well aware of Wilmore's status, as (contrary to Savage's claim at p. 579 of his motion) they had been furnished with Wilmore's Jencks material. Discovery Batch #12/Redacted Jencks by Witness Name/Wilmore, Raymond/Reports. Eric Johnson and Calvin "Cheesesteak" Davis were involved in both drugs and witness intimidation, as testified to at trial, and as shown in discovery disclosures. Davis threatened Eugene Coleman at the federal courthouse the day before the arson murders of his family. Johnson was part of the pact entered into by Savage and Lamont Lewis that, if anyone snitched, their mothers would be killed. It is thus doubtful that their testimonies would have been persuasive to a jury. Trial counsel were wise to avoid them as potential witnesses.

**Claim 6A(9): Investigating and Blame-Shifting to Others**

Savage suggests that his attorneys should have attempted to shift the blame for Savage's

crimes to others. That is precisely what they spent months in trial doing. The two specific

potential targets of this strategy, Gerald Thomas and Kareem Bluntly, were indeed the subject of

trial counsel's efforts. The government offered recordings from the Gerald Thomas wiretaps

which showed the relationship between Thomas and Savage. Bluntly, as mentioned above, was

Savage's hitman, but was dead by the time this case was charged.

## Claim 6A(10): Defense Theories in Murder Cases

Savage misconstrues his attorneys' obligations and efforts, and dismisses his counsel's

defenses to the murders, claiming that they were "ineffective for failing to develop a theory of

defense for each murder charged . . . ." Motion at p. 14. He now conjures up alternative

"defenses" to those presented at trial, comprised mostly of wild theories as to who else might

have committed each murder. But, as shown above, this was not a failure to develop a theory of

defense; rather, trial counsel wisely chose instead to attack the witnesses and evidence presented

by the government, to sow the seeds of reasonable doubt, in lieu of promoting alternative

theories that would have blown up in their faces and, in totality, would have lacked credibility

and reeked of desperation.

## Claim 6A(11): Assailing the Investigation

Savage's complaint that his attorneys failed to question witnesses in a way to

"undermine( ) the integrity of the investigations" is wrong for two reasons: First, they did

precisely that in their marathon cross examinations of FBI case agent Kevin Lewis. Second, if

the evidence in this case showed anything, it was that the FBI conducted many years of

painstaking investigation to bring this case, leaving no stone unturned. Given the facts and

testimony in this trial, defense counsel would have been foolish to pin their hopes on a not guilty

83

verdict to a claim that the FBI did a poor job of investigation. This point is underscored below regarding the use of a purported "expert" in FBI investigations.

**Claim 6B: Estoppel Theory as to Toliver Murder**

Savage puts forth a novel theory of estoppel as to the Toliver murder. There is no such viable theory. The evidence put forth at trial did not, and would not, support such a theory. Savage bases his claim on an errant entry into a Philadelphia police form that states that Eugene Coleman shot Toliver. But he didn't. In fact, all Coleman did was participate in what he thought was a drug deal in which Kareem Bluntly shot Toliver, then assisted Bluntly in moving Toliver's body after the shooting. For this, Coleman pled guilty to third-degree murder. The police report with the errant passage was disclosed in discovery, and Coleman was cross examined and was repeatedly referred to as a "convicted murderer" by defense counsel in trial.

Even if Coleman had shot Toliver, that would not provide an estoppel theory for the person who ordered the murder, Kaboni Savage. There is no legal support for such a theory.

Likewise, Savage cannot take refuge in a statement at the 2005 drug trial by former AUSA Mark Ehlers that the murder of Tyrone Toliver "had nothing to do with the drug case." Motion at p. 315. The Toliver murder was largely unsolved and uncharged at that point, except that Coleman had been charged with, and pled guilty to 3d degree murder. AUSA Ehlers in 2005 did not have all the evidence that the government later had in 2009 or in 2013. Thus, there is nothing "binding" about Ehlers' statement. Moreover, the context of the statement was as to extent the Toliver murder could be used as impeachment of Coleman in the 2005 trial. Coleman was impeached with his murder conviction, as he later was in 2013 in the instant case. But the underlying facts of the Toliver murder would not have had "anything to do" with the 2005 drug

case. Furthermore, Savage would have been foolhardy to further pursue that in his 2005 trial, given that he ordered the Toliver murder. In short, there is no valid estoppel defense.

### Claims 6C, 6C(3): Alleged Failure to Hire Expert Witnesses

Savage alleges that trial counsel were ineffective for not hiring expert witnesses to opine as to three specific matters. As to the first matter (the erroneously based Abdullah murder claim), the proposed testimony would not have been supported by the physical evidence, and the proposed "experts" would have looked foolish. As to the second claim regarding cell site evidence, any expert defense testimony would have been inconsequential, as the evidence speaks for itself, and was used persuasively as to co-defendants Merritt and Northington, not Savage.

As to the remaining matter, as noted below, the proposed "expert's" criticism of the FBI case agent's investigation would have looked petty and foolish, and would have only served to underscore what a superb job the case agent did in successfully investigating this case. As these claims are conclusively controverted by the record, they do not merit a hearing.

### Claim 6C(1): "Expert" for the Abdullah Murder Crime Scene

The alternate theory of defense proposed by current counsel is just flatly wrong, as it is based entirely on false facts. Counsel bases this "new defense" on the false premise that Abdullah's body was in the driver's seat, from that extrapolating that Abdullah must have been killed where he was found on Park Avenue, and not moved when dead from another scene, as witness Eugene Coleman related. But Abdullah was <u>not</u> seated in the driver's seat. He was seated in the front passenger seat, which is clearly and unequivocally established by the crime scene photos, and by the testimony of EMT McFadden who initially found Abdullah's body. GX 403. The top portion of Abdullah's body was slumped over into the driver's seat area, but he was not

seated there when found. Any "expert" opining to the contrary would be conclusively contradicted by the physical evidence in the case.

### Claim 6C(2): "Expert" for Cell Site Data

The cell site data presented at trial had little or no impact on Savage's defense. That data mostly implicated Steven Northington as to the Flowers murder, as it showed his immediate flight from the homicide scene at 8th and Butler Streets at the time of the murder, all the way up the Northeast extension of the Pennsylvania turnpike to the Scranton-Wilkes Barre area, where Northington hid as a fugitive from prosecution in the Parker murder.

The cell site data also heavily implicated Robert Merritt, by showing the location of his cell phone on the night of the Coleman family firebombing. It tracked his movements from Norristown to North Philadelphia.

The cell site data, however, did little to implicate Savage, who was incarcerated in local custody at the time of the Flowers murder, incarcerated in FDC-Philadelphia at the time of the Coleman family arson murders, and confined to house arrest for the Lassiter murder during much of the case. Savage's location during the murders has never been in dispute. Thus, apart from the fact that the cell site evidence is irrefutable, any testimony from a reputed cell phone expert would have done nothing to assist Savage in his defense.

### Claim 6C(3): "Expert" Regarding the FBI Investigation

Savage forwards an extremely weak argument that defense counsel should have called an "expert" in investigations to assail the job done by the FBI in this case. This would have been ineffectual, if not disastrous. Even their own newly acquired expert, a retired FBI agent with a modest career record, offers only minimal criticism as to some minor procedural issues – hardly

86

the stuff that would sway a jury to vote not guilty in the face of overwhelming evidence as to 12 murders. This proposed expert also never appears to have been a case agent in a case remotely approaching the size and seriousness of this one, or any RICO case; instead, having been relegated to working fairly routine investigations throughout his career. At best, the defense expert's testimony would have amounted to a "so what?" and at worst, he would have looked foolish and the defense would have appeared desperate.

## Claim 6D: Confidential Informants

This case did not rely on the use of confidential informants. In any event, the disclosure of confidential informants is governed by *Roviaro v. United States*, 353 U.S. 53 (1957), which sets forth well-established specific procedures and criteria for motions to divulge the identity of confidential informants. To prevail on a motion to disclose identity, a defendant has to set forth a specific legitimate defense and prove to the court that disclosure of a confidential informant's identity would be essential to establishing that defense. Savage did not meet that steep burden pre-trial, and he does not meet it here. There was one motion filed, DDE # 753, which the government properly addressed in an ex parte pleading on January 23, 2013. Thus, Savage's claim should be summarily denied. This claim is repeated as to appellate counsel in Claim 16G.

## Claim 6E: Witness Jhonathan Baker

Savage claims that his trial attorneys were ineffective for "failing to accept the Court offered continuance to talk to Jonathan (sic) Baker." This claim lacks any foundation. Defense counsel's request to speak to Baker was dutifully conveyed to Baker by the prosecutors, and Baker declined to speak with them, as is his right. Baker testified at trial, consistently with his prior statements, that he saw Kaboni Savage shoot and kill Kenneth Lassiter.

87

## Claim 6F: Defense Witness Preparation

Savage complains that counsel failed to adequately prepare defense witnesses. Motion at pp. 549-553. This claim fails to establish ineffective assistance of counsel. Most witnesses called by the defense were either hesitant or recalcitrant civilians, or were adverse witnesses. Thus, it is understandable that such witnesses would not be amenable to pretrial preparation, or might under-perform on direct and cross examination.

Oddly, Savage mostly takes his trial attorneys to task for questions they did *not* ask witnesses. In each instance, the suggested additional questions would have been perilous, potentially opening a Pandora's box of inculpatory evidence. For example, Maggie Jimenez was a psychologically frail woman subject to auditory and visual hallucinations. Additional questions about that would not have benefitted Savage. Tyrone Beal was a government witness who, had he been asked questions about Gerald Thomas's role, vis-à-vis Savage's role, would have led to extended cross examination about Beal's role as a cocaine compressor for Savage who also could testify as to Savage pistol-whipping Beal's friend and fellow re-compressor, Darren Blackwell, over a dispute about unpaid, and/or deficient cocaine Savage fronted to Blackwell (thus fully corroborating Blackwell's trial testimony). Savage's trial counsel were well aware of this peril, having been furnished in discovery with Beal's prior testimony and other Jencks material. Discovery Batch #11/First Jencks and Simon Murder/Jencks Disclosure 7/12/12 /Beal, Tyrone. Thus, Savage's attorneys were wise to constrict their direct examination and stay away from other, more perilous areas. Likewise, Stephen Robinson implicated Savage as the boss of the organization. Robinson, whose prior testimony was also disclosed in discovery, had no interest in meeting with defense counsel.

**Claim 6G: Alleged Failures to Object to Evidence**

The guilt phase of the jury trial in this case lasted more than three months, from February 4, 2013 to May 13, 2013. This was followed by penalty phase hearings as to Savage and Northington, from May 20, 2013 to June 13, 2013. Approximately 70 witnesses were called in the guilt phase of the trial. More than 1,000 exhibits were received in evidence. Decisions as to what testimony and what exhibits should be objected to are within the sound discretion of trial counsel. Savage specifically complains of the evidence listed below:

**Claim 6G(1): Autopsy Reports**

Savage claims that counsel were ineffective for not objecting to the three autopsy reports admitted at trial through Dr. Bennett Preston. Dr. Preston was a highly experienced Medical Examiner, who taught medical students and supervised newer doctors during their fellowships at the Philadelphia Medical Examiner's Office. Savage's claim is realleged in Claim 27B.

Dr. Preston conducted the Mansur Abdullah autopsy with a fellow he supervised, Dr. Chase Blanchard. Tr. of 3/13/13 at p. 58. Dr. Preston supervised the autopsy. Id. at p. 59. He found multiple gunshot wounds and soot, and found that Abdullah had been shot and then set on fire. Id. at p. 62. Based on the lack of carbon monoxide, Dr. Preston found that Abdullah was "dead before the fire started," the cause of death being "multiple gunshot wounds." Id. at p. 63. The government moved in the autopsy report, as GX 405. After Savage's counsel conferred with one another, there was no objection and it was admitted. Tr. of 3/13/13 at p. 69.

Dr. Preston also supervised the autopsy of Barry Parker, performed with another fellow, Dr. Susan Williams. They found the cause of death to be multiple gunshot wounds. Id. at pp. 83-84. The autopsy report, GX 607, was admitted without objection. Id. at p. 88.

89

Dr. Preston also conducted the autopsy of Carlton Brown. Id. at pp. 73-81. Brown died of multiple gunshot wounds. Id. at p. 74. That autopsy report, GX 510, was also admitted without objection. Id. at 79.

Attorney Purpura cross examined Dr. Preston, *Id*. at pp. 95-104, as did counsel for the co-defendants. *Id*. at pp. 104-111. Attorney Purpura specifically used the autopsy report of Mansur Abdullah to cross examine Dr. Preston as to the gunshot wound to the head. *Id*. at pp. 98-99. Likewise, attorney Purpura used the autopsy report of Carlton Brown to cross examine Dr. Preston as to the gunshot wound to Brown's head. *Id*. at pp. 100-104. Counsel for Northington did the same with the autopsy report for Barry Parker. *Id*. at 108. Thus, there were strategic reasons for defense counsel to not object to the admission of these reports, as they made liberal use of them in cross examination, and wanted the jury to see them. Moreover, these autopsy reports were of no additional benefit to the government's case, as the cause of death for Abdullah, Brown, and Parker were all incontrovertible (gunshot wounds) and not in dispute. Thus, Savage inured no prejudice as a result of admitting these reports.

### Claim 6G(2): The Jorge Reyes Account

Savage now complains that the hearsay account of Jorge Reyes was admitted at trial, as to events at the time of the Coleman family firebombing. Savage forfeited his right to complain about the admission of Jorge Reyes's grand jury testimony, as it was *defense* counsel who moved to admit it, over government objection. Savage admits that he posed no objection to the admission of this transcript. Motion, p. 548. This claim is realleged in Claim 27C.

Reyes' account, the government argued, was unreliable hearsay. Reyes claimed he heard 8 to 10 shots, whereas both the testimony and the forensics conclusively proved there were just

90

two shots fired into the Coleman home immediately prior to the firebombing. Reyes also reported a conversation between one of the firebombers and a neighborhood person, which conversation never happened. Of course, the government disclosed this account and testimony in discovery, as *Brady* material, on September 17, 2012, in Discovery Batch #12/redacted Jencks by Witness Name/Reyes, Jorge.

The defense argued to the district court, successfully and over government objection, that Reyes was unavailable, and thus presented an account of the arson murders that they argued conflicted with the testimony of Lamont Lewis. Savage cannot now complain of its admission; nor can Savage allege a failure on the part of his lawyers for seeking its admission, as it arguably supported his defense, in that it certainly contradicted the testimony of witness Lamont Lewis, at least to some extent. See Trial Transcript of 4/24/13 at pp. 48-61.

There are certainly valid reasons why Savage's trial counsel did not object to the admission of Reyes' grand jury transcript. Reyes' grand jury testimony contradicted the testimony of key witness Lamont Lewis. Specifically, Reyes claimed to have recalled hearing one of the firebombers have a verbal exchange with a neighbor immediately after the firebombing, contrary to Lamont Lewis' testimony. Moreover, because defense counsel convinced the district court to admit the transcript (over government objection), the government had no ability to cross examine Reyes on his limited ability to perceive and remember the events. Thus, trial counsel cannot be held to be ineffective for making this strategic decision not to oppose the admission of the transcript. Reyes' account was so favorable that Savage's attorney, Hoey, attempted to elicit it in the cross examination of FBI case agent Kevin Lewis. Transcript of 4/15/13 at pp. 143-44.

91

**Claim 7: Trial Continuance**

Savage claims that counsel were ineffective for not requesting a continuance of the trial, and for not demonstrating to the Court that they were unprepared to try the case. This claim, which repeats part of Claims 1 and 2, and was rejected by the Third Circuit on direct appeal, is frivolous, and is conclusively contradicted by the record. *Savage*, 970 F. 3d at 248. Trial counsel demonstrated over the course of several months that they were adequately prepared to defend the case, and did so well within the bounds of professional and ethical requirements. The government asks the district court to make this finding, and to preclude a hearing on this claim, as none is merited. If a hearing were to be convened on this issue, attorneys Hoey and Purpura would state succinctly that defense counsel were prepared and had enough time to be prepared.

**Claim 8: Motion To Sever Defendants**

Savage claims that counsel were ineffective for failing to seek a severance. This claim is conclusively refuted by the record. Savage's attorneys filed two motions for severance (DDE # 383 on February 21, 2012, and DDE # 883 on January 8, 2013). Savage's attorneys also were permitted to adopt motions of co-counsel, who also filed motions to sever. Savage also requested a severance mid-trial after a few verbal outbursts by co-defendant Northington. These motions were all considered by the district court and properly denied. Because any further requests to sever would also have been denied by the district court, Savage cannot meet either prong of *Strickland*. His claim thus fails and is subject to summary dismissal.

**Claim 9: Challenging The SAMs:**

Savage next claims that his attorneys were ineffective by failing to challenge Savage's conditions of confinement under the Special Administrative Measures (SAMs). This claim

92

prompts one to wonder if current habeas counsel even reviewed the docket in this case, as multiple motions and hearings were held regarding the SAMs and Savage's conditions of confinement. See Dk. #137, 347, 483, and hearing of October 22, 2010. Indeed, from the time of the initial racketeering murder indictment (2009) to the present, no issue has been litigated more than this one. This clam is specious and should be summarily denied. Savage also raises this claim as to his appellate attorneys (in Claim 16B), who also vigorously contested the SAMs. In any event, as the district court and other courts found, Savage has not suffered "inhumane conditions" and has not been deprived of his constitutional rights. Because any additional motions would have been substantively meritless, the claim also fails to establish prejudice.

## Claim 10: Attempts To Prevent Authorization Of The Death Penalty

Savage claims that his attorneys were ineffective in their presentation at the "authorization hearing" at Main Justice, and otherwise failed to seek a non-death resolution. This is false. It is also rendered moot by President Biden's commutation to a life sentence.

Savage's attorneys indeed made a presentation to the Capital Crimes Review Committee, seeking non-authorization. They made reasonable, cogent arguments. In any event, Attorney General Eric Holder understandably ordered government counsel to seek the death penalty, and the government would not have been receptive to any additional requests to de-authorize that order. Thus, this claim lacks merit, Savage suffered no prejudice, and the claim should be denied.

Because the precise arguments and presentation of counsel to the Committee are inherently a matter of strategy, there is no need for a hearing, and any attempts of current counsel to obtain work product of government counsel should be rejected by the district court. Moreover, it is abundantly apparent, from the facts and circumstances of this case, and the 13 unanimous

death penalty verdicts rendered by the jury, that any additional arguments of trial counsel would have been unsuccessful in any event.

**Claim 11: Savage's Leg Restraints**

Savage falsely claims that counsel failed to make a reasonable objection to Savage's leg restraints during trial. He repeats this in Claim 27E. As an example of a reasonable alternative, Savage's current counsel cite the possibility of "restraints that were not noticeable to the jury." Motion at p. 16. However, that is precisely what Savage had in his trial. The Court ordered opaque cloth curtains that adorned all counsels' tables all the way to the floor, in front and on the sides of all tables, thus preventing the jury from seeing Savage's leg restraints. Thus, this claim fails as factually false and conclusively refuted by the record. Indeed, Savage cannot point to a single shred of evidence that the jury saw, heard, or was otherwise aware of his leg shackles.

**Claim 12: Alleged Failures To Object To Evidence**

Savage alleges ineffectiveness of trial counsel for purported failures to object to, and for eliciting, "prejudicial evidence."[19] His five claims (12A-E), which range from the trivial to the absurd, are all meritless. All of the pieces of evidence to which Savage now says his attorneys should have objected, were properly admitted. Thus, any such objections would have been overruled. Accordingly, Savage has inured no prejudice under *Strickland*, as a result of any purported failure to object. Moreover, the decision whether to object or not has been recognized by appellate courts as being inherently a matter of trial strategy, which will not be disturbed under the guise of a 2255 petition.

---

19 Government counsel assumes that habeas counsel meant to say, "unfairly prejudicial evidence." All evidence presented is presumptively prejudicial, assuming it is relevant.

## Claim 12A: The FDC Cell Bug Recordings

Savage complains that counsel was ineffective for not contesting the admission of the recordings made in Savage's FDC Philadelphia cell. This is factually false, as trial counsel indeed moved to suppress the recordings, and repeatedly sought to exclude them. DDE # 386, 421, 447, 500, 501, 505, 506, 531, 568, 574, 628. The district court properly denied those motions, as these recordings were the result of a court-ordered "wiretap." DDE # 1051, 1215. There was also a *Starks* motion and hearing concerning the authenticity and admissibility of these recordings. DDE # 393, 523, 577, 594, 675, 1094. Even after that *Starks* hearing, in which the recordings were authenticated and found to be admissible, trial counsel still objected to their admission during the trial. Those objections were properly denied.

The admitted recordings contained Savage's admissions to charged crimes, evidence of the racketeering enterprise and, most importantly, plots to kill more witnesses and witnesses' family members, as part of the racketeering conspiracy. As to the penalty phase, these recordings comprised damning evidence of future dangerousness, coming from Savage's own mouth. Thus, despite trial counsel's efforts to exclude them as "inflammatory," they were properly admitted. Any further attempts to prevent their admission, or for appellate counsel to pursue such issues, would have been fruitless.

Savage attempts to characterize the recorded statements as Rule 404(b) evidence, but they were not. Rather, they were direct intrinsic evidence of guilt. Savage chastises his trial counsel for not arguing that the recorded statements were mere "propensity" evidence. Motion at p. 527. However, that argument would clearly fail, as the grand jury found, and charged, that they were part of the conspiracy, by including them in the indictment. Savage's next, equally

95

desperate, claim that an expert should have been called to "explain" the statements is unavailing, as such testimony, assuming it could even pass a *Daubert* standard for admission, simply would have highlighted this extremely inculpatory evidence.

This claim is repeated in Claim 16E as to appellate counsel, and once again in Claim 27A. Based on the record, these claims are conclusively refuted and are undeserving of a hearing.

### Claim 12B: Witness in the WITSEC (Witness Protection) Program

Continuing his pattern of arguing the opposite of whatever trial counsel did or did not do, Savage now argues that they were ineffective for not attempting to prevent testimony of witnesses' participation in the U.S. Marshal's WITSEC (witness security) program. This argument presents the proverbial double-edged sword, as the benefits accorded to WITSEC witnesses comprise *Giglio* material, and are typically the subject of cross examination.

WITSEC participation, both as a prisoner and as a Phase II (post-incarceration) participant accords benefits to witnesses. Specifically, they are housed in separate facilities, they are moved to secure locations in the United States, they are provided benefits to assist them in obtaining employment, and they are provided protection from those who may want to harm them. These benefits necessitate the expenditure of government funds. All of these benefits, monetary and otherwise, comprise *Giglio / Napue* material that is, and was, disclosed to defense counsel. Defense counsel typically cross examine witnesses regarding the benefits the government has given them on account of their cooperation. Therefore, had defense counsel done as Savage now suggests, that is, exclude any mention of WITSEC participation, they would have prevented themselves from exposing these benefits to the jury. Undoubtedly, had Savage's

lawyers done as he now suggests, Savage would now be arguing that they were ineffective for *not* cross examining the witnesses on benefits given to them by the government. It is inherently a strategic decision, and Savage's trial counsel made the correct decision. Thus, this claim is foreclosed.

**Claim 12C: The Coleman Family Pets and the Coleman Family Deaths**

The crimes in this case were ugly; thus, the evidence was sometimes ugly. Facts are inconvenient things. One such fact is that the firebombing of the Coleman family home not only resulted in the murders of six innocent people, it also took the lives of their pets. The notion, however, that the death of animals is unfairly prejudicial in light of the death of six innocent human beings (four of whom were children), is a perverse argument. Moreover, the jury questionnaire and extensive voir dire process screened out those few jurors who claimed they could meaningfully consider mitigating circumstances as to the Coleman murders, but could not do so when told that pets were killed. Question #83 stated:

> Kaboni Savage, Kidada Savage and Robert Merritt are accused, respectively, of ordering, orchestrating and setting fire to the home of Eugene Coleman because he was a government witness. In that fire, Mr. Coleman's infant son, Mr. Coleman's mother and his mother's niece and niece's daughter, his mother's grandsons, and the family's three pets were all killed. Is there anything about the nature of these charges, in and of themselves, that would interfere with your ability to consider the evidence with an open mind and remain completely objective and impartial?

Questionnaire, #83. Thus, any potential prejudice that would have inured to the defendants was prevented, and Savage's current claim must fail.

Evidence of the dog in the living room was relevant, as it can explain why the firebombers did not further enter the house and why they quickly tossed the gas cans and fled. Even though the dog was caged, a barking dog can provide an alert to victims and surrounding

neighbors that the firebombers would probably choose to avoid.

In making this argument, Savage also inserts the false statements that the six human victims of the arson murders died of "carbon monoxide poisoning," that the four Coleman family children "likely died without ever waking up," and that Medical Examiner Ian Hood "never opined on the consciousness (or unconsciousness) of the victims at all during his testimony." Motion at pp. 535-536, 662-665. These statements are conclusively false. Dr. Hood's testimony was that they died from "smoke and soot inhalation," not from carbon monoxide poisoning. Trial transcript of 4/17/13 at p. 20. Dr. Hood also testified as to how long it may have taken for the victims to die, stating as to victim Sean Rodriguez, that "he hung in there the longest." Trial transcript of 4/17/13 at p. 21. Furthermore, the crime scene photo of victim Tajh Porchea show that he is found in bed, on his back, with his lower legs tucked under him, indicating that he got up on his knees in response to the fire, then fell backwards. GX 904(53), 904(56). Furthermore, the photos showed that Marcella Coleman's body was found in the front (boys') bedroom, meaning she ran from her back bedroom before collapsing near Tajh Porchea and Sean Rodriguez, GX 904(58). Fire fighter Joe Finley also testified that victim Tameeka Nash was found on her knees in the baby's room, crouched over infant victim Damir Jenkins, "like she was kneeling down to pray." Trial transcript of 4/9/13 at pp. 81-82. Thus, Ms. Nash also did not die in her sleep; rather, she was attempting to rescue Damir Jenkins before they both succumbed to the heat and smoke.

**Claim 12D: The "Kaboni Savage Organization"**

Savage claims three times (as repeated in Claims 16F and 18G) that the government should not have been able to refer to the racketeering enterprise by the name by which the grand

jury indicted it: the Kaboni Savage Organization. This is a racketeering (RICO) case. An enterprise was charged. That enterprise, or organization, was appropriately charged as "a group of individuals associated in fact." 18 U.S.C. § 1961(4). That organization was led by the defendant, Kaboni Savage. Thus, it makes perfect sense to refer to that enterprise as "the Kaboni Savage Organization." It's not complicated.

Savage's argument is meritless. Both the Third Circuit district courts have made clear that in RICO cases like Savage's, the government may assign its own name to a criminal enterprise and reference that name in its indictments and at trial. *United States v. Vastola*, 899 F.2d 211, 230-32 (3d Cir. 1990), *vacated in part on other grounds*, 497 U.S. 1001 (1990); *United States v. Vastola*, 670 F. Supp. 1244, 1255-56 (D.N.J. 1987); *United States v. Gatto*, 746 F. Supp. 432, 455-56 (D.N.J. 1990), *rev'd on other grounds*, 924 F.2d 491 (3d Cir. 1991). It may do so, provided the government bears its burden of proving that (a) the criminal enterprise described by the assigned name actually exists, and (b) the defendant is in fact atop that enterprise. *Vastola*, 899 F.2d at 230-32. The government easily satisfied these requirements in this case. The Third Circuit in *Vastola* noted, "While the co-conspirators did not specifically refer to the enterprise as the 'Vastola Organization,' the record clearly shows that Vastola was in charge." *Id*. at 232. Thus, the government's use of "the Kaboni Savage Organization" was proper.

Although Savage cites *Vastola* to support his argument, Motion at p. 543, he conspicuously ignores its holding on the permissibility of using his name to define the enterprise. Likewise, his cite to *United States v. Farmer*, 583 F.3d 131, 144-48 (2d Cir. 2009), Motion at p. 540, is unavailing, as *Farmer* is easily distinguishable. In *Farmer*, a conviction was reversed because the district court, in a murder and firearms trial, would not strike the defendant's

99

nickname, "Murder," from the indictment. By contrast, no such pejorative nickname was used in Savage's trial; rather, a properly alleged racketeering enterprise led by Savage was properly labeled "the Kaboni Savage Organization."

Grand juries, prosecutors, and trial courts have considerably more leeway in the context of racketeering cases. "In RICO cases, courts have refused to strike allegations of organized crime connections that serve to identify the enterprise and the means by which its members and associates conduct criminal activities." *United States v. Scarpa*, 913 F.2d 993, 1013 (2d Cir. 1990). Accordingly, trial counsel was not ineffective, the district court did not err, and Savage is not entitled to relief.

### Claim 12E: Defense Counsel's Utterance of a Racial Slur

Savage complains that a particular racial slur, commonly referred to as the "N-word," was uttered by his trial counsel during questioning. However, the tactical decision whether or not to articulate the actual word, as a quote used by another, does not constitute ineffective assistance of counsel. In this case, the properly admitted recordings were replete with racial slurs; specifically, the so-called "N-word," at all times uttered by Savage and his co-defendants, all of whom are African-American. The word was ubiquitous during trial, so much so that the jury was forewarned, lest they be offended to the point of unfairness. Question #78 of the Juror Questionnaire asked:

> During the trial, numerous tape recorded conversations may be introduced which include crude language, explicit profanities, racial epithets and other derogatory statements. Many of these conversations will be played aloud at trial. Is there anything about you or your background which would affect your ability to listen to these conversations and to make an impartial decision about this case?

Id. In the context in which counsel used the word, that use does not equate to ineffective assistance of counsel, and this claim should be denied.

**Claim 13: Jury Selection**

Savage makes numerous claims that trial counsel were ineffective during jury selection (13A-J). Many of these claims are duplicated elsewhere, under the guise of alleged "ineffective assistance of appellate counsel" (Claim 16C), "prosecutorial misconduct" (Claim 24), and "constitutional violations" (Claim 26A-F). However characterized, none have merit and, as they are conclusively rebutted by the record, none require a hearing.

The jury selection process in this case was comprehensive. It occurred from late September 2012 through the end of January 2013. In those four months, more than one thousand people were summoned to participate. All were required to complete a comprehensive jury questionnaire that covered every conceivable issue, including the death penalty, pre-trial publicity, and the anonymous nature of the jury. All counsel were given time to review those questionnaires, and were then provided a full and fair opportunity for individual voir dire.

Jury selection was an arduous four-month process for all counsel. It is well established that the government is entitled to a "death-qualified" jury, meaning that anyone who could not impose the death penalty was disqualified. *Lockhart v. McCree*, 476 U.S. 162, 174 (1986). The facts and evidence in this case were extreme, presenting a challenge to defense counsel. On the other side of the coin, government counsel had to ensure that they did not mistakenly seat someone who did not have the ability, or intestinal fortitude, to impose the death penalty. To weed out those jurors for whom the voir dire process would be an exercise in futility, government counsel and defense counsel conferred as to upcoming prospective jurors, and

101

agreed to forego questioning those who, by the answers in their questionnaires, were unquestionably unqualified, in that they either could never impose the death penalty, or could never meaningfully consider mitigating factors and impose a life sentence.

During questioning, Savage's trial counsel employed an extremely effective strategy by which they would take apparently government-oriented jurors and "push them over the edge" by presenting the facts in such a way as to get them to disqualify themselves by saying that they could not meaningfully consider a life sentence. This strategy effectively eliminated numerous jurors who may have been more inclined to impose the death penalty. Despite defense counsel's efforts, Savage's current counsel now derides trial counsel as "very weak," "distracted," "a train wreck," and "grossly uninformed." Motion at pp. 465-66. These characterizations are unfair, unwarranted, obviously self-serving, and unsupported by the record. Indeed, it appears to be an overall defense strategy in this case for mitigation assistants, jury consultants, and capital resource counsel to render unfavorable and even inflammatory criticisms of trial counsel in order to provide fodder for future post-conviction pleadings. Such a transparent effort to thwart justice should not be allowed to succeed.

The result of the four-month voir dire process in this case was a fair, racially mixed jury, comprised of carefully selected people who were both death-qualified, but also amenable to a life sentence, and who could meaningfully consider mitigation evidence. Indeed, essentially the same jury (with the exception of one alternate substitute) that unanimously condemned Savage to death on 13 counts also unanimously voted for life as to co-defendant Steven Northington. Nevertheless, Savage now advances the following meritless claims:

102

**Claim 13A: Alleged Failure to Rehabilitate Extreme Jurors**

A comprehensive juror questionnaire, the result of collaboration between government counsel and defense counsel, was given to all jurors. Based on the answers provided in these questionnaires, some potential jurors were dismissed by agreement, as their answers were so extreme that they could never serve on the jury. These included those who said that they would either always impose the death penalty, or never impose the death penalty. Likewise, anyone who unequivocally declared that they could not be fair, to either side, were also dismissed without wasting the time of the court and counsel in questioning them. Where an agreement could not be reached, the potential juror was summoned for questioning.

Oftentimes, during questioning, it would become apparent that the potential juror must be excused for cause. In other words, counsel for the government or the defense would accept the obvious conclusion that any attempt at rehabilitation would be futile. These are judgment calls, and are subject to deference at this stage.

Savage specifically complains about three jurors who were excused without being questioned: Jurors #210, #217, and #223. However, these jurors were not questioned because the answers given in their questionnaires proved that they were incapable of serving on a capital case, and could not have been rehabilitated. Juror  #210 indicated, as to Question #43, that he held religious beliefs that would prevent him from imposing the death penalty in any case involving murder, writing, "I am against the death penalty." In answering Question #96, he indicated (by checking one of five options), "I am strongly opposed to the death penalty and

20 Savage erroneously refers to Juror #210 as a female.

103

could never vote to sentence someone to death," adding, "I think it has been used unfairly in this country." He also added, "I hope I am not a juror on that case." He was unqualified to be a juror in a capital case.

Juror #217 also answered Question #43 by stating that she held religious beliefs that prevented her from imposing the death penalty in any case involving murder, further stating, "I don't believe we have the right decide if someone should die or not. Only God makes that choice." As to Question #96, she indicated, "I am strongly opposed to the death penalty and could never vote to sentence someone to death." When asked her views in Question #97, she wrote, "Nobody should have the right to decide if someone should die. In this case however I am torn because of the violence. I will have to uphold by opinion (sic) that nobody has the right to decide if someone should die." Question #100 asked her to circle a number from 1 to 10 that best reflects her overall opinion regarding the death penalty, with "1" being "strongly opposed" and "10" being "strongly in favor." Juror #217 chose "1" adding in Question #101, "I don't think it is appropriate." Thus, Juror #217 was clearly unqualified to sit on this jury, and trial counsel was not ineffective for not questioning her further.

Juror #223 indicated, in response to Question #43, that she held religious beliefs that would prevent her from imposing the death penalty, adding, "I don't believe in the death penalty – I am not sure I could agree to sentence someone to death." She clarified and solidified her opposition to the death penalty in responding to Question #96, indicating that she was "strongly opposed to the death penalty and could never vote to sentence someone to death," further writing, "I feel like death is not necessary if the person is imprisoned for life without parole then the person is not a threat to society." These answers disqualified Juror #223 to sit on the jury.

104

Were this Court to review all of the questioning that occurred for three months (November 2012 through January 2013), it would see that there are countless instances in which counsel were successful in rehabilitating jurors, resulting in the denial of a government motion to strike for cause. Other attempts were not successful. The same is true for government counsel's attempts at rehabilitation. This claim lacks any basis for reversal, and should be summarily denied based on the substantial record in this case.

Savage cites 12 other potential jurors as examples of what he claims were defense challenges for cause denied by the court due to what Savage now alleges was a failure to properly question them. Without engaging in a page-by-page, line-by-line recitation of the trial transcripts, Savage's statements are either gross over-statements of the testimony, or outright false statements.

Savage's suggestion that trial counsel failed to uncover racial bias, Motion at pp. 481-485, is unfounded. Questions of racial bias were covered in Questions #52-56 of the questionnaire. Savage cites five potential jurors, none seated, whom he says should have been removed for cause. Removals for cause are within the sound discretion of the trial judge, who has the benefit of observing the demeanor of the juror and judging the juror's credibility. Savage outright mis-cites the record, falsely quoting Jurors #143, #576, and #875. In any event, if any juror had manifested any hint of racial bias, both defense counsel and trial counsel would have moved to excuse them for cause, and Judge Surrick surely would have done so. Savage's further claims regarding penalty phase questioning will not be further addressed here, as that issue is now moot.

Because Savage's claims of ineffective assistance in the jury selection process are devoid of merit, appellate counsel were also not ineffective by forbearing from furthering these claims on appeal.

## Claim 13B: Alleged Failure to Adequately Question Pro-Death Penalty Jurors

This claim essentially repeats the claim above. However, there is an additional element. Defense counsel employed a strategy as to pro-death penalty jurors that was very effective. Specifically, when faced with a juror who, on the face of his or her questionnaire, did not appear to be subject to a strike for cause, but who gave strong pro-government answers, defense counsel would embark on a strategy to "push them over the edge," in order to preserve peremptory strikes.  This strategy was comprised of presenting facts to the jury in an extreme way so as to make it nearly impossible for the juror to agree that they could meaningfully consider mitigating circumstances. In most cases, the juror would conclude that they could not meaningfully consider mitigating circumstances, and would be dismissed for cause. If the strategy failed, then defense counsel exercised a peremptory challenge, which they would have done in any event.

Savage now feigns ignorance of this strategy, or simply fails to understand it. In either event, trial counsel's strategy was a sound one, and not indicative of ineffective assistance.

## Claim 13C: Alleged Failure to Question re Racial Bias

Savage now claims that his trial counsel failed to inquire, in the jury selection process, as to potential racial bias. He is wrong. Every juror was provided a comprehensive jury questionnaire which assisted all counsel in identifying potential problem areas. All jurors were required to complete the entire questionnaire. Any juror who indicated in the questionnaire that they harbored racial prejudice would have been dismissed by agreement and would not even

106

have been questioned. All counsel, for the defense and the government, properly exercised judgment as to which questions required follow-up. The trial court patiently permitted virtually unlimited individual voir dire as to any potential juror that counsel wished to question.

**Claim 13D: Failure to *Batson*-Challenge Three Potential Jurors**

Savage claims his trial counsel were ineffective for not raising *Batson* challenges to the government's use of peremptory challenges as to Jurors #20, 263, and 364. However, as the record conclusively shows, the government's excusal of these jurors was clearly not based on race. As such, any *Batson* claim would have been devoid of merit. Thus, counsel could not be ineffective for forbearing from making false and futile *Batson* challenges.

Juror #20 was a single, unemployed / retired 68-year-old male who lived in North Philadelphia, the area dominated by the Kaboni Savage Organization, the home of the defendants and most civilian witnesses, and where almost all of the crimes in this case occurred. In his questionnaire, Juror #20 indicated in Question #6 that his opinion was tainted by the media coverage. When questioned, he stated that he thought the death penalty seems to be selectively used. Transcript of 11/6/12 at p. 34. As to his age and health, and the length of the trial, he expressed concern whether he can "hold up and see it through." *Id*. at pp. 40-41. Thus, despite his generally pro-death penalty views, he was excused. Given those pro-death penalty views, in conjunction with the above issues, defense counsel understandably did not pose a *Batson* challenge. In other words, neither side wanted him. In fact, had defense counsel accepted this juror, that action would undoubtedly be the grounds today for a claim of ineffectiveness. Thus, Savage's claim as to Juror #20 fails on its face.

107

Juror #263 was another juror neither side wanted. She was a 25-year-old single woman who reported in her questionnaire that she had suffered abuse. See Questions #24, 25. As to the death penalty, she gave radically inconsistent answers. In Question #96, she indicated, "I strongly believe in the death penalty and view it as the correct punishment for a person who has been found guilty of a capital offense, and could not vote for a life sentence under those circumstances." This is a disqualifying answer. In so indicating, she crossed out an earlier "X" indicating the position, "Although I support the death penalty, I believe there are some cases where the death penalty is not the correct punishment, even where a person has been convicted of a capital offense." Thus, the juror specifically weighed the alternatives, eschewed the qualifying, more even-handed answer, in favor of the absolute, disqualifying answer. As with Juror #20, it would have been malpractice for defense counsel to attempt to seat this juror. Thus, Savage's claim as to Juror #263 also fails.

Juror #364 indicated in her questionnaire that she did "not support the death penalty," Question #96, p. 49, and stated, "It should be considered only in the most extreme cases." Id., Questions 97 and 98. When asked to circle a number from 1 to 10, with "1" being strongly opposed to the death penalty and "10" being strongly in favor, Juror #364 circled "3." Question 100, p. 50. When asked, "What purpose, if any, does the death penalty serve in our society?" Juror #364 wrote, "none." Question 103c, p. 51. All of these answers, standing alone, provided adequate race-neutral reasons for excusing Juror #364.

Nevertheless, the defense argued a *Batson* violation for the government's exercise of a peremptory challenge as to Juror #364. As the district court succinctly summarized, the government offered the following race-neutral reasons for excusing her:

> First of all, that the juror has indicated that she does not support the death penalty. On the jury questionnaire she indicated that she was opposed to the death penalty and that it should be used only in extreme cases. The government also indicated that they were concerned that the juror's son had been involved in a shooting incident. He was shot while sitting in a car and that this was similar to a matter that is before the district court, the Tybius Flowers shooting. The government points out that the juror became very emotional during the questioning with regard to that incident, actually started crying. The juror also indicated that the crime had not been solved and that she thought the police were indifferent in dealing with it. The government also indicated that the juror's boyfriend was arrested on an assault charge and the juror visited that boyfriend in prison.

Transcript of 12/11/12, pp. 4-5. The court correctly concluded, "These reasons are all race neutral and they are credible," and found "no pattern of discrimination here." *Id*. at p. 5. Given this conclusive record, trial counsel were not ineffective for failing to further its efforts to rehabilitate Juror #364, and appellate counsel were not ineffective for not pursuing this futile issue on appeal. On appeal, the Third Circuit made note of Juror 364's excusal, without disapproval, in footnote 54 of its opinion. *Savage*, No. 14-9003 at p. 82, fn. 54. Subsequently, the Third Circuit specifically denied this claim as to Juror #364 in its October 24, 2023 opinion as to Kidada Savage's appeal. See *United States v. Savage*, #14-1493 (3d Cir. 2023), at pp. 46-49, and p. 49, fn.32. Thus, Savage's claim as to Juror #364 fails and is precluded by law.

## Claim 13E: Failure to Excuse Juror #2

In a bizarre twist of irony, having now falsely accused government counsel of excluding African-American jurors based on race, Savage then complains about the first juror *selected* in this case – Juror #2, an African-American woman. Specifically, Savage alleges that his attorneys were ineffective for *selecting* this juror "because of her race." Motion at p. 492. This claim is factually and legally unsupportable, and should be summarily dismissed.

Juror #2, through both the answers to the lengthy questionnaire, and her responses to extensive questioning, proved herself to be a fair-minded juror who could consider both the death penalty and a life sentence. She was grilled by defense counsel repeatedly, in different ways, not simply asked "textbook rehabilitation questions," as Savage now suggests. Motion at p. 494.

The sole underpinnings by which Savage attempts to prop up this novel argument are the unsupported opinions and conclusions of his one-time "jury expert," Elizabeth Bochnak. Those stated opinions, however, are conclusively refuted by the record. While Bochnak opined in her declaration (Defense Exhibit 25), that Juror #2 "wanted the death penalty for killing kids and she believed that the death penalty was automatically appropriate for all first-degree killings," *Id*. at ¶ 9, this is flatly untrue. Juror #2's answers to Questions #96, 109, 110, 111, 112, 122, and 123 prove the contrary. When asked about a response she gave concerning the appropriateness of the death penalty when children were victims, she admitted in questioning that she hadn't understood the question. Transcript of 11/5/12 at p. 26. When asked about meaningfully considering mitigating circumstances and being fair, she affirmed *22 times* that she could do so, with 20 of those questions coming from defense counsel. *Id*. at pp. 24-50.

The desperate nature of this claim is highlighted by a sickening conclusion that the "team's decision to seat Juror #2 based solely on her race was not surprising for this team," Motion at p. 496, propped up by two random and bizarre statements. First, Savage impugns his own jury consultant who, he says, "openly emailed about her own racial bias" (against Asians). *Id*. Second, he observes, "All the attorneys working on Mr. Savage's defense were white." *Id*. It is hard to fathom a more racist comment than one suggesting that defense counsel were

110

ineffective merely based on the color of their skin. This Court should not tolerate or indulge such racially prejudiced statements.

In the end, the fairness of Juror #2 and her ability to meaningfully consider mitigating evidence was proven beyond any doubt. While she voted to condemn Savage to death, she also voted to sentence co-defendant Northington to life.

## Claim 13F: Questions Involving Aggravating Circumstances

This claim is rendered moot by the Presidential commutation of December 22, 2024. However, the claim is baseless, as trial counsel did not "prime( ) the jury to misapply the aggravators at sentencing" in their voir dire questioning. As mentioned above, counsel were persistent and diligent throughout the four-month-long voir dire process to ensure that jurors understood the concepts of aggravating and mitigating circumstances, and to exclude potential jurors who could not properly apply them.

## Claim 13G and H: Failure to Challenge the Anonymous Jury

Savage now complains that his attorneys were ineffective for not challenging the order for an anonymous jury, and for not seeking an unnecessary jury instruction to "minimize the impact" of the anonymous jury. However, as the district court found, the anonymous jury was proper, no further instruction was necessary, and there is no legal support for the position that Savage's Due Process rights were violated by this order. Savage repeats this argument in Claim 16C as to his appellate counsel, and in Claims 26D, 26E, and 26F in which he falsely asserts a violation of his constitutional rights. These claims are all subject to summary dismissal.

The Third Circuit has held that there is a presumption of public access to jurors' identities. *United States v. Wecht*, 537 F.3d 222, 239 (3d Cir. 2008). However, a district court

111

may empanel an anonymous jury pursuant to 18 U.S.C. § 3432. *See, e.g.*, *United States v. Solomon*, 387 F. App'x 258, 260 (3d Cir. 2010). 18 U.S.C. § 3432 provides that a "person charged with . . . [a] capital offense shall . . . be furnished with . . . a list of the veniremen . . . stating the place of abode of each venireman. . . except that such list of the veniremen . . . need not be furnished if the court finds by a preponderance of the evidence that providing the list may jeopardize the life or safety of any person." 18 U.S.C. § 3432. This is because the ability of a jury to render a fair and impartial verdict may be adversely affected by even a general fear of retaliation, and a distinct possibility of a serious threat to the safety of jurors requires that precautionary measures be taken. *United States v. Thomas*, 757 F.2d 1359, 1364 (2d Cir. 1985).

A district court is not required to hold an evidentiary hearing on juror safety before deciding to empanel an anonymous jury. *See United States v. Eufrasio*, 935 F.2d 553, 574 (3d Cir. 1991). The Third Circuit has suggested that district courts are also not required to "articulate express findings" when empaneling an anonymous jury outside of the § 3432 context, even though doing so would be advisable. *Solomon*, 387 F. App'x at 260. They have also held that, provided a defendant is permitted a full voir dire, a district court may empanel an anonymous jury "if the court believes there is potential for juror apprehension." *See e.g.*, *id.*; *Eufrasio*, 935 F.2d at 574.

Here, although Savage has alleged that the use of an anonymous jury infringes on the presumption of innocence, Motion at p. 500, a sequestered and anonymous jury is entirely consistent with, not antithetical to, impartiality. *United States v. Savage*, No. 2:07-cr-00550-RBS ("2255 Motion"). The Third Circuit has noted that juror anonymity promotes impartial, dispassionate jury verdicts:

112

> [E]ven in routine criminal cases, veniremen are often uncomfortable with disclosure of their names and addresses to a defendant. The need for such information in preparing an effective defense is not always self-evident . . . [J]ury anonymity promotes impartial decisionmaking . . . Because the [jury] system contemplates that jurors will inconspicuously fade back into the community once their tenure is completed, anonymity would seem entirely consistent with, rather than anathema to, the jury concept . . . [T]he probable merits of the anonymous jury procedure are worthy, not of a presumption of irregularity, but of disinterested appraisal by the courts.

*Eufrasio*, 935 F.2d at 574. (quoting *United States v. Scarfo*, 850 F.2d 1015, 1023 (3d Cir. 1988)).

A trial court has discretion to permit an anonymous jury without holding an evidentiary hearing if the court believes there is potential for juror apprehension, so long as the defendant is afforded a full voir dire inquiry. *Id.* A court's decision to empanel an anonymous jury is entitled to particular deference. *Id., see also United States v. Stewart*, 325 F. Supp. 2d 474, 498 (D. Del. 2004), *aff'd*, 179 F. App'x 814 (3d Cir. 2006). Factors courts consider when making this decision include (1) pretrial publicity from prior related cases, (2) any history of violence by the defendant, (3) the severity of the charges facing the defendant, and (4) any claims that the defendant previously intimidated witnesses. *Stewart*, 325 F. Supp. 2d at 498. Here, all of those factors favored an anonymous jury.

The Third Circuit has recognized the sound discretion of the trial judge as to whether empaneling an anonymous jury is justified because of the potential for juror apprehension. *See Eufrasio*, 935 F.2d at 574. In *United States v. Solomon*, the Third Circuit affirmed a district court's decision to empanel an anonymous jury. *Solomon*, 387 F. App'x at 261. The district court explained that its reasoning was based on testim]ony heard during pretrial proceedings "that, if believed by the jurors, might well cause [the jury] to be apprehensive—not only for their own

113

safety but . . . for the safety of their families." *Id.* Specifically, the Third Circuit found that the jurors would be apprehensive due to the government proffering evidence that the defendant "contracted with and paid a co-defendant . . . to kill the victim in order to intimidate and/or retaliate against the victim's son who was expected to testify against [the] Defendant." *Id*. Additionally, the Third Circuit held that the potential risks of having an anonymous jury were mitigated through the actions of the district court: (1) that it withheld from itself and both parties only the names and specific addresses of prospective jurors; (2) that the jurors still filled out an extensive questionnaire and indicated their general area of residence; and (3) that both parties were permitted to question the venirepersons individually and to exercise peremptory challenges. *Id*. Here, all three conditions were met.

There was ample testimony in this case that would reasonably cause apprehension. In the government's motion for an anonymous jury panel and heightened jury security, the government highlighted that of the twelve murders in the indictment, six of the victims were family members of Eugene Coleman, who testified against Savage. Four of the murdered victims were children, ranging from fifteen months to fifteen years of age; the other two were women. Kaboni Savage ordered these murders while incarcerated as a pre-trial detainee at the Federal Detention Center in Philadelphia. Moreover, Mr. Savage and each of his co-defendants, Robert Merritt, Steven Northington, and Kidada Savage, had separately threatened witnesses, jurors, or both.

On November 28, 2004, in anticipation of his federal drug trial, defendant Kaboni Savage expressed his plan to have people use cellphone cameras to take pictures of witnesses as they testify at trial to be disseminated in order to bring pressure and retribution to those who testified at Savage's trial.

114

On September 8, 2005, Robert Merritt plotted to retaliate against witnesses in his federal firearms trial, planning to disseminate transcripts of trial testimony, and stating "He'll get his. He's gonna get his." (sic)

On November 28, 2005, during the federal drug trial of defendants Kaboni Savage and Steven Northington, defendant Northington threatened witness Robert Wilks in the courtroom, stating, "The same thing that happened to Twin's family is going to happen to your family."

Kidada Savage sent a note to witness Eugene Coleman warning him not to testify against Kaboni Savage, which note stated, "Death Before Dishonor --- to your family."

On April 21, 2010, MCC-NY officials conducted a routine search for weapons of the cells of Savage and five other inmates. As part of this search, mattresses were removed, for the purpose of x-raying them to determine the presence of weapons. One of these mattresses was discovered to contain the writing, "A rat is an animal (police's pet) that will chew off his own motherfuckin tail, to get out of a trap. I wish I had a bullet for every rats head." (sic)

On the same day, Savage was at FDC-Philadelphia for an attorney contact visit. While in transit, he had brief contact with an inmate, with whom Savage had a conversation. Savage learned that the inmate was housed with one of Savage's co-conspirators, whom Savage suspected was cooperating with law enforcement. About the co-conspirator, Savage told the inmate, "He's working" (cooperating with law enforcement). Savage then said, "You know what you can tell D__B__? He can run, but he can't hide. A smoky sad night will solve all of that." Although the inmate did not relay the threat to D__B__, the allegation of D__B__'s cooperation eventually did reach D__B__, which resulted in a physical confrontation between D__B__ and another inmate.

115

On June 22, 2011, defendant Kidada Savage was arrested pursuant to the Second Superseding Indictment, returned that same day. At the time of her arrest, her automobile was seized, as subject to forfeiture. Pursuant to that seizure, an inventory search was conducted on the automobile, which revealed that Kidada Savage possessed a list of names and addresses of witnesses and their family members in this case.

Savage had also expressed an intent to seek retribution against jurors if they convicted him in the 2005 federal drug trial. On November 11, 2004, he was recorded plotting to obtain the addresses and telephone numbers of those jurors, stating, "If I don't beat this joint or I have to go up and come back on appeal and pay you motherfuckers a visit." While the grammar and syntax of this statement is lacking, the intent of the statement is clear.

These actions would most certainly cause juror apprehension warranting anonymity. The charges against Savage were far more severe than those held sufficient in *Solomon*. Where in that case, the government proffered evidence that the defendant had contracted a co-defendant to kill a witness's father in retaliation, Savage was charged and convicted of murdering twelve people. Six of those individuals, four of whom were children between fifteen months and fifteen years old, and two women, were murdered in retaliation for Coleman testifying against him. This sufficed to permit the empanelment of an anonymous jury.

The Third Circuit had previously held, in the 2005 drug trial, that evidence introduced by the government against Savage sufficiently justified an anonymous jury. *United States v. Walker*, 392 F. App'x 919 (3d Cir. 2010). In *Walker*, the government introduced tapes from a wiretap of Savage's prison cell. *Id.* at 924. That evidence "reflected numerous threatening and violent remarks by Savage—specifically, threats to further intimidate witnesses at trial, disrupt the

116

judicial process, and intimidate jurors." *Id.* (cleaned up). The Third Circuit held that it could "easily conclude that the Court did not abuse its discretion in empaneling an anonymous jury." *Id*. at 924–25. There is no reason that this decision should be uprooted.

After a district court makes the decision to empanel an anonymous jury, it is required that it takes steps to ensure that defendants are not prejudiced and are afforded a full voir dire inquiry. *Eufrasio*, 935 F.2d at 574. Empaneling an anonymous jury "is not intrinsically suggestive of any ]inference of guilt" where adequate jury instructions concerning the need for anonymity are given. *Id*. (citing *Scarfo*, 850 F.2d at 1026). Additionally, an anonymous jury does not impair a defendant's right to intelligently exercise peremptory challenges where "measures are taken to inform a defendant of jury demographics and to permit ample voir dire." *Eufrasio*, 935 F.2d at 574 (citing *Scarfo*, 850 F.2d at 1022-23). In this case, the district court did just that.

The defense's allegations that the court "fail[ed] to take any steps to minimize the prejudicial impact of its anonymous jury order" and "failed to provide any such instruction to the jury" is false. Motion at pp. 503, 505. The district court dispelled an inference of guilt through the written instructions in its questionnaire to potential jurors. Jury Questionnaire, pp. 2-3. The Third Circuit has held that proper instructions should dispel "any possible inference of defendants' guilt arising from the use of an anonymous jury." *Walker*, 392 F. App'x at 925 (citing *United States v. Thornton*, 1 F.3d 149, 154 (3d Cir. 1993)). This is accomplished by giving the prospective jurors "a neutral reason to explain why their identities would remain anonymous." In *Walker*, the Third Circuit held that this was accomplished when the court instructed prospective jurors that, "These steps are taken to protect your privacy and to aid in your work as jurors. I have done this to ensure that both sides will receive a fair trial in this case,

117

as is both sides' right." *Id*.

Here, the instructions to prospective jurors in the juror questionnaire are substantively equivalent to those approved by the Third Circuit. Specifically, the juror questionnaire in the current case stated:

> To protect your rights of privacy and to assist you in discharging your responsibility as jurors fairly and impartially, you are part of an anonymous group of potential jurors. This means that although your identity is known to limited members of the staff of the Clerk of the Court, your name and address have not been and will not be disclosed to the judge, to the attorneys for the government or the attorneys for the defendants.

Jury Questionnaire, pp. 2-3. This sentence conveys the same meaning as that approved in *Walker* by acknowledging protection of privacy and assistance in conducting a fair trial as the reasons for anonymity. Thus, the instruction appropriately dispelled any possible inference that the use of the anonymous jury was evidence of the defendant's guilt or that it "primed [the jury] to be afraid of Mr. Savage" as alleged by the defense. Motion at p. 503. The fact that one potential juror out of hundreds interviewed, who was not seated, did not comprehend this instruction and stated that she believed she was a juror by number only because her own safety was at risk, does not mean the instruction was improper.

The Third Circuit has held that defendants were afforded a full voir dire inquiry where the court made use of written questionnaires and individual voir dire during jury selection, as these measures were sufficient to allow counsel to intelligently exercise peremptory challenges. *Walker*, 392 F. App'x at 925 (citing *Scarfo*, 850 F.2d at 1022). That was done here.

Savage alleges that he was deprived of full voir dire because defense counsel were prevented from researching jurors, or asking potentially identity-revealing detailed questions such as their employer or whether they live close to any of the crime scenes. However, the

118

district court has already addressed this argument in an earlier opinion, holding that "the practice of withholding jurors' names, addresses and places of employment does not deprive the defense of the information it needs to conduct an effective voir dire and exercise its peremptory challenges." *United States v. Savage*, 2012 WL 4068341 (E.D. Pa. Sept. 14, 2012).

The government and defense in this case conducted extensive voir dire over four months. Prospective jurors completed a nearly sixty-page questionnaire that asked about several non-identifying factors of their personal lives. Individual voir dire was conducted. Savage contends that dismissal of those jurors who revealed personal identifying information was an improper proxy used to strike jurors based on their opinions on capital punishment. To support this, he cites precedent that the death sentence cannot be carried out where "prospective jurors are barred from jury service because of their views about capital punishment on any broader basis than ability to follow the law or abide by their oaths." *Adams v. Texas*, 448 U.S. 38, 47-48 (1980). However, this ignores the fact that a juror whose anonymity is compromised may likewise be compromised in their ability to follow the law; such is the purpose of anonymous juries in the first place. *Thomas*, 757 F.2d at 1364. Also, as discussed elsewhere, jurors were not excluded solely on their views of the death penalty, provided they could follow the law.

Savage's motion in this current action to eliminate the jurors' anonymity (breaking the court's promise to the contrary to the jurors) has been denied by Judge Surrick and should not be revisited. Savage has no right to interview, "Google," or otherwise investigate the jurors. The sanctity of the jury should be left intact.

Because the district court properly decided to employ an anonymous jury, dispelled an inference of guilt through its instructions, and provided defense counsel the opportunity to

119

conduct full voir dire, neither trial counsel nor appellate counsel were ineffective for not challenging this order.

**Claim 13I: Supporting the "Fair Cross-Section" Motion**

Contrary to Savage's claim, the issue of the jury being pulled from a "fair cross section" of the Eastern District of Pennsylvania was indeed raised and fully litigated, before both the district court and on appeal, where the Third Circuit rejected this claim. *Savage*, 970 F.3d at 266.

Trial counsel indeed filed such a motion, Dk. # 379 on 2/21/12, and also adopted the motions filed by co-defendants on this issue. Dk. # 368, 369, 370, 371, 372. The jury panel did in fact reflect a fair cross section of the community. As the Third Circuit noted:

> The voir dire process resulted in seventy-eight qualified prospective jurors who were neither removed for cause nor for hardship. Of these seventy-eight, eleven were black. After the parties exercised their peremptory strikes, the jury was comprised of ten white venirepersons, two black venirepersons, five white alternates, and one black alternate.

*Savage*, 970 F.3d at 266.

In terms of how the jurors were drawn from the community, the Third Circuit viewed this from three distinct statistical viewpoints: absolute disparities; comparative disparities; and standard deviation. *Savage*, at pp. 59-69, and found that the statistics failed to establish that the qualified jury wheel systematically discriminated or under-represented African-Americans. *Id*. at pp. 69-73. Savage repeats his argument in Claim 16D. However, both arguments are conclusively rebutted by the record and thus subject to summary dismissal.

**Claim 13J: The Motion to Change Venue**

Savage argues ineffective assistance for his trial counsel's alleged failure to "adequately support" a motion to change venue. Motions to change venue are commonly filed, but rarely

granted. Trial courts have a wide latitude of discretion in considering the motions. In this case,

all events in the indictment occurred in Philadelphia. All defendants and victims lived in

Philadelphia. All exposure of jurors to pretrial publicity was adequately vetted in jury selection.

On page 47 of the Questionnaire, the jurors were told:

> This case has received some publicity in the media. There is nothing wrong with having read, seen or heard something about the case. However, we need to know what you have read, seen, or heard, if anything, regardless of whether you believe the information is accurate or not.

*Id*. The jurors were then asked whether they had "read, seen, or heard any news stories" about

the case, or had ever discussed the case with anyone. Question #93. They were also asked, "What

stands out most in your mind about what you have read, seen, heard or learned" about the case.

Question #94. Finally, they were asked, "What opinions and feelings, if any, do you have about

the case?" Question #95. Counsel were afforded the opportunity to ask follow-up questions about

this issue to any juror. Thus, any chance of prejudice by keeping venue in Philadelphia was

dissipated.

Moreover, throughout the months of trial, the district court conscientiously gave the jury

daily reminders not to read about or talk about the case. Thus, there was no error in the district

court denying this motion, and no chance of such a motion succeeding. This claim is

conclusively frivolous.

**Claim 14: Jury Instructions**

Savage claims his attorneys were ineffective for not objecting to purportedly improper or

unconstitutional jury instructions, and for not requesting instructions on "lesser included"

offenses. Because there was no error by counsel or the Court as to the jury instructions, and

121

because Savage was not entitled to instructions on alleged "lesser included" offenses, his claim fails on its face, and does not merit a hearing.

**Claim 15: Preserving Issues For Appeal**

Savage claims that trial counsel were ineffective for failing to preserve issues later raised by appellate counsel and rejected by the Third Circuit. His argument is insufficient on its face. There is simply no support for the proposition that the Third Circuit would have treated these arguments more favorably had they reviewed them under a standard other than plain error review.

**C.    Savage Received Competent, Constitutionally Effective Representation From Appellate Counsel (Claims 16A-N).**

**Claim 16 :**

Savage next raises 14 claims of ineffective assistance of appellate counsel, in Claims 16A through 16N. None of these claims have merit, all are conclusively refuted by the record, and none require a hearing. Twelve of his claims cite alleged failures to appeal issues that were meritless. Two of his claims argue that appellate counsel did not competently pursue or argue issues they did raise on appeal. Those, too, are meritless on their face. Savage was ably represented on appeal by a team of attorneys from the federal capital habeas section of the Federal Defender's Office in Albany, New York, and by experienced attorneys from the Gibbons firm in Newark, New Jersey.

**Claim 16A: Pursuing Issues To The Detriment Of Post-Conviction Efforts**

Savage's first claim of appellate ineffectiveness is perhaps the oddest claim. He takes his appellate lawyers to task for actually raising and pursuing claims on appeal because doing so

now precludes him from raising the issues in post-conviction proceedings. Such a novel theory is not recognized by the law.  [ address specifics ]

**Claim 16B: The SAMs**

Savage once again argues that his pre-trial conditions of confinement were "inhumane" (see responses to Claims 4 and 9), and faults appellate counsel for not pursuing that claim on appeal. However, the issue was fully litigated on multiple occasions, and the district court's findings were well supported in fact and law. Thus, it would have been futile to pursue the issue on appeal. Because this is conclusively reflected in the record, the claim requires no hearing.

Savage is also factually incorrect in alleging that appellate counsel did not raise the issue. Indeed, on July 20, 2015, they filed a motion in the Third Circuit on direct appeal, which motion was unsuccessful. At the same time, Savage also has had pro bono counsel pursue a civil suit in U.S. District Court for the District of Columbia which, thus far, has also been unsuccessful. *See*, D.D.C. #21-CIV-1057.

**Claim 16C: Jury Selection**

Savage claims error in not pursuing jury selection arguments on appeal. He argues this as to three sub-categories: (1) potential jurors who claimed adamant opposition to the death penalty, and an alleged failure to try to "rehabilitate" such jurors; (2) the failed *Batson* challenge as to a properly excused juror, Juror #364; and (3) failure to challenge the excusal of jurors who inadvertently revealed identifying information, compromising the anonymity of the jury. None of these claims have merit, and none would have succeeded on appeal if pursued. These claims are adequately addressed and disposed of herein, as to Claims 13A-J (alleging ineffective assistance of trial counsel) and Claims 26A-F (alleging the district court's denial of Savage's right to a fair

and impartial jury).

As to appellate counsel, it is worth noting that Savage raised both a specific *Batson* challenge, as to Juror #185, and a larger claim of racial discrimination in jury selection, on appeal, which the Third Circuit entirely rejected. *Savage*, 970 F.2d at 266-272.

Juror #364 indicated in her questionnaire that she did "not support the death penalty," Question #96, p. 49, and stated, "It should be considered only in the most extreme cases." Questions 97 and 98. Id. When asked to circle a number from 1 to 10, with "1" being strongly opposed to the death penalty and "10" being strongly in favor, Juror #364 circled "3." Question 100, p. 50. When asked, "What purpose, if any, does the death penalty serve in our society?" Juror #364 wrote, "none." Question 103c, p. 51. All of these answers, standing alone, provided adequate race-neutral reasons for excusing Juror #364.

Nevertheless, the defense argued a *Batson* violation for the government's exercise of a peremptory challenge as to Juror #364. As the district court succinctly summarized, the government offered the following race-neutral reasons for excusing her:

> First of all, that the juror has indicated that she does not support the death penalty. On the jury questionnaire she indicated that she was opposed to the death penalty and that it should be used only in extreme cases. The government also indicated that they were concerned that the juror's son had been involved in a shooting incident. He was shot while sitting in a car and that this was similar to a matter that is before the district court, the Tybius Flowers shooting. The government points out that the juror became very emotional during the questioning with regard to that incident, actually started crying. The juror also indicated that the crime had not been solved and that she thought the police were indifferent in dealing with it. The government also indicated that the juror's boyfriend was arrested on an assault charge and the juror visited that boyfriend in prison.

Transcript of 12/11/12, pp. 4-5. The court correctly concluded, "These reasons are all race neutral and they are credible," and found "no pattern of discrimination here." Id. at p. 5. Given

this conclusive record, trial counsel was not ineffective for failing to further its efforts to rehabilitate Juror #364, and appellate counsel were not ineffective for not pursuing this futile issue on appeal. As to the appeal, the Third Circuit made note of Juror 364's excusal, without disapproval, in footnote 54 of its opinion. *Savage*, 970 F.3d at 265, fn. 54. This claim is thus conclusively refuted by the record and precluded.

Savage also repeats Claims 16G and H, in which he complains of the anonymous jury, this time arguing that appellate counsel was ineffective for not pursuing it. Because, as set forth in our response to Claims 16G and H, the district court properly granted the motion for anonymous jury, this claim fails here as well, and should be summarily dismissed.

### Claim 16D: The "Fair Cross Section" Jury Claim

Savage claims that appellate counsel failed to properly cite record evidence as to the defense's "fair cross section" claim. He is wrong. This claim was fully litigated and properly rejected by the Third Circuit. *Savage*, 970 F.3d at 254-262. Appellate counsel's performance did not constitute constitutionally ineffective representation. This claim repeats Claim 13I, addressed above. Savage does not merit a hearing, let alone a new trial, merely because current habeas counsel think they could have done a marginally better job in presenting the motion, or in arguing on appeal the denial of that motion.

### Claim 16E: The FDC Cell Bug Recordings

Savage complains that appellate counsel did not appeal the admission of the recordings made in Savage's FDC Philadelphia cell. He repeats this claim in Claim 27A. These recordings were the result of a court-ordered "wiretap;" thus, the motion to suppress was properly denied by the district court. The admitted recordings contained Savage's admissions to prior charged

crimes, evidence of the racketeering enterprise and, most importantly, plots to kill more witnesses and witnesses' family members, as part of the racketeering conspiracy. As to the penalty phase, these recordings comprised damning evidence of future dangerousness, coming from Savage's own mouth. Indeed, they were perhaps the most relevant and compelling evidence admitted during the penalty phase. Thus, they were properly admitted, and advancing claims to the contrary on appeal would have been fruitless.

### Claim 16F: Use Of "The Kaboni Savage Organization"

Savage re-packages his claim against trial counsel that they should have objected to the use of the term "Kaboni Savage Organization." See response to Claims 12D and 18G. As described above, the government's use of this term was totally proper, and the term for the enterprise was indeed the one found by the grand jury and alleged in the indictment. Moreover, as a claim against his appellate counsel, the argument would certainly fail under a plain error test given no objection to the term by trial counsel.

### Claim 16G: Confidential Informants

Savage resuscitates his complaint against trial counsel that the "names of confidential informants" were not sought or obtained. See Claim 6D. This claim is specious. This case did not rely on the use of confidential informants. In any event, the disclosure of confidential informants is governed by *Roviaro v. United States*, 353 U.S. 53 (1957), which sets forth well-established specific procedures and criteria for motions to divulge the identity of confidential informants. Such motions and procedures were not sought in this case, because no such motion would have been appropriate. Thus, appellate counsel cannot be ineffective for foregoing pursuit of this baseless claim, which should be summarily denied.

126

### Claim 16H: Aggravating Factors In Penalty Phase

Savage complains that appellate counsel did not appeal the district court's overruling of objections to the government pursuing aggravating circumstances in the penalty phase. However, all aggravating circumstances pursued by the government were properly approved by the court, as they were well established in law and appropriate to the evidence presented in the case. Thus, this claim fails on its face. It is also moot.

### Claim 16I: Motion To Dismiss The Death Penalty

Savage alleges that appellate counsel was ineffective for not appealing the district court's denial of Savage's motion to dismiss the death penalty as violating *Ring v. Arizona*, 536 U.S. 584 (2002). This issue was raised by trial counsel (see Motion, Dk. # 380), and properly denied by the district court (see Order, Dk. # 1376). The district court's rulings, and the procedures employed at trial, fully complied with *Ring*. Thus, this claim should be summarily dismissed. The claim is also moot, due to the commutation of sentences.

### Claim 16J: Motion To Change Venue

Savage alleges that appellate counsel was ineffective for not appealing the district court's denial of Savage's motion for change of venue. This claim is repeated in Claim 27D. Because the district court's ruling was correct, this claim fails. Motions to change venue are typically granted in cases in which the jury pool is fatally tainted by pre-trial publicity. In this case, however, jurors were fully vetted, both in the questionnaires and via individual voir dire, as to whether they were exposed to, and remembered, any such publicity, and whether they would be affected by it. No jurors or alternate jurors expressed such thoughts or sentiments. There is no evidence to suggest that venue was improper. Thus, the motion for change of venue was meritless, as is

127

Savage's claim here.

## Claim 16K: Jury Instructions

Savage alleges that there were "unconstitutional, improper, or missing jury instructions," and then claims that appellate counsel were ineffective for not advancing that issue on appeal. Because there were no jury instructions that were "unconstitutional, improper, or missing," Savage's claim fails and is subject to summary dismissal.

Appellate counsel did indeed advance on appeal both a claim that the jury instructions, and charging conference notes, were missing or incomplete, *United States v. Savage*, 970 F.3d 217, 237, 240, and that the instructions were erroneous. *Id*. at 273-288. The Third Circuit analyzed those instructions in great detail, and rejected Savage's argument. Thus, Savage is precluded from arguing those issues here.

## Claim 16L: Double Jeopardy Motion

Savage alleges ineffective assistance based on appellate counsel's failure to appeal the denial of a double jeopardy motion. There were no non-frivolous double jeopardy motions made. Savage was tried in federal court on a 2004 indictment alleging Title 21 drug charges. Those same substantive charges were not brought in the instant case; rather, Savage was charged here with racketeering (RICO) conspiracy, murders in aid of racketeering, retaliation by murder, and the use of fire in commission of a felony. RICO conspiracy has entirely different elements than the Title 21 drug charges. The fact that evidence from the 2004 drug case was admitted against him in the RICO case, as RICO predicate evidence, was entirely proper. It is well established that this does not violate double jeopardy. *United States v. Pungitore*, 910 F.2d 1084, 1107 (3d Cir. 1990). Thus, appellate counsel was not ineffective for not pursuing this frivolous claim.

128

As to the Lassiter murder, Savage was tried in state court for that murder, and the doctrine of dual sovereignty permits his federal prosecution for murder in aid of racketeering. A proper "Petit policy" waiver was obtained by the federal prosecutors from Main Justice to permit that federal prosecution. The fact that the prosecution was allowed was entirely proper, especially since the reason Savage was acquitted in the state court Lassiter murder case was because he murdered the key witness against him, Tybius Flowers, on the eve of trial. It is well established that the doctrine of dual sovereignty allows a federal prosecution to proceed, and a conviction to be had, based on the same evidence. *Pungitore*, 910 F.2d at 1105; *United States v. Wheeler,* 435 U.S. 313, 320 (1978).

**Claim 16M: Motions To Suppress**

Appellate counsel were not ineffective for forbearing from appealing the denial of suppression motions, none of which had merit. It is not "ineffective" for counsel to forbear from pursuing a frivolous ground on appeal. Savage cannot show that any of these motions had merit, and would have resulted in a reversal on appeal. Savage fails to articulate, with any specificity, just what the district court allegedly got wrong in denying his motions; thus, this claim must fail under the *Strickland* prejudice prong for failing to adequately argue prejudice.

The government relies on the many responses it filed to these motions, and on the well-reasoned decisions and written opinions of Judge Surrick in denying those motions. Savage has the burden to prove that an appeal of the denial of these motions would have prevailed, and would have resulted in a new trial. He cannot meet this burden. Thus, his claims of ineffective appellate advocacy must fail, and should be summarily dismissed.

129

Savage filed numerous motions in this case, including a Motion for Joinder in Co-Defendants' Motions, filed on February 21, 2012. DDE # 387. But Savage now limits his claim to five motions to suppress, the denial of which he claims appellate counsel should have appealed: one motion to suppress court-authorized interceptions; and four separate searches, all conducted pursuant to validly issued search warrants. The five motions Savage cites are:

1. <u>Motion to Suppress Wiretaps</u>;

2. <u>Motion to Suppress the Search of 3510 Palmetto Street</u>;

3. <u>Motion to Suppress the Search of 3643 Darien Street</u>;

4. <u>Motion to Suppress the Search of the Maple Shade, NJ Apartment and Car</u>; and

5. <u>Motion to Suppress the Search of Devon Storage Locker # 105</u>.

As to the motion to suppress the wiretaps, and accompanying memoranda of law, these were filed in DDE # 386, 421, 500, 501, 505, 506, and 531. The government responded in opposition to the motions on April 2, 2012. DDE # 447. The district court denied the motions to suppress in DDE # 1051 and 1215. As the district court found, the wiretaps were all lawfully issued, and there were no material misstatements nor omissions in the affidavits supporting the orders.

Savage's motions to suppress the remaining four searches fail because the searches were all based on validly issued search warrants, upon which law enforcement relied in good faith in executing those warrants. The government responded to all four of these in an Omnibus Response in Opposition to Motions to Suppress Eight Searches, filed on April 16, 2012. DDE # 466.

Savage's motion to suppress the search of 3510 Palmetto Street failed because the search warrant was valid and because Savage had no standing (reasonable expectation of privacy) in that structure, which consisted of a second-floor apartment rented and inhabited by Eugene Coleman, and a first-floor garage where Coleman recompressed cocaine kilograms for Savage's drug organization. The search warrant was obtained after Tyrone Toliver was murdered in that apartment. The motions to suppress and memoranda of law are found at DDE # 398, 413, 415, 423, and 502. The district court's order denying the motions to suppress is at DDE # 945 and 946.

Savage's motion to suppress the search of 3643 Darien Street (Savage's North Philadelphia row home), and accompanying memoranda, are at DDE # 400, 402, 422 and 504. The district court's order and memorandum denying the motions to suppress is at DDE # 1013 and 1014.

Savage's motion to suppress the search of the Maple Shade, NJ apartment and car (Savage's temporary abode while he was a fugitive from the state court Lassiter murder case), and accompanying memoranda, are at DDE # 404, 418. The district court's order and memorandum denying the motions to suppress the motion attacking the New Jersey state court search warrant is at DDE # 947.

Savage's motion to suppress the search of Devon Storage Locker # 105, and accompanying memoranda, are at DDE # 405. The district court's order and memorandum denying the motion to suppress is at DDE # 949 and 950.

Before denying the motions, the district court held a hearing on the motions, on June 11, 2012. In the transcript on that date, the district court specifically addressed the Title III orders

131

(wiretaps) and cell phone/cell site records at pp. 10-149, and the Darien Street and Palmetto Street search warrants at pp. 175-277. The district court credited the 53-page affidavit supporting the search warrants for the Darien Street and Palmetto Street locations.

Although Savage refers vaguely to allegations of *Franks* violations, as he did in the district court, he offers this Court nothing to require any further evidentiary inquiry. Thus, this claim must fail for lack of showing prejudice.

**Claim 16N: Alleged Prosecutorial Misconduct**

Appellate counsel were not ineffective for failing to allege prosecutorial misconduct on appeal, as there was no prosecutorial misconduct. These are addressed in the responses to Claims 17 through 25.

> **D.    There Was No Prosecutorial Misconduct, No Withholding Of *Brady* Or *Giglio* Material, No Presentation Of False Testimony, And No Racial Discrimination In Jury Selection (Claims 17A-K, 18A-G, and 19-25).**

**Claim 17:**

Savage robotically sets forth eleven baseless claims of alleged *Brady* or *Giglio* violations, blithely claiming, without support, that the government withheld *Brady* material as to each homicide. None of these claims has merit, and none are supported by the record.

Government counsel recognized from the inception of this investigation that this case was an historical conspiracy case, partially dependent on cooperators' testimony, and that it also consisted of seven separate homicide scenes. Some of those homicide cases were "old cases" that had already been tried in state court (Lassiter as to Savage, Brown three times as to Lamont Lewis, and Parker as to Northington). Others (Abdullah, Toliver, Flowers) were essentially "cold cases" that received initial police attention but went essentially unsolved until the federal

132

investigation. Government counsel were thus diligent to disclose in discovery literally every scrap of paper in the Philadelphia Police homicide files and District Attorney files, and fastidiously combed through separate FBI informant files looking for anything that could even remotely be considered "exculpatory," "materially favorable," or otherwise disclosable. Taking no chances, and knowing that someday post-conviction attorneys would comb the record for such things, the government turned over everything it obtained from those files. The government even disclosed alleged witness accounts it *knew* were baseless and wrong (such as the account of a neighborhood junkie who passed on a rumor that witness Paul Daniels committed a murder he did not commit, and the offerings of a state prisoner crackpot who offered to testify that Savage admitted to *shooting* the Coleman family) – because the government recognized that even the accounts of crackpots and liars can be deemed to comprise *Brady* material. Indeed, Savage's trial counsel were permitted to cross examine Paul Daniels and Kevin Lewis concerning the junkie's account. Savage nevertheless alleges that the government withheld *Brady* material as to each murder, proposing fanciful yet erroneous theories. Indeed, as to each murder investigation, Savage appears to be simply making up evidence that never existed.

**Claim 17A: *Brady* And *Giglio* Information Regarding Witnesses**

The government did not fail to disclose any *Brady*, *Giglio*, or *Jencks* material concerning cooperating witnesses Eugene Coleman and Lamont Lewis. All such information was fully disclosed. No such information was suppressed. Coleman and Lewis were each cross examined for many days. No stone was left unturned by Savage's trial counsel. Coleman also testified in the 2005 Savage drug trial, and thus had extensive *Jencks* material, all of which was disclosed in discovery and used by defense counsel in cross examination.

Kareem Bluntly, one of Savage's hitmen who was killed years before the trial, was never a cooperating witness. Savage's current claim to the contrary is pure fabrication. Likewise, Dawud Bey and Al-Shannon Muse were also not cooperating witnesses.

**Claim 17B: *Brady* And *Giglio* Information Regarding The Mansur Abdullah Murder**

As to the Mansur Abdullah murder, the government disclosed all evidence in its possession. Savage now posits a theory that there must have been: (1) undisclosed witness accounts that conflicted with Coleman's testimony; (2) informant accounts of the murder; (3) information about cooperation given to the FBI by Kareem Bluntly; (4) evidence from an Abdullah cell phone possessed by the government; and (5) unstated miscellaneous "other exculpatory or impeaching facts" not disclosed by the government. No such things exist; thus, there were no *Brady* violations. Specifically, as to Kareem Bluntly, he was neither a witness nor a defendant in this case. He probably would have been a defendant had he been alive when this case was indicted. But, in fact, as Savage and his counsel are well aware, he was dead.

**Claim 17C: *Brady* And *Giglio* Information Regarding The Tyrone Toliver Murder**

As to the Tyrone Toliver murder, everything in the Philadelphia Police homicide file was disclosed in discovery. There was no evidence in that file, or anywhere known to the government, showing that Eugene Coleman fired the shot that killed Toliver. To the contrary, the evidence was that Savage sent Kareem Bluntly to kill Toliver in Coleman's apartment, in order to (1) steal Toliver's drug money; (2) kill someone Savage regarded as a "snitch;" and (3) have the murder occur in Coleman's apartment in order to have a murder he could attribute to Coleman, to prevent Coleman from ever testifying against him. Surveillance camera footage corroborated Bluntly's arrival at that apartment immediately preceding Toliver's murder. GX

134

708 (VHS video).

Savage appears to hang his hat on one line typed into a standard local criminal complaint form by a detective, in charging Coleman for his role in the Toliver murder. That form states that Coleman had a firearm and shot Toliver. However, that precise factual allegation is false. Moreover, that form was disclosed by the government in discovery, twice: in Discovery Batch #2/Homicide and other Crime Files/Toliver/Arrest Paperwork, on October 19, 2009; and in Discovery Batch #10/Homicide Files/Toliver, on June 4, 2012.  Thus, Savage's *Brady* / due process claim is conclusively false and fails on its face.

**Claim 17D: *Brady* And *Giglio* Information Regarding The Barry Parker Murder**

As to the Barry Parker murder, the government disclosed all evidence in its possession, including all *Jencks* material and reports of interview of Lamont Lewis. There was also no informant information comprising *Brady* material. Savage's current theory that Lamont Lewis did not shoot and kill Parker is made up of whole cloth, unsupported, and contrary to the evidence. Lewis admitted that he shot Parker in the chest three times and killed him. Lewis' account is consistent with the forensic evidence and the trial testimony. Moreover, Lewis admitted to this murder at a time when neither the government nor homicide investigators even *suspected* Lewis of being involved in the murder, thus making it highly unlikely that he would confess to the murder under those circumstances. Lewis pled guilty to the Parker murder in federal court. Savage is not entitled to a hearing merely by making up unsupported theories.

Savage falsely claims in his motion, at p. 406, that his defense counsel did not request, and the government did not disclose, the state court trial transcripts of the Barry Parker murder, as to Steven Northington. This is false, as these transcripts were disclosed in discovery on

135

October 19, 2009 (more than three years before trial) in Discovery Batch #2/Homicide and Other Crime Files/Parker/Trial Transcripts. Even a cursory review of discovery reveals this.

**Claim 17E: *Brady* And *Giglio* Information Regarding The Carlton Brown Murder**

As to the Carlton Brown murder, no *Brady* or *Giglio* material was withheld from the defense. There was no evidence indicating that Gerald Thomas was involved in the murders of either Carlton Brown or Ronald "Pumpkin" Walston, notwithstanding Savage's fabricated claim to the contrary. Everything in the police homicide files was disclosed in discovery. All reports of interview of Eugene Coleman were disclosed in discovery. Moreover, the evidence abundantly supported the testimony of Lamont Lewis that he murdered Brown, and did so because Savage hired him and paid him to do so. The Brown homicide was heavily litigated, as Lamont Lewis was tried in state court for this murder three times (resulting in two hung juries and an acquittal) before admitting and pleading guilty to the murder in federal court. Walston was Savage's best friend and mentor. Indeed, Walston's picture was prominently displayed in Savage's home. GX 48. When Brown, a neighborhood drug rival, murdered Walston, Savage naturally sought revenge, hired Lewis to kill Brown, and paid Lewis with a jar of 16 ounces of liquid PCP ("oil"). Transcript of 4/1/13 at p. 148. Savage's newly concocted theory is baseless and affords him no relief.

Savage also falsely claims in his motion, at p. 406, that his counsel did not request, and the government did not disclose, the transcripts of the Carlton Brown murder trials in state court against Lamont Lewis. This is false. The transcripts were provided in discovery on October 19, 2009, in Discovery Batch #2/Homicide and Other Crime Files/Brown/Trial T-1 and Trial T-1a. Defense counsel did not have to request the transcripts – they had them for more than three years

before trial.

**Claim 17F: *Brady* And *Giglio* Information Regarding The Coleman Family Murders**

As to the arson murders of the six members of the Coleman family, the government did not withhold any evidence comprising *Brady* or *Giglio* material. All witness interview reports of Lamont Lewis were disclosed, and there is no exculpatory or impeachment information that was not recorded in a report. The government had no evidence that "others" conspired with Lewis to commit the firebombing, other than the charged participants: Kaboni Savage, Kidada Savage, and Robert Merritt. Savage's allegation that Al-Shannon Muse and Dawud Bey were "acting as government agents" when they were recorded speaking with him in the FDC Special Housing Unit is meritless, unsupported, and fabricated. They were not government agents.

Savage's habit of making blatantly false allegations continue, with his claim that the government disclosed only portions of the Philadelphia police homicide file. This is plainly untrue, as the entire homicide file was provided in discovery (as it was as to every charged homicide in this case). Nothing was suppressed. Indeed, every scrap of paper, no matter how obscure or apparently useless, was suppressed. The government purposely disclosed everything, for the very purpose of avoiding these types of claims. Sadly, Savage's current counsel have resorted to false claims and fabrications.

Savage manufactures out of whole cloth the claim that the government suppressed evidence that Dawud Bey and Al-Shannon Muse were offered benefits in exchange for talking to Savage in the SHU, specifically as to comments intercepted in the cell bug wire. Motion at pp. 395-96. This claim is specious. No such benefits were ever offered. Neither Bey nor Muse were government agents. This is just reckless speculation.

137

Savage next recklessly speculates that the government suppressed evidence that Lamont Lewis planned and executed the arson murders with people other than Savage, specifically naming Dawud Bey, Gerald Thomas, and Anthony Walthour. There is, quite simply, no evidence that any of these three people were involved in the arson murders. The government did not suppress any such information, because it had no such information.

## Claim 17G: *Brady* And *Giglio* Information Regarding The Lassiter Murder

As to the Kenneth Lassiter murder, the government did not fail to disclose any *Brady* or *Giglio* material. There was no evidence withheld as to the purpose of the murder. In fact, defense trial counsel argued that, at best, the murder was over a parking space, and not committed for the purpose of increasing or maintaining anyone's position in the enterprise. Attorney Hoey in fact argued this very point at great length. Transcript of 4/30/13 at pp. 142-152.

The government had no evidence that would negate or call into question whether the state facility conversation between Savage and Lamont Lewis occurred. Likewise, as with the other cases, everything in the homicide file was disclosed, and nothing from it was withheld from the defense.

The only information that later became known to the government (during trial) was the brief and fleeting assignment, on paper, of the co-defendant's case to an Assistant District Attorney who later represented Kidada Savage at trial. That information, which has been separately fully litigated, was immediately disclosed by the prosecutors when brought to their attention. It was contained in a box in the District Attorney's Office and, when inadvertently discovered mid-trial by a local homicide prosecutor in a District Attorney's office corridor, was promptly turned over to the federal prosecutors in this case. The prosecutors, in turn,

138

immediately disclosed the information (within an hour) to defense counsel.

Savage recklessly claims that "the government told Lamont Lewis everything they needed from him to prove their case." Motion at p. 398. This is patently false, as no such thing happened. Also, there were ample witnesses to prove Savage's murder of Lassiter; the government did not need anything from Lamont Lewis as to this murder.

Savage either misunderstands or misrepresents the evidence when he claims that "Mr. Savage and Mr. Flowers were friendly." Motion at p. 401. Nothing could be further from the truth, and contrary to what Savage now claims, witness Jhonathan Baker never claimed they were friendly. Savage and Flowers were bitter enemies, in both the boxing ring and in the drug trafficking world. It was only the intervention of Flowers' brother, Ronald Walston, that prevented Savage from murdering Flowers earlier. Once Walston was killed by Carlton Brown, Savage had no reason to refrain from killing Flowers. Likewise, Savage oddly claims that the government "withheld" a report regarding Jhonathan Baker, while correctly acknowledging that it was disclosed in discovery. The "government" withheld nothing. The fact that the local District Attorney's Office once failed to find a witness who was incarcerated in their own jails is not a failure attributable to "the government."

Savage falsely claims that the government suppressed evidence as to witness Sam Rosado. The FBI 302 report of Rosado's interview was indeed disclosed, and Rosado's prior denial that he witnessed the murder (later recanted) was fully explored at trial, in which Rosado admitted that he was on probation and was caught in a lie. Trial transcript of 2/27/13 at p. 128. Savage's suggestion that Rosado's testimony was influenced by the government was also explored at trial and debunked: "Q: Anybody from the government threaten you? A: No." *Id*. at

139

p. 129.

Savage also conflates the testimony that witness Jhonathan Baker was afraid to testify in state court, with the fact that the Assistant District Attorney did not call Baker at trial because he could not find him (despite being incarcerated in local custody at the time of trial). Both were true. The government did not lie to the court, nor did it elicit perjured testimony – both allegations are specious.

Finally, in a claim against both the government and his own trial counsel, Savage asserts another bald-faced lie, claiming in his motion, at p. 406, that his counsel had not requested, and the government had not provided, the state court transcripts of the Lassiter murder trial. This is simply untrue, as those transcripts were provided in Discovery Batch #14/KS Phila murder trial transcripts, on September 17, 2012. Even the most cursory review of the files would disclose this fact. Savage makes similar false statements as to the state trial transcripts of the Barry Parker (Northington) murder and the Carlton Brown (Lamont Lewis) murder.

**Claim 17H: *Brady* And *Giglio* Information Regarding The Tybius Flowers Murder**

As to the Tybius Flowers murder, all evidence was disclosed, and none was withheld, as conclusively shown by the record. Savage's claim of *Brady* violations are a lie. Mary Phy's statements to law enforcement were fully disclosed, including the report of interview of which Savage complains, which interview occurred on September 8, 2004. This was specifically provided in Discovery Batch #12/Redacted Jencks by Witness Name/Phy, Mary/Report, provided on September 17, 2012. This topic was comprehensively covered on March 25, 2013, as reflected by the trial transcript of that date, at pages 251, 280-83. Indeed, trial counsel fully cross-examined Phy on her alleged earlier failure to recall certain specific events. *See* Trial

140

Transcript of March 25, 2013 at p. 286.

Savage hypothesizes that CFCF housing records would show that witness Michael Crosby and Kaboni Savage were not housed together. Even if true, this would hardly preclude the possibility that Savage and Crosby could have interacted in or near the gymnasium, or elsewhere. This claim fails on its face, as yet more unsupported speculation. Savage even admits in his motion, at p. 400, that there were windows between the two sides of the gymnasium, through which separated inmates communicated. This claim is thus unsupported.

Savage falsely claims that the government suppressed statements made by witness Mary Phy. This is not true. Savage purports a prior inconsistent statement and cites a transcript that in fact does not support his claim. The truth is that every prior statement made by Phy was disclosed in discovery. The FBI 302 report of a September 8, 2004 interview, and Phy's grand jury testimony transcript of May 16, 2007, were both disclosed in Discovery Batch #12/Redacted Jencks/Phy, Mary.

Savage also alleges that the government falsely attributed a telephone number to John Tillman. This is also false, as the 8069 number attributed to Tillman was supported by evidence. This was fully disclosed in discovery on June 4, 2012, in Discovery Batch #10/Tybius Flowers Cell Site records.

Savage falsely claims that the government suppressed evidence of Dawud Bey's involvement in the Flowers homicide. Evidence of Dawud Bey's involvement in the Flowers homicide was indeed disclosed, and was openly discussed at trial. Charts and phone mapping of telephone contacts between Bey and others were introduced, were testified to, and were subject to substantial cross examination. The government has never denied or contradicted the theory

141

that Bey was involved in the Flowers murder. There was thus no violation of Savage's rights pertaining to this homicide.

### Claim 17I: Phone Records Of Witnesses

Savage complains that the government withheld recorded FDC calls made by co-defendants in his drug case. He is wrong, as the government's prosecution team did not have these recordings, and thus could not provide them in discovery. Savage then speculates that such calls may have had information helpful to him. Such conjecture, however, does not equal proof.

All discovery from the 2004 Savage drug case, which consisted of approximately 2,078 items, was provided in the first batch of discovery in the instant RICO case, provided on July 21, 2009.

The government cannot disclose what it does not have. It is well established that the government has no responsibility to procure every conceivable item from every corrections entity that is not a part of the prosecution team, including jail calls. *See United States v. Merlino*, 349 F.3d 144 (3d Cir. 2003).

Savage says nothing regarding how these FDC calls would have assisted him, or what exculpatory or materially favorable evidence is contained in such calls. Thus, Savage fails to allege prejudice, and thus fails to meet the threshold for obtaining an evidentiary hearing on this allegation.

### Claim 17J: Records Regarding Non-Cooperator Bistrian

The government did not fail to disclose any information regarding FDC inmate Peter Bistrian's "cooperation with law enforcement" because Bistrian never cooperated with law enforcement in this case. The government did not make false statements to the court, knowingly

or otherwise. Bistrian was never a witness. Government prosecutors in this case never spoke to Bistrian. The FBI case agent never spoke to Bistrian. Whether Bistrian ever did anything with or for corrections officers is of no moment. FDC security personnel were not part of the prosecution team, and the government is not responsible for knowing all that they may have known. *See United States v. Merlino*, 349 F.3d 144 (3d Cir. 2003); *United States v. Marshall*, 2009 WL 1160929 (D. S.D. 2009) ("The BOP is typically not a law enforcement investigatory agency, but rather fulfills a custodial role"). Bistrian, a convicted fraudster, was not part of the Kaboni Savage Organization and, to the government's knowledge, not a witness to any events charged in the indictment. Whatever Bistrian may have known or not known, done or not done, or said or not said, had no impact on Savage's case.

**Claim 17K: Reverse Proffer Of Lamont Lewis**

Last in this group of claims, Savage oddly claims that the government violated the Due Process clause by "failing to disclose the content of the reverse proffer made to co-defendant turned key cooperating witness, Lamont Lewis." Motion at p. 21. Apparently, Savage and his post-conviction attorneys are not aware of what a "reverse proffer" is. What it is *not* is a disclosable event. Reverse proffers do not involve the subject (in this case, Lamont Lewis) speaking at all, or providing any information. Thus, there is no *Brady, Giglio* or *Jencks* material, or any report of interview, because there was no interview then. There were also no promises or enticements made to Lewis during the reverse proffer. Had there been any, they would have been disclosed. Thus, there was nothing to disclose, and Savage's assertions to the contrary are, once again, baseless speculation. Any claim by Savage that there were disclosable items emanating from this event are wholly fabricated and unsupported by any evidence. Thus, this issue is

143

foreclosed and does not merit an evidentiary hearing. A defendant cannot force an evidentiary hearing merely by making up facts that do not exist.

**Claim 17 Allegations Regarding Miscellaneous Homicides Not Charged**

To underscore the desperation of Savage's attempts to identify non-existent *Brady* material, he now complains that the government had a duty to disclose, and suppressed, evidence of homicides not charged in this case, and not committed by any witnesses in the case. As there is no such obligation, this claim should be summarily dismissed.

Savage claims entitlement to the Philadelphia police homicide files as to the Ronald Walston, Mustafa Bey, and Kareem Bluntly homicides. These are uncharged cases. No defendant is accused of committing these crimes. No witness is accused or suspected of committing these crimes. No *Brady* material exists in these files. No request was ever made by defense counsel to view these files.

Ronald Walston, a/k/a "Pumpkin," a good friend of Kaboni Savage, was murdered by Carlton Brown, which caused Kaboni Savage to hire Lamont Lewis to murder Brown. Lamont Lewis admitted to the Carlton Brown murder, and pled guilty to the murder. Lamont Lewis was cross examined extensively about this. The Walston homicide file is irrelevant, as his murderer, Carlton Brown, is dead.

Mustafa Bey was killed by someone who is not a defendant in this case. His homicide was well known to defense counsel. No *Brady* or *Giglio* material exists in the file. FBI reports of interview of witnesses who had knowledge of this event were fully disclosed. Thus, this file was not discoverable and any claim that it was discoverable is unsupported and meritless.

144

Kareem Bluntly was one of Kaboni Savage's assassins, or "hit men." He was killed by drug dealers in a deal that had nothing to do with the Savage organization. Thus, once again, there is nothing discoverable in this file.

**Claim 18: Alleged "False Impression" Evidence**

Savage makes seven baseless claims that the government violated Due Process by "presenting evidence that created a false impression" that wrongly secured convictions and death penalty verdicts (Claims 18A – G). None of these claims are factually supported, none are legally supported, and none have merit. These fabricated claims are conclusively refuted by the record, and are undeserving of a hearing.

**Claim 18A: The Toliver Murder**

Savage makes a series of claims, mostly trivial, of alleged "false impressions" that have no factual basis, concerning the Toliver murder. None of these have merit, although none of these would have affected the verdict or penalty phase in any event. The claims regarding Mario Melendez were fully disclosed, and fully discussed at trial in the cross examination of Eugene Coleman. See Trial Transcript of March 19, 2013, at pp. 195-225. Even the specific claim that Toliver had previously been to the Palmetto Street address that would later become the Toliver murder scene, was fully explored on cross examination, in the context of whether Coleman had previously recompressed cocaine there for Toliver. *Id.* at p. 190. Thus, there was no "false impression," and the record conclusively debunks any claim of a Due Process violation.

**Claim 18B: The Lassiter Murder**

Savage next argues with the government's common-sense assertion, and evidence presented at trial, that a homicide occurring on a drug corner frequently results in temporarily

145

shutting down drug activity on that corner. This claim is specious, and defies common sense. As a matter of simple common sense, of course the presence of police crime scene investigators and homicide detectives has a chilling effect on open air drug markets. Nobody is going to sell drugs on a street corner teeming with cops, and nobody is going to buy drugs at that corner. This was specifically testified to not only by Lamont Lewis but also by a veteran Philadelphia homicide detective, Chuck Boyle.[21] See Trial Transcript of February 27, 2013 at pp. 249-250. Savage's motive in killing Lassiter was also well supported. This was specifically testified to by Coleman and elicited on cross examination: "Kaboni never liked Tibby." Trial Transcript of March 19, 2013 at p. 89. Of course, defense counsel argued contrary to the government's theory, but did not prevail. The jury's finding was well supported by the evidence.

**Claim 18C: The Flowers Murder**

Savage argues against the evidence that Savage discussed Tybius Flowers with Lamont Lewis and Michael Crosby while incarcerated in a local facility. He also argues against the government's assertion that a particular phone number was used by John Tillman. These claims, that the government created "false impressions" through this presentation of this evidence, are unsupported and meritless. Michael Crosby was cross examined at great length about his encounter with Savage, fully exploring this topic. See Trial Transcript of April 4, 2013 at pp. 192-227. The "gym" at CFCF was specifically mentioned in cross examination multiple times.

---

21 The Philadelphia homicide detectives' use of lawn chairs to "camp out" on a drug corner until witnesses to a homicide would come forward was actually so well known it was even reenacted on an episode of the CBS television show, "Cold Case," for which a former Philadelphia Assistant District Attorney (and former Assistant U.S. Attorney) sometimes served as a consultant.

Id. at pp. 192, 219-221, 226-227. Likewise, Lamont Lewis was cross examined about this as well by Northington's counsel. See Trial Transcript of April 3, 2013 at p. 296. The conversations were well established.

Savage's claim that he and Crosby were assigned to different parts of CFCF and exercised in separate parts of the gymnasium, while clever, are unavailing. Crosby's testimony was specific that he was called down to the gym at Savage's request; thus, any mention of being assigned to different parts of CFCF is irrelevant. Transcript of 4/4/13 at p. 179. Savage cannot establish that the two of them did not speak. Thus, his claim is meritless.

**Claim 18D: "Future Dangerousness" Evidence**

In the penalty phase, the government is entitled to present evidence of a capital defendant's future dangerousness. Title 18, United States Code, Section 3592(c) permits the government to rely on non-statutory aggravating factors, one of which is future dangerousness, as it states, "The jury . . . may consider whether any other aggravating factor for which notice has been given exists." Id. Courts have upheld the admission of evidence of "future dangerousness" in capital penalty phases. *Simmons v. South Carolina*, 512 U.S. 154, 169 (1994); *United States v. Llera-Plaza*, 179 F.Supp.2d 464, 487 (E.D. Pa. 2001); *United States v. Bin Laden*, 126 F.Supp.2d 290, 304 (S.D.N.Y. 2001).

Savage remarkably argues against the mountain of evidence that proved Savage's future dangerousness. Savage is the proverbial poster child for future dangerousness. Evidence of his plans and determination to kill witnesses, witness' children, an FDC Captain, and the FBI case agent are legion. Savage even vowed that, even if incarcerated for a long time, he would still kill

147

them as long as he was alive. Evidence of this was abundant, and was mostly in the form of his own recorded statements. This claim is specious.

## Claim 18E: Savage's Possession Of Contraband BOP Records

Savage had U.S. Bureau of Prisons papers showing where certain prisoners were housed. He was not permitted to have such papers. This evidence was fully documented, and testimony of it was properly admitted. Specifically, on March 7, 2011, 27 pages of "Sentry CIM clearance and separatee data" were found in Savage's cell at FDC-Philadelphia, as documented in reports. *See*, Discovery Batch #6/Disk 1/FBI 302s and Documents/82681 Vol. 18, item #11, provided in discovery on July 29, 2011. Thus, there were no "false impressions" created, and no Due Process violation. His claim to the contrary is specious and conclusively proven false by the record.

## Claim 18F: Savage's Misuse of FDC Legal Lines; Subversion Of The SAMs

There was no "mischaracterization" of Savage's phone calls from FDC-Philadelphia in 2012. Savage was not permitted to make personal calls using the unrecorded, unmonitored legal line, which was reserved for calls with his attorneys. In fact, no detainee or prisoner is allowed to do so. Savage corrupted an FDC corrections officer, convincing him to let Savage dial the numbers, contrary to the SAMs protocol. The result was that Savage spoke to known criminals on an unrecorded, unmonitored legal line reserved for attorney-client calls. This was conclusively proven and not rebuttable. The record conclusively debunks this claim.

## Claim 18G: The "Kaboni Savage Organization"

Savage claims the suppression of "favorable exculpatory evidence" that the Kaboni Savage organization did not exist. This claim is a repeat of Claim 12D (as to trial counsel) and

148

Claim 16F (as to appellate counsel), and is frivolous. The government proved the existence of this organization, indeed in the form of a racketeering enterprise, many times over, beyond a reasonable doubt to the satisfaction of a unanimous jury. Savage tries to split hairs by saying that there was no organization that "went by this name." Motion at p. 22. This is a red herring. The organization, referred to in the indictment as the "Kaboni Savage Organization," clearly existed, whether its members commonly referred to it as that or not. This is akin to claiming that Pablo Escobar did not refer to his organization as the "Medellin Cartel," so it must not have existed. This claim is undeserving of further consideration.

**Claim 19: Eugene Coleman**

Savage alleges that the government violated Due Process by "relying on the statement of a single informant, Eugene Coleman . . . ." This argument ignores the veritable mountain of evidence in this case, which amply corroborated Coleman's testimony, and in any event fails to state a Due Process violation. It is thus subject to summary dismissal.

**Claim 20: Alleged Intimidation Of Witnesses**

Savage's claim that FBI agents interfered with and intimidated witnesses is absurd. No such thing ever occurred. A defendant cannot earn an evidentiary hearing by making wholly unsupported allegations out of whole cloth. Savage offers nothing to advance him beyond that threshold.

**Claim 21: Testimony Of FBI Case Agent Kevin Lewis**

The testimony of FBI case agent Kevin Lewis was properly presented and properly admitted. Special Agent Lewis engaged in no misconduct. Savage was not denied a fair trial or a

149

fair sentencing procedure. Savage's claim that Special Agent Lewis offered "misleading testimony," "vouch(ed) for government witnesses, or "testif(ied) to hearsay" is false.

Agent Lewis's lay opinion testimony was an issue raised by trial counsel, decided by the district court, raised by appellate counsel, and fully discussed by the Third Circuit, who affirmed the government's use of this testimony, the district court's admission of it, and the jury instruction given by the district court as to how the jury should consider and weigh it. *Savage*, at 284-288. The Third Circuit soundly rejected Savage's arguments, and Savage is thus foreclosed from relitigating them here.

**Claim 22: "Prejudicial" Arguments And Evidence In Guilt Phase**

The government's presentation during the guilt phase of the trial did not violate Savage's right to a fair trial or fair sentencing procedure. Government counsel presented properly admitted evidence and made arguments that were legally permissible. Savage presents a desperate litany of alleged misdeeds, none of which have factual or legal merit.

First, Savage generally argues that the opening statement was "highly sympathy-based," a claim that is not legally cognizable and is devoid of merit. The few examples given regarding the children and pets who were killed by Savage were factual in nature, and fully supported by the evidence.

Next, Savage complains that witnesses were shown photographs of their family members, who were victims of the firebombing. All of these photographs were innocuous. None evoked emotion or tears from witnesses Eugene Coleman or Regina Nash. Moreover, all of the photo identifications served as proof of identifications of the victims, which are necessary elements to

the crimes charged. The remaining statements of which Savage claims are clearly innocuous, non-prejudicial and deserve no further elaboration.

Savage complains about murder victim Kenneth Lassiter's daughter identifying a photo of her father and the contents of his wallet. This, too, was a necessary function in order to prove the victim's identity. The witness' fleeting voluntary and reference to her father's religious medallion was not in response to a prosecutor's question, and was inconsequential. Defense counsel's strategic decision to not object, and call further attention to it, was reasonable and smart. In any event, the medallion cemented the identification of Lassiter, and was subject to fair comment.

Savage's complaints about the prosecutors' comments in closing argument also ring hollow. The comments were all fair argument, not objected to, and were based in facts. To be sure, quoting Savage's own recorded words (e.g., "killing everything they love") are fair argument. The only misstatement by a prosecutor in closing argument came at the end, only implicated co-defendant Northington, was cured via instruction, and was deemed to not be grounds for reversal by the Third Circuit as to Northington.

Savage's complaint, at page 623 of his motion, regarding the prosecutor's comment in closing argument is misplaced, as it was entirely proper in the context in which it was made. AUSA Gallagher stated, "In the end, a jury trial is just that, it is a search for the truth, a search for justice. Kaboni Savage doesn't see it that way." Trial transcript of 4/29/13 at p. 15. That comment was true, and certainly not a lowering of the burden of proof. This is particularly true in the context in which the comment was made, as the comment directly addressed the Tybius Flowers murder, in which Savage ordered the murder of a witness who was gunned down just

151

hours before he was to testify at Savage's state court murder trial for the murder of Kenneth Lassiter. In that context, the argument is spot-on. Likewise, Savage's various complaints about comments in the government's opening statement were all fair comment, and not reversible error.

Savage also misrepresents the record in claiming that the prosecutor misstated the evidence, when no such thing occurred. Savage erroneously states that no in-court identification of Savage took place as to the Lassiter murder when, in fact, both witnesses Johnathan Baker and Sam Rosado identified him, as did Tybius Flowers via his admitted statement.

Savage fabricates complaints that character evidence and victim impact evidence being introduced during the guilt phase. No such thing occurred. Likewise, there were no "arguments that lowered the burden of proof." Motion at p. 623. Savage is simply making this up, sans factual support.

**Claim 23: "Prejudicial" Arguments And Evidence In Penalty Phase**

Savage's arguments of allegedly "prejudicial" arguments and evidence in the penalty phase are now rendered moot as a result of the Presidential commutation. However, the government engaged in no "egregious misconduct" during the penalty phase, and did nothing to "effectively foreclose[ ] the jury's consideration of mitigating evidence." Motion at p. 22. To the contrary, the government acknowledged the existence of mitigating evidence, and merely argued, quite properly, that the aggravating circumstances outweighed the mitigating circumstances. The jury, who alone decides what weight to give such aggravating and mitigating circumstances, made a proper decision given the facts of this case.

The Third Circuit rejected Savage's claims of government penalty-phase misconduct as to: (1) future dangerousness arguments, *Savage* at pp. 141-159; (2) use of victim-impact statements, *Id*. at pp. 159-169; (3) use of autopsy photos to support the "especially heinous, cure or depraved" aggravator, *Id*. at pp. 169-176; (4) its argument against the "equally culpable" mitigator, *Id*. at pp. 176-184; and (5) its rebuttal of the mitigators relating to Savage's relationship with his family. *Id*. at pp. 184-196. The government's cross examination questions of Savage's expert, Dr. Burry, was invited by her direct examination. Savage's current arguments as to these issues are thus foreclosed and must be summarily dismissed.

## Claim 24: Racial Discrimination In Jury Selection

Savage once again argues, as prosecutorial misconduct, that the government improperly struck potential jurors "in a non-race neutral manner." This is clearly false, and conclusively contradicted by the ample record in this case. Indeed, both the district court and the Third Circuit explored this issue and properly ruled that the government did no such thing. *Savage*, at pp. 51-98. The specific rebuttals to these claims are more specifically contained in the responses to Claims 13D and 26C.

## Claim 25: Selective Prosecution

Savage argues that his prosecution was "(s)elective prosecution on the basis of race." Motion at p. 22. This claim is specious, factually unsupportable, and conclusively contradicted by the record. Indeed, as with many of his other claims, Savage offers nothing to support this allegation but the bare allegation itself. That is insufficient, and undeserving of further inquiry.

Savage murdered twelve people. One victim was a witness against him, murdered on the eve of trial. Six victims were family members of a witness, four of them children. All twelve

153

victims were African-American. To *not* prosecute Kaboni Savage only because he, too, is African-American, would be the height of racial discrimination, as it would essentially deny the humanity of the twelve poor souls he murdered based on the color of their skin.

      **E.**      **The district court Did Not Violate Savage's Constitutional Rights (Claims 26A-F, 27A-F, 28, 29A-B, 30A-C, and 31).**

**Claim 26: Jury Selection Claims Re-Argued**

Savage was not denied his right to a fair and impartial jury. The district court engaged in a four-month long, painstaking process by which all potential jurors filled out lengthy questionnaires, and were subject to individual voir dire. The jury selection process employed by the district court fully honored and complied with Savage's Constitutional rights. The specific claims of violations were addressed earlier in this response, specifically: Claim 26A was addressed as to Claim 13A; Claim 26B was addressed as to Claim 13B; Claim 26C was addressed as to Claims 13C and 24; Claim 26D was addressed as to Claims 13G and 13H; and Claims 26E and 26F were addressed as to Claim 13H. As stated therein, none of these claims are meritorious.

**Claim 27: Allegedly Improper Evidentiary Rulings**

Savage claims various alleged violations of Due Process and the Confrontation Clause, as a result of various evidentiary rulings by the district court at trial. None of these claims have merit. The rulings were correct, and did nothing to deny Savage his Constitutional rights. Moreover, evidentiary rulings are not the proper subject of a 2255 motion, whether or not objections to those rulings were preserved.

**Claim 27A: FDC Cell Bug Recordings**

Savage realleges his claim (Claim 16E) that the FDC cell bug recordings were improperly admitted. As noted above, these recordings were properly obtained, and properly admitted. The district court need only reaffirm its prior, sound rulings to summarily dispose of this claim.

**Claim 27B: Autopsy Reports**

The autopsy reports of Mansur Abdullah and Barry Parker were admitted without objection, and did not violate Savage's rights. The Medical Examiner who performed and/or oversaw these autopsies testified at trial and was subject to cross examination. Furthermore, defense counsel had strategic reasons for admitting these reports, as they were used by trial counsel in the cross examination of the Medical Examiner. This claim repeats Claim 6G(1), the response to which more fully and specifically recounts Dr. Preston's testimony.

**Claim 27C: Grand Jury Transcript Offered By Defense Counsel**

Savage repeats Claim 6G(2), arguing that the district court erred in granting the *defense* motion to admit the grand jury transcript of Jorge Reyes over government objection. Transcript of 4/24/13 at pp. 48-61. For the reasons articulated as to Claim 6G(2), this was a strategic decision by Savage's trial counsel to not object to the transcript's admission, which mostly benefitted Savage's defense. Savage cannot now complain of the district court's decision to admit a transcript to which he posed no objection. Thus, this claim is precluded.

**Claim 27D: Change Of Venue And Media Exposure**

Savage repeats his complaint made in Claim 16J, that there should have been a change of venue due to pretrial publicity. Motion at p. 688. There is no evidence to support Savage's claim

that "prejudicial media" biased Savage's jury to his detriment. Such issues were fully vetted in

jury selection, and were successfully avoided throughout the trial.

Media exposure was specifically addressed in Questions #93-95 of the jury questionnaire.

They were prefaced with:

> **This case has received some publicity in the media. There is nothing wrong with having read, seen or heard something about the case. However, we need to know what you have read, seen or heard, if anything, regardless of whether you believe the information is accurate or not.**

Questions #93-95 were posed as follows:

1.    (a)    Have you, at any time, read, seen or heard any news stories about the defendants, the victims, or this case in the newspapers, on television, through the internet or while listening to the radio?

☐ Yes          ☐ No

(b) Have you, at any time, ever participated in any discussions about this case with anyone (friends, family, co-workers, associates, other jurors or court personnel, etc.) or heard other people talking about his case?

☐ Yes          ☐ No

IF YES to (a) or (b), please indicate in detail what you have read, seen, heard or discussed about this case:

_____

_____

_____

2.    What stands out most in your mind about what you have read, seen, heard or learned about this case up to this point?

_____

_____

_____

156

3.        What opinions and feelings, if any, do you have about this case?

_____

_____

_____

All counsel were able to individually question anyone who gave an answer that called into question that they may have been exposed to media coverage. Not one person seated on the jury claimed that he or she was "influenced" by media coverage, and indeed, Savage cites none. Savage's reference to Juror #68 is unavailing since, as he admits, the juror stated she did not remember the details of the news stories, wasn't even sure that it was about this case, and repeatedly assured counsel that it was not a problem. Transcript of 11/7/12 at pp. 143-44, 149. Thus, this claim is precluded, as it is conclusively refuted by the record.

**Claim 27E: Savage's Leg Restraints**

Savage repeats his complaint in Claim 11 that the use of leg restraints denied him a fair trial. Motion at p. 687. Savage was not meaningfully restrained during trial, and the restraints placed on him by court and corrections officials were never exposed to the jury. Leg irons were hidden by an opaque cloth curtain that surrounded all counsel's tables (including that of government counsel). There is simply no support for any claim that the jury saw, heard, or were otherwise aware of, leg shackles. This claim is meritless.

**Claim 27F: Pennsylvania Predicate Crimes for Murder In Aid Of Racketeering**

The claim that the "predicate crimes" charged in Counts 11 through 15 were "not recognized crimes under Pennsylvania law" is plainly wrong. Motion at p. 690. Those crimes

157

charged murder, which is indeed a recognized crime under Pennsylvania law and was properly cited as such in the indictment. Title 18, Pa. Consolidated Statutes Annotated, Section 2502(a) provides:

> A criminal homicide constitutes murder of the first degree when it is committed by an intentional killing.

Id. Title 18, Pa. Consolidated Statutes Annotated, Section 2501(a) provides:

> A person is guilty of criminal homicide if he intentionally, knowingly, recklessly, or negligently causes the death of another human being.

As to accomplice liability, Title 18, Pa. Consolidated Statutes Annotated, Section 306 provides, in pertinent part:  a) A person is guilty of an offense if it is committed by his own conduct or by the conduct of another person for which he is legally accountable, or both.

> (b) A person is legally accountable for the conduct of another person when:
>
> .   .   .   .
>
> (3) he is an accomplice of such other person in the commission of the offense.

*Id*.

As to co-conspirator liability, Title 18, Pa. Consolidated Statutes Annotated, Section 903 provides:

> (a) A person is guilty of conspiracy with another person or persons to commit a crime if with the intent of promoting or facilitating its commission he:
>
> (1) agrees with such other person or persons that they or one or more of them will engage in conduct which constitutes such crime or an attempt or solicitation to commit such crime; or
>
> (2) agrees to aid such other person or persons in the planning or commission of such crime or an attempt or solicitation to commit such crime.

*Id.*

Reference to the underlying Pennsylvania statutes were specifically set forth in the indictment and in the superseding indictments, including the Fourth Superseding Indictment on which Savage was tried.  These citations and references are replete in the Fourth Superseding Indictment. They are in: Count One (pp. 2-3); in the Notice of Special Sentencing Factors (as to each murder (pp. 33-37); in the murder counts, Counts Two through Seven (pp. 38-44) and Counts Ten through Fifteen (pp. 47-52); and in Count Nine, the conspiracy to commit murder count (p. 46).

There is simply no cognizable argument that the "predicate crime" of murder is not a recognized crime under Pennsylvania law. Thus, this claim must be summarily dismissed.

Savage attempts to further his unsuccessful argument of "transferred intent" as to the Colemand family arson murders. As the Third Circuit already determined, this argument fails. This is not a case of transferred intent. The intent was to burn down the Coleman house and kill the family. That is precisely what happened. The Third Circuit has already rejected Savage's argument on this point; thus, it is foreclosed here. *United States v. Savage*, 970 F.3d 217, 273-76 (3d Cir. 2020).

**Claim 28: Aggravating Circumstances In Penalty Phase**

The statutory and non-statutory aggravating circumstances alleged by the grand jury and proved by the government were not unconstitutional. Indeed, all are well established and have been affirmed in prior court cases. In any event, this issue is now moot.

**Claim 29: Jury Instructions**

There were no errors in the jury instructions, let alone any that rendered the convictions or sentences unconstitutional. These arguments are easily disposed of based on the record.

**Claim 29A: The Reasonable Doubt Instruction**

The reasonable doubt instruction given by the district court fully complied with Constitutional requirements, and neither lessened the government's burden of proof nor shifted the burden to the defense. The district court gave the 3rd Circuit Model Criminal Instruction, No. 3.06. Savage's complaint regarding the instruction is baseless.

**Claim 29B: Attempts And Lesser Included Offenses**

The district court was under no obligation to instruct the jury on uncharged crimes, uncharged attempts, or lesser-included offenses. Furthermore, there was no defense request for such instructions, and forbearing from giving such instructions was not plain error. In the context of the charges in this case, it would have been ludicrous to charge the jury on crimes of *attempted* murder, when all twelve victims were indeed murdered. The murders of everyone except Lassiter were all contract murders, ordered by Savage, and were thus all premeditated. Therefore, no evidence existed to support a lesser for "manslaughter" or some lesser degree of murder. Likewise, there was no defense argument that drugs were not distributed, or that money was not laundered, but that such crimes were merely attempted. The trial court is not required to instruct on lesser crimes not supported by the evidence.

**Claim 30: Constitutional Claims Regarding The Death Sentences**

Savage's arguments regarding the 13 death sentences are now rendered moot, due to the Presidential commutation issued in December 2024. Nevertheless, as both the trial judge and the

160

Third Circuit found, Savage's death sentences were not unconstitutional. His sub-claims are briefly addressed below.

**Claim 30A: Proportionality**

The death sentences imposed for the specific counts of murder in aid of racketeering, in Counts Three through Seven, and Ten through Fifteen of the fourth superseding indictment, did not violate the Constitution as "not proportional." As found by the jury, these were premeditated murders committed in order to increase or maintain Savage's position in the enterprise. The six Coleman family murders were also committed in retaliation for Eugene Coleman's testimony at Savage's federal drug trial, resulting in the conviction as to Count Sixteen. As to each murder, the jury properly found that the aggravating circumstances outweighed the mitigating circumstances, and that death was the appropriate punishment. In any event, the Presidential commutation renders this issue moot.

**Claim 30B: Alleged Neuropsychological Impairments And Brain Impairment**

There is no credible evidence that Savage ever suffered, or now suffers, from "neuropsychological deficits and brain impairment." Motion at p. 24. Savage was and is an intelligent, albeit evil, human being who was in complete control of his mental faculties, and who made his own decisions and choices. The scores of recordings, including a recording of Savage's 2005 trial testimony, conclusively shows that Savage suffers from no such impairments. Even the experts now retained by Savage's current post-conviction counsel do not claim that Savage is intellectually disabled.

161

**Claim 30C: Equal Protection Claim**

In an attempt to blaze new legal trails, Savage tries to "shoehorn" his argument that he has "neurocognitive deficits and brain impairment" into an Equal Protection argument that he is unconstitutionally being treated differently from those with actual intellectual disabilities. This desperate argument lacks a factual foundation, a medical foundation, and a legal foundation. Savage is not intellectually disabled – far from it. To seek protection by claiming that he should be treated as intellectually disabled is pure folly. In any event, as this argument goes toward the penalty phase, the issue is moot.

**Claim 31: Alleged Cumulative Errors**

There was no "cumulative error" in violation of Savage's rights, as there was no error, and his underlying claims are all meritless.

**V.      NO EVIDENTIARY HEARING IS NECESSARY AS TO MOST ISSUES**

When a motion is made under Section 2255, the question of whether to order an evidentiary hearing is committed to the sound discretion of the district court. In exercising that discretion, the district court must accept the truth of the defendant's factual allegations unless they are clearly frivolous on the basis of the existing record. *Government of Virgin Islands v. Forte*, 865 F.2d 59, 62 (3d Cir. 1988); *Government of Virgin Islands v. Bradshaw*, 726 F.2d 115, 117 (3d Cir. 1984). However, "vague or conclusory allegations" unsupported by specifics, and contentions that in the face of the record are "palpably incredible" or "patently frivolous or false," are subject to summary dismissal. *Blackledge v. Allison*, 431 U.S. 63, 74, 76 (1977); *see also United States v. Thomas*, 221 F.3d 430, 437 (3d Cir. 2000) (vague and conclusory

162

allegations contained in a 2255 petition may be disposed of without further investigation by the district court); *United States v. Dawson*, 857 F.2d 923, 928 (3d Cir. 1988) (same).

Rule 4(b) of the Rules Governing Section 2255 Proceedings requires a judge to order the summary dismissal of a 2255 motion "[i]f it plainly appears from the face of the motion and any annexed exhibits and prior proceedings in the case that the movant is not entitled to relief." Conversely, "Section 2255 directs courts to conduct an evidentiary hearing unless, taking all of the petitioner's non-frivolous allegations as true, 'the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief.'" *United States v. Stephens*, Case No. 23-1464 (3d Cir. Dec. 8, 2025), citing 28 U.S.C. § 2255, *Solis v. United States*, 252 F.3d 289, 295 (3d Cir. 2001). Where the record affirmatively demonstrates that a claim for relief is without merit, it is well settled that the refusal to hold a hearing is within the trial court's discretion. *See, e.g., Page v. United States*, 462 F.2d 932, 933 (3d Cir. 1972). In considering the factual allegations in a Section 2255 motion, it is appropriate for the trial judge to draw upon his personal knowledge and recollection of events that occurred in his presence. *Government of Virgin Islands v. Nicholas*, 759 F.2d 1073, 1077 (3d Cir. 1985).

In the context of discussing 28 U.S.C. § 1915(d), which allows a court to dismiss a claim filed *in forma pauperis* if the court finds that the action is frivolous, the Supreme Court stated that an action is frivolous when it lacks an arguable basis in law or in fact, and explained that the term frivolous "embraces not only the inarguable legal conclusion, but also the fanciful factual allegation." *Neitzke v. Williams*, 490 U.S. 319, 325 (1989).

As discussed above, when the defendant's arguments lack an arguable basis in both law and fact, then the defendant's motion under Section 2255, as to those arguments, should be

163

denied without a hearing. If, on the other hand, the district court determines that certain factual

matters need to be presented and adjudicated, then the district court should order an evidentiary

hearing, but limit the scope of that hearing to only those issues for which a hearing is necessary.

## VI.    <u>NO CERTIFICATE OF APPEALABILITY SHOULD ISSUE</u>

Upon the denial of a Section 2255 motion by the district court, an appeal to the Court of

Appeals by the movant is not permitted unless he obtains a certificate of appealability. 28 U.S.C.

§ 2253. The law permits the issuance of a certificate of appealability "only if the applicant has

made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).

The application for such a certificate should first be made to the district court.  Local

Rule 22.2 provides as follows:

> At the time a final order denying a petition under 28 U.S.C. § 2255 is issued, the district
> judge shall make a determination as to whether a certificate of appealability should issue.
> If the district judge issues a certificate, the judge shall state the specific issue or issues
> that satisfy the criteria of 28 U.S.C. § 2253.  If an order denying a petition under § 2254
> or § 2255 is accompanied by an opinion or a magistrate judge's report, it is sufficient if
> the order denying the certificate references the opinion or report.

The Third Circuit has further instructed that "as a matter of practice . . . an unsuccessful

movant in a § 2255 case should in the first instance seek a certificate of appealability from the

district court." *United States v. Williams*, 158 F.3d 736, 742 n.4 (3d Cir. 1998).

Accordingly, in the interests of judicial economy, the government requests that in

addition to denying the instant motion, the district court also find that the defendant has failed to

make a substantial showing of a denial of any constitutional right. In order to present a

"substantial showing of a denial of any constitutional right," to justify an appeal, the mere

allegation of a constitutional wrong, such as deprivation of the petitioner's Sixth Amendment

rights, is insufficient; the petitioner must make a substantial showing of such an error in order to present an appeal. *Santana v. United States*, 98 F.3d 752, 757 (3d Cir. 1996).

To establish the required showing, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Further, the claim must be constitutional in nature; there may be no certificate of appealability for an issue which presents only a statutory or sentencing guidelines question. *United States v. Cepero*, 224 F.3d 256, 262-68 (3d Cir. 2000) (en banc). For the reasons stated above, the defendant has not made the required showing, and therefore a certificate of appealability should be denied. The absence of merit of the defendant's constitutional claim is plain, and not debatable.

## VII.    CONCLUSION

For the reasons set forth above, the United States respectfully requests that the district court enter an order denying the petitioner's Habeas Corpus Motion. The district court should also deny the issuance of a certificate of appealability.

Respectfully submitted,

DAVID METCALF
United States Attorney


 *s/ David E. Troyer*                    /
DAVID E. TROYER
Assistant United States Attorney
Chief, Narcotics & Organized Crime

165

CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Government's

Response in Opposition to Defendant's Habeas Corpus Motion Pursuant to 28 U.S.C. § 2255

was filed via ecf and thus served upon counsel:

Ryan Norwood, Esquire
Assistant Federal Defender
ryan_norwood@fd.org

Bridget L. Kennedy, Esquire
Assistant Federal Defender
Southern District of Ohio
bridget_kennedy@fd.org

Natalie Olmstead, Esquire
Assistant Federal Defender
Southern District of Ohio
natalie_olmstead@fd.org

Kathryn Bailey, Esquire
Assistant Federal Defender
Western District of Pennsylvania
kara_bailey@fd.org
Attorneys for Kaboni Savage

*s/ David E. Troyer*               /
DAVID E. TROYER
Assistant United States Attorney

Date:  December 19, 2025

166